IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THOMAS PATTON, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 01-161C |
| | ) | (Judge George Miller) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S CONCLUSIONS OF LAW

Pursuant to the Court's order dated April 7, 2006 and Appendex A, paragraph 14(d) of the Rules of the Court of Federal Claims, defendant respectfully files its conclusions of law.

I. The 1994 Agreement Was Terminated No Later Than November 14, 1996 When The Federal Bureau Of Investigation Paid $30,000 To Mr. Patton

Mr. Patton asserts that the parties' 1994 Agreement ("agreement" or "contract") was never terminated in writing and, therefore, the FBI owes him monthly payments in the amount of $7,250 from the date of his last monthly payment under the agreement in February 1996. In its opinion dated February 12, 2002, this Court ruled that the issue whether the 1994 Agreement was in fact terminated at the time of the FBI's $30,000 payment to Mr. Patton on November 14, 1996 depended upon "whether or not the subsequent conduct of the parties after plaintiff signed the receipt indicates that no further work was contemplated under the contract." In its opinion dated March 3, 2006, the Court also stated that the issue whether the contract was terminated on November 14, 1996 depends upon "whether a reasonable person in

Mr. Patton's position would have believed that the contract was ongoing." (Citing Dravo v. United States, 202 Ct. Cl. 500, 504, 480 F.2d 1331, 1333 (1973)).

A. A Reasonable Person In Mr. Patton's Position Would Have Believed That The 1994 Agreement Was Terminated No Later Than Payment Of The $30,000

A reasonable person in Mr. Patton's position would have believed that the 1994 Agreement was terminated no later than payment to him of the $30,000. In the fall of 1995, Mr. Patton was informed by the FBI's contracting representative for the 1994 Agreement, Special Agent ("SA") Michael Wacks, that the FBI would soon be closing the investigation which was the subject of that contract. SA Wacks repeated this statement to Mr. Patton numerous times over the next several months. Indeed, when he received his last monthly payment under the contract, in February 1996, Mr. Patton moved to Garland, Texas, where his sister lived. He performed no additional services under the contract after his move to Texas.

After he had moved to Texas, and after becoming upset at the loss of his personal property in storage in Florida, for which he blamed the FBI's Miami Division, Mr. Patton began complaining to the FBI about the lack of payments under the 1994 Agreement. When he again was informed that the agreement was no longer in effect and that he would not receive any more payments, Mr. Patton asserted that the agreement, by its terms, could be

terminated only in writing. In addition to claiming that the agreement was still in effect because it had not been terminated in writing, Mr. Patton insisted that he was due a "lump-sum" dollar amount from the FBI as a final "bonus" payment, similar to what he had received when the earlier Annapolis, Maryland investigation was completed.[1]

During the spring, summer, and fall of 1996, FBI agents and Mr. Patton discussed an amount that would be paid to Mr. Patton in order to terminate and close out the 1994 Agreement, including any lump-sum, "bonus" payment. Mr. Patton's notes of telephone conversations that he had with FBI agents demonstrate that the parties negotiated this amount, and that it constituted a settlement of any and all outstanding claims under the 1994 Agreement. The parties finally settled upon an amount of $30,000 to be paid to Mr. Patton.

On November 14, 1996, the FBI made a final payment of $30,000 to Mr. Patton under the 1994 Agreement, for which Mr. Patton acknowledged receipt, and agreed that it "represent[ed] a full and final payment for services rendered to [the] FBI." Defendant's Exhibit 5.

[1] Mr. Patton previously received $25,000 from the FBI as a final bonus payment at the completion of the Annapolis, Maryland contract.

The 1994 Agreement provided that:

> This agreement shall commence on the date of acceptance by Mr. Patton as signified by his signature, and shall continue as long as the FBI deems that Mr. Patton [sic] services are required. It may be terminated at any time by either party by deliverance of a written notice to terminate.

Defendant's Exhibit 3.

We previously argued that, contrary to Mr. Patton's assertion that the 1994 Agreement was not been terminated by the FBI, the termination of that agreement was made effective with the receipt of final payment as acknowledged by Mr. Patton. See Kraemer Mills, Inc. v. United States, 162 Ct. Cl. 367, 319 F.2d 535 (1963).[2] In Kraemer Mills, the plaintiff contended that defendant's failure to issue a formal termination of the contract prevented the statute of limitations from beginning to run. This Court's predecessor, the Court of Claims, rejected this argument, and determined that it would be a "mistake to assume that the contract must be terminated by some clear-cut agreement of a formal nature in order to give rise to a cause of action in the

[2] Aside from the termination through the receipt of payment in November 1996, the United States contends that the contract was orally terminated in February 1996 when Mr. Patton was notified that his services were no longer needed and that the contract was terminated. This was sufficient notice under the 1994 Agreement, which provided that it "shall continue as long as the FBI deems that Mr. Patton's services are required." The fact that Mr. Patton concedes that he was not actually performing services under the contract after February 1996 further supports the conclusion that the oral termination was sufficient.

plaintiff." Id. at 538.

When he received the payment from FBI Special Agent Larry Sandri, Mr. Patton was informed that the payment was the final payment from the FBI. Mr. Patton responded by stating that he believed that the payment was for the "California Investigation" only. The "California Investigation" was the term the parties used for the 1994 Agreement, which was based out of the FBI's Los Angeles, California Division. By making this statement, Mr. Patton distinguished his remaining claims for (1) the loss of his personal property in storage in Florida, and (2) a lump-sum amount of $150,000 allegedly promised to him by an agent of the FBI's Miami Division, both of which Mr. Patton had been discussing with the FBI during the spring, summer, and fall of 1996, and both of which were unrelated to the 1994 Agreement.

A reasonable person in Mr. Patton's position, viewed objectively, would have understood that the 1994 Agreement was terminated no later than the payment of $30,000 to Mr. Patton. Dravo, 202 Ct. Cl. at 504, 480 F.2d at 1333. Indeed, the evidence demonstrates that Mr. Patton believed that the payment terminated the agreement. The negotiations between the parties for the $30,000, Mr. Patton's acknowledgment that it represented "a full and final payment for services rendered," and his statement upon its receipt, that it was for the "California Investigation," e.g., the 1994 Agreement, clearly support our

position that both parties understood that the 1994 Agreement was terminated no later than November 14, 1996.

B. The Conduct Of The Parties After The $30,000 Payment To Mr. Patton Indicates That The Parties Understood That The 1994 Agreement Had Been Terminated No Later Than November 14, 1996

The conduct of the parties subsequent to the $30,000 payment indicates that the contract was terminated no later than the time of the November 14, 1996 payment. Indeed, Mr. Patton's handwritten notes of various telephone conversations with FBI agents after November 14, 1996, indicate that he agreed that the 1994 Agreement was over, as he pursued his other claims against the FBI, involving his personal property and an alleged oral promise of payment from the FBI's Miami Division. It is noteworthy that his letter dated October 20, 1997 to FBI Headquarters complained about the FBI's handling of these other matters, but makes no mention of being owed any money under the 1994 Agreement.

Approximately two years transpired, from November 14, 1996, until October 7, 1998, during which Mr. Patton did not perform work for, did not receive payment from, and did not complain to the FBI regarding the 1994 Agreement.[3] On October 7, 1998, after

[3] Upon two occasions since November 1996, Mr. Patton has performed some services for the FBI, but in neither case were the services performed pursuant to the 1994 Agreement. On November 17, 1999, Mr. Patton traveled to Baltimore, Maryland to meet with agents, claiming that he had information about a threat against a

he obtained his present counsel, Mr. Patton for the first time contended that the $30,000 payment did not terminate the 1994 Agreement.

The lengthy lapse of time during which neither party performed under the 1994 Agreement, and during which Mr. Patton did not seek payment from the FBI, clearly supports our position that the parties intended that no further work was contemplated under the agreement once the $30,000 was paid to Mr. Patton on November 14, 1996. The fact that Mr. Patton claims to have performed slightly more than one day of "services" for the FBI since November 1996 belies his claim that the parties contemplated further work or payments under the 1994 Agreement. It is abundantly clear that the parties intended that the 1994 Agreement was terminated no later than the FBI's final, $30,000 payment to Mr. Patton on November 14, 1996. Indeed, Mr. Patton's statement when he received the payment and signed the release, that the payment was for the "California Investigation," reflects his understanding that it was the final payment for the 1994 Agreement, which was also referred to as the "California Contract" or "California Investigation" by Mr. Patton and some of the FBI agents with whom he worked.

---

retired agent. He was paid for his expenses for that trip. And in November 2001, Mr. Patton contacted FBI SA Charles Goodwin regarding a fugitive who might have been in Arizona, where Mr. Patton was living, and Mr. Patton allegedly drove around looking for the fugitive.

The Court's decision in Kraemer Mills cited Enright v. United States, 73 Ct. Cl. 416, 54 F.2d 182 (1931), cert. denied, 286 U.S. 543 (1932), in which the Court of Claims held that a formal notice of termination was not required to commence the running of the statute of limitations, where the contractor had been told to suspend all work. In reaching its decision, the Court of Claims, in Enright, also considered the fact that "the subsequent conduct of the parties showed that neither party contemplated any further work under the contract . . . ." Id. Here, as in Enright, there was no indication by either party that they envisioned continued contract performance after the November 1996 payment to Mr. Patton. Indeed, there is nothing in the record that demonstrates that either party continued to perform after the November 1996 final payment. Therefore, the effective date of termination of the parties' 1994 Agreement was no later than November 14, 1996, and Mr. Patton has been fully paid under this agreement.

This Court is reluctant to interpret contracts to provide for perpetual or unlimited contractual rights unless the contract clearly states that that is the intention of the parties. In Consumers Ice Company v. United States, 201 Ct. Cl. 116, 475 F.2d 1161 (1973), the Court of Claims held that in interpreting a contract, "there is [a] judicial reluctance to lock [the] parties into [a] given set of rights and obligations for long or

indefinite periods without some clear indication that such was actually intended by the parties." Id. The Court held that the longer the period for performance, the heavier the burden was upon the enforcing party to prove that the extended duration was intended. Id. Here, Mr. Patton cannot meet his burden of proving that the parties intended to continue the 1994 Agreement after the final, lump-sum payment to him on November 14, 1996.

## CONCLUSION

For the reasons stated above, and the reasons set forth in our proposed findings of fact, we respectfully request that the Court rule in favor of the United States and dismiss the complaint with prejudice.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Kathryn A. Bleecker

KATHRYN A. BLEECKER
Assistant Director

s/ Lauren S. Moore

LAUREN S. MOORE
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 616-0333
Fax: (202) 514-8640

Attorneys for Defendant

OF COUNSEL:

TED G. SCHWARTZ
Assistant General Counsel
Federal Bureau of
Investigation

SEPTEMBER 21, 2006

**CERTIFICATE OF ELECTRONIC FILING**

I hereby certify that on the 21st day of September, 2006, a copy of the foregoing "DEFENDANT'S CONCLUSIONS OF LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system, and that the parties may access this filing through the Court's system.

/s/ Lauren S. Moore