**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THOMAS PATTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.-01-161C |
| | ) | (Judge Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S NOTICE OF FILING CERTAIN REDACTED DOCUMENTS**

Pursuant to the Court's Order of November 1, 2006, the Plaintiff, Thomas J. Patton, respectfully files the attached redacted copies of Defendant's Trial Exhibit 20 and Defendant's Trial Exhibit 21, being, respectively, the portions of Mr. Patton's deposition transcript designated by the Defendant and the deposition transcript in its entirety. The Plaintiff redacted those passages from the documents as identified in the parties' proposed "Order to Seal Certain Documents", filed on October 26, 2006.

Dated: November 1, 2006

Respectfully Submitted,

HEIDEMAN NUDELMAN & KALIK, P.C.
1146 19th Street NW
Fifth Floor
Washington, DC 20036
Telephone: 202.463.1818
Telefax: 202.463.2999

By: *___/s/ Richard D. Heideman___________*
Richard D. Heideman

Attorney for Thomas Patton

# EXHIBIT A

# <u>Patton v. United States</u>

# Case No. 01-161C

PENGAD-Bayonne, N.J.
DEFENDANT'S EXHIBIT 20



gap between Patton 172 and 204, and, Faye, if that's not intentional, then --

MS. EISEN: That must only be in that package, because it's good in our package.

MR. HEIDEMAN: Okay. So I'll give it back to you.

MS. EISEN: Yes.

MR. HEIDEMAN: Give me a different one that you think is complete, and then I'm finished with this explanation. Ted, thank you for your patience.

Yes, this one that we'll give you starts again with these phone records at Patton 000173 and then runs through Patton 000215 of phone records. We'll be glad to explain this again, but I wanted you to know what you have.

MR. SCHWARTZ: Thank you. Counsel, how come these records were not produced earlier when they were originally requested?

MR. HEIDEMAN: We received them from Mr. Patton. Some of them, by the way, I believe have been produced. If we had them before, they were produced. We received them from Mr. Patton upon his arrival here in preparation for the deposition and direct response to your subpoena.

MR. SCHWARTZ: You have not produced any of

these records before.

MS. MOORE: Yes. Actually you haven't produced any documents at all.

MR. HEIDEMAN: I believe phone records were produced.

MS. MOORE: No, no. We've asked for them many times for the past three years in about five different letters. We haven't seen one phone record, nothing, not one document even.

MR. HEIDEMAN: We received these particular documents last evening after Mr. Patton got off the airplane. We stayed last night and reviewed them, Bates stamped them, and we're producing them at the outset of the deposition.

MR. SCHWARTZ: Okay. All right. That's fair enough.

THE REPORTER: Would you raise your right hand, please?

Whereupon,

THOMAS J. PATTON

having been duly sworn, was called as a witness and was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. SCHWARTZ:

Q Could you state your full name for the

notified that you were going to be deposed?

A I don't understand that question.

Q You said earlier I think that you started looking for documents after you were notified that you were going to be deposed.

A Correct.

Q My question is before you were notified that you were going to be deposed, had you looked for documents relating to this case?

A I've looked for them probably over how many years has this case been going on.

Q Had you found any documents before finding these documents that were delivered today?

A Well, if I found any, they would have been sent to my attorney.

Q And had you sent your attorney any documents before handing these documents to him when you arrived in Washington, D.C.?

A I probably have to the best of my recollection.

Q What type of documents did you give your attorney?

A I believe I gave him all the 302s.

Q What is a 302?

A A 302 is when you're being interviewed by

FBI agents.

Q Had you given your attorney any phone records?

A To the best of my recollection, I believe that at one time, we did send the records to the best of my recollection. Is my recollection right? I don't remember.

Q Do you remember giving any other types of records to your attorney before you gave him these records that are here today?

A I believe he could probably answer that better than I can.

Q You don't have any recollection of any other records?

A I believe we gave most of the records up, right, Rich? We gave whatever I had up at that certain time.

Q Well, what type of records did you give your attorney?

A Like 302s and conversations and whatever I had and whatever Ms. Moore asked for.

Q What's your date of birth, sir?

A 2-10-38.

Q Do you recall the first time you had any contact with agents from the FBI's Los Angeles

Q Now, under this agreement, which is Exhibit B, you were going to get $4,000 a month for services, correct?

A That is correct.

Q And under the agreement, you were required to cooperate fully with the FBI?

A That is correct.

Q And you would get $1,030 per month during the term of the agreement for rental of a vehicle and securing appropriate insurance under paragraph 2?

A Yes.

Q The FBI had arranged for the rental of a vehicle for you, correct?

A That is correct.

Q Do you recall what the rental charge was for this vehicle?

A I believe this is the actual charge, to the best of my recollection.

MR. SCHWARTZ: I'll show you what I'm going to mark as Exhibit C, which is on the letterhead of Enterprise Rent-A-Car Leasing. It's dated November 7, 1994. It actually consists of two November 7, 1994, letters.

//

//

(The document referred to was marked for identification as Exhibit C.)

BY MR. SCHWARTZ:

Q Do you recognize Exhibit C?

A No. This is the first time I've ever seen this.

Q Well, according to paragraph 3, Enterprise was going to charge $1,029.70 a month.

A Correct.

Q For a Lincoln Town Car.

A Mm-hmm.

Q Recall you have to respond verbally as opposed to --

A Yes. To the best of my recollection, I believe it was $1,030.

Q And did you rent a Lincoln Town Car?

A Yes, I did.

Q From Enterprise?

A [redacted]

Q Under Exhibit B, which is the Agreement.

A Mm-hmm.

Q You were going to get $320 a month for utilities and phones, correct?

A Yes.

Q And that was to cover the utilities and phones at the apartment in Marina Del Rey that you were living in?

A Yes, but I never got them bills. Them were paid by someone else. I never received the bills. Whoever paid them I have no idea.

Q The agreement at least contemplated that you were going to be paying the bills, correct?

A Yes, that I would be paying the bills, but I never got the bills. The money was taken out of the money that I was supposed to be receiving, and whoever paid it, I have no idea. You'd have to ask someone back there.

Q The FBI was also paying the monthly charge for the apartment, correct?

A [redacted]

Q And that, as you said before, was sort of a cover company?

A Correct.

Q But it was not coming out of your pocket?

A No, it was not.

Q And your wife and son were living with you

at that apartment?

A That is correct.

Q Under the agreement, which is Exhibit B, you were to get $300 a month for furniture rental.

A That is correct.

Q And that was to put furniture --

A In the apartment.

Q The one in Marina Del Rey?

A Yes, sir.

Q You were also under the agreement to get $1,600 a month for travel and entertainment expenses incurred in furtherance of investigation-related activities, correct?

A That is correct, and that would cover not only my expenses but Scott Garriola's, too.

Q So, under the agreement, you were to pay for entertainment-related expenses that Scott Garriola incurred?

A Yes, because we worked together.

Q If you turn to the third page of Exhibit B.

A Mm-hmm.

Q Two paragraphs above your signature, it says the representative for the FBI contracting officer for this agreement is Special Agent Michael F. Wacks, correct?

A That is correct.

Q And you understood that he was the representative for the contracting officer?

A Yes.

Q You were never advised that any other agent took over from Mike Wacks as the representative for the contracting officer?

A No.

Q When you were paid under this agreement, Exhibit B, you were paid in cash, correct?

A That is correct.

Q And there would be at least two FBI agents from Los Angeles that would witness the payment?

A Not always.

Q Was there sometimes only one agent?

A Yes.

Q And that would be typically Mike Wacks?

A Mike Wacks or Scott Garriola.

Q And Scott Garriola was also with the Los Angeles division of the FBI?

A That is correct, and I believe he still is.

Q Do you remember the name Andy Stefanak?

A Yes, I do.

Q He was also an FBI Los Angeles agent?

A Yes.

the $30,000 in November of '96?
A No. When they paid me the $30,000, it was the one agent. Stan I believe was his name if it's coming back to my recollection.
Q Is it Larry Sandri?
A Sandri. That's the name. Larry Sandri. And when he came to give me the $30,000, that was negotiated between Pete McCann and L.A. office.
Q Was Larry Sandri one of the agents you spoke to before November of '96 about doing work for the Dallas division?
A It was not before. I was asked where I wanted to be transferred, and I had very good rapport with Pete McCann and Chuck Goodwin, and they said that Dallas would be a very good area for you because there's a lot of good work there and would you be willing to go there, and I said sure, so then Mike Wacks asked me where would I want to be transferred to, and I said Dallas, and then everything started from there.
Q Did you or your wife have any family in the Dallas area?
A I have a sister that lives in Garland, Texas.
Q And she was living there as of February of

'96?

A Yes.

Q And you ended up moving to Garland, correct?

A That is correct.

Q And getting back now to the two agents, you described one as a tall, black-haired, middle-aged --

A That's Sandri.

Q And the other one was a shorter, older agent. Those were two agents that you had met with to talk about doing work?

A Yes, sir.

Q So you met Sandri at that point?

A Right.

Q And then later in November of '96, he was present when you were paid the $30,000?

A Yes.

Q Do you remember any other conversations with agents from the Dallas division?

A Just while I was there, I would have many conversations with them, dates and everything. That's my recollection. I can't remember.

Q Do you think those are in the records that your attorney delivered today?

A They might be. I'm not sure.

Q Do you remember taking any notes of

conversations that you had with Dallas agents?

A I believe I did. I usually did take notes, a lot of notes, which I was taught by the FBI to do that.

Q And did you keep those notes?

A Yes, I did.

Q And as far as you know, they have not been lost or destroyed?

A No.

Q So you had a face-to-face meeting with these two agents that you described prior to November of '96?

A That is correct. They were more or less picking my brain to see which road to take to infiltrate these people, and I explained what I would have done, how I would have done it.

Q And you said this was relating to stolen heavy equipment?

A Heavy equipment, yes.

Q Was this a --

A Ongoing case.

Q Was it a La Cosa Nostra case?

A No, it was not, not to my knowledge.

Q Was it a drug trafficking case?

A No, it was not.

Q And it was not a money laundering case?
A You'd have to talk to them about that. All I know, it was a stolen heavy equipment.
Q Getting back to the meeting that you had with Pete McCann, do you remember where you met him?
A Yes. I met him in the hotel, and there was him and Fred Robertson and a retired FBI agent named Vinny, which I don't know his last name.
Q And this was to discuss Donald Eugene Webb?
A Right. And Webb's partner, who worked with us in Florida -- what was his name right now -- Latch.
Q Frank Latch?
A Frankie Latch.
Q Do you know what Webb was wanted for?
A Murder. Killing a police officer in Pennsylvania.
Q So it was not a La Cosa Nostra investigation?
A No, it was not.
Q And it wasn't money laundering?
A No.
Q Or drug trafficking?
A No.
Q You were paid $2,500 for your services at that meeting?

A I never knew I was getting paid anything for it. I did it as a favor to Pete McCann and Chuck Goodwin. I was notified later that they were going to send to me for my time spent with them.

MR. HEIDEMAN: Can we take a break, please?

MR. SCHWARTZ: One second.

MR. HEIDEMAN: No, I need to take a break now, please.

MR. SCHWARTZ: I want to ask one more question, please.

MR. HEIDEMAN: I'm sorry. I need to go to the restroom. I need to take a break.

MR. SCHWARTZ: You can hold it for a moment.

MS. MOORE: You have to have another counsel here then.

MR. HEIDEMAN: Counsel, I'm very sorry.

MS. MOORE: I mean, nobody should be leaving.

MR. HEIDEMAN: I'm very sorry. I need to take a break to go to the restroom.

MS. MOORE: Okay. We'll take a five-minute break.

MR. HEIDEMAN: Thank you.

(Whereupon, a short recess was taken.)

MR. SCHWARTZ: Read back the last question.

(Whereupon, the reporter played back the previous question.)

BY MR. SCHWARTZ:

Q Mr. Patton, I think you were saying that you had met with Agents McCann and Robertson --

A Robinson.

Q Robinson. As a favor to McCann and to Chuck Goodwin, correct?

A That is correct.

Q And you had not expected to get paid for that?

A No, I did not.

Q But you were paid $2,500 for that?

A That is correct.

MR. HEIDEMAN: Excuse me. Counsel, you're talking about monies other than under the agreement that is Exhibit B? Monies that he's been paid other than under the agreement, Exhibit B?

MR. SCHWARTZ: I don't understand the question.

MR. HEIDEMAN: You started the deposition by introducing Exhibit A and B and C, and under B, you gave him a copy of the agreement. You asked him some things about the compensation under the agreement. So is your question now are you talking about

Q And it says Mr. Patton was paid approximately $9,250 per month under this contract from November 24, 1994 until February of 1996. Do you see that?

A Yes, I do.

Q And that's actually a mistake. It should be $7,250, correct?

A Right.

Q The next sentence says Mr. Patton has not been paid under this contract since February 1996 and accordingly is owed approximately $342,250, and then it says $9,250 times 37 months as of the date of this filing plus interest thereon at the legal rate. Do you see that?

A Yes.

Q Is it correct that as of the writing of this letter by your attorney, you had not been paid under the contract since February of 1996?

A That is correct.

MR. SCHWARTZ: I'm going to mark as Exhibit E a declaration of Thomas J. Patton dated October 19, 2001.

(The document referred to was marked for identification as Exhibit E.)

THE WITNESS: Well, I was told by Michael Wacks that there would be a lump sum given to me at a further date when they got the paperwork done.

BY MR. SCHWARTZ:

Q When did he tell you that?

A He told me that the week before he said that our work was going to be done in L.A.

Q Now he did tell you orally that your services were no longer needed in Los Angeles, correct?

A Orally, right. And I kept asking him, I needed it in writing. According to my contract, it says that all parties will hereby acknowledge that they have read, understood and will abide by the foregoing statement, and it says that, you know, because I've had this contact before in Annapolis. They would, you know, give me a copy to say the contract was terminated.

I asked for it many, many times to Mike Wacks before I left there, and he said we're working on it, we're working on it, but it's best that we don't do it because we can just transfer it to Dallas, and they won't have to wait six to eight months for Washington to approve it.

Q And you had this conversation about a week

before you left?

A Yes.

Q Why did you ask for the termination in writing?

A Because it says in your contract that's how it's supposed to be done. See, that was probably my biggest fault is I put too much trust in the FBI agents and found out that they're not all very trustworthy.

Q And your recollection is that Michael Wacks also told you you would get a $30,000 lump sum at some point?

A Yes.

Q Was that an oral agreement that you had with him?

A It was his statement to me. It was not an oral agreement. I didn't agree to the amount. It's up to them to come up with the amount. He said that's what he would put in for.

MR. SCHWARTZ: I'm going to mark as the next in order a July 14, 1999, letter from your attorney, Mr. Heideman.

(The document referred to was marked for identification as Exhibit F.)

put it across. It was discussed between Pete McCann and me. I did not negotiate it, which this statement in my thinking was is what Mike Wacks told me that he was trying to get from the L.A. office, and that's where I say in here Mr. Patton and Pete McCann. Mike told me Pete McCann would make the request for me, and he had many conversations with Mike Wacks, and Mike Wacks agreed to that statement.

Q Let me now ask you to turn to your declaration, which is Exhibit E.

A Okay.

Q If you look on the page that you're at now, paragraph 27.

A Okay.

Q It says, "While I was in Dallas, I negotiated and received a single lump sum payment for $30,000 as a final payment for the services I provided the agency in Los Angeles."

A That is correct.

Q And you would agree with that statement?

A Yes.

Q Before, I think you said that you had talked to Michael Wacks about the $30,000 before you left Los Angeles.

A Left Los Angeles. That is correct. He

Q That's fine.

A Because you are getting to a point where you're mixing words.

MR. SCHWARTZ: Is five minutes okay?

THE WITNESS: That's fine.

MR. SCHWARTZ: Okay.

MR. HEIDEMAN: We're in recess by agreement.

(Whereupon, a short recess was taken.)

BY MR. SCHWARTZ:

Q Mr. Patton, when you were in Los Angeles working under the 1994 agreement --

A Yes, sir.

Q You were paid on a monthly basis, correct?

A Correct.

Q And you were paid timely, correct?

A Well, it wasn't always timely. There would be days when, you know, they'd be busy and they'd meet me the following day, you know, but I got it every month.

Q Right. Do you agree with the statement on page 47 of Exhibit F, which we were just looking at, that the $30,000 payment does not relate to the 1994 contract? Do you see where I am?

A No, I don't. The last payment?

Q Right. That paragraph, the second sentence

in that paragraph. It says the lump sum was negotiated by you and Agent McCann for services rendered in L.A., and then the last part says, "and it does not relate to the 1994 contract." Do you agree that the $30,000 payment did not relate to the 1994 contract?

A No, I think it does relate to the '94 contract.

Q Now, prior to receiving that payment in November of 1996, you had discussions with FBI officials about the fact that you had not been receiving your monthly payment under the 1994 agreement, correct?

A I don't understand the question.

Q I'll try to rephrase it.

MR. HEIDEMAN: Excuse me. Can we go off the record?

(Discussion held off the record.)

MR. HEIDEMAN: Could you repeat the question? Because I didn't hear it. I'm sorry.

MR. SCHWARTZ: There is no question pending.

BY MR. SCHWARTZ:

Q In November of 1996, you received a $30,000 payment, correct?

A That is correct.

Q Before that time, you were aware that the FBI had not been making the normal monthly payment under the 1994 agreement, correct?
A That is correct.
Q And you talked to FBI officials about that?
A Right.
Q And you were unhappy with that?
A I was very unhappy about it.
Q Who did you talk to about that?
A Esposito.
Q Anybody else?
A Cordes, Divers.
Q When you say "Cordes," that's Jack Cordes?
A Yes.
Q And you spoke with him directly?
A Yes.
Q Who was the other person you mentioned?
A Divers.
Q Neil Divers?
A Neil Divers.
Q You spoke to him directly about it?
A Right.
Q Do you remember what Esposito had to say about that?
A Esposito said he was looking into it.

Q And you complained to Pete McCann about that?

A Yes, I did, and then Mr. Esposito and everybody else that I could reach out to.

Q And that was approximately April of 1996, correct?

A Approximately. I don't know the exact date. It should be somewhere where I found out about it.

Q And at that point, you also complained about the fact that you hadn't been getting your monthly payment under the contract?

A That is correct.

Q And you understood that it was the FBI's position that the contract had been terminated orally, correct?

A I never had that under -- no one told me orally that it was terminated.

Q Mike Wacks didn't tell you the contract was terminated?

A Never. Never.

Q Scott Garriola didn't tell you the contract was terminated?

A Never.

Q When you received the $30,000 --

A Mm-hmm.

Q You signed a receipt, correct?
A That is correct.
Q Let me back up. Did you talk to Michael Wacks about not having received the monthly payment?
A Yes.
Q What did Mike Wacks say about it?
A He just said it's out of his hands.
Q Did he say anything else about it?
A No.
Q Did you understand what he meant when he said it was "out of his hands"?
A No, I did not.
Q And you didn't ask him to explain that?
A No.
MR. SCHWARTZ: I'll mark as Exhibit G the receipt dated November 14, '96.
(The document referred to was marked for identification as Exhibit G.)
BY MR. SCHWARTZ:
Q That's the receipt you signed when you got the $30,000, correct?
A That is correct.
Q And it states, "I acknowledge receipt of $30,000, which represents full and final payment for

services rendered," correct?

A Right.

Q And what did you understand by the phrase "full and final payment for services rendered?"

A For the L.A. office. L.A. office, that Mike Wacks promised me the $30,000.

Q Now it doesn't say that obviously, correct?

A No.

Q But you had an understanding that was different from what the words of the receipt said, correct?

A That is correct. And I questioned it at the time, and they said no, this is just the money that they give you to go forward.

Q Who said that?

A Sandri.

Q Didn't Sandri tell you that from the FBI's point of view that this was the last payment you were going to be getting?

A No, he never told me that.

Q Now, at this point in time, this is November of 1996?

A Correct.

Q You were aware that that personal property storage in Miami had been lost, correct?

that there were certain documents attached to various pleadings, plus my recollection was that there was an exchange of documentation between you and Ms. Kalik, I think, I think if I remember correctly early in the case. We don't need to spend time on this now.

MR. SCHWARTZ: Yes, let's talk about this --

MR. HEIDEMAN: I just want to make sure. I mean, there was an implication that somebody said we'd never given you anything, and I think that that's --

MS. MOORE: Yes, it is my recollection. I don't want to get into an argument.

MR. HEIDEMAN: Of course.

MS. MOORE: But just to clarify what I said before or confirm actually. Yes, there might have been documents attached to pleadings, but thereafter, we requested by many letters additional documents, which I never got any documents in response to any of the letters.

MR. HEIDEMAN: Okay. Well, we're going to go back after the depo, because --

MS. MOORE: If you find something that you sent me, give me a cover letter or a copy of it with the documents.

MR. HEIDEMAN: Fine. Of course, we will.

MS. MOORE: But I didn't get anything until

today.

MR. HEIDEMAN: Thank you. We'll address that afterward right away.

MS. MOORE: Okay.

BY MR. SCHWARTZ:

Q Okay. Do you know how the $30,000 figure came about?

A No, I do not.

Q As of the date that you received the $30,000 --

A Mm-hmm.

Q You were not working on any matters with the FBI, correct?

A No, I was -- reask me that question, please?

Q At the time you received the $30,000 --

A Mm-hmm.

Q You were not working on any matters with the FBI?

A No, I was not.

Q And you moved from Garland, Texas, shortly after receiving that money, correct?

A That's correct.

Q Where did you move to?

A To Niceville, Florida.

Q How did you decide to move to Niceville?

A Just, you know, we always liked Florida, so I moved there.

Q The FBI did not tell you to go to Niceville, correct?

A No, they did not.

Q They had nothing to do with that?

A No.

Q Did you tell Mike Wacks that you had moved to Niceville?

A Yes.

Q When did you tell him?

A Probably before I even moved.

Q How did you tell him?

A Over the phone.

Q Do you have notes of that conversation?

A Yes, there probably is in there.

Q Sorry. Did you finish your answer?

A Yes.

Q So if you had a conversation with him about the move, would it be in the notes that your attorneys provided?

A It's probably in the notes, yes. To the best of my recollection, it's probably in there.

Q If it's not in the notes, would that indicate to you that you did not have that

conversation?

A No.

Q Did you take notes pretty diligently when you had conversations with FBI agents?

A A biggest percentage, but not 100 percent.

Q Did you notify anybody else in the FBI that you were moving to Niceville?

A Pete McCann and Chuck Goodwin and John Donahue, because they always knew where I was in case they needed me for anything.

Q When you spoke to Mike Wacks, what information did you give him about your move?

A Just that I was moving. There was no information I would have to give him other than moving so he would be able to contact me if he needs me for anything.

Q Did you give him a phone number?

A Yes.

Q Did you give him an address?

A Yes.

Q How long did you live in Niceville for?

A I believe three years.

Q And where did you move next?

A Tucson, Arizona.

Q Why did you decide to move to Tucson?

A For my wife's health.

Q So your move to Tucson had nothing to do with the FBI, correct?

A No.

Q Is that correct?

A That is correct.

MR. HEIDEMAN: Excuse me. I'm going to object to the form of the question only because you've said "had nothing to do with the FBI."

BY MR. SCHWARTZ:

Q The FBI did not ask you to move to Tucson, correct?

A No, they did not.

Q Who did you notify, if anybody, in the FBI that you had moved to Tucson?

A Probably Chuck Goodwin, Pete McCann, John Donahue.

Q Anybody else?

A To the best of my recollection, no.

Q You had a meeting in Baltimore in 1999 concerning an alleged threat against FBI agent Joe Pistone, correct?

A That is correct.

Q And that came about because you overheard a conversation in a restaurant?

A In a restaurant, right.

Q Where was that restaurant?

A It was in Destin, Florida, which is, you know, right over the bridge from Niceville in Destin, Florida.

Q And you contacted John Donahue about that?

A Yes, I did.

Q He was retired at the time?

A Yes.

Q And then at least as far as you know, he then contacted other FBI agents, correct?

A To the best of my knowledge, yes.

Q John Donahue was deposed in this matter, in this lawsuit, correct? Do you remember being on the telephone when John Donahue gave a deposition?

A Before that?

Q No, I'm talking about within the last couple of years in connection with this lawsuit that John Donahue gave a deposition?

A Yes. To my understanding, yes, he did do that.

Q Do you remember you were on the phone at the time?

A That is correct.

Q Do you recall him testifying that you had a

lot of concern about who you're going to work with in the FBI in connection with this Joe Pistone matter?

A Right. When I went up to Baltimore to meet in Baltimore with the agents in Baltimore about this situation, they asked me who would I like to work with, and I said Mark Tillio, who is an FBI agent who I worked with before in Annapolis, and I brought him out to California on cases that he worked with agents out in California.

Q Do you remember you had asked John Donahue not to reveal your identity for the meeting?

A Yes.

Q And that was because you had concern about who you were going to work with, correct?

A That is correct.

Q And you didn't want to meet any other agents without John Donahue being present, correct?

A That is right.

Q John Donahue said at his deposition that you came to that meeting voluntarily, is that correct?

A That is correct.

Q You were paid for your expenses?

A I was paid strictly just for a ticket.

Q Does $1,325 ring a bell?

A Yes.

polygraph examinations, or you might have no idea whether or not since you've already had testimony on the record about an FBI agent, although retired, advising the witness that he shouldn't give an exam whether or not that was a factor, so if you can try to withdraw and rephrase your question.

MR. SCHWARTZ: I'm going to do that.

MR. HEIDEMAN: Assuming you need to press this.

MR. SCHWARTZ: That's fine.

MR. HEIDEMAN: But I don't want there to be any waiver, and I'd ask you to be very careful and therefore rephrase before proceeding.

MR. SCHWARTZ: That's fine.

MR. HEIDEMAN: Thank you.

BY MR. SCHWARTZ:

Q You said earlier that you initially agreed to give a polygraph, correct?

A That is correct.

Q At some point, did you change your mind about that?

A John Donahue changed my mind.

Q And you changed your --

A I took his advice.

Q And then you said you would not give a

polygraph?

A I did not say I would not. I said I am taking John Donahue's advice and not to take a polygraph.

Q And that's what you told the agents that you had met with in Baltimore?

A That is correct.

MR. HEIDEMAN: But so the record is clear, I think I would have no objection if you chose to ask him did he confer with counsel at any time about that issue, because I know the answer to that. So if you choose to ask him if he conferred without getting into what was discussed with counsel or what the advice was, I'm sure he would be glad to answer that question if you choose to ask it.

MR. SCHWARTZ: Thank you for the offer.

MR. HEIDEMAN: Thank you.

BY MR. SCHWARTZ:

Q Under the agreement, which is Exhibit B, if you look at the first page, paragraph 3.

A Which one did you say? B?

Q B, which is the agreement, 1994 agreement.

A Okay.

Q Look at the first page of that. In paragraph 3, it indicates that it's your

BY MR. SCHWARTZ:

Q Sir, did you report --

MS. MOORE: Did he file tax returns.

MR. SCHWARTZ: Okay.

BY MR. SCHWARTZ:

Q Did you file any tax returns where you reported the money you received from the FBI?

MR. HEIDEMAN: I'm going to object, and yes, I am objecting.

MR. SCHWARTZ: Sir, you need to answer the question.

THE WITNESS: I'm listening to my attorney.

MR. SCHWARTZ: Your attorney made an objection, but unless he instructs you not to answer, you need to answer the question.

THE WITNESS: I will take my Fifth Amendment.

MR. SCHWARTZ: Okay.

BY MR. SCHWARTZ:

Q Did you understand the contract to require you to report the monies you were receiving from the FBI on your taxes?

A The only thing that I can say about that that might ease your mind is that I asked many times for 1099s. Since I was supposedly an employee for

your singular question as to his filing of tax returns. That's the only question you've asked about that issue at this time.

BY MR. SCHWARTZ:

Q Just to make sure I cover what I intended to cover, did you report the monies you were receiving from the FBI under the 1994 agreement on your taxes?

MR. HEIDEMAN: Same objection, and let that be continuing.

BY MR. SCHWARTZ:

Q Are you going to answer that, or are you going to assert your rights under the Fifth Amendment?

A I'm going to assert my rights under the Fifth Amendment.

Q When you moved from Los Angeles to Garland, Texas, you tried to find work with the Dallas division, correct?

A Yes.

Q At some point in time, you came to learn that someone in the Los Angeles division had bad-mouthed you?

A That is correct.

Q How did you learn that?

A From Pete McCann. He told me that I was being bad-mouthed out of L.A.

Q Did Pete McCann indicate how he knew that?

A No, he did not.

Q Did you understand that it was Michael Wacks that had bad-mouthed you?

A No, I do not, no.

Q As far as you knew, had somebody spoken to Adams, who was in charge of the Dallas division, about you?

A I have no idea.

Q Do you know who in the Dallas division was on the receiving end of this bad-mouthing?

A No, I do not.

Q But the bottom line is that you were not able to find any work with the Dallas division, correct?

A That is correct.

Q Were you upset when you were told by Pete McCann that you had been bad-mouthed?

A Yes, because I thought I did a very good job out there. They were just too lazy to do the work that Scott Garriola and I did. They didn't want to do the paperwork. We did a lot of cases that should have been put in -- other than the Denti case and the Ori case, there should have been a lot more, but they didn't want to do the paperwork on it. It was too

much work for them.

Q When you say "they," are you talking about Michael Wacks mainly?

A That's correct, because he's the contact officer.

Q Right. Were you unhappy with Michael Wacks after you had moved out of Los Angeles?

A No, I'm still not unhappy with him. I gave him a gift for his wedding, so he must have been --

Q Do you remember when that was?

A It was while I was out there. I don't remember the day he got married.

Q Do you remember talking to Chuck Goodwin also about the fact you were unhappy having been bad-mouthed to the Dallas division?

A Yes. I probably told Esposito that, too. I probably told every FBI agent I know that I was unhappy that someone was bad-mouthing, because I was never bad-mouthed by any office I ever worked in. I was always praised for the work that I did, which is in my Rule 35. Read it.

Q You're still on terms with Chuck Goodwin, correct?

A Yes.

Q You don't have any reason to think he would





AUG-14-2006 10:35 CDC FBILA 310 996 3573 P.16

lie about you, correct?

A No, I don't think he would ever lie about me.

Q The same with Pete McCann?

A The same with Pete McCann.

Q Since you moved out of Los Angeles in February of 1996, I want to find out what kind of work you've done unrelated to the FBI.

A I haven't done any.

Q So you've been out of work since February of 1996?

A That is correct.

Q Do you have any source of income?

A Just my family helping us. And I have social security.

Q The monies you had been receiving under the 1994 agreement, which was $7,250 a month, that was a significant amount of money to you, correct?

A No, it was not to me. Not being in the business I was before I came over. That was pennies to me. I'd spend that for lunch. That was not a lot of money to me.

Q Well, at the time that you were working under the 1994 agreement with the Los Angeles division --

A It was fair.
Q Did you have any other income at that time?
A No, I did not.
Q So the $7,250 a month was all the income you had?
A That's it.
Q Was your wife working at the time?
A No.
Q So you were relying on that income for your daily expenses, correct?
A While I was in L.A.?
Q Correct.
A Yes.
Q And after you moved from Los Angeles and the payments stopped, that was a significant issue for you because you no longer had any income, correct?
A That is correct. But that has nothing to do with why I filed the suit against the FBI. It's because they did not do what they said they were going to do.
Q Let me just get back to where you've lived, and we went through some of that before. I think you said you lived in the Destin area for about three years?
A Right. Approximately three years.

moved to Gainesville, Florida.

MR. SCHWARTZ: Okay.

THE WITNESS: To help my daughter so she could finish college. She had two children, so we went and moved down there to help her.

BY MR. SCHWARTZ:

Q And you were living in Gainesville at the time, and then you moved to Los Angeles to work on a case?

A That is correct.

Q When you moved to Cottage Grove, Oregon --

A Right.

Q That was not at the FBI's request, correct?

A No.

Q Why did you move to Cottage Grove?

A Because my daughter and grandchildren were up there.

Q And did you notify anybody in the FBI that you had moved to Cottage Grove?

A Yes, I did. I notified Chuck Goodwin, Pete McCann, John Donahue, because we would be sending birthday cards and Christmas cards. We've always had a good rapport.

Q Anybody else that you notified?

A Yes. I sent Christmas cards to Scott

Q I'm going to get back to a question I asked a second ago. Your position in the lawsuit is that the contract with the Los Angeles division, the 1994 agreement, was not properly terminated, correct?

A That is correct.

Q Because it was not terminated in writing?

A Because that's what it says.

Q My question is now did you give up any opportunities you had for other jobs because you were relying on the fact that you believed that 1994 agreement was still in effect?

A No, I did not give up any opportunities for any other jobs.

MR. HEIDEMAN: I'm going to object to the form of the question because he's already said he couldn't get another job because of his criminal record.

BY MR. SCHWARTZ:

Q Other than the meetings you had in the Dallas area with Pete McCann on the Webb matter and the meeting you had in Baltimore in 1999 on the Joe Pistone matter --

A Mm-hmm.

Q Did you do any other work for the FBI after you moved out of Los Angeles?

him to go over every word, so let's take three minutes if we can. It's only one and a quarter pages.

MR. SCHWARTZ: We can go off the record.

(Whereupon, a short recess was taken.)

BY MR. SCHWARTZ:

Q Mr. Patton, did you finish reviewing --

A Yes.

Q -- Charlie Goodwin's declaration, which is Exhibit -- what's the exhibit number on that?

A H.

Q Is there anything else in here that is not accurate?

A No, I think that's the only thing that I can see in here that I think that he misstated.

Q Other than the "Cherry Nose" Brown matter and the Baltimore meeting and the Dallas meeting with Pete McCann, did you perform any other services for the FBI after you --

A No, I did not.

Q Let me just finish the last part of my sentence. Other than the "Cherry Nose" Brown matter, the meeting in Baltimore in 1999, and the meeting in the Dallas area in 1996, have you performed any other services for the FBI since you left Los Angeles in February of 1996?

MR. HEIDEMAN: Do you mean has he been asked to perform services or has he performed services. Those are two separate questions.

MR. SCHWARTZ: Okay.

MS. MOORE: The question stands. He said did you perform any other services. It was clear.

MR. SCHWARTZ: Right. That's the question. Did you perform any other services?

THE WITNESS: No. Conversations. I mean, FBI agents would call me and ask me if I knew anything, but, you know, nothing. I did no work if that's the question, if I understand your question.

MR. SCHWARTZ: That's what I asked.

THE WITNESS: Right. No, I did not.

MR. SCHWARTZ: Thank you.

BY MR. SCHWARTZ:

Q Do you remember being interviewed in August of 1997 while you were living in Florida by two FBI agents?

A Yes.

Q Clyde Merryman was one?

A And Steve Morris.

Q Right.

A Right. And they sat in the thing and cried like children because they thought that I was so

the monthly payment under the 1994 agreement, correct?

A Well, he didn't come down for that. He came down for this, for the Miami thing and the storage. That's what he came for. He never brought up the contract or anything else, so we did not discuss the contract.

Q So when you were interviewed in Florida by Merryman and Morris --

A Merryman and Morris.

Q You didn't discuss the 1994 agreement, correct?

A No, he never brought it up, and we never discussed it. He was sent down there by Esposito to intervene, him and Morris. Esposito is the one that sent them down.

Q Your last payment under the 1994 agreement was in February of '96, correct?

A Correct.

Q You didn't receive a payment in March of '96?

A No.

Q Or April of '96?

A No.

Q So you were on notice at that point that the FBI was not making the payments, correct?

A Yes. And if you look at the phone records from '97 to '98, you'll see that I was trying to deal with it myself without going to attorneys to deal directly with Washington through the people in Washington that I knew.

Q I think you testified earlier that before you received that $30,000 in November of '96, you had talked to Clyde Merryman. He was one of the agents you had talked to about the fact that you had not been paid under the 1994 agreement, correct?

A I don't think I testified to that.

Q I apologize if I'm misremembering. Who did you talk to prior to November of 1996? Who did you talk to in the FBI about the fact that you had not received your monthly payment?

A Pete McCann, Chuck Goodwin, Donahue, Esposito, Divers. I'm trying to count. Coulson, Danny Coulson.

Q And what was Danny Coulson's position?

A He was I believe one of the deputy directors or in that category.

Q And you knew him from some investigation?

A Right. From Baltimore.

Q And isn't it the case that they told you that the FBI's perspective was the contract was

over, that was not sufficient in your mind?

A No, it's not, because it wasn't my first contract. I had a contract before, and I know what they do.

Q After you moved out of Los Angeles in February of '96, did any FBI official affirmatively tell you yes, the contract is ongoing?

A No.

Q Let me get back to the kind of work you were doing in Los Angeles under the 1994 agreement. We went over some of them earlier on. You were undercover, and so was Scott Garriola.

A Mm-hmm.

Q Is that a yes?

A Yes.

Q And you were posing as jewel thieves, correct?

A Correct.

Q And you and Scott Garriola met just about every day, correct?

A No.

Q How often did you guys meet?

A Three to four times a week.

Q Did you speak with him every day?

A Every day.

Q And you met with a lot of subjects of the FBI investigation?

A Right. Sometimes on my own and sometimes with him.

Q What kinds of things would you do with Agent Garriola? For example, sometimes you would go to a restaurant and meet the subjects there?

A Right.

Q Can you give me other examples of things you did?

A Well, we'd follow people. You know, you do what you do undercover. It's not easy to explain if you never did it.

Q Can you just give me a little bit more details about the nature of the work?

A We worked very hard. We talked to a lot of people, and, you know, we followed people, you know, surveillance, certain stuff that we had to do, and we would do it. He's a very good agent, and he never did this work before until he worked with me.

Q You recorded numerous conversations with subjects?

A That is correct.

Q Do you have any ball park estimate? Was it in the hundreds?

A Yes.

Q How did you go about recording conversations?

A I'd wear a body mic, and then we'd have the car wired up, too.

Q Was it risky in your view to be wearing a body mic when you were meeting with subjects?

A It's always risky. I mean, they were a threat always. I've had them in both places that I work. If they ever found out who I was, they would have killed me. No, I've had them.

Q After you left Los Angeles in February of '96, you were not working undercover anymore, correct?

A No.

Q Is that correct?

A That is correct.

Q And you weren't recording conversations with subjects, correct?

A No, I was not.

Q And you were not meeting with subjects of investigations, correct?

A No, I was not.

Q After you left Los Angeles in February of '96, you didn't think the FBI was going to be paying you when you weren't actually performing services, did

you?

A Yes, I did, because they did not terminate the contract.

Q Did you think the FBI intended that the contract was going to continue even though you weren't performing any services?

A Yes.

Q Do you have an understanding of why the FBI would intend to continue to pay you even though you weren't performing services?

A Well, if they go by their rules and regulations, you know, yes, I believe that they are obligated to pay me under the contract just like you're under contract for your job. I mean, if they tell you stay home for the month, you're still going to get your check, right? Under your contract?

Q Well, I understand, though, your position that under the contract, because it wasn't terminated in writing, that you were owed the monthly payment, correct?

A Right. That is correct.

Q Did you have an understanding that the FBI intended to pay you even though you weren't performing services?

A Yes.

Q And that was based on the fact that it hadn't been terminated in writing?

A That is correct.

Q Is it based on any other facts?

A No.

Q If you turn to the agreement, which is Exhibit B.

A Mm-hmm.

Q If you look at the third page, paragraph 14.

A Mm-hmm.

Q It says, "This agreement shall commence on the date of acceptance by Mr. Patton as signified by his signature and shall continue as long as the FBI deems that Mr. Patton's services are required." Do you see that?

A Mm-hmm.

Q Is that a yes?

A Yes.

Q What was your understanding of the meaning --

A But you didn't finish the paragraph, sir.

Q That's correct. I just want to focus on this first sentence right now.

A Okay.

Q Did you have an understanding as to what was

Q Do you think you have a copy at home of the other letter or letters that you think you've sent?

A It's possible. I will look for them, and if I do have them, I will forward them on to my counsel.

Q Was it your practice to make a copy of the letter that you were sending out?

A Yes.

Q By the date of this letter, which is Exhibit J --

A Mm-hmm.

Q -- this is October --

A Twenty.

Q -- 20, 1997 -- you had not received your monthly payment under the 1994 agreement for roughly a year and a half, correct?

A That's correct.

Q Is there any reason you didn't include a mention of that in this letter, which is Exhibit J?

A It was never brought up, and we never got into that conversation.

Q You mentioned a minute or two ago that you said that you were willing to work with the FBI and still feel that way. Do you remember when you were interviewed down in Florida by Clyde Merryman and Steve Morris that you indicated to them also that you

were willing to work with the FBI?

A Yes.

Q And they indicated to you that they remained open to that idea, but they first had to resolve these issues about your claim for your personal property and the lump sum payment from Miami?

A Yes.

(The document referred to was marked for identification as Exhibit K.)

BY MR. SCHWARTZ:

Q I want to show you what I marked as Exhibit K, which is a different agreement with the FBI. This one I believe has your signature of May 28, 1991. This is the agreement you originally had with Miami, correct?

A That is correct.

Q If you look at paragraph 12.

A All right. Mm-hmm.

Q Actually, let me ask you a different question. This agreement was eventually terminated in writing by the Baltimore division, correct?

A That's correct.

Q And in your mind, the fact that this agreement had been terminated in writing was

Q You mentioned earlier regarding "Cherry Nose" Brown that you had traveled around Arizona somewhat?

A Mm-hmm.

Q Can you give me some more details about that?

A Yes. I went from Tucson to up around the Phoenix/Mesa area, Scottsdale area.

Q You were living in Tucson at the time?

A That's right.

Q Why did you go to the Mesa area?

A Well, because I figured he wasn't living in Tucson. I could maybe spot his car. It was a green El Dorado somewhere up in that area.

Q Did you have any information that he was in fact living in the Mesa area?

A No, I did not.

Q And you didn't spot him in the Mesa area, correct?

A No, I did not.

Q And after looking in Mesa, you looked in Scottsdale?

A In Scottsdale, right.

Q And did you have any information indicating he was living in Scottsdale?

A No, I did not.
Q Did you have any information that he was in Arizona?
A Just by what Chuck Goodwin told me.
Q Do you remember what Chuck said?
A That his information by the Chicago office was that he was in Arizona.
Q Did you look anywhere else?
A No.
Q How much time did you spend looking for "Cherry Nose" Brown?
A Probably a month.
Q Is that one continuous month?
A Yes. Every day.
Q Where were you living at the time?
A In Tucson.
Q Did you go home every night?
A Yes. It's not that far away. I mean, you can go from Tucson to Phoenix in 35 minutes.
Q You didn't talk to Mike Wacks about this, did you?
A No, I did not.
Q Did you incur any expenses in connection with this?
A Just out of my own pocket, gas.

whatever page I'm told it goes through, whether or not all of that is or is not your handwriting?

THE WITNESS: It's all my handwriting.

MR. HEIDEMAN: Okay. So all the batch of pages that start with 59 and continue straight through to --

MS. EISEN: Through 172.

MR. HEIDEMAN: I'm sorry, Faye?

MS. EISEN: 172.

MR. HEIDEMAN: 172 you're telling us all of these come out of your files?

THE WITNESS: Right.

MR. HEIDEMAN: And they constitute your handwriting, is that correct?

THE WITNESS: That is correct.

MR. HEIDEMAN: Okay. If when we go through any pages you see a notation made by your wife or somebody else, please tell opposing counsel that it's not your handwriting.

THE WITNESS: I will notify him. Right.

MR. HEIDEMAN: Okay?

THE WITNESS: I will notify him.

MR. HEIDEMAN: Thank you very much. Counsel, I hope that's helpful.

MR. SCHWARTZ: It is.

MR. HEIDEMAN: I interrupted.

MR. SCHWARTZ: Yes.

BY MR. SCHWARTZ:

Q Just comparing page 59, for example, to page 62, it just seems like it's two different people writing, so I want to make sure that that's not your wife or someone else.

A No, that's me. It's all my handwriting.

Q Did you keep a continuous log in a yellow pad of the conversations?

A Yes.

Q Do you know how many pads of notes you had of these conversations?

A No, I do not, not to my recollection at this time.

Q And the notes are dated. Were they written at the time that you had the conversations?

A Yes, sir.

Q If you look at 59 again, the first entry of 2-27-96.

A Right.

Q Is that supposed to be crossed out, 2-27? Is that the date, or is that a crossed out date?

A That's just a mistake. No, that was the date.

see if there's someone there and let me know.

Q Did you use an abbreviation for morning?

A Yes.

Q What's your abbreviation?

A M-O-N.

Q Oh, okay. Do you know what letter you're referencing there? "He got the letter and thanked me for it."

A Well, I sent a letter to the SAC praising him for the hard work he did.

Q And this is Scott Garriola, right?

A Yes. And that was, to the best of my recollection, to Tim McNally.

Q Do you know what that last two lines are about? "He said he will call in the morning."

A He didn't trust Ori, and later on, which I don't know if it's in these notes somewhere, while he [redacted] You know about that probably. You do know about it.

Q [redacted] L.A. division, he was a subject, right?

A Right.

Q Can you turn to page 64?

A Mm-hmm.

Q And the second entry dated 5/13/96.

A Right. Called Mike and he said he will talk to Pat about the money and he said that J.B. died. That's Joe Bett died. He said he don't think the contract is in force. He says he will call me on Tuesday or Wednesday.

Q And that's a conversation with Mike Wacks, right?

A That is correct.

Q Can you read the last entry on page 64?

A Pete called and asked if I heard from Mike. I said no. He said that he is not going to call Mike anymore and that he will call Bill Esposito in Washington and have him call me. He says that he will call me after he talks to Bill. He said that Mike don't know what he is doing. He said that the things in Florida were never in Rick Delahey's name.

I said I didn't want to give anyone trouble. He said you don't just let them run over you. You have to stand up for your rights. He told me that someone in L.A. is bad-mouthing me. He didn't know who it was. He said he knew someone in Houston, and he will call him and see if there is something there.

Q Could you read the last entry on page 65?

A Pete called and said he talked to --

MR. HEIDEMAN: What date?

MR. SCHWARTZ: Thanks. It's May.

THE WITNESS: May 24, '96.

MR. SCHWARTZ: Right.

THE WITNESS: Pete called and said he talked to Mr. Esposito and that Esposito was going to look into the Florida and California things and he will get back to Pete Tuesday or Wednesday. Pete said that Chuck was talking to Kurt in Washington about getting me somewhere. He said that the $2,500 from W.A. to give me has nothing to do with California and it was for me to do that.

BY MR. SCHWARTZ:

Q Does this refresh your recollection at all about you having complained about not receiving payments under the contract?

A Yes. I told you that I did complain to Pete and to Esposito and to Chuck and to John Donahue.

Q Right.

A I'm sorry I didn't bring it up to Merryman. I should have brought it up to him. I'm sorry now, but he was down there strictly for the California thing and the $150,000 thing. He never brought up the contract to me, so we never got into that discussion. The man sat in a room with tears in his eyes the whole time, him and Morrisey.

MR. SCHWARTZ: Thanks. It's May.

THE WITNESS: May 24, '96.

MR. SCHWARTZ: Right.

THE WITNESS: Pete called and said he talked to Mr. Esposito and that Esposito was going to look into the Florida and California things and he will get back to Pete Tuesday or Wednesday. Pete said that Chuck was talking to Kurt in Washington about getting me somewhere. He said that the $2,500 from W.A. to give me has nothing to do with California and it was for me to do that.

BY MR. SCHWARTZ:

Q Does this refresh your recollection at all about you having complained about not receiving payments under the contract?

A Yes. I told you that I did complain to Pete and to Esposito and to Chuck and to John Donahue.

Q Right.

A I'm sorry I didn't bring it up to Merryman. I should have brought it up to him. I'm sorry now, but he was down there strictly for the California thing and the $150,000 thing. He never brought up the contract to me, so we never got into that discussion. The man sat in a room with tears in his eyes the whole time, him and Morrisey.

They said we cannot believe that you were treated this way for all the work that you've done for the FBI. I didn't have to do all that work, go to Baltimore and do that work. Take depositions and go to the grand jury. I didn't have to go to San Diego and take depositions and go to the grand jury and have people indicted and put in jail.

I didn't have to do that. My life wasn't threatened. But I turned my life around and I put all my belief in the Bureau. My whole life was in the Bureau to help them out, but it seems like I must have been mistaken. I'm sorry it came out this way, but that's the way I guess things work. It wasn't that way on the outside. Your word was your bond.

Q Did anybody in the FBI tell you that from the FBI's perspective, that $30,000 payment you had gotten in November was a settlement of your claim about not having gotten more monthly payments under the 1994 agreement?

A No one ever told me that. No one ever told me that. That's the third time you asked me that question and it's the same answer. They never told me that. And it states right in here about the $30,000 that I think we just read, didn't we? That it had nothing to do with California?

A Right.

Q And then how long did you live there for?

A Three years.

Q [redacted]

A For my wife's health, right.

Q And again, the FBI hadn't asked you to move?

A No. Plus I have a daughter and granddaughter and great-granddaughter there, and most of it was for my wife's health. It's easier out there for her breathing.

Q Can you read the entry on page 67? It looks like it's the second one that's dated June 4, '96. It starts "Called Chuck".

A Called Chuck and he said he will look into things. He said that Dallas would put me on only on a COD basis.

Q What does that mean to you?

A That means for everything that you would do they would pay you that. That's like being a stool pigeon, you know? That's what they do with these informants, you know? Here's $1,000, go do this. I know what that is.

Q And so that's very different from -- let me finish the question.

A Right.

Q That's very different from the arrangement that you had had under the 1994 agreement?

A Or the '91 agreement, too. Yeah. Completely different.

Q Could you keep reading that?

A COD basis. I said that I can't do that without a car and money to spend. He said he can understand that. He said he talked to Kent and he will look for something.

Q Do you know who Kent is?

A Yeah. He's an agent. He used to be an agent in Arizona. Now he's a prosecutor in Palm Beach, Florida.

Q Do you know his last name?

A No, I do not. I used to know it, but, you know, you meet so many of them you can't remember them all.

Q Can you finish reading that?

A He said he will talk to Pete and see if there is any --

Q He will talk to Kent?

A --- attorneys that will look into this and he will let me know. He said he will call me later.

See, they were all getting very fed up because I was trying to deal directly with the Bureau

filled so I can lose that weight.

(Discussion held off the record.)

BY MR. SCHWARTZ:

Q Can you turn to page 68 and look at the last entry? It's June 11, '96. 68.

A 6/11/96?

Q Right.

A Mike called and said he, I think, asked not to put in for the money yet. He has not put in for the money yet. He is waiting for the right time. He said that I should get in touch with someone in Washington, Esposito, and tell them when I'm in Florida. He says that I shall not wait to do something. He said that he told the guys in Boston that my contract is over in L.A. and that they can pay me. I asked if he would put it in a lump sum so I can get on with --

Q Is it "so I can get out of here"?

A Out of here. Right. He said he will. I said that someone out there was bad-mouthing me and he said he did not talk to Tim or Scottie or Andy. He said that he would let me know what he put in for the money.

Q Is that last line "he will let me know *when* he put in for the money"?

them a lot of credit.

Q Do you remember getting a letter from Neal Divers after you were --

A What?

Q After you were interviewed down in Florida by Clyde Merryman and Steve Morris.

A Yes. Mm-hmm.

Q Then you got a letter that Divers signed off on saying that your claim for your lump sum is denied and that if you want to submit a claim for your lost property, you should submit forms under the Federal Tort Claims Act?

A Correct.

Q Did you respond to Neal Divers about that letter?

A No, I did not.

Q Did you ask anyone in the FBI why does this letter talk about the lump sum from Miami, the personal property, but it doesn't talk about the payment under the 1994 agreement?

A No. I never asked anyone. There wasn't too many people I think that liked Divers.

Q Could you turn to page 70 of Exhibit L?

A Mm-hmm. What do you want to know?

Q You don't need to read the whole thing, but

Q Do you think this reference is about the $2,500?

A Yes.

Q Could you continue reading the entry on top of page 75?

A Mm-hmm. Pete said he talked to Whity in Washington, and he said that they agreed with us on the contents about they owe me to July 15.

Q Let me stop you for a second. Is that "they agreed with us on the contracts"?

A Mm-hmm.

Q Could you read it again, because I don't think it came out clearly the first time?

A They agreed with us on the contract and they owe me to July 15. He said Whity was going to talk to Espo today if he was in. I asked him when he thinks that will be done. He said in a week or two. He said that they had someone from California and Washington and they all agreed.

He said he told Whity that I was still willing to work for the B -- that's the Bureau -- and Whity said he will look into it. He told Whity about Florida and he wants --

Q Is that "was shocked"?

A Was shocked about hearing that. He told him

A I can't remember what the actual conversation was.

Q Can you read the next entry on page 76? It's dated July 18.

A Yeah. Pete called and asked what was the number on the contract. I gave that to him. He said that he will call Whity and ask for $28,125 plus lump sum.

Q Now do you know where that figure came from, $28,125?

A I have no idea.

Q Was it a multiple of the amount that you would have been paid under the contract?

A I have no idea, sir. He will call me back on what they say today or tomorrow. I told him what was said with Fred. Pete called and said that he talked to Whity and he thinks that Whity agrees with him on the matter, that it would be a letter --

Q A little more?

A A little more. He said I am on the first --

Q This is very hard to read, right, this passage?

A Yeah. It is.

Q I'm going to ask if you could try to make a better copy of this page.

reference to?

A Yeah. Go to work there.

Q So you were talking to?

A Chuck Goodwin.

Q Chuck about where you might go to find work?

A Right. Mm-hmm.

Q The first part of that entry, "he said to make sure that the money I'm to get from California" --

A California does not include Florida.

Q What does that mean?

A The money that I was supposed to get from Florida for my storage and the --

Q Now, the money you were supposed to get from California, was that both the lump sum and the payment under the '94 agreement?

A Correct. See, under the '94 agreement, I still thought he was willing to work under that agreement because it was never terminated, and why it was never terminated, it wasn't until 2002, but I was willing to go anywhere they wanted me to go.

Q But none of that panned out, right?

A No, but that's not my fault. My fault was I took their word for it that I would work for them anywhere they wanted me to go. With the knowledge I

Q It says, "I called Pete and he said that he talked to Chuck the day I talked to," it looks like Chuck, right?
A Chuck. Right.
Q "And he said" or "he say that he told me that the sum of $28,000 to $30,000 was for California and Florida." So am I correct that Chuck Goodwin had a conversation with you and told you that you were going to get paid $28,000 to $30,000 and that was going to be for California and Florida?
A No. It was California only.
Q Well, what does the reference mean and your understanding again?
A That it was for California only.
Q But somebody told you it was for California and Florida, right, and then you said that that was not what you understood?
A I believe it says California, not Florida. That's the way I abbreviate not, Florida.
Q So you think it says $28,000 to $30,000 was for California, not Florida?
A Right.
Q The next sentence says "I said that" --
A That's not what I understood.
Q And why is that not what you understood?

A Because I thought it was going to be more at that time for California.

Q The symbol between California?

A So then you see as you go on, see, you always stop before you go any further. "He said Whity was waiting for California to call him." So that's the sentence where it tells you he's waiting for California where Florida has nothing to do with it. It's just California.

Q I just want to make sure the record is clear. The line on page 81, an entry dated August 1, '96, the fourth line down starts "$28,000 to $30,000 was for Cal," which is abbreviated C-A-L.

A Not Florida.

Q And that symbol between C-A-L and F-L is a not?

A Right.

MR. HEIDEMAN: But it looks like what we would call an ampersand or an and sign.

THE WITNESS: Right.

MR. HEIDEMAN: But is that not the way you do -- show us another example of --

THE WITNESS: Here's another.

MR. SCHWARTZ: Okay.

MR. HEIDEMAN: He's pointing to 8/6/96,

third entry up from the bottom, same page.

Maybe, counsel, you could move to that and inquire. I'm not trying to direct him. I'm trying to make sure we don't have an inadvertent misunderstanding here.

THE WITNESS: Called Mark and we talked about California, not Florida. He said it's time for me to get in with him. You have to look out for yourself. He says he will call me later.

BY MR. SCHWARTZ:

Q How sure are you that that symbol -- now let me again refer to page 81 of Exhibit L. The entry is dated August 1, '96.

A Uh-huh.

Q It's the fourth line of that entry.

A Right.

Q The symbol between Cal and F-L for Florida, how sure are you that that stands for the word not?

A Because not would be too big of a writing for me to put in, so I abbreviate not. That's the way of my abbreviation to understand.

Q So you're positive that that stands for not?

A Yes, sir. And it's the same thing down here through the but when I talked to Mark.

MR. HEIDEMAN: And what do you use then as a

symbol for and, A-N-D, because I think all the lawyers at the table when we write an ampersand and we don't use the squirly curly que ampersand we put something that looks like a cross, but it -- right. And to us, that means and, but you're answering the question that that doesn't mean and, it means not, so can you explain the discrepancy?

THE WITNESS: Right. Well, that's just the way I do it.

BY MR. SCHWARTZ:

Q And you're absolutely sure of that?

A I'm positive. And probably if you go through a lot of this, you're going to see that as not.

(Pause.)

Q Can you turn to page 82?

A Okay.

Q The long entry that's dated August 6, '96?

A I talked to Chuck, and he said that he was doing all he can about the money.

Q Does that say "the money thing"?

A On the money thing.

Q Thing?

A Right. I asked him if Pete was mad at me. He said he talks to Pete every day and Pete is not mad

at me. He said that he's talking to Kent in Washington and --

Q Are you sure that's Kent? Could it be Keith?

A Could be Keith.

Q Okay. But you're not sure?

A No. In Washington. He did not have anything for me, but he will look around. I told Chuck that I talked to Jim Robertson and I told him what was said. He said that he has not heard from Jim Robertson. I told him that Jim said he will call Chuck on Monday, but Chuck said he has not heard from him. I told Chuck that I gave Jim Robertson Pete's phone number.

Chuck said I ought to go into business when I get the money, and then when they need me, they can bring me in on cases. He said he will call me when he hears something.

Q This is a conversation with Chuck Goodwin?

A Right.

Q And he says that you should go into business when you get the money?

A Right.

Q Do you know what money he's talking about?

A Yes. The money from California.

Q Okay. Actually, let me ask you to turn to page 128 first.

A Okay.

Q And there's an entry. The big entry.

A Whity called?

Q Right. That's dated 10/28/96.

A Whity called with another agent on the line. I don't remember his name. They talked about the California contract, and they didn't believe the contract is in force because I am --

Q Is it "actually"?

A Actually not doing anything for the Bureau, Federal Government, but they asked me what my expenses were here. I said approximately $2,000, and they said they will -- that they will --

Q "That they said well, how about"?

A Said well, what about $2,000 a month for eight months, which comes to $16,000, and I said no, I am not going for that. As far as I am concerned, the contract is still in force until I receive something in writing because that is what the contract says. I said a contract is a contract. As far as I am concerned, I am owed $32,000 on the contract, which is less than what the contract reads. They kept pushing the $2,000 per month, and I said okay, if you want to

go with $2,000, what is the lump sum going to be? They say that they don't know that it's --

Q Is it "they said they don't know that"?

A Right. That's what I said I think.

Q Go ahead, please.

A Now we've got to go to 29?

Q Right.

A Up to the people --

Q I don't know if you read the last part of the bottom of 128. Looks like it says "It is strictly."

A It is strictly up to the people they work for. I told them I got $25,000 from Maryland. They said okay, how about if we settle for $25,000? I said no, I would not settle for that. They asked what I would settle for. I said $40,000. That is $32,000 for the contract, $8,000 lump sum. They said they didn't know if that could be done -- that could --

Q "If they could"?

A If they could do that, but they would bring it upstairs and see what they say. They asked me about the Florida thing. I told them about the $150,000 I was promised plus also the storage, loss of the storage. I explained all about the money problems in Florida and the promise that was made about the

Bureau taking care of the storage.

The other agent on the line asked me how much I would take for all three things. I said I would have to think about that and talk it over with my family. I said let's get the California thing done first, then we can work on the Florida thing. Whity said that was like an alternative investigation in Florida.

I told them who all knew about this. They asked the attorney's name and I told them. They asked who was with me when I was told, and I told them it was Special Agent Malynda Irby. They said let's find out about the storage thing like three months ago. I asked them when I would have a answer on this California thing. They said they or Pete McCann will call me by noon tomorrow.

The conversation then got very heated because they constantly were saying that I did not do anything for the last months for the government. As far as they were concerned, if you don't work, you don't get paid. I told them that I know who told them because they knew there is a disagreement between California and me.

I know they told you that I had a verbal cancellation of the contract. However, I said that is

an outright lie and would be willing for me and the agent likewise taking a lie detector test, and if I fail, they wouldn't have to pay me. If he fails, then he gets fired. They said wait a minute. We don't have to go that far. We have your word.

Q Is it "We took your word"?

A We have your word and we know all the good you have done for the Bureau, and you should keep in good standing with the Bureau. They mentioned if I considered going into the witness protection program, they would give you a new ID and give you a job. I said I never had that thought and never would have that thought. They kept saying you want to stay in good graces because we might have some work for you. Whity said that sometimes people understand what they are doing, are told.

Q Can you go now to 132?

A I think I want to get a photocopy of this. I think I want to get a book. I'm going to have somebody write me a book so I can send you a book.

Q Can you look at the bottom entry? It says 11/1.

A 11/1. Pete called and said he talked to Whity and there is an offer for $30,000. He thinks you should take it because that is the final and only

offer, and if I don't receive it --

Q Is that "accept it"?

A Accept it I can get in line with all the others and sue for it. This is for L.A. only. He said he could call Whity and tell him our conversation, sign off, and I will have a check in hand. Pete thought the amount was low but said your back is against the wall and you will have no other choice but to sue.

Whity is supposed to call me when the check will be cut, when I should have it in hand. Pete says he will call and discuss this with Chuck and that if Pete has another option, he'll call and let me know. He said he will call me later anyway. He has two calls in for Prillamen.

Q Do you know who Prillamen is?

A He was the deputy director.

Q And this is a conversation you had with Pete McCann?

A That's correct.

Q And he had talked to Whity, and Whity was Clyde Merryman, correct?

A Right.

Q And Clyde Merryman was an FBI official at FBI headquarters?

A He was assigned to this case by Esposito.

MR. HEIDEMAN: When it says "L.A. only", what does that mean?

THE WITNESS: $30,000.

MR. HEIDEMAN: For what?

THE WITNESS: For the lump sum. For me to leave. $30,000.

MR. HEIDEMAN: What do you mean, "leave"? You mean going to Dallas?

THE WITNESS: Yeah.

BY MR. SCHWARTZ:

Q If you look back, Mr. Patton --

A Pete called and said he talked to Whity and their offer is $30,000.

Q Just so the record is clear, when there's a reference to L.A. in these notes that you've just read, that refers to your claim about not having received your monthly payment under the 1994 agreement and the lump sum you say you were promised, correct?

A No. It's just the lump sum I was promised.

Q Well, let me put it this way. The reference to L.A. does not include the $150,000 lump sum you said that Miami had promised you, nor does it refer to your personal property claim, correct?

A Right.

Q And if you go back to page 129, which you read a minute or two ago?

A Yeah. What about it?

Q There's a discussion. It says fourth line down, "They asked what I would settle for. I said $40,000. That is $32,000 for the contract and $8,000 lump sum." Do you see that?

A Mm-hmm.

Q Is that a yes?

A Yes.

Q And this is a note of conversation that you had on October 28, 1996?

A Right.

MR. HEIDEMAN: What was that settlement for if you were willing to settle?

THE WITNESS: Just for the money coming from, you know, the money I was promised from Mike Wacks to me to go on to the same case where the cases were over. The contract wasn't over, so it had nothing to do with the contract. The contract was still in force.

BY MR. SCHWARTZ:

Q Mr. Patton, referring again to that entry on page 129 where you said "I said $40,000. That is $32,000 for the contract and $8,000 lump sum," the

contract you're referring to is the 1994 agreement with the Los Angeles division, correct?

A No.

Q Okay. Then what is that contract?

A It's been so far long ago I can't remember that. It had nothing to do with this contract.

Q That's your sworn testimony is that the reference to the contract you're positive is not the 1994 agreement with the Los Angeles division?

A You're correct.

Q And you don't know what contract this is talking about?

MR. HEIDEMAN: Excuse me. You said with the Los Angeles division. You mean the whole contract or the work that was done in Los Angeles?

MR. SCHWARTZ: Thank you.

MR. HEIDEMAN: I think that's the confusing issue.

MR. SCHWARTZ: I appreciate your pointing that out.

BY MR. SCHWARTZ:

Q You're saying that the reference to $32,000 for the contract is not the 1994 agreement that's Exhibit B?

A No. It's not for our contract, but I

A I guess it is. They talked about the California contract. They didn't believe the contract is in force is what they're saying. They're not saying about any money about it.

Q Right.

A They're just saying they don't believe it's in force, and my position was it's still in force until I get something in writing stating that it's not in force.

Q Now, if you look at a couple of lines down there, it says, "But they asked me what my expenses were here, and I said approximately $2,000" --

A Right.

Q -- "and they said well, how about $2,000 a month for eight months, which comes to $16,000."

A Right.

Q Now the eight months --

A And I said no.

Q You said no. Do you know where they came up with eight months from?

A I have no idea.

Q Well, I think we established earlier that the last payment you had received under the 1994 agreement was in February of '96?

A Right.

contract is still in force until I receive something in writing because that is what the contract says. I said a contract is a contract.

As far as I am concerned, I am owed $32,000 on the contract, which is less than what the contract reads. They kept pushing $2,000 per month, and I said okay, if you want to go with the $2,000, what is the lump sum going to be? They said they don't know that.

Q And you said I am owed $32,000. That would be eight months times $4,000 a month, right?

A Right.

Q and you used the $4,000 figure because that was the services figure, right?

A Correct.

Q You weren't claiming that you should be paid expenses, the expenses part, correct?

A That is right. At that time, because I was planning not to go into a suit. I was trying to negotiate with them. Esposito tried as hard as he can and he couldn't get no further up. And that's when they all told me I better get a lawyer and just go do what I got to do, which you will read in many of the letters.

Q And now getting back to page 132 of Exhibit L.

A What about it?

Q You're still sure that when it says Pete called -- and this is --

A Right.

Q -- the November 1 entry.

A And offered $30,000.

Q And he thinks you should take it, that that $30,000 was for --

A That's what I got.

Q Let me figure --

A The lump sum.

Q Right. Let me finish. That was for the monthly amount that you were claiming under the contract plus the lump sum?

A No. No. It was the $30,000 that I got from leaving California, and that's what we finally agreed to, the $30,000, and that's what I got, $30,000.

Q Can you go to page 133?

A Yeah. What about it? I got it.

Q The entry that starts in the middle of the page, November 1, '95. Can you read that?

A Yeah. It says, "Whity called and said he understood that I agreed about the $30,000." That's what we were talking about. "I said yes, I guess that's the only thing I could do. He admitted that

California made a big mistake, but who is to know if you would have gotten this much of the lump sum?

"Maybe if you went another route you might get more, but who knows how long that could take? I told him that I still wanted to stay friends with the Bureau and would still be open to working with them. I mentioned New Orleans, and he said that might be good place for you. He said he will go upstairs because Prillamen leaves early on Friday and he wants to get this done.

"He will find out exactly when I will receive my money. After he finds out, he will call Pete and he will give us a date. He said they will try to put" -- then it goes on to the next page.

Q Do you have that next page?

A I'm going to look for it. "Have some work for you. Whity said that sometimes people misunderstand what they are told."

Q Was that page 134 you were reading from?

A 131. I should go to 132, right?

Q No. You should go to 134.

A 134?

Q Right. Because I think the last part you read --

A All things together, but he --

# EXHIBIT B

# Patton v. United States

# Case No. 01-161C

UNITED STATES DEPARTMENT OF JUSTICE

THOMAS J. PATTON, )
)
Plaintiff, ) No. 01-161C
)
v. )
)
THE UNITED STATES, )
)
Defendant. )

Deposition of:

THOMAS J. PATTON

a witness of lawful age, taken on behalf of the Defendant, pursuant to notice, in the offices of the Law Firm of Richard Heideman, 1146 19th Street, N.W., Washington, D.C., on Thursday, June 8, 2006, at 10:00 a.m., before Bernadette Herboso, Notary Public in and for the District of Columbia, when were present:

APPEARANCES:

On behalf of Plaintiff:

RICHARD HEIDEMAN, Esquire
Heideman, Nudelman & Kalik, PC
1146 19th Street, N.W.
Washington, D.C. 20535
(202) 462-8990

On behalf of Defendant:

TED G. SCHWARTZ, Esquire
Federal Bureau of Investigation
935 Pennsylvania Avenue, N.W.
Washington, D.C. 20535
(310) 966-3421

APPEARANCES: (Cont'd.)

Also for the Defendant:

LAUREN S. MOORE, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-6288

## C O N T E N T S

WITNESS:

Thomas J. Patton


| | PAGE |
|---|---|
| EXAMINATION BY COUNSEL FOR DEFENDANT | 9 |
| FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT | 109 |

## E X H I B I T S

| EXHIBITS | IDENTIFIED | DESCRIPTION |
|---|---|---|
| A | 13 | Deposition notice |
| B | 19 | Agreement |
| C | 23 | Enterprise rental car leasing |
| D | 40 | Letter Heideman law firm |
| E | 41 | Declaration of Patton |
| F | 45 | 07-14-99 letter |
| G | 58 | 11-14-96 receipt |
| H | 90 | Declaration of Goodwin |
| I | 95 | 302/Report of Interview |
| J | 96 | 10-20-97 letter to Merryman |
| K | 115 | 5-28-91 agreement |
| L | 128 | Handwritten notes |
| M-1 | Reserved p. 165 | Revised copy page 00076 |
| M-2 | Reserved p. 165 | Revised copy page 00077 |
| M-3 | Reserved p. 185 | Revised copy page 00084 |

P R O C E E D I N G S

(10:00 a.m.)

MR. HEIDEMAN: All counsel will be introducing themselves in a moment. I also want to introduce our associate, Faye Eisen. Although I am licensed generally before the Court and therefore practicing in this particular matter, my other partners, Noel Nudelman and Tracy Kalik, appeared or participated from time to time with consent of counsel.

We would request the same professional courtesy for Faye Eisen so that she can assist and perhaps even from time to time will sit in without me in the room if I need to step out for some other ongoing matters, although it's our intention that of course one of the four members of our law firm will be in the deposition at all times. If that would be agreeable with counsel.

MS. MOORE: Is Faye a member of the Claims Court?

MR. HEIDEMAN: Faye is not a member of the Claims Court. She is, however, a member of the Maryland Bar.

MR. SCHWARTZ: That's fine. She does need to sign the confidentiality orders. I don't know.

Has she done that yet?

MS. EISEN: No.

MR. HEIDEMAN: No, but we'll be glad to do that, and you have my pledge that that will done.

MR. SCHWARTZ: Okay. That's fine. And just have the court reporter sign it before we start.

MR. HEIDEMAN: Fine.

MS. MOORE: Do you have another copy of it?

MR. SCHWARTZ: I do.

MS. MOORE: Then we can have Faye sign it because the court reporter signed this.

MR. HEIDEMAN: Thank you. And thank you for your courtesy. One other thing before you start on the witness. You requested that Mr. Patton do another search of records and bring with him specific things. He has done that, and we've Bates stamped them. Did they get all finished this morning?

MS. EISEN: Yes.

MR. HEIDEMAN: Okay. We've Bates stamped them. I'm going to hand you a packet that starts with Patton 00001 and runs through Patton 000215. What they constitute are certain business cards on the first page that he had of various agents that he met with. He'll be glad to answer questions about that.

On Patton 02 is an e-mail communication he

had with a particular agent. Patton 03 is a photograph provided to him someone at the FBI wanted him to identify and assist in locating, which he did.

MR. SCHWARTZ: Why don't we hold off on that for now.

MR. HEIDEMAN: Let me just finish.

MR. SCHWARTZ: How far are you going to go with that? Because I don't want to take up too much time going page by page.

MR. HEIDEMAN: Just two seconds.

MR. SCHWARTZ: Go ahead.

MR. HEIDEMAN: Starting with page Patton 04 are phone records from a certain time period through a certain time period covering the relevant time periods. And then starting with Patton 57 is another business card, and 58 is a receipt, and 59 through Patton 000172 are various handwritten notes of Mr. Patton over the course of relevant time periods that I understand were contemporaneous notes that he took even if they were in anticipation of potential litigation. That's not an allegation. It's just simply my information.

And then lastly we jump to Patton 204 through 215. There are some additional phone records that have been faxed into us. There appears to be a

gap between Patton 172 and 204, and, Faye, if that's not intentional, then --

MS. EISEN: That must only be in that package, because it's good in our package.

MR. HEIDEMAN: Okay. So I'll give it back to you.

MS. EISEN: Yes.

MR. HEIDEMAN: Give me a different one that you think is complete, and then I'm finished with this explanation. Ted, thank you for your patience.

Yes, this one that we'll give you starts again with these phone records at Patton 000173 and then runs through Patton 000215 of phone records. We'll be glad to explain this again, but I wanted you to know what you have.

MR. SCHWARTZ: Thank you. Counsel, how come these records were not produced earlier when they were originally requested?

MR. HEIDEMAN: We received them from Mr. Patton. Some of them, by the way, I believe have been produced. If we had them before, they were produced. We received them from Mr. Patton upon his arrival here in preparation for the deposition and direct response to your subpoena.

MR. SCHWARTZ: You have not produced any of

these records before.

MS. MOORE: Yes. Actually you haven't produced any documents at all.

MR. HEIDEMAN: I believe phone records were produced.

MS. MOORE: No, no. We've asked for them many times for the past three years in about five different letters. We haven't seen one phone record, nothing, not one document even.

MR. HEIDEMAN: We received these particular documents last evening after Mr. Patton got off the airplane. We stayed last night and reviewed them, Bates stamped them, and we're producing them at the outset of the deposition.

MR. SCHWARTZ: Okay. All right. That's fair enough.

THE REPORTER: Would you raise your right hand, please?

Whereupon,

THOMAS J. PATTON

having been duly sworn, was called as a witness and was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. SCHWARTZ:

Q Could you state your full name for the

record, please?

A Thomas J. Patton, P-A-T-T-O-N.

Q Mr. Patton, do you understand the oath that you just took is the same type of oath that you would take if your were testifying in a court of law?

A That is correct.

Q Even though we're in an informal setting here, the oath that you took has the same importance and meaning.

A Yes, sir.

Q Now the court reporter here is going to be transcribing what is said here into a booklet, which you'll have a chance to review.

A Mm-hmm.

Q It's important because it's being transcribed that you respond to questions verbally as opposed to uh-huhs, mm-hmms. Do you understand that?

A Yes, sir.

Q Also it's important so that we have a clear record that we don't talk over each other, so please wait until I finish my question before you respond, and I'll do the same. I'll wait until you finish your answer before I ask the question. Is that okay?

A Yes, sir.

Q If I ask a question that you don't

understand, please let me know that you don't understand it.

A Yes.

Q If you answer the question, I'm going to assume that you understood what the question was, okay?

A Yes, sir.

Q If you need a break at some point, you can let me know, okay?

A Yes, sir.

MR. HEIDEMAN: And on administrative detail, logistical notes, we have lots of coffee, water, soft drinks. There are restrooms on the floor. We have bagels and we also have muffins. And lastly, if anybody needs any kind of a break or to have a confidential meeting, we have other conference rooms and offices, private offices, available for that should that be needed.

MR. SCHWARTZ: Thank you.

MS. MOORE: We're well provided for.

MR. HEIDEMAN: Thank you.

BY MR. SCHWARTZ:

Q Mr. Patton, I may ask you a question that requires you to estimate something. I am entitled to your best estimate. I don't want you to guess,

however.

A I will never guess.

Q Okay. And just as an example, if I ask you how long this table is that we're sitting at, you could give me an estimate of that.

A Sure.

Q But if I ask you how long is the table in my house, that would be a guess because you have no information.

A Yes, sir.

Q Are you on any medication at this time?

A No, I am not.

Q Is there any reason you cannot give your best testimony today?

A No, there is none.

Q Have you reviewed any documents in preparation for this deposition?

A Yes, I have.

Q What documents did you review?

A Just the ones that you've asked me to bring.

Q All right. And that's the packet that your attorney gave us this morning, which is Bates stamped Patton 1 through Patton 215?

A Yes, sir.

Q When did you gather the documents that were

produced this morning?

A As soon as I was notified that I was coming for a deposition, I started going through everything that I had.

MR. SCHWARTZ: I'm going to mark as Exhibit A Defendant's notice to take the deposition of Mr. Thomas Patton.

(The document referred to was marked for identification as Exhibit A.)

BY MR. SCHWARTZ:

Q Have you seen this document before, Mr. Patton?

A Yes, I have.

Q Did you go through the requests for documents Nos. 1 through 15?

A Yes.

Q And did you produce all the documents that you had that were responsive to those requests?

A Yes, I did.

Q Prior to being notified that you were going to be deposed, had you looked for documents relating to this case?

A For many years.

Q Had you found any documents prior to being

notified that you were going to be deposed?

A I don't understand that question.

Q You said earlier I think that you started looking for documents after you were notified that you were going to be deposed.

A Correct.

Q My question is before you were notified that you were going to be deposed, had you looked for documents relating to this case?

A I've looked for them probably over how many years has this case been going on.

Q Had you found any documents before finding these documents that were delivered today?

A Well, if I found any, they would have been sent to my attorney.

Q And had you sent your attorney any documents before handing these documents to him when you arrived in Washington, D.C.?

A I probably have to the best of my recollection.

Q What type of documents did you give your attorney?

A I believe I gave him all the 302s.

Q What is a 302?

A A 302 is when you're being interviewed by

FBI agents.

Q Had you given your attorney any phone records?

A To the best of my recollection, I believe that at one time, we did send the records to the best of my recollection. Is my recollection right? I don't remember.

Q Do you remember giving any other types of records to your attorney before you gave him these records that are here today?

A I believe he could probably answer that better than I can.

Q You don't have any recollection of any other records?

A I believe we gave most of the records up, right, Rich? We gave whatever I had up at that certain time.

Q Well, what type of records did you give your attorney?

A Like 302s and conversations and whatever I had and whatever Ms. Moore asked for.

Q What's your date of birth, sir?

A 2-10-38.

Q Do you recall the first time you had any contact with agents from the FBI's Los Angeles

division?

A Do I remember the dates?

Q Well, do you remember that happening for the first time you had some contact with Los Angeles agents?

A Yes, I had contact with them. They used to pick me up at the airport when I was going out to do a deposition in a grand jury case in San Diego, California. That's the first time I met Mike Wacks and Fred I don't remember his last name. I'm sorry.

Q Do you remember roughly when that was?

A No, I do not.

Q Do you remember the first time that you started actually working with the Los Angeles division of the FBI?

A Well, I did a thing for them even before I was under contract. They had a thing against a person named Moore, and they asked me if I would do it, and I did it.

Q Do you remember the first name of this person, Moore?

A No, I do not.

Q What was the nature of that work?

A It was a Chinese scam, some type of a money laundering scam.

Q Did you work with Mike Wacks on that?
A Yes, I did.
Q Do you remember around when that was?
A No, I do not.
Q But that was before you were under contract?
A That is correct.
Q Did you come out to Los Angeles to do that work?
A Yes, I did.
Q Do you remember any other details about that?
A Well, just that, you know, they wanted me to go in there and discuss stuff with them, and I did it. I did whatever they asked. For all the years since I came over, whatever the FBI ever asked me I did for them.
Q Did you record any conversations with Moore?
A No. They did not want to wire up.
Q Do you remember meeting with someone named [redacted]

[redacted] that correct? Is that what you're stating to me?

Q Well, please don't interpret my questions as being statements. The way the deposition works is I ask the questions. If you don't understand it, you can ask me to clarify. But in this context, I ask the questions and you give the answers or respond to them, okay? Do you recall coming out to Los Angeles to meet with Joe Denti before you were under contract?

A No, I did not. I never did that. I was under contract when I met Joe Denti.

Q Did you know Joe Denti before you had any connection to the Los Angeles division?

A No, I did not. Never heard of him.

Q Do you remember when you were first under contract with the Los Angeles division?

A I believe it was in 1994, to the best of my recollection.

MR. SCHWARTZ: I'll mark as Exhibit B --

THE WITNESS: Could I see that, please?

MR. SCHWARTZ: I'll show it to you in a second. A document entitled "Agreement", and it appears to have your signature of November 11, 1994.

//

(The document referred to was marked for identification as Exhibit B.)

THE WITNESS: That's correct.

BY MR. SCHWARTZ:

Q So your testimony is prior to November 11, 1994, you did not meet with Joe Denti?

A No, I did not.

MR. HEIDEMAN: Excuse me for just one moment. Mr. Patton?

THE WITNESS: Yes.

MR. HEIDEMAN: In answering any question, if you're absolutely sure, then you may answer absolutely sure. If, however, it is possible that a timeline might be off, you can certainly answer whatever is the truth and to the best of your recollection. Do you understand the distinction that I'm making?

THE WITNESS: Yes.

MR. HEIDEMAN: I'm not instructing you how to answer any question, I'm just listening here. You've been asked a direct question, did you meet with this person before a certain date, and you've said no.

THE WITNESS: No.

MR. HEIDEMAN: Thank you.

//

BY MR. SCHWARTZ:

Q Do you remember the circumstances when you first did meet Joe Denti?

A Yes, I do.

Q What were the circumstances?

A We went to a restaurant in L.A. called Matty's.

Q On Melrose Avenue?

A Yes. And that's the first time I met Joe Denti.

Q You sent him a bottle of wine?

A Yes, I did.

Q You were with Scott Garriola at the time?

A Yes. That is correct.

Q And he was an FBI agent?

A Correct. Working with me as an undercover.

Q Right. And he was posing as your nephew, correct?

A That's correct.

Q And you were working undercover as well?

A Yes.

Q You were using the name Tom Piazzi?

A Piazzi.

Q Before you signed this agreement, which is Exhibit B, you had conversations with Michael Wacks

about your willingness to come to Los Angeles to work on this investigation?

A Yes.

Q And you knew that Joe Denti was a subject of the investigation?

A No, I did not.

Q What did you know about the nature of the investigation?

A Just that it was going to be organized crime figures, for me to try to infiltrate with organized crime figures.

Q And your best recollection is that before the date you signed this agreement, you didn't know that Joe Denti was a subject?

A No, I did not.

Q Do you remember negotiating this agreement that's Exhibit B?

A Did I negotiate it?

Q Correct.

A No, I did not negotiate it. It was done by Mike Wacks and Fred I don't know his last name. They did all the negotiations.

Q And Fred is an FBI agent?

A Yes. And there was Stan, Fred, and Mike Wacks that did the negotiations.

Q Now, under this agreement, which is Exhibit B, you were going to get $4,000 a month for services, correct?

A That is correct.

Q And under the agreement, you were required to cooperate fully with the FBI?

A That is correct.

Q And you would get $1,030 per month during the term of the agreement for rental of a vehicle and securing appropriate insurance under paragraph 2?

A Yes.

Q The FBI had arranged for the rental of a vehicle for you, correct?

A That is correct.

Q Do you recall what the rental charge was for this vehicle?

A I believe this is the actual charge, to the best of my recollection.

MR. SCHWARTZ: I'll show you what I'm going to mark as Exhibit C, which is on the letterhead of Enterprise Rent-A-Car Leasing. It's dated November 7, 1994. It actually consists of two November 7, 1994, letters.

//

//

(The document referred to was marked for identification as Exhibit C.)

BY MR. SCHWARTZ:

Q Do you recognize Exhibit C?

A No. This is the first time I've ever seen this.

Q Well, according to paragraph 3, Enterprise was going to charge $1,029.70 a month.

A Correct.

Q For a Lincoln Town Car.

A Mm-hmm.

Q Recall you have to respond verbally as opposed to --

A Yes. To the best of my recollection, I believe it was $1,030.

Q And did you rent a Lincoln Town Car?

A Yes, I did.

Q From Enterprise?

[redacted]

Q Under Exhibit B, which is the Agreement.

A Mm-hmm.

Q You were going to get $320 a month for utilities and phones, correct?

A Yes.

Q And that was to cover the utilities and phones at the apartment in Marina Del Rey that you were living in?

A Yes, but I never got them bills. Them were paid by someone else. I never received the bills. Whoever paid them I have no idea.

Q The agreement at least contemplated that you were going to be paying the bills, correct?

A Yes, that I would be paying the bills, but I never got the bills. The money was taken out of the money that I was supposed to be receiving, and whoever paid it, I have no idea. You'd have to ask someone back there.

Q The FBI was also paying the monthly charge for the apartment, correct?

[redacted]

Q And that, as you said before, was sort of a cover company?

A Correct.

Q But it was not coming out of your pocket?

A No, it was not.

Q And your wife and son were living with you

at that apartment?
A That is correct.
Q Under the agreement, which is Exhibit B, you were to get $300 a month for furniture rental.
A That is correct.
Q And that was to put furniture --
A In the apartment.
Q The one in Marina Del Rey?
A Yes, sir.
Q You were also under the agreement to get $1,600 a month for travel and entertainment expenses incurred in furtherance of investigation-related activities, correct?
A That is correct, and that would cover not only my expenses but Scott Garriola's, too.
Q So, under the agreement, you were to pay for entertainment-related expenses that Scott Garriola incurred?
A Yes, because we worked together.
Q If you turn to the third page of Exhibit B.
A Mm-hmm.
Q Two paragraphs above your signature, it says the representative for the FBI contracting officer for this agreement is Special Agent Michael F. Wacks, correct?

A That is correct.
Q And you understood that he was the representative for the contracting officer?
A Yes.
Q You were never advised that any other agent took over from Mike Wacks as the representative for the contracting officer?
A No.
Q When you were paid under this agreement, Exhibit B, you were paid in cash, correct?
A That is correct.
Q And there would be at least two FBI agents from Los Angeles that would witness the payment?
A Not always.
Q Was there sometimes only one agent?
A Yes.
Q And that would be typically Mike Wacks?
A Mike Wacks or Scott Garriola.
Q And Scott Garriola was also with the Los Angeles division of the FBI?
A That is correct, and I believe he still is.
Q Do you remember the name Andy Stefanak?
A Yes, I do.
Q He was also an FBI Los Angeles agent?
A Yes.

Q On occasion, do you recall if he would make a payment to you under the contract?
A He would come with Mike or with Scottie, but he never handed me the money. Either Scottie or Mike would hand me the money.
Q If you turn to again the last page of Exhibit B, which is the agreement, at the top, it says confidentiality, paragraph 13.
A Mm-hmm.
Q "Mr. Patton will in no way reveal the confidential and sensitive nature of this investigation or identify any undercover FBI agent to any unauthorized personnel persons."
A That is correct.
Q When it says "this investigation," what investigation did you understand this to be referring to?
A To the best of my recollection, it was any investigations we were doing. It was not just one. Any investigations we were doing. When we were [redacted] and some other people, it was not involved. It was mostly involved with kiddie porn and other activities that they were involved in.
[redacted]

A Yes, sir.

[redacted]

A Uh-huh.

Q That's a yes?

A Yes, sir.

Q Were they connected to Joe Denti's organization at all?

A No, they were not.

Q Were they part of La Cosa Nostra?

[redacted] claimed, which there are probably many, many tapes of him claiming, to have contacts with organized crime figures back in the east.

[redacted] trafficking as far as you know?

A No, not to my knowledge.

Q Was he involved in money laundering?

A No, not to my knowledge.

Q When I use the term "La Cosa Nostra", most people would understand that as mafia, Italian mafia, is that correct?

A That is correct in certain circles. In Chicago, it's not called the mafia. It is called the organization.

Q Was Joe Denti connected to a La Cosa Nostra crime family as far as you know?
A Yes, sir.
Q What was the connection?
A I believe he was connected to the Bonanno family.
Q Not the Genovese family?
A I don't believe so. It could be possible, but to the best of my recollection, I believe it was the Bonanno.
Q Let me move to the time after you left Los Angeles.
A Yes, sir.
Q Well, you got to Los Angeles in February of 1996, is that correct?
A That is correct.
Q And in March of 1996, you met with FBI agent Pete McCann and FBI agent John Robertson relating to the Donald Eugene Webb fugitive matter?
A That is correct.
Q And how did that come about?
A Well, I was notified by Chuck Goodwin that they wanted to talk to me about Donald Webb. Donald Webb was on the 10 most wanted list, and he was living in south Florida, and one of our organizations was

hiding him out. Sam Urbano was hiding him out in a condominium in Kendall, Florida.

Q How did Chuck Goodwin learn that you had information about Webb?

A Through conversations that we had.

Q You and Chuck Goodwin?

A Me and Chuck.

Q Do you remember when the conversations took place?

A No, because I had a lot of conversations with Chuck Goodwin. You know, my agreement with the federal government, original agreement, was just to help out just with Miami organized crime, but since I had so much trust in the FBI at that time and still do in a lot of them, that they asked me to help them on a lot of other cases throughout the country, and I agreed to do that.

Q Do you remember was there a large gap of time between the time you talked to Chuck Goodwin about Donald Webb and the time that Pete McCann and John Robertson came down to talk to you about it?

A To the best of my recollection, I can't remember that. That's too many years ago.

Q Did McCann and Robertson come to where you were living at that time?

A No, I met them in Dallas, Texas, because I was supposed to be transferred to Dallas, Texas, from L.A.

Q What do you mean you were "supposed to be transferred"?

A Well, there was some contacts made for me to go to Dallas, Texas, to work undercover for them involving heavy equipment, stolen heavy equipment, and they thought that I would be a good person to infiltrate the company that was doing that.

Q Who is "they?" Who thought that you would be good for that?

A The SAC in Dallas, Texas.

Q Was that Adams?

A Right.

Q Do you remember his first name?

A Not at this present moment I do not.

Q Did you talk to Adams before you moved to the Dallas area?

A I believe Pete McCann talked to him. I didn't talk to him direct.

Q Were you in contact with Pete McCann before you left, before you moved out of Los Angeles?

A Oh, yes.

Q Do you remember when you first were

contacted by Pete McCann?

A Well, I met Pete McCann when I first went to Annapolis, Maryland, because he had the contact to get the rental cars that we would use as undercover cars up in Pennsylvania, so Chuck Goodwin and I would drive up there to pick up the cars, and Pete would always meet us there because he was stationed in New Castle, Pennsylvania.

Q So your recollection is that it was Pete McCann that told you there was some work in Dallas for you?

A Yes.

Q Did you ever talk to any agent in the Dallas division before you moved out to that area?

A Yes, I met with -- I can't think of his name right now. I can't think of his name at this present time. I'm sorry.

Q But it was an agent with the Dallas division?

A Two of them.

Q Do you remember what they looked like?

A Yes. One was a tall, black-haired, middle-aged agent, and the other one was a shorter, older agent.

Q Are these the same two agents that paid you

the $30,000 in November of '96?

A No. When they paid me the $30,000, it was the one agent. Stan I believe was his name if it's coming back to my recollection.

Q Is it Larry Sandri?

A Sandri. That's the name. Larry Sandri. And when he came to give me the $30,000, that was negotiated between Pete McCann and L.A. office.

Q Was Larry Sandri one of the agents you spoke to before November of '96 about doing work for the Dallas division?

A It was not before. I was asked where I wanted to be transferred, and I had very good rapport with Pete McCann and Chuck Goodwin, and they said that Dallas would be a very good area for you because there's a lot of good work there and would you be willing to go there, and I said sure, so then Mike Wacks asked me where would I want to be transferred to, and I said Dallas, and then everything started from there.

Q Did you or your wife have any family in the Dallas area?

A I have a sister that lives in Garland, Texas.

Q And she was living there as of February of

'96?

A Yes.

Q And you ended up moving to Garland, correct?

A That is correct.

Q And getting back now to the two agents, you described one as a tall, black-haired, middle-aged --

A That's Sandri.

Q And the other one was a shorter, older agent. Those were two agents that you had met with to talk about doing work?

A Yes, sir.

Q So you met Sandri at that point?

A Right.

Q And then later in November of '96, he was present when you were paid the $30,000?

A Yes.

Q Do you remember any other conversations with agents from the Dallas division?

A Just while I was there, I would have many conversations with them, dates and everything. That's my recollection. I can't remember.

Q Do you think those are in the records that your attorney delivered today?

A They might be. I'm not sure.

Q Do you remember taking any notes of

conversations that you had with Dallas agents?

A I believe I did. I usually did take notes, a lot of notes, which I was taught by the FBI to do that.

Q And did you keep those notes?

A Yes, I did.

Q And as far as you know, they have not been lost or destroyed?

A No.

Q So you had a face-to-face meeting with these two agents that you described prior to November of '96?

A That is correct. They were more or less picking my brain to see which road to take to infiltrate these people, and I explained what I would have done, how I would have done it.

Q And you said this was relating to stolen heavy equipment?

A Heavy equipment, yes.

Q Was this a --

A Ongoing case.

Q Was it a La Cosa Nostra case?

A No, it was not, not to my knowledge.

Q Was it a drug trafficking case?

A No, it was not.

Q And it was not a money laundering case?
A You'd have to talk to them about that. All I know, it was a stolen heavy equipment.
Q Getting back to the meeting that you had with Pete McCann, do you remember where you met him?
A Yes. I met him in the hotel, and there was him and Fred Robertson and a retired FBI agent named Vinny, which I don't know his last name.
Q And this was to discuss Donald Eugene Webb?
A Right. And Webb's partner, who worked with us in Florida -- what was his name right now -- Latch.
Q Frank Latch?
A Frankie Latch.
Q Do you know what Webb was wanted for?
A Murder. Killing a police officer in Pennsylvania.
Q So it was not a La Cosa Nostra investigation?
A No, it was not.
Q And it wasn't money laundering?
A No.
Q Or drug trafficking?
A No.
Q You were paid $2,500 for your services at that meeting?

A I never knew I was getting paid anything for it. I did it as a favor to Pete McCann and Chuck Goodwin. I was notified later that they were going to send to me for my time spent with them.

MR. HEIDEMAN: Can we take a break, please?

MR. SCHWARTZ: One second.

MR. HEIDEMAN: No, I need to take a break now, please.

MR. SCHWARTZ: I want to ask one more question, please.

MR. HEIDEMAN: I'm sorry. I need to go to the restroom. I need to take a break.

MR. SCHWARTZ: You can hold it for a moment.

MS. MOORE: You have to have another counsel here then.

MR. HEIDEMAN: Counsel, I'm very sorry.

MS. MOORE: I mean, nobody should be leaving.

MR. HEIDEMAN: I'm very sorry. I need to take a break to go to the restroom.

MS. MOORE: Okay. We'll take a five-minute break.

MR. HEIDEMAN: Thank you.

(Whereupon, a short recess was taken.)

MR. SCHWARTZ: Read back the last question.

(Whereupon, the reporter played back the previous question.)

BY MR. SCHWARTZ:

Q Mr. Patton, I think you were saying that you had met with Agents McCann and Robertson --

A Robinson.

Q Robinson. As a favor to McCann and to Chuck Goodwin, correct?

A That is correct.

Q And you had not expected to get paid for that?

A No, I did not.

Q But you were paid $2,500 for that?

A That is correct.

MR. HEIDEMAN: Excuse me. Counsel, you're talking about monies other than under the agreement that is Exhibit B? Monies that he's been paid other than under the agreement, Exhibit B?

MR. SCHWARTZ: I don't understand the question.

MR. HEIDEMAN: You started the deposition by introducing Exhibit A and B and C, and under B, you gave him a copy of the agreement. You asked him some things about the compensation under the agreement. So is your question now are you talking about

compensation he was paid, this $2,500 separate from money paid under the agreement? That's what I'm trying to ask you.

MR. SCHWARTZ: Counsel, I'm not sure why you're asking that. I hope you're not trying to coach the witness.

MR. HEIDEMAN: You know, Mr. Schwartz, I'm a licensed attorney just like you. I'm not coaching anybody. I'm asking a question while we're all here. The witness is here. He flew in special for this. None of us are going to want to have to do this another time. I thought it would be helpful to you if I inquired now.

I certainly could have done it off the record at a future break, but you're at this point. You jumped from the agreement to Dallas to one meeting and this $2,500, and your question was relating to the $2,500 in terms of money paid, and I'm asking you do you not intend to ask about monies paid under the agreement?

MR. SCHWARTZ: I'm still not following your confusion.

MR. HEIDEMAN: Never mind. I withdraw my question.

MS. MOORE: I'm sure he'll get to those

questions if he deems they're necessary.

MR. HEIDEMAN: That's fine. That's fine.

MS. MOORE: I mean, he has his agenda, so you have to respect that.

MR. HEIDEMAN: That's fine. Of course.

(The document referred to was marked for identification as Exhibit D.)

BY MR. SCHWARTZ:

Q I've marked as Exhibit D a document on the letterhead of your attorney, Mr. Heideman, dated April 19, 1999, correct?

A Yes.

Q If you turn to page 11 of that document.

A Yes.

Q In the middle of that page, actually there's a heading for monies paid to and/or owed and/or claimed by Mr. Patton, correct?

A Pardon me?

Q Do you see the heading No. 4? It says monies paid to and/or owed and/or claimed by Mr. Patton.

A Yes.

Q And under C, it says 1994 contract.

A Mm-hmm.

Q And it says Mr. Patton was paid approximately $9,250 per month under this contract from November 24, 1994 until February of 1996. Do you see that?

A Yes, I do.

Q And that's actually a mistake. It should be $7,250, correct?

A Right.

Q The next sentence says Mr. Patton has not been paid under this contract since February 1996 and accordingly is owed approximately $342,250, and then it says $9,250 times 37 months as of the date of this filing plus interest thereon at the legal rate. Do you see that?

A Yes.

Q Is it correct that as of the writing of this letter by your attorney, you had not been paid under the contract since February of 1996?

A That is correct.

MR. SCHWARTZ: I'm going to mark as Exhibit E a declaration of Thomas J. Patton dated October 19, 2001.

(The document referred to was marked for identification as Exhibit E.)

BY MR. SCHWARTZ:

Q Do you recognize that document?

A I do.

Q Do you recall signing it?

A Yes, I do.

Q And you knew it was signed under penalty of perjury?

A Yes.

Q And it's accurate?

MR. HEIDEMAN: Excuse me. With your permission, I'd like Mr. Patton to reread this before answering the question.

MR. SCHWARTZ: That's fine.

MR. HEIDEMAN: Of course, the document speaks for itself on its face, but since you've asked him an additional question about it, I'd like the witness to be able to read it before answering.

MR. SCHWARTZ: Actually, let me strike that. That's a fair point, but let me strike my last question then, because I don't want to take the time to read the whole thing.

MR. HEIDEMAN: Well, he's already on page 2, and it's on the record, and the Judge is going to see the record, and unless you have objections, let's let the man read it so he can then answer questions about

it.

MR. SCHWARTZ: Okay then. Let him read it.

MR. HEIDEMAN: Thank you.

(Pause.)

BY MR. SCHWARTZ:

Q Did you review that document prior to the --

A Yes.

Q Did you review it prior to the deposition?

A No, I did not.

Q Is it accurate?

A I believe it's accurate. To the best of my recollection, it's accurate.

Q Let me ask you a question that's not about that declaration for a moment.

A Okay.

Q You moved out of Los Angeles at the end of February of '96, correct?

A Right.

Q At that time, you were not owed $30,000 under the contract, correct? And when I say "the contract", I mean the 1994 agreement, which is Exhibit B.

MR. HEIDEMAN: Objection to the form of the question.

MR. SCHWARTZ: You can answer.

THE WITNESS: Well, I was told by Michael Wacks that there would be a lump sum given to me at a further date when they got the paperwork done.

BY MR. SCHWARTZ:

Q When did he tell you that?

A He told me that the week before he said that our work was going to be done in L.A.

Q Now he did tell you orally that your services were no longer needed in Los Angeles, correct?

A Orally, right. And I kept asking him, I needed it in writing. According to my contract, it says that all parties will hereby acknowledge that they have read, understood and will abide by the foregoing statement, and it says that, you know, because I've had this contact before in Annapolis. They would, you know, give me a copy to say the contract was terminated.

I asked for it many, many times to Mike Wacks before I left there, and he said we're working on it, we're working on it, but it's best that we don't do it because we can just transfer it to Dallas, and they won't have to wait six to eight months for Washington to approve it.

Q And you had this conversation about a week

before you left?

A Yes.

Q Why did you ask for the termination in writing?

A Because it says in your contract that's how it's supposed to be done. See, that was probably my biggest fault is I put too much trust in the FBI agents and found out that they're not all very trustworthy.

Q And your recollection is that Michael Wacks also told you you would get a $30,000 lump sum at some point?

A Yes.

Q Was that an oral agreement that you had with him?

A It was his statement to me. It was not an oral agreement. I didn't agree to the amount. It's up to them to come up with the amount. He said that's what he would put in for.

MR. SCHWARTZ: I'm going to mark as the next in order a July 14, 1999, letter from your attorney, Mr. Heideman.

(The document referred to was marked for identification as Exhibit F.)

BY MR. SCHWARTZ:

Q If you see on the bottom, there are numbers starting with 43.

A Yes.

Q If you would turn to page 47. By the way, do you recall having seen this document before?

A I probably have.

Q If you look towards the middle of that page, there's a paragraph that starts, "The last payment of any kind...". Do you see that?

A Yes.

Q It says, "The last payment of any kind received by Mr. Patton was for $30,000 in November 1996, attached hereto as Exhibit D and incorporated by reference. This lump sum, however, was negotiated by Mr. Patton and S.A. Pete McCann for services rendered in L.A., and it does not relate to the 1994 contract." Do you see that?

A Yes, I see it.

Q Do you agree with that statement?

A Well, it wasn't me and Pete McCann. It was between Pete McCann, Bill Esposito, who was deputy director of the FBI, and the Los Angeles office.

Q Were you involved in the negotiation?

A No, I was not.

Q So then this statement in your attorney's letter is not accurate?

A Well, it's accurate to a point. I believe it's accurate.

Q Well, just focusing on the part that says that it was negotiated by you and Pete McCann.

MR. HEIDEMAN: Excuse me. Specifically which page of this exhibit?

THE WITNESS: Forty-seven.

MR. HEIDEMAN: And which line, counsel, since you're inquiring about whether something I submitted was accurate or inaccurate?

MR. SCHWARTZ: It's the paragraph that starts, "The last payment of any kind...".

MR. HEIDEMAN: Yes, in III, last paragraph.

MR. SCHWARTZ: Right.

MR. HEIDEMAN: All right. I'm with you.

BY MR. SCHWARTZ:

Q And then my question now is the part where it says that the lump sum was negotiated by Mr. Patton and Pete McCann, that's not accurate. Correct, Mr. Patton?

A No. Negotiating, the word "negotiating" is very confusing to me the way that you are putting it, okay? I disagree with the way that you are trying to

put it across. It was discussed between Pete McCann and me. I did not negotiate it, which this statement in my thinking was is what Mike Wacks told me that he was trying to get from the L.A. office, and that's where I say in here Mr. Patton and Pete McCann. Mike told me Pete McCann would make the request for me, and he had many conversations with Mike Wacks, and Mike Wacks agreed to that statement.

Q Let me now ask you to turn to your declaration, which is Exhibit E.

A Okay.

Q If you look on the page that you're at now, paragraph 27.

A Okay.

Q It says, "While I was in Dallas, I negotiated and received a single lump sum payment for $30,000 as a final payment for the services I provided the agency in Los Angeles."

A That is correct.

Q And you would agree with that statement?

A Yes.

Q Before, I think you said that you had talked to Michael Wacks about the $30,000 before you left Los Angeles.

A Left Los Angeles. That is correct. He

brought that to me.

Q So when it says, "While I was in Dallas, I negotiated and received a single lump sum payment," is it correct that you were in Dallas when you negotiated and received it?

A I received it in Dallas, but I didn't negotiate it in Dallas. I was told that was what I was going to get. I did none of the negotiations. That was all done between Pete McCann, Bill Esposito, and the Los Angeles office.

Q Did you have a conversation with Bill Esposito about it?

A Many conversations.

Q Do you remember talking to an agent named Clyde Merryman about it?

A Yes, I did.

Q And at one point, you had a conversation with both of them at the same time?

A You mean on a conference call-type thing?

Q Right.

A No, I don't believe there was a conference call. To the best of my recollection, I don't believe so.

Q These discussions that you had about the $30,000, they were before the $30,000 was actually

paid in November, correct?

A That is correct.

Q And if you turn to paragraph 35 of your declaration.

A Mm-hmm.

Q That says, "It was not until April 1996 when I began to attempt to recover my personal possessions from storage that I learned that the FBI was denying its obligations for the promises made by SA Leahy and SA Irby and that it was refusing to continue to honor my 1994 contract."

A That is correct.

Q And when you refer to "my 1994 contract" in your declaration, you were referring to Exhibit B, which was the agreement that you signed November 11, '94, correct?

A Well, that was a misstatement, and it should have said the 1991 contract, the written agreement in 1991 that ran through August of 1993.

Q So your declaration is inaccurate?

A It's accurate, but the date is not accurate.

Q Well, you had a 1994 contract, correct?

A Yes. But that had nothing to do with Miami or my source. They had nothing to do with that. That was strictly Miami's office, which you do have a

letter where he took it over. Leahy took my stuff over, put his own locks on there and everything else.

Q And that wasn't part of your 1991 contract with Miami, was it?

A It was his verbal contract. It was never put in writing, which a lot of things the FBI does not put in writing, which you know. It's a lot of verbal. We'll do this for you. You do this for us, we'll do this for you. That's their way of doing business.

Q Right. But just focusing on what's in your declaration in paragraph 35.

A Mm-hmm.

Q Because you earlier went through your declaration and you said it was accurate, correct?

A Mm-hmm.

Q Is that correct?

A Right. The only thing I'm disputing on here is that what you're trying to put across is where I'm saying that it was the 1994 contract. That's what I'm getting out of you, is that correct? Where Leahy and Irby and that is refusing to continue to honor the '94 contract. They had nothing to do with the '94 contract. That was California. So the date there is wrong.

Q Well, when you signed this declaration, you

reviewed it carefully, correct?

A To the best of my knowledge, I did. I'm not an attorney.

Q And you think now that it should say 1991 contract?

A That is right.

Q Your 1991 contract was with the Miami division, correct?

A Right. And then it was transferred to the Annapolis office.

Q And paragraph 35 talks about your attempt to recover personal possessions from storage?

A Mm-hmm.

Q That pertains to an oral agreement that you had, that you claimed you had with Agent Leahy, correct?

A It's not an oral agreement, sir. It's in writing where he takes it over, and you have a copy of it.

Q Do you think that's what your 1991 contract was? Is that what you're referring to as the 1991 contract?

A Right. You're trying to cross strings here, and I'm not understanding you, and I think I'm going to take a break right now.

Q That's fine.
A Because you are getting to a point where you're mixing words.
MR. SCHWARTZ: Is five minutes okay?
THE WITNESS: That's fine.
MR. SCHWARTZ: Okay.
MR. HEIDEMAN: We're in recess by agreement.
(Whereupon, a short recess was taken.)
BY MR. SCHWARTZ:
Q Mr. Patton, when you were in Los Angeles working under the 1994 agreement --
A Yes, sir.
Q You were paid on a monthly basis, correct?
A Correct.
Q And you were paid timely, correct?
A Well, it wasn't always timely. There would be days when, you know, they'd be busy and they'd meet me the following day, you know, but I got it every month.
Q Right. Do you agree with the statement on page 47 of Exhibit F, which we were just looking at, that the $30,000 payment does not relate to the 1994 contract? Do you see where I am?
A No, I don't. The last payment?
Q Right. That paragraph, the second sentence

in that paragraph. It says the lump sum was negotiated by you and Agent McCann for services rendered in L.A., and then the last part says, "and it does not relate to the 1994 contract." Do you agree that the $30,000 payment did not relate to the 1994 contract?

A No, I think it does relate to the '94 contract.

Q Now, prior to receiving that payment in November of 1996, you had discussions with FBI officials about the fact that you had not been receiving your monthly payment under the 1994 agreement, correct?

A I don't understand the question.

Q I'll try to rephrase it.

MR. HEIDEMAN: Excuse me. Can we go off the record?

(Discussion held off the record.)

MR. HEIDEMAN: Could you repeat the question? Because I didn't hear it. I'm sorry.

MR. SCHWARTZ: There is no question pending.

BY MR. SCHWARTZ:

Q In November of 1996, you received a $30,000 payment, correct?

A That is correct.

Q Before that time, you were aware that the FBI had not been making the normal monthly payment under the 1994 agreement, correct?
A That is correct.
Q And you talked to FBI officials about that?
A Right.
Q And you were unhappy with that?
A I was very unhappy about it.
Q Who did you talk to about that?
A Esposito.
Q Anybody else?
A Cordes, Divers.
Q When you say "Cordes," that's Jack Cordes?
A Yes.
Q And you spoke with him directly?
A Yes.
Q Who was the other person you mentioned?
A Divers.
Q Neil Divers?
A Neil Divers.
Q You spoke to him directly about it?
A Right.
Q Do you remember what Esposito had to say about that?
A Esposito said he was looking into it.

Q Do you remember what Jack Cordes said about it?
A They were all looking into it. It came down. He was deputy director at the time, Esposito. And see, when I was in Maryland, he was the SAC in Maryland and he was the SAC in San Diego, and his wife was an agent there at that time. She was pregnant at the time. I mean, Esposito and I have a long ways, a long period of time of being involved in cases.
Q Did you speak to any other agents about it that you recall?
A Yes. Pete McCann, Chuck Goodwin.
Q To switch gears a little bit, when you were working with Pete McCann in connection with the Donald Eugene Webb matter --
A Mm-hmm.
Q You found out that your personal possessions that had been in storage in the Miami area had been lost, correct?
A That is correct. And how that came about is --
Q Well, let me just ask the questions.
A Okay.
Q You were very upset about that naturally.
A Very upset. Still am to this day.

Q And you complained to Pete McCann about that?

A Yes, I did, and then Mr. Esposito and everybody else that I could reach out to.

Q And that was approximately April of 1996, correct?

A Approximately. I don't know the exact date. It should be somewhere where I found out about it.

Q And at that point, you also complained about the fact that you hadn't been getting your monthly payment under the contract?

A That is correct.

Q And you understood that it was the FBI's position that the contract had been terminated orally, correct?

A I never had that under -- no one told me orally that it was terminated.

Q Mike Wacks didn't tell you the contract was terminated?

A Never. Never.

Q Scott Garriola didn't tell you the contract was terminated?

A Never.

Q When you received the $30,000 --

A Mm-hmm.

Q You signed a receipt, correct?

A That is correct.

Q Let me back up. Did you talk to Michael Wacks about not having received the monthly payment?

A Yes.

Q What did Mike Wacks say about it?

A He just said it's out of his hands.

Q Did he say anything else about it?

A No.

Q Did you understand what he meant when he said it was "out of his hands"?

A No, I did not.

Q And you didn't ask him to explain that?

A No.

MR. SCHWARTZ: I'll mark as Exhibit G the receipt dated November 14, '96.

(The document referred to was marked for identification as Exhibit G.)

BY MR. SCHWARTZ:

Q That's the receipt you signed when you got the $30,000, correct?

A That is correct.

Q And it states, "I acknowledge receipt of $30,000, which represents full and final payment for

services rendered," correct?

A Right.

Q And what did you understand by the phrase "full and final payment for services rendered?"

A For the L.A. office. L.A. office, that Mike Wacks promised me the $30,000.

Q Now it doesn't say that obviously, correct?

A No.

Q But you had an understanding that was different from what the words of the receipt said, correct?

A That is correct. And I questioned it at the time, and they said no, this is just the money that they give you to go forward.

Q Who said that?

A Sandri.

Q Didn't Sandri tell you that from the FBI's point of view that this was the last payment you were going to be getting?

A No, he never told me that.

Q Now, at this point in time, this is November of 1996?

A Correct.

Q You were aware that that personal property storage in Miami had been lost, correct?

A I don't know the exact date when I found out that it was.
Q If you look at your declaration, paragraph 35 of your declaration. Paragraph 35.
A Paragraph 35?
Q Right.
A It wasn't until April of 1996.
Q Right.
A That's when I found out my stuff was gone.
Q Right. And November of 1996 when you received the $30,000.
A Mm-hmm.
Q You were obviously aware that the property had been lost?
A Yes, and very unhappy about it.
Q Right. You also were claiming that you had been promised a lump sum by the Miami division of $150,000, correct?
A That is correct.
Q And by signing this receipt, you did not mean to be giving up your claim about the $150,000 lump sum from Miami?
A No.
Q And you were not intending to give up your claim about your personal property, correct?

A No.
Q It's not correct?
A It is correct. I was not giving up anything.
Q And those two points, the storage facility property and the $150,000 lump sum --
A Mm-hmm. Correct.
Q Those were issues in your mind?
A And plus my contract with the L.A. office.
Q I want to make sure the record is clear, so please let me finish my question before you answer. At the time you signed the receipt on November 14, '96, you had a claim about your personal property in storage and a claim about the $150,000 lump sum, correct?
A I don't believe we had a claim. I don't believe I hired an attorney. I was negotiating with Esposito and Washington, D.C., directly at that time.
Q So it was not a formal claim at that point?
A No, it was not a formal claim.
Q But those were two issues that you were concerned about and you wanted to get reimbursed or paid by the FBI, correct?
A That is correct.
Q And by signing this receipt, you did not

intend to give up your rights on those two issues, correct?

A No, I was not giving up any rights.

Q You were not giving up your claims about the storage property or --

A The lump sum.

Q The lump sum.

A Or the contract, the '94 contract.

Q What did the term "final payment" mean to you, if anything, in the receipt?

A Well, the way I knew about this $30,000 is I was notified by Pete McCann that they were negotiating, Bill Esposito, Pete McCann and whoever was -- I think it was Tim McNally was the SAC out there at that time I think to the best of my recollection. I think he became the SAC at that time. That was negotiated between them, and then they told me what I was going to receive, and someone from Dallas would contact me, and that's who contacted me is these two.

Sandri contacted me, and then both of them came to my house with the $30,000. So this in my eyes did not represent the contract or the oral agreement by Irby and Leahy or on the storage and the $150,000. This has nothing to do with that. This is just what

they were supposed to give me, which you know that Annapolis gave me $25,000 when I left there, and I was there, you know.

Q And that was after the contract was terminated, right?

A That is correct. And there's a receipt signed to that, too.

Q Do you have a copy of that? Is that in the packet of information that you gave to your attorney that your attorney gave to us?

A Yes.

MS. EISEN: I don't believe it is in the packet. I think it's been attached to prior pleadings, but I can double-check if we received it.

MR. HEIDEMAN: What's the date of the document you're referring to, Mr. Schwartz?

MR. SCHWARTZ: I don't know. Mr. Patton referred to a receipt he said he received I guess when he was paid by Baltimore. That's okay. We can move on. We can talk about that later.

MR. HEIDEMAN: Okay. But while we're at this point, Ms. Eisen appropriately made a comment that I just want to address since at the beginning of the deposition there were some discussions about document turnover, and, Ms. Moore, my recollection is

that there were certain documents attached to various pleadings, plus my recollection was that there was an exchange of documentation between you and Ms. Kalik, I think, I think if I remember correctly early in the case. We don't need to spend time on this now.

MR. SCHWARTZ: Yes, let's talk about this --

MR. HEIDEMAN: I just want to make sure. I mean, there was an implication that somebody said we'd never given you anything, and I think that that's --

MS. MOORE: Yes, it is my recollection. I don't want to get into an argument.

MR. HEIDEMAN: Of course.

MS. MOORE: But just to clarify what I said before or confirm actually. Yes, there might have been documents attached to pleadings, but thereafter, we requested by many letters additional documents, which I never got any documents in response to any of the letters.

MR. HEIDEMAN: Okay. Well, we're going to go back after the depo, because --

MS. MOORE: If you find something that you sent me, give me a cover letter or a copy of it with the documents.

MR. HEIDEMAN: Fine. Of course, we will.

MS. MOORE: But I didn't get anything until

today.

MR. HEIDEMAN: Thank you. We'll address that afterward right away.

MS. MOORE: Okay.

BY MR. SCHWARTZ:

Q Okay. Do you know how the $30,000 figure came about?

A No, I do not.

Q As of the date that you received the $30,000 --

A Mm-hmm.

Q You were not working on any matters with the FBI, correct?

A No, I was -- reask me that question, please?

Q At the time you received the $30,000 --

A Mm-hmm.

Q You were not working on any matters with the FBI?

A No, I was not.

Q And you moved from Garland, Texas, shortly after receiving that money, correct?

A That's correct.

Q Where did you move to?

A To Niceville, Florida.

Q How did you decide to move to Niceville?

A Just, you know, we always liked Florida, so I moved there.

Q The FBI did not tell you to go to Niceville, correct?

A No, they did not.

Q They had nothing to do with that?

A No.

Q Did you tell Mike Wacks that you had moved to Niceville?

A Yes.

Q When did you tell him?

A Probably before I even moved.

Q How did you tell him?

A Over the phone.

Q Do you have notes of that conversation?

A Yes, there probably is in there.

Q Sorry. Did you finish your answer?

A Yes.

Q So if you had a conversation with him about the move, would it be in the notes that your attorneys provided?

A It's probably in the notes, yes. To the best of my recollection, it's probably in there.

Q If it's not in the notes, would that indicate to you that you did not have that

conversation?

A No.

Q Did you take notes pretty diligently when you had conversations with FBI agents?

A A biggest percentage, but not 100 percent.

Q Did you notify anybody else in the FBI that you were moving to Niceville?

A Pete McCann and Chuck Goodwin and John Donahue, because they always knew where I was in case they needed me for anything.

Q When you spoke to Mike Wacks, what information did you give him about your move?

A Just that I was moving. There was no information I would have to give him other than moving so he would be able to contact me if he needs me for anything.

Q Did you give him a phone number?

A Yes.

Q Did you give him an address?

A Yes.

Q How long did you live in Niceville for?

A I believe three years.

Q And where did you move next?

A Tucson, Arizona.

Q Why did you decide to move to Tucson?

A For my wife's health.
Q So your move to Tucson had nothing to do with the FBI, correct?
A No.
Q Is that correct?
A That is correct.
MR. HEIDEMAN: Excuse me. I'm going to object to the form of the question only because you've said "had nothing to do with the FBI."
BY MR. SCHWARTZ:
Q The FBI did not ask you to move to Tucson, correct?
A No, they did not.
Q Who did you notify, if anybody, in the FBI that you had moved to Tucson?
A Probably Chuck Goodwin, Pete McCann, John Donahue.
Q Anybody else?
A To the best of my recollection, no.
Q You had a meeting in Baltimore in 1999 concerning an alleged threat against FBI agent Joe Pistone, correct?
A That is correct.
Q And that came about because you overheard a conversation in a restaurant?

A In a restaurant, right.
Q Where was that restaurant?
A It was in Destin, Florida, which is, you know, right over the bridge from Niceville in Destin, Florida.
Q And you contacted John Donahue about that?
A Yes, I did.
Q He was retired at the time?
A Yes.
Q And then at least as far as you know, he then contacted other FBI agents, correct?
A To the best of my knowledge, yes.
Q John Donahue was deposed in this matter, in this lawsuit, correct? Do you remember being on the telephone when John Donahue gave a deposition?
A Before that?
Q No, I'm talking about within the last couple of years in connection with this lawsuit that John Donahue gave a deposition?
A Yes. To my understanding, yes, he did do that.
Q Do you remember you were on the phone at the time?
A That is correct.
Q Do you recall him testifying that you had a

lot of concern about who you're going to work with in the FBI in connection with this Joe Pistone matter?

A Right. When I went up to Baltimore to meet in Baltimore with the agents in Baltimore about this situation, they asked me who would I like to work with, and I said Mark Tillio, who is an FBI agent who I worked with before in Annapolis, and I brought him out to California on cases that he worked with agents out in California.

Q Do you remember you had asked John Donahue not to reveal your identity for the meeting?

A Yes.

Q And that was because you had concern about who you were going to work with, correct?

A That is correct.

Q And you didn't want to meet any other agents without John Donahue being present, correct?

A That is right.

Q John Donahue said at his deposition that you came to that meeting voluntarily, is that correct?

A That is correct.

Q You were paid for your expenses?

A I was paid strictly just for a ticket.

Q Does $1,325 ring a bell?

A Yes.

Q That's what you were paid?
A Right.
Q And at that meeting, you offered to perform services for the FBI, including wearing a wire in exchange for entering into a new agreement with the FBI?
A I never said anything about a new agreement. I said I'm still under contract. I'd be willing to take whoever you want, but I asked for Mark to be the agent, which they all knew who he is, to come down, and I'd be able to introduce him to the people in the restaurant.
Q Mark was not actually at the meeting, correct?
A No, he was not.
Q Do you know why that is?
A I have no idea.
Q The agents who were at that meeting asked you to take a polygraph, correct?
A Right. I agreed to do it.
Q You agreed to do it?
A Yes.
Q Do you remember John Donahue testifying at his deposition that he recommended that you not do it?
A Right. I agreed to do it, and John Donahue

told me no, you're not going to do it.

Q And then didn't you have a conversation with your lawyer after the meeting, and then you contacted the agents and said you were not going to give a polygraph?

MR. HEIDEMAN: Excuse me just one second. I'm going to instruct you that anything at any time you ever discussed with me or any other attorney who represented you is covered by the attorney/client privilege. I'm instructing you not to waive that privilege, although it's yours to waive, but I don't want there to be an unintentional waiver.

So I'm instructing you that anything you've ever discussed with me or any other attorney is covered by the attorney/client privilege, and therefore, without further discussing that with me out of the presence of opposing counsel and off the record, I believe you should not answer any question that relates to communications you've had with any of your attorneys, including, but not limited to, me or members of our law firm.

So any question that's asked, including the last one, that you desire to answer, let's be sure we take a break so that you answer properly and that there is no unintentional waiver of the

attorney/client privilege. Do you understand?

THE WITNESS: Now I understand.

MR. HEIDEMAN: Thank you.

BY MR. SCHWARTZ:

Q I don't want to know what you talked about with your attorney, but do you recall having a conversation with your attorney after being asked to take a polygraph?

A I'd rather go outside and ask my attorney how I should answer that.

Q Well, unless your attorney instructs you not to answer. I'm not asking you what you talked about with your attorney. I'm just asking you if you did talk to your attorney.

MR. HEIDEMAN: The nature of the particular question, Mr. Schwartz, as tied to this particular sequence can only lead to him answering questions did he consult with his attorneys and essentially you getting at whatever his attorney may have told him without you having any idea either what the attorney told him or whether the conversation took place, but it would lead to some inferences that may not be at all relevant to this case or may not be accurate.

For example, you have no idea if any particular lawyer might have a policy in relation to

polygraph examinations, or you might have no idea whether or not since you've already had testimony on the record about an FBI agent, although retired, advising the witness that he shouldn't give an exam whether or not that was a factor, so if you can try to withdraw and rephrase your question.

MR. SCHWARTZ: I'm going to do that.

MR. HEIDEMAN: Assuming you need to press this.

MR. SCHWARTZ: That's fine.

MR. HEIDEMAN: But I don't want there to be any waiver, and I'd ask you to be very careful and therefore rephrase before proceeding.

MR. SCHWARTZ: That's fine.

MR. HEIDEMAN: Thank you.

BY MR. SCHWARTZ:

Q You said earlier that you initially agreed to give a polygraph, correct?

A That is correct.

Q At some point, did you change your mind about that?

A John Donahue changed my mind.

Q And you changed your --

A I took his advice.

Q And then you said you would not give a

polygraph?

A I did not say I would not. I said I am taking John Donahue's advice and not to take a polygraph.

Q And that's what you told the agents that you had met with in Baltimore?

A That is correct.

MR. HEIDEMAN: But so the record is clear, I think I would have no objection if you chose to ask him did he confer with counsel at any time about that issue, because I know the answer to that. So if you choose to ask him if he conferred without getting into what was discussed with counsel or what the advice was, I'm sure he would be glad to answer that question if you choose to ask it.

MR. SCHWARTZ: Thank you for the offer.

MR. HEIDEMAN: Thank you.

BY MR. SCHWARTZ:

Q Under the agreement, which is Exhibit B, if you look at the first page, paragraph 3.

A Which one did you say? B?

Q B, which is the agreement, 1994 agreement.

A Okay.

Q Look at the first page of that. In paragraph 3, it indicates that it's your

responsibility to report the monies you were being given by the FBI on your taxes, correct?

MR. HEIDEMAN: I'm going to object. The document speaks for itself.

MR. SCHWARTZ: You can answer that.

THE WITNESS: I don't know what this tax thing has to do with our deposition. This is what we were contracting. It has nothing to do with my taxes.

BY MR. SCHWARTZ:

Q Sir, did you report the money you received on your tax return?

MR. HEIDEMAN: Excuse me. Let me interrupt and object. As the witness just said and as is implied from his answer and my objection, Exhibit B was introduced, it has paragraph 3, it says whatever it says. We can all read it into the record, but it's in the record. The witness objects to any questions regarding his tax filing.

MR. SCHWARTZ: Are you instructing him not to answer?

MR. HEIDEMAN: I'm waiting for your next question.

MR. SCHWARTZ: Well, the witness needs to answer the question.

MR. HEIDEMAN: Please repeat the question.

BY MR. SCHWARTZ:

Q Sir, did you report --

MS. MOORE: Did he file tax returns.

MR. SCHWARTZ: Okay.

BY MR. SCHWARTZ:

Q Did you file any tax returns where you reported the money you received from the FBI?

MR. HEIDEMAN: I'm going to object, and yes, I am objecting.

MR. SCHWARTZ: Sir, you need to answer the question.

THE WITNESS: I'm listening to my attorney.

MR. SCHWARTZ: Your attorney made an objection, but unless he instructs you not to answer, you need to answer the question.

THE WITNESS: I will take my Fifth Amendment.

MR. SCHWARTZ: Okay.

BY MR. SCHWARTZ:

Q Did you understand the contract to require you to report the monies you were receiving from the FBI on your taxes?

A The only thing that I can say about that that might ease your mind is that I asked many times for 1099s. Since I was supposedly an employee for

[redacted] they refused to give me one. They said you have to do that on your own. And I would never have filed unlawfully or any other way, because I was waiting for the Bureau to give me and which I believe that's how it was supposed to have been done.

Q Who did you talk to about that?

A Michael Wacks.

Q Anybody else?

A Scott Garriola.

Q So you asked Michael Wacks and Scott Garriola for 1099 forms?

A Yes, I did.

Q And that was so you could report them on your taxes?

A Correct.

Q And just to be clear, in response to an earlier question, I think you said you're going to assert the Fifth or taking the Fifth. I just want to clarify, that means you're refusing to respond based on your rights under the Fifth Amendment to the Constitution? Is that what you meant?

A That is correct.

MR. HEIDEMAN: And that's specifically as to

your singular question as to his filing of tax returns. That's the only question you've asked about that issue at this time.

BY MR. SCHWARTZ:

Q Just to make sure I cover what I intended to cover, did you report the monies you were receiving from the FBI under the 1994 agreement on your taxes?

MR. HEIDEMAN: Same objection, and let that be continuing.

BY MR. SCHWARTZ:

Q Are you going to answer that, or are you going to assert your rights under the Fifth Amendment?

A I'm going to assert my rights under the Fifth Amendment.

Q When you moved from Los Angeles to Garland, Texas, you tried to find work with the Dallas division, correct?

A Yes.

Q At some point in time, you came to learn that someone in the Los Angeles division had bad-mouthed you?

A That is correct.

Q How did you learn that?

A From Pete McCann. He told me that I was being bad-mouthed out of L.A.

Q Did Pete McCann indicate how he knew that?

A No, he did not.

Q Did you understand that it was Michael Wacks that had bad-mouthed you?

A No, I do not, no.

Q As far as you knew, had somebody spoken to Adams, who was in charge of the Dallas division, about you?

A I have no idea.

Q Do you know who in the Dallas division was on the receiving end of this bad-mouthing?

A No, I do not.

Q But the bottom line is that you were not able to find any work with the Dallas division, correct?

A That is correct.

Q Were you upset when you were told by Pete McCann that you had been bad-mouthed?

A Yes, because I thought I did a very good job out there. They were just too lazy to do the work that Scott Garriola and I did. They didn't want to do the paperwork. We did a lot of cases that should have been put in -- other than the Denti case and the Ori case, there should have been a lot more, but they didn't want to do the paperwork on it. It was too

much work for them.

Q When you say "they," are you talking about Michael Wacks mainly?

A That's correct, because he's the contact officer.

Q Right. Were you unhappy with Michael Wacks after you had moved out of Los Angeles?

A No, I'm still not unhappy with him. I gave him a gift for his wedding, so he must have been --

Q Do you remember when that was?

A It was while I was out there. I don't remember the day he got married.

Q Do you remember talking to Chuck Goodwin also about the fact you were unhappy having been bad-mouthed to the Dallas division?

A Yes. I probably told Esposito that, too. I probably told every FBI agent I know that I was unhappy that someone was bad-mouthing, because I was never bad-mouthed by any office I ever worked in. I was always praised for the work that I did, which is in my Rule 35. Read it.

Q You're still on terms with Chuck Goodwin, correct?

A Yes.

Q You don't have any reason to think he would

lie about you, correct?

A No, I don't think he would ever lie about me.

Q The same with Pete McCann?

A The same with Pete McCann.

Q Since you moved out of Los Angeles in February of 1996, I want to find out what kind of work you've done unrelated to the FBI.

A I haven't done any.

Q So you've been out of work since February of 1996?

A That is correct.

Q Do you have any source of income?

A Just my family helping us. And I have social security.

Q The monies you had been receiving under the 1994 agreement, which was $7,250 a month, that was a significant amount of money to you, correct?

A No, it was not to me. Not being in the business I was before I came over. That was pennies to me. I'd spend that for lunch. That was not a lot of money to me.

Q Well, at the time that you were working under the 1994 agreement with the Los Angeles division --

A It was fair.
Q Did you have any other income at that time?
A No, I did not.
Q So the $7,250 a month was all the income you had?
A That's it.
Q Was your wife working at the time?
A No.
Q So you were relying on that income for your daily expenses, correct?
A While I was in L.A.?
Q Correct.
A Yes.
Q And after you moved from Los Angeles and the payments stopped, that was a significant issue for you because you no longer had any income, correct?
A That is correct. But that has nothing to do with why I filed the suit against the FBI. It's because they did not do what they said they were going to do.
Q Let me just get back to where you've lived, and we went through some of that before. I think you said you lived in the Destin area for about three years?
A Right. Approximately three years.

Q All right. So you moved around late November of '96.

A Mm-hmm.

Q From Garland to Niceville.

A Right.

Q And then you think about three years later you moved out of Niceville to?

A Right. Gainesville, Florida.

Q Did you move to Arizona first, or you moved first to Gainesville?

A No, I came from Gainesville to -- I mean -- I'm sorry. From Niceville to Tucson.

Q Okay. So around --

A I don't remember.

Q August of '99. Does that sound about right?

A I don't remember the date, sir.

Q How long did you live in the Tucson area?

A Three years.

Q And then where did you move to?

A To Cottage Grove, Oregon.

MR. HEIDEMAN: Excuse me. I think there's some confusion. What about Gainesville? Because that was part of a question.

THE WITNESS: I moved from Gainesville. I'm sorry. How that came up, when I left Annapolis, I

moved to Gainesville, Florida.

MR. SCHWARTZ: Okay.

THE WITNESS: To help my daughter so she could finish college. She had two children, so we went and moved down there to help her.

BY MR. SCHWARTZ:

Q And you were living in Gainesville at the time, and then you moved to Los Angeles to work on a case?

A That is correct.

Q When you moved to Cottage Grove, Oregon --

A Right.

Q That was not at the FBI's request, correct?

A No.

Q Why did you move to Cottage Grove?

A Because my daughter and grandchildren were up there.

Q And did you notify anybody in the FBI that you had moved to Cottage Grove?

A Yes, I did. I notified Chuck Goodwin, Pete McCann, John Donahue, because we would be sending birthday cards and Christmas cards. We've always had a good rapport.

Q Anybody else that you notified?

A Yes. I sent Christmas cards to Scott

Garriola, and he would send pictures of his sons and stuff. I mean, I had a good rapport with everybody.

Q Let me back up a little bit. When you were living in Garland, were you using the name Tom Patton at the time?

A Yes.

Q You were not using the name Tom Piazzi?

A No.

Q Did you give up any job opportunities after you moved from Los Angeles because you thought you were under contract with the FBI?

A That is correct.

Q What job opportunities did you give up?

A What do you mean by "job opportunities"?

Q In other words --

A I could not get a job because of my record.

Q When you say your "record," you mean your criminal record?

A Right. I went out and tried to get jobs, and when they asked you if you've ever been arrested, I'm not going to lie. I'm not going to lie on anything.

Q What type of jobs did you try to get?

A Selling cars or, you know, used car lots, new car lots.

Q I'm going to get back to a question I asked a second ago. Your position in the lawsuit is that the contract with the Los Angeles division, the 1994 agreement, was not properly terminated, correct?

A That is correct.

Q Because it was not terminated in writing?

A Because that's what it says.

Q My question is now did you give up any opportunities you had for other jobs because you were relying on the fact that you believed that 1994 agreement was still in effect?

A No, I did not give up any opportunities for any other jobs.

MR. HEIDEMAN: I'm going to object to the form of the question because he's already said he couldn't get another job because of his criminal record.

BY MR. SCHWARTZ:

Q Other than the meetings you had in the Dallas area with Pete McCann on the Webb matter and the meeting you had in Baltimore in 1999 on the Joe Pistone matter --

A Mm-hmm.

Q Did you do any other work for the FBI after you moved out of Los Angeles?

A Yes, I did that thing for Chuck Goodwin and the Chicago office trying to find -- and that was in 2002 -- in trying to --

THE WITNESS: Is that right there? Do you have that there?

MR. HEIDEMAN: Which one?

THE WITNESS: The thing that Chuck Goodwin e-mailed me?

MS. EISEN: It's in the package I believe.

MR. HEIDEMAN: It's in the packet. It's one of the top pages. Maybe two or three or four.

BY MR. SCHWARTZ:

Q Can you tell me what it is you did for Chuck Goodwin in 2002?

A Well, Chuck Goodwin called me up in the morning and said we got a phone call from an FBI agent in Chicago that a most wanted person was down in the Tucson area. Do I think that I could try to locate him in the area? I said well, Chuck, I'll do what I can. I said, you know, I do know who the guy is. Why don't you, you know, fax me his picture, because it's been many years since I've been in Chicago, so he faxed me the picture, and it's right there in the record.

And then I went looking for him from Tucson

all the way to Scottsdale. I spotted him one time in November I believe it was. Okay. Just a second.

THE WITNESS: Is the phone thing in here when I called him?

MS. MOORE: Do you have a separate copy for him? Okay. You might want to show him that.

THE WITNESS: On November 5, I called Chuck Goodwin at his office in Cincinnati, Ohio, and told him that I spotted him at a place called Rocky's Restaurant. He was in a green El Dorado, and Chuck said okay, I will forward this on further, and that was it.

BY MR. SCHWARTZ:

Q That was November 5, 2002?

A That is correct. That's when I called him. He faxed this to me on November 2. Or was it 2001? I believe it's 2001. I'm sorry. I misspoke. I believe it was 2001.

Q So that was a call on November 5, 2001?

A To Chuck Goodwin, right. Now he called me on 11-2-01 and asked me if I could help the Chicago office try to locate this "Cherry Nose" Brown.

Q Do you know what "Cherry Nose" Brown was wanted for?

A No, I do not.

Q And you didn't know he was wanted before this call?

A No. How would I know that? I have no contacts in Chicago.

THE WITNESS: Here you are, ma'am.

MS. MOORE: Thank you.

MR. SCHWARTZ: What's the next exhibit? I'm going to mark as Exhibit H a declaration from Charles L. Goodwin, FBI.

MR. HEIDEMAN: You said Exhibit H?

MR. SCHWARTZ: H, right.

(The document referred to was marked for identification as Exhibit H.)

BY MR. SCHWARTZ:

Q Have you seen that before, Mr. Patton?

A Yes, I have.

Q Go ahead and read it, please.

(Pause.)

A What's your question?

Q Is there anything in the declaration that is not accurate?

A Yes. In paragraph 4, he said, "In or around September of 2001, he received a call from me in which he stated that he may have seen a fugitive." How

would I know someone is a fugitive? That's a misstatement. I don't say that he lied. I don't think he remembered. I'm not calling him a liar.

Q You don't think that you had heard on the news or maybe --

A No, I mean, I can't afford to have cable. I have just local antenna.

MS. MOORE: Let counsel finish the question, please. He was mentioning several media. It could be newspaper or other things other than the news on TV.

THE WITNESS: No.

BY MR. SCHWARTZ:

Q Do you think you had heard from talking with some other agent that --

A No.

Q Let me finish, because sometimes I pause. I apologize. Do you think you had heard form any other agent that "Cherry Nose" Brown was a fugitive?

A No, I would have not.

Q Is there anything else in Mr. Goodwin's declaration that's not accurate?

MR. HEIDEMAN: I'm going to ask that we just take a few-minute recess so he can read it carefully. Since you're asking him whether or not the declaration of this FBI agent is accurate in every respect, I want

him to go over every word, so let's take three minutes if we can. It's only one and a quarter pages.

MR. SCHWARTZ: We can go off the record.

(Whereupon, a short recess was taken.)

BY MR. SCHWARTZ:

Q Mr. Patton, did you finish reviewing --

A Yes.

Q -- Charlie Goodwin's declaration, which is Exhibit -- what's the exhibit number on that?

A H.

Q Is there anything else in here that is not accurate?

A No, I think that's the only thing that I can see in here that I think that he misstated.

Q Other than the "Cherry Nose" Brown matter and the Baltimore meeting and the Dallas meeting with Pete McCann, did you perform any other services for the FBI after you --

A No, I did not.

Q Let me just finish the last part of my sentence. Other than the "Cherry Nose" Brown matter, the meeting in Baltimore in 1999, and the meeting in the Dallas area in 1996, have you performed any other services for the FBI since you left Los Angeles in February of 1996?

MR. HEIDEMAN: Do you mean has he been asked to perform services or has he performed services. Those are two separate questions.

MR. SCHWARTZ: Okay.

MS. MOORE: The question stands. He said did you perform any other services. It was clear.

MR. SCHWARTZ: Right. That's the question. Did you perform any other services?

THE WITNESS: No. Conversations. I mean, FBI agents would call me and ask me if I knew anything, but, you know, nothing. I did no work if that's the question, if I understand your question.

MR. SCHWARTZ: That's what I asked.

THE WITNESS: Right. No, I did not.

MR. SCHWARTZ: Thank you.

BY MR. SCHWARTZ:

Q Do you remember being interviewed in August of 1997 while you were living in Florida by two FBI agents?

A Yes.

Q Clyde Merryman was one?

A And Steve Morris.

Q Right.

A Right. And they sat in the thing and cried like children because they thought that I was so

mistreated by the Bureau. They were very upset about it.

Q Have you seen the 302 on that?

A I have not.

Q I'm going to see if I can find that. Actually, before I give you this, do you remember that you were paid the $30,000 in November of '96, correct?

A Correct.

Q And then, at some point after that, you contacted some officials with the FBI to talk about the lump sum from Miami.

A Mm-hmm.

Q And your personal property, correct?

A That is correct.

Q And you wanted reimbursement for the personal property and you wanted the $150,000 lump sum?

A Correct.

Q And the two agents were sent down to Florida to interview you about those issues, correct?

A Correct.

Q I'm going to show you exhibit -- well, since you say you never saw the report of your interview?

A I never reviewed it, no.

Q Okay.

(The document referred to was marked for identification as Exhibit I.)

MR. HEIDEMAN: Please may I have a copy of Exhibit I that you just marked?

MR. SCHWARTZ: You know what, I'm going to hold off on that for now since I'm not asking the witness about it. In fact, I may even strike that and change it.

MR. HEIDEMAN: So the record is clear then, if you would please give me copy of Exhibit I that you've identified, whether you use it or not, that would be helpful.

MR. SCHWARTZ: Well, I'll give you the document, but I don't want to get confused on the lettering, so we may end up changing the number. I'll just give you the document.

MR. HEIDEMAN: Or my suggestion would be leave it as I, and the next one would be J.

(Pause.)

MR. SCHWARTZ: Okay. I'm going to take you up on your suggestion. We'll mark as J a handwritten letter dated 10-20-97 to Clyde Merryman, which I believe is from you.

THE WITNESS: From me, right?

MR. SCHWARTZ: From you, yes.
MR. HEIDEMAN: Thank you.
(The document referred to was marked for identification as Exhibit J.)
BY MR. SCHWARTZ:
Q That is a letter you wrote, correct?
A That is correct.
Q And it's a two-page letter?
A Yes.
Q And you see the third page of the exhibit has the envelope?
A There's no envelope on here unless it's stuck together.
Q And Clyde Merryman was one of the agents that came down to Florida?
A Right.
Q Could you go ahead and review that letter?
(Pause.)
A Okay. What is your question?
Q In this letter, you complain about how the issues of your personal possessions and monies promised from Miami have been handled, correct?
A Right.
Q You did not complain about not being paid

the monthly payment under the 1994 agreement, correct?
A Well, he didn't come down for that. He came down for this, for the Miami thing and the storage. That's what he came for. He never brought up the contract or anything else, so we did not discuss the contract.
Q So when you were interviewed in Florida by Merryman and Morris --
A Merryman and Morris.
Q You didn't discuss the 1994 agreement, correct?
A No, he never brought it up, and we never discussed it. He was sent down there by Esposito to intervene, him and Morris. Esposito is the one that sent them down.
Q Your last payment under the 1994 agreement was in February of '96, correct?
A Correct.
Q You didn't receive a payment in March of '96?
A No.
Q Or April of '96?
A No.
Q So you were on notice at that point that the FBI was not making the payments, correct?

A Yes. And if you look at the phone records from '97 to '98, you'll see that I was trying to deal with it myself without going to attorneys to deal directly with Washington through the people in Washington that I knew.

Q I think you testified earlier that before you received that $30,000 in November of '96, you had talked to Clyde Merryman. He was one of the agents you had talked to about the fact that you had not been paid under the 1994 agreement, correct?

A I don't think I testified to that.

Q I apologize if I'm misremembering. Who did you talk to prior to November of 1996? Who did you talk to in the FBI about the fact that you had not received your monthly payment?

A Pete McCann, Chuck Goodwin, Donahue, Esposito, Divers. I'm trying to count. Coulson, Danny Coulson.

Q And what was Danny Coulson's position?

A He was I believe one of the deputy directors or in that category.

Q And you knew him from some investigation?

A Right. From Baltimore.

Q And isn't it the case that they told you that the FBI's perspective was the contract was

terminated?

A No, they never told me that, because when I found out, and in your letter, which Ms. Moore sent to my attorney and he sent it to me, it was Divers stating in 2002, July of 2002 I think.

THE WITNESS: Is that when it was?

MS. EISEN: It was in the year 2002 if I'm on the right letter.

THE WITNESS: Right. That they were terminating it at that date.

BY MR. SCHWARTZ:

Q And that was the date that there was a written termination from your point of view?

A Right. That's correct.

Q Your understanding of the contract was that an oral termination was not sufficient?

A There was never an oral termination. You keep asking me that question, sir, and I'm answering it to you truthfully. No one ever gave me an oral that said that the contract was over.

Q Well, was it your understanding that under the contract, that would have been sufficient?

A No. because the contract reads that it has to be in writing. I know how to read.

Q So if somebody had told you the contract was

over, that was not sufficient in your mind?
A No, it's not, because it wasn't my first contract. I had a contract before, and I know what they do.
Q After you moved out of Los Angeles in February of '96, did any FBI official affirmatively tell you yes, the contract is ongoing?
A No.
Q Let me get back to the kind of work you were doing in Los Angeles under the 1994 agreement. We went over some of them earlier on. You were undercover, and so was Scott Garriola.
A Mm-hmm.
Q Is that a yes?
A Yes.
Q And you were posing as jewel thieves, correct?
A Correct.
Q And you and Scott Garriola met just about every day, correct?
A No.
Q How often did you guys meet?
A Three to four times a week.
Q Did you speak with him every day?
A Every day.

Q And you met with a lot of subjects of the FBI investigation?

A Right. Sometimes on my own and sometimes with him.

Q What kinds of things would you do with Agent Garriola? For example, sometimes you would go to a restaurant and meet the subjects there?

A Right.

Q Can you give me other examples of things you did?

A Well, we'd follow people. You know, you do what you do undercover. It's not easy to explain if you never did it.

Q Can you just give me a little bit more details about the nature of the work?

A We worked very hard. We talked to a lot of people, and, you know, we followed people, you know, surveillance, certain stuff that we had to do, and we would do it. He's a very good agent, and he never did this work before until he worked with me.

Q You recorded numerous conversations with subjects?

A That is correct.

Q Do you have any ball park estimate? Was it in the hundreds?

A Yes.
Q How did you go about recording conversations?
A I'd wear a body mic, and then we'd have the car wired up, too.
Q Was it risky in your view to be wearing a body mic when you were meeting with subjects?
A It's always risky. I mean, they were a threat always. I've had them in both places that I work. If they ever found out who I was, they would have killed me. No, I've had them.
Q After you left Los Angeles in February of '96, you were not working undercover anymore, correct?
A No.
Q Is that correct?
A That is correct.
Q And you weren't recording conversations with subjects, correct?
A No, I was not.
Q And you were not meeting with subjects of investigations, correct?
A No, I was not.
Q After you left Los Angeles in February of '96, you didn't think the FBI was going to be paying you when you weren't actually performing services, did

you?

A Yes, I did, because they did not terminate the contract.

Q Did you think the FBI intended that the contract was going to continue even though you weren't performing any services?

A Yes.

Q Do you have an understanding of why the FBI would intend to continue to pay you even though you weren't performing services?

A Well, if they go by their rules and regulations, you know, yes, I believe that they are obligated to pay me under the contract just like you're under contract for your job. I mean, if they tell you stay home for the month, you're still going to get your check, right? Under your contract?

Q Well, I understand, though, your position that under the contract, because it wasn't terminated in writing, that you were owed the monthly payment, correct?

A Right. That is correct.

Q Did you have an understanding that the FBI intended to pay you even though you weren't performing services?

A Yes.

Q And that was based on the fact that it hadn't been terminated in writing?
A That is correct.
Q Is it based on any other facts?
A No.
Q If you turn to the agreement, which is Exhibit B.
A Mm-hmm.
Q If you look at the third page, paragraph 14.
A Mm-hmm.
Q It says, "This agreement shall commence on the date of acceptance by Mr. Patton as signified by his signature and shall continue as long as the FBI deems that Mr. Patton's services are required." Do you see that?
A Mm-hmm.
Q Is that a yes?
A Yes.
Q What was your understanding of the meaning --
A But you didn't finish the paragraph, sir.
Q That's correct. I just want to focus on this first sentence right now.
A Okay.
Q Did you have an understanding as to what was

meant by "shall continue as long as the FBI deems that Mr. Patton's services are required"?

A Yes.

Q What was your understanding?

A That until they terminated in writing, I'm still under contract.

Q But the second sentence in that paragraph talks about a termination by deliverance of a written notice to terminate, correct?

A Right. By both parties.

Q Right.

A Either party by deliverance of a written notice to terminate.

Q Right. But just focusing on the first sentence in paragraph 14.

A Mm-hmm.

Q Did you have an understanding of what was meant by "shall continue as long as the FBI deems that Mr. Patton's services are required"?

A Do I understand what it means?

Q Did you have an understanding of what that meant?

A Yes, I have an understanding of what it means, but you keep saying that. Let's go on with it and read the next sentence.

Q Just focusing on the first sentence, what was your understanding of --

A Well, this is the third time, sir, we're focusing on it, and I gave you my answer three times. Until it is in writing either by me or by them, the contract is in force. And I can show probably a thing by the person that wrote up these contracts that certifies it, Mr. Hill, from the Academy, John Hill. Have you ever heard that name?

Q That's an FBI agent?

A Yes, he's an instructor at the academy.

THE WITNESS: Do we have that letter?

MS. EISEN: I don't think so. I don't know.

THE WITNESS: No? Okay.

BY MR. SCHWARTZ:

Q Can you explain to me what the letter is about?

A It's about how a contract is supposed to be written and how it's supposed to be terminated.

Q And where did you get that from?

A Off the internet.

Q Was that recently?

A It's been a while. I don't remember the date.

Q Is it a few months ago?

A No, it's probably a couple years ago.
Q After you filed the lawsuit?
A No, before I filed the lawsuit. I didn't want to file a lawsuit. I thought we could have negotiated this thing without going through all this, but I guess the government doesn't work that way. They'd rather have you sue them. And I'm very, very sorry, and I should ask my lawyer if I can say this first.

THE WITNESS: Can we have a minute?

MR. HEIDEMAN: Yes. Why don't we take a lunch recess at this time.

MR. SCHWARTZ: You know what?

MR. HEIDEMAN: It's already 12:30, and we've been going two and a half hours. I do give time for lunch. We'll break for 30 minutes.

MS. MOORE: Okay. Let Ted speak. He might have a few more questions to finish his line of questions, and that certainly would make sense, so let's find out from him.

Did you say 30 minutes for lunch?

MR. HEIDEMAN: I did.

MS. MOORE: Fine. That's good.

MR. SCHWARTZ: Yes. That's fine.

MS. MOORE: There are a lot of places close

by.

MR. SCHWARTZ: Yes. Let's try to be --

THE WITNESS: I don't need any. It doesn't make any difference.

MR. SCHWARTZ: Let's try to be back in 30 minutes.

THE WITNESS: No, I don't even need the full 30 because I don't eat.

MR. SCHWARTZ: Okay. So 30 minutes we're going to start up again.

MR. HEIDEMAN: I thought that's what I proposed.

MR. SCHWARTZ: Right. But sometimes people propose 30 minutes and then come in around 45 minutes.

MS. EISEN: Well, where is a fast place?

MR. SCHWARTZ: We're off the record.

(Whereupon, at 12:30 p.m., the deposition in the above-entitled matter was recessed, to reconvene at 1:00 p.m. this same day, Thursday, June 8, 2006.)

//

//

//

//

//

//

A F T E R N O O N S E S S I O N

(1:00 p.m.)

MR. SCHWARTZ: Thank you for returning so promptly.

Whereupon,

THOMAS J. PATTON

having been previously duly sworn, was recalled as a witness herein and was examined and testified further as follows:

FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. SCHWARTZ:

Q Mr. Patton, I asked you earlier about whether you had reported the payments by the FBI under the 1994 agreement on your tax returns, and you asserted your Fifth Amendment right not to respond. I want to ask a related question, which is did you file any tax returns for the period covering 1994 -- well, let me ask that first. Did you file a tax return for that period?

MR. HEIDEMAN: I'm going to advise counsel that all questions relating to this particular line are covered by the answer that the witness has already given you specifically and only as it relates to tax issues.

//

BY MR. SCHWARTZ:

Q Okay. So you're asserting your Fifth Amendment right not to respond to any questions about the filing of tax returns?

A Yes, sir.

Q Okay. If you look at Exhibit J again, which is your handwritten letter to Clyde Merryman.

A Mm-hmm. Mm-hmm.

Q Did you at any time write a letter to an FBI official complaining about the fact that you weren't getting your monthly payment under the 1994 agreement?

A Yes, I did.

Q And do you have a copy of that?

A No, I do not.

Q Who was it sent to?

A I don't remember, sir. I'm sorry.

Q Do you think it was to Clyde Merryman?

A No, it was another official.

Q Do you have a copy of that somewhere?

A No, I do not.

Q You didn't keep a copy?

A No, I don't believe so. To the best of my recollection, I don't have a copy.

MR. HEIDEMAN: And is this a different letter you're referring to than Exhibit J, counsel?

MR. SCHWARTZ: Right.

BY MR. SCHWARTZ:

Q Do you know when you sent it?

A No, I do not.

Q What did you say in the letter?

A I don't remember, sir.

Q What kind of response did you get?

A I don't believe I got any.

Q Do you know if in fact it was received at the FBI?

A I believe it was.

Q And what do you base that on?

A Well, I can't base it on anything. You have to understand one thing. When I came over to the FBI, I made a 180-degree turn in my life. I was shot nine times, four in the head, five in the body. I made a decision to go with the FBI and to protect my family and protect me. I had so much trust in the FBI that I took anything they told me for gospel.

After learning that their word is not their bond, I still have respect for the FBI, and I'm willing to work whenever they want me to work. So whenever they call me and ask me about anything, I give them the best of my knowledge of all I've known for all the years I was involved with organized crime.

Q Getting back to the letter, is it correct that you don't have any information indicating that it was actually received at the FBI?

A No, I don't believe I --

MR. HEIDEMAN: Objection. He answered the question saying he believed it was received.

BY MR. SCHWARTZ:

Q Was that your earlier response?

A Right. Mm-hmm.

Q What's the basis for that belief?

A I think by a phone call by who I mailed it to, which I don't remember at this present moment. I believe that he called me and told me he received it, but I don't believe that he ever responded to it in writing.

Q And you think you sent just one letter or more than one?

A I might have sent more than one.

Q And you don't remember who those --

A No.

Q Let me finish my question. You don't remember who other letters might have been sent to?

A No, sir.

Q And you don't remember when they were sent?

A No.

Q Exhibit J, which is your October 20, '97, letter to Clyde Merryman, do you have a copy of that?
A Right. Right here.
Q Do you have a copy of that at home?
A No, I do not.
MR. HEIDEMAN: However, in light of your inquiry, I'm going to ask the witness on the record that when you go home tonight you make another search through all boxes and all records you have for any additional records that haven't been provided that you may find that relate to the issues in controversy in this case or that has been requested under anything that's been sent to you before,
Make another search and advise us immediately of anything that you find so that we can properly put a number on it and provide it to counsel. They're entitled to that under the rules of the Court.
THE WITNESS: Okay.
MR. HEIDEMAN: Do you understand?
THE WITNESS: Yes, sir.
MR. HEIDEMAN: Thank you.
BY MR. SCHWARTZ:
Q Do you think you have a copy at home of Exhibit J?
A It's a possibility I might.

Q Do you think you have a copy at home of the other letter or letters that you think you've sent?
A It's possible. I will look for them, and if I do have them, I will forward them on to my counsel.
Q Was it your practice to make a copy of the letter that you were sending out?
A Yes.
Q By the date of this letter, which is Exhibit J --
A Mm-hmm.
Q -- this is October --
A Twenty.
Q -- 20, 1997 -- you had not received your monthly payment under the 1994 agreement for roughly a year and a half, correct?
A That's correct.
Q Is there any reason you didn't include a mention of that in this letter, which is Exhibit J?
A It was never brought up, and we never got into that conversation.
Q You mentioned a minute or two ago that you said that you were willing to work with the FBI and still feel that way. Do you remember when you were interviewed down in Florida by Clyde Merryman and Steve Morris that you indicated to them also that you

were willing to work with the FBI?

A Yes.

Q And they indicated to you that they remained open to that idea, but they first had to resolve these issues about your claim for your personal property and the lump sum payment from Miami?

A Yes.

(The document referred to was marked for identification as Exhibit K.)

BY MR. SCHWARTZ:

Q I want to show you what I marked as Exhibit K, which is a different agreement with the FBI. This one I believe has your signature of May 28, 1991. This is the agreement you originally had with Miami, correct?

A That is correct.

Q If you look at paragraph 12.

A All right. Mm-hmm.

Q Actually, let me ask you a different question. This agreement was eventually terminated in writing by the Baltimore division, correct?

A That's correct.

Q And in your mind, the fact that this agreement had been terminated in writing was

significant to how the Los Angeles agreement should be terminated, correct?

A That is correct.

Q Now, if you look at paragraph 12 of Exhibit K, the last sentence says, "It may be terminated at any time by either party by deliverance of written notice to terminate."

A That is correct.

Q That's the same language that was in your agreement with the Los Angeles division, correct?

A Los Angeles. Correct. Mm-hmm.

Q Actually, let me ask you this. Did you ever sit down and compare the two agreements to sort out the issue of whether the Los Angeles agreement had to be terminated in writing?

A Yes.

Q So you sat down and compared the two?

A Many, many times.

Q When did you do that?

A I've done it from the day that I left L.A.

Q Now if you look at the 1994 agreement.

A Mm-hmm.

Q Exhibit B, the first sentence in paragraph 14.

A Wait a minute. I have to find it. B.

Okay. Go ahead.
Q Look at paragraph 14 in B. It's on that page that you're open to already.
A Okay.
Q We talked about this before.
A Right.
Q And I asked you questions about the first sentence.
A Right. "This agreement shall commence on the date of acceptance by Mr. Patton and specified by his signature and shall continue as long as the FBI deems that Mr. Patton's services are required."
Q Right.
A "It may be terminated at any time by either party by deliverance of a written notice of termination."
Q Right. Now let's look at paragraph 12 of the 1991 agreement.
A Okay. That says the exact same thing.
Q Could you read paragraph 12, please?
A "It may be renewed thereafter for..." --
Q Sir, I'm sorry. Could you start at the beginning of paragraph 12?
MR. HEIDEMAN: I'm going to object to taking the time to read it into the record. The document

speaks for itself, but counsel, I defer to you.

MR. SCHWARTZ: Thank you.

MR. HEIDEMAN: He's now reading from paragraph No. 12 from Exhibit K.

BY MR. SCHWARTZ:

Q All right. Could you go ahead and read that?

A "This agreement shall commence on the date of acceptance by Mr. Patton as specified by his signature and will continue until 9-30-91. It may be renewed thereafter for an agreed upon period for the time continuing upon the written agreement of the parties. It may be terminated at any time by either party by deliverance of a written notice to terminate."

Q If you look at the two paragraphs, between the two contracts --

A Mm-hmm.

Q They're not identical, correct?

A To me, it seems like it's the exact same.

Q Well, if you look at paragraph 14 on Exhibit B.

A Right.

Q It has that language that we went over before, "and shall continue as long as the FBI deems

that Mr. Patton's services are required."

A Mm-hmm.

Q There's no similar language like that in Exhibit K, is there?

MR. HEIDEMAN: I'm going to object, counsel, because the next sentence that you didn't read on Exhibit B says, "It may be terminated at any time by either party by deliverance of a written notice to terminate," and I quote.

MR. SCHWARTZ: That's not really an objection. That's a statement.

MR. HEIDEMAN: It is an objection because (a) the documents speak for themselves, (b) you asked us to take a short lunch hour, which we all agreed to, so that we could use the time properly, and reading documents that are in the record doesn't seem to me to be a proper use of time. And if you're going to ask him a question, please do it in the context of the entire paragraph, because it's one numbered 14 paragraph in Exhibit B. Thank you, counsel.

BY MR. SCHWARTZ:

Q Mr. Patton, my question was there is no similar language in Exhibit K to the phrase "and shall continue as long as the FBI deems that Mr. Patton's services are required," correct?

A What paragraph was that?
Q In paragraph 12 of Exhibit K, there's no similar language, correct?
A To me, it's almost the same. You tell me where the difference is.
Q Well, let me ask you this. The phrase "shall continue as long as the FBI deems that Mr. Patton's services are required," does that mean anything to you?
A Well, I thought by being with the FBI that I would be working with the FBI the rest of my life until I was too old to do it.
Q What gave you that impression?
A Just by, you know, conversations and me making a 180-degree turn in my life and trying to do the right thing for the United States government, which I think I did, and I did it honestly and truthfully and worked very hard.
Q Let me ask you this. Did you ever before today ever notice that paragraph 12 --
A No.
Q Let me finish my question. Did you ever notice that paragraph 12 in Exhibit K is different from paragraph 14 in Exhibit B?
A No, I have never noticed that.

Q You mentioned earlier regarding "Cherry Nose" Brown that you had traveled around Arizona somewhat?
A Mm-hmm.
Q Can you give me some more details about that?
A Yes. I went from Tucson to up around the Phoenix/Mesa area, Scottsdale area.
Q You were living in Tucson at the time?
A That's right.
Q Why did you go to the Mesa area?
A Well, because I figured he wasn't living in Tucson. I could maybe spot his car. It was a green El Dorado somewhere up in that area.
Q Did you have any information that he was in fact living in the Mesa area?
A No, I did not.
Q And you didn't spot him in the Mesa area, correct?
A No, I did not.
Q And after looking in Mesa, you looked in Scottsdale?
A In Scottsdale, right.
Q And did you have any information indicating he was living in Scottsdale?

A No, I did not.
Q Did you have any information that he was in Arizona?
A Just by what Chuck Goodwin told me.
Q Do you remember what Chuck said?
A That his information by the Chicago office was that he was in Arizona.
Q Did you look anywhere else?
A No.
Q How much time did you spend looking for "Cherry Nose" Brown?
A Probably a month.
Q Is that one continuous month?
A Yes. Every day.
Q Where were you living at the time?
A In Tucson.
Q Did you go home every night?
A Yes. It's not that far away. I mean, you can go from Tucson to Phoenix in 35 minutes.
Q You didn't talk to Mike Wacks about this, did you?
A No, I did not.
Q Did you incur any expenses in connection with this?
A Just out of my own pocket, gas.

Q Other than gas, any other expenses?
A No.
Q You were never advised that anyone other than Michael Wacks was the representative for the contracting officer under the 1994 agreement, correct?
A That's correct.
Q The 1991 agreement, which we were just looking at, says in paragraph 13, "This document constitutes the full and complete agreement between Mr. Patton and the FBI," correct?
A Mm-hmm. Right.
Q You did have a claim in this case, though, that you had an agreement with the FBI or with Agent Leahy about a lump sum payment, correct?
A That is correct.
Q So your understanding was in this case that the language of the agreement really didn't mean what it said, right?
A Well, I took his word for it. You have to understand when you come over and work for them, who else are you going to trust? You sure can't go back to the people you used to be with, so you put everything in their hands to protect your family, for you to work for them, and for you to do whatever you want to do.

I changed my life 180 degrees around. I've never had a traffic violation. Never had no problems with nothing. I've just changed my whole life, and I'm glad that I did it, and I'd be willing if they asked me today to go anywhere in the United States and work for them, I would do it.

Q I appreciate that. I want to just focus on the real specific questions right now.

A Okay. Well, I'm answering your question I think, sir.

Q Getting back to the first sentence in paragraph 13 about the document being a full and complete agreement, your understanding was that should not be read literally, correct?

MR. HEIDEMAN: Objection to the form of the question. That actually calls for a legal conclusion, but he can answer. In fact, the document just speaks for itself. It says what it says. This is a document between the Federal Bureau of Investigations and a U.S. citizen.

I don't know, counsel. With all due respect, since the lunch break, it seems like we're dragging here, and you must have your own purpose, but this document and the last document speaks for itself. Argument about what the language is just doesn't seem

to be productive, and I'd ask you kindly to move on.

MR. SCHWARTZ: I need a response on this one.

MR. HEIDEMAN: Then you'll have to read the question back.

MR. SCHWARTZ: All right. Do you understand the question, sir?

MR. HEIDEMAN: Well, I've interrupted, so let's read the question back if you want an answer to that specific question. Counsel, I'm please asking you to move on once you have this answer that you seem to need.

MR. SCHWARTZ: I'll give the question again.

BY MR. SCHWARTZ:

Q Would you agree that with respect to the first sentence in paragraph 13 of Exhibit K that you did not intend for that language to be taken literally?

MR. HEIDEMAN: Objection. He's previously answered that this agreement was in full force and effect, and the document speaks for itself.

MR. SCHWARTZ: You can answer the question.

THE WITNESS: Yes, sir. I thought it was in full effect.

//

BY MR. SCHWARTZ:

Q I know that's what your counsel just said, but my question is did you understand that sentence to be taken literally, that it really was the full and complete agreement between you and the FBI?

A Right.

MR. HEIDEMAN: I'm now going to object on the grounds that it calls for a legal conclusion. I instruct him not to answer if this is the only way we can get you counsel after 24 minutes into this postlunch break to move on.

MR. SCHWARTZ: And what's the basis for your objection?

MR. HEIDEMAN: I've stated it three times. Please, counsel, let's move on. The document speaks for itself.

MR. SCHWARTZ: Right. My question is not what the document says but whether he understood it to be taken literally.

BY MR. SCHWARTZ:

Q Did you literally think that this was the full and complete agreement?

A Yes.

Q But you also said you had an agreement with Agent Leahy with the FBI that you would be owed

$150,000, correct?
A That's what he told me.
Q So you had an agreement?
A With him.
Q Right.
A An oral agreement.
Q Right.
A And I asked him to put it in writing, and he said it doesn't have to be in writing. My word is my bond.
Q You didn't think he was going to be paying the $150,000 out of his own pocket, right?
A No.
Q So it was an agreement that he made on behalf of the FBI with you?
A Right.
Q So you had another agreement with the FBI when this document was signed, right?
A I had an oral agreement.
Q Okay. So this written agreement was not the full and complete agreement between you and the FBI?
A Yes, I thought it was the full agreement, but he said you do what we ask you to do and I promise you you'll get $150,000, you know, for doing what you're doing.

Q And who told you that?

A Leahy.

Q I'm going to turn now to the documents that your attorney delivered this morning and ask you about some of them.

A Okay.

MR. SCHWARTZ: Let's mark this as the next in order, L.

(The document referred to was marked for identification as Exhibit L.)

MR. SCHWARTZ: I have only this one copy. Do you have a copy for the witness?

MR. HEIDEMAN: Yes. In fact, before you mark your page, since during the deposition Ms. Moore has taken the time to review the documents and has made some markings on it, we have a second complete clean set that what I suggest we do for your consideration, counsel, assuming there are no missing pages, and if there are, they are unintentional, but as I look at them, it appears to be 0001 through 000215, so assuming it's a full and complete set, and I trust that it is -- if it isn't, it's by a clerical error -- why don't we perhaps mark this as a group exhibit, whatever is the next number. I think it's L,

but maybe I kept it wrong.

MR. SCHWARTZ: L is correct.

MR. HEIDEMAN: And then we could go L-1 for page 1 and L-183 for page 183. It would probably save some time and give you a clean package to work from without you having to tear apart Ms. Moore's notes.

MR. SCHWARTZ: That was my plan. Thank you. Here's Exhibit L.

MR. HEIDEMAN: And by the way, I recognize, as I said off the record, first of all, Ms. Moore in our office has had nothing but excellent cooperation from the beginning of the case. Of course, we've lost many aspects of this case, and so she's done a very good job, and maybe we haven't done as good a job, but the Judge has ruled however the Judge has ruled.

I recognize in the spirit of that cooperation I want to make this comment. We gave you this what is now marked as Group Exhibit L first thing this morning when everyone arrived. I know you will need to go over it in greater detail than you've had an opportunity to do here during the deposition.

And we of course will cooperate fully with you as it relates to ever page of the turnover and as it relates to whatever you may need to do about further inquiry as a result of something you may learn

that you didn't know or didn't have the time to pursue, so I don't mean to suggest therefore that I would expect that you don't have the opportunity to continue that review even after we recess today.

And if there's a need to reconvene hopefully by teleconference, but if we need to reconvene in some other way, we will appropriately deal with that as fellow officers of the Court. And I didn't ask my client about that before I said it, but as an officer of the Court, I'm saying it, and I'm sure my client will fully make himself available. Again, I would hope it could be by teleconference continuation of the deposition, but that may not be feasible.

MS. MOORE: Thank you. When we finish looking it, we'll let you know if we think it necessary to ask further questions at that time.

MR. HEIDEMAN: Thank you. And similarly, as soon as Mr. Patton goes back through all the records that he has, knowing of course he has moved many times and knowing of course his possessions we know he lost, whether there were records in that, I honestly don't know, but once he's gone back through all the records that he has, if he has any more records that are produced to us, we will give them to you. There's no privilege log at this time. To my knowledge, we've

not withheld any document that's been given to us.

MS. MOORE: Okay.

MR. HEIDEMAN: But if something does occur, we'll tell you immediately. And if that affects the timetable that's already in this case, we certainly will address with you in an appropriate, cooperative manner how there should be some adjustments so that no one is disadvantaged by this.

MS. MOORE: Okay. Okay.

MR. HEIDEMAN: Thank you.

MS. MOORE: Thank you very much.

MR. SCHWARTZ: Thank you.

BY MR. SCHWARTZ:

Q If you could just turn to Exhibit L-59.

A Volume L. Okay. Now?

Q L, this big one here.

A Now what page?

Q 59.

A Is that 0059?

Q Right.

MR. HEIDEMAN: While he's looking, if I could ask counsel a question without boxing you in or binding you? Do you think you've covered the questions you anticipate covering in this deposition other than in relation to these documents?

MR. SCHWARTZ: Not necessarily.

MR. HEIDEMAN: Okay. Thank you. In light of your answer, if there's any way to do all of the other issues today so that in the event this has to be continued after a recess where we're dealing with the matters that arise out of the documents produced today, that would be our request. Thank you.

MR. SCHWARTZ: All right.

BY MR. SCHWARTZ:

Q You're at 59?
A Yes, sir.
Q Do you recognize it?
A Yes.
Q Where did you find this document?
A In my files.
Q Was it on a yellow pad?
A Yes, sir.
Q And the same with page 60?
A Yes, sir.
Q Is this your handwriting on pages 59 and 60?
A Yes, sir.

MR. HEIDEMAN: May I interrupt, counsel? To save us all time, please tell us whether or not the pages starting from, in Group Exhibit L-59, all the way through these handwritten pages that go to

whatever page I'm told it goes through, whether or not all of that is or is not your handwriting?

THE WITNESS: It's all my handwriting.

MR. HEIDEMAN: Okay. So all the batch of pages that start with 59 and continue straight through to --

MS. EISEN: Through 172.

MR. HEIDEMAN: I'm sorry, Faye?

MS. EISEN: 172.

MR. HEIDEMAN: 172, you're telling us all of these come out of your files?

THE WITNESS: Right.

MR. HEIDEMAN: And they constitute your handwriting, is that correct?

THE WITNESS: That is correct.

MR. HEIDEMAN: Okay. If when we go through any pages you see a notation made by your wife or somebody else, please tell opposing counsel that it's not your handwriting.

THE WITNESS: I will notify him. Right.

MR. HEIDEMAN: Okay?

THE WITNESS: I will notify him.

MR. HEIDEMAN: Thank you very much.

Counsel, I hope that's helpful.

MR. SCHWARTZ: It is.

MR. HEIDEMAN: I interrupted.
MR. SCHWARTZ: Yes.
BY MR. SCHWARTZ:
Q Just comparing page 59, for example, to page 62, it just seems like it's two different people writing, so I want to make sure that that's not your wife or someone else.
A No, that's me. It's all my handwriting.
Q Did you keep a continuous log in a yellow pad of the conversations?
A Yes.
Q Do you know how many pads of notes you had of these conversations?
A No, I do not, not to my recollection at this time.
Q And the notes are dated. Were they written at the time that you had the conversations?
A Yes, sir.
Q If you look at 59 again, the first entry of 2-27-96.
A Right.
Q Is that supposed to be crossed out, 2-27? Is that the date, or is that a crossed out date?
A That's just a mistake. No, that was the date.

Q Okay.
A I believe it will be in the phone records.
Q And you still have the originals of all these notes, correct?
A Yes.
Q At home?
A Mm-hmm.
MR. SCHWARTZ: During the lunch break, I started to skim some of these, and some of them are hard to read, and I'm going to have to ask the witness to read a few of them.
BY MR. SCHWARTZ:
Q If you look at page 63, there's an entry in the middle. 5/7/96, Scottie called.
A Yes, sir. Right. Because he didn't trust Ori and he was going to give him a lie test. He said that he was working with Vick on some things. He said that they are giving Ori $6,500 a month, but he has not given him the money because Ori has not met with them. He said that he got the letter and thanked me for it. He said he will call Saturday in the morning to see if there was someone there and let me know.
Q That second to the last sentence, "He will call", what does that say again?
A He will call on Saturday in the morning to

see if there's someone there and let me know.

Q Did you use an abbreviation for morning?

A Yes.

Q What's your abbreviation?

A M-O-N.

Q Oh, okay. Do you know what letter you're referencing there? "He got the letter and thanked me for it."

A Well, I sent a letter to the SAC praising him for the hard work he did.

Q And this is Scott Garriola, right?

A Yes. And that was, to the best of my recollection, to Tim McNally.

Q Do you know what that last two lines are about? "He said he will call in the morning."

A He didn't trust Ori, and later on, which I don't know if it's in these notes somewhere, while he [redacted] You know about that probably. You do know about it.

[redacted] L.A. division, he was a subject, right?

A Right.

Q Can you turn to page 64?

A Mm-hmm.

Q And the second entry dated 5/13/96.

A Right. Called Mike and he said he will talk to Pat about the money and he said that J.B. died. That's Joe Bett died. He said he don't think the contract is in force. He says he will call me on Tuesday or Wednesday.
Q And that's a conversation with Mike Wacks, right?
A That is correct.
Q Can you read the last entry on page 64?
A Pete called and asked if I heard from Mike. I said no. He said that he is not going to call Mike anymore and that he will call Bill Esposito in Washington and have him call me. He says that he will call me after he talks to Bill. He said that Mike don't know what he is doing. He said that the things in Florida were never in Rick Delahey's name.
I said I didn't want to give anyone trouble. He said you don't just let them run over you. You have to stand up for your rights. He told me that someone in L.A. is bad-mouthing me. He didn't know who it was. He said he knew someone in Houston, and he will call him and see if there is something there.
Q Could you read the last entry on page 65?
A Pete called and said he talked to --
MR. HEIDEMAN: What date?

MR. SCHWARTZ: Thanks. It's May.

THE WITNESS: May 24, '96.

MR. SCHWARTZ: Right.

THE WITNESS: Pete called and said he talked to Mr. Esposito and that Esposito was going to look into the Florida and California things and he will get back to Pete Tuesday or Wednesday. Pete said that Chuck was talking to Kurt in Washington about getting me somewhere. He said that the $2,500 from W.A. to give me has nothing to do with California and it was for me to do that.

BY MR. SCHWARTZ:

Q Does this refresh your recollection at all about you having complained about not receiving payments under the contract?

A Yes. I told you that I did complain to Pete and to Esposito and to Chuck and to John Donahue.

Q Right.

A I'm sorry I didn't bring it up to Merryman. I should have brought it up to him. I'm sorry now, but he was down there strictly for the California thing and the $150,000 thing. He never brought up the contract to me, so we never got into that discussion. The man sat in a room with tears in his eyes the whole time, him and Morrisey.

They said we cannot believe that you were treated this way for all the work that you've done for the FBI. I didn't have to do all that work, go to Baltimore and do that work. Take depositions and go to the grand jury. I didn't have to go to San Diego and take depositions and go to the grand jury and have people indicted and put in jail.

I didn't have to do that. My life wasn't threatened. But I turned my life around and I put all my belief in the Bureau. My whole life was in the Bureau to help them out, but it seems like I must have been mistaken. I'm sorry it came out this way, but that's the way I guess things work. It wasn't that way on the outside. Your word was your bond.

Q Did anybody in the FBI tell you that from the FBI's perspective, that $30,000 payment you had gotten in November was a settlement of your claim about not having gotten more monthly payments under the 1994 agreement?

A No one ever told me that. No one ever told me that. That's the third time you asked me that question and it's the same answer. They never told me that. And it states right in here about the $30,000 that I think we just read, didn't we? That it had nothing to do with California?

Q I think that was a reference to the $2,500 you had gotten.
A No. The $30,000.
MR. HEIDEMAN: What page, Mr. Patton, are you referring to so the record is clear?
THE WITNESS: I have to find it.
BY MR. SCHWARTZ:
Q Look on the bottom of 65, that May 24, '96, entry. The last sentence there. Is that what you were thinking of? That Pete McCann said that the $2,500 had nothing to do with California?
A Right. No. That had nothing to do with California. That was for the work I did for them in Dallas.
Q Right. Can you read page 66? The May 28 entry?
A Right. Scottie called me and said that Ori was not doing anything for him. He says that Ori only lied to him about being made. I asked him who was mad.
Q Is that bad-mouthing?
A Bad-mouthing me in California and he said that the only one that might do that is Pat Marshall. Pat or Stan.
Q Yes. Now who are Pat and Stan?

A Pat Marshall was the supervisor of the spot we were in.
Q And who was Stan?
A Stan was another agent that was involved with our cases.
Q What was your relationship with Stan?
A Very good.
Q Did you work on a matter with him separate from the matter you worked on with Scott Garriola?
A No. I had Mark Tillio come out and work with him on what they were working on.
Q What was it that they were working on?
A I have no idea. That was not discussed with me.
Q And Mark Tillio I think you said before was an agent?
A Yeah. He's here in Washington, D.C., in the District. You know, he's not in headquarters.
Q And was that separate from the Joe Denti investigation?
A Yes.
Q But you don't know what it was?
A I think to the best of my knowledge, to the best of my recollection, it had something to do with bookmaking people, which is legal now in the United

States, bookmaking, and so is extortion with money laundering.

But there is so much work, Mr. Schwartz, that I could be doing for the FBI right now and they're not interested in sitting down to talk about [redacted] from Mexico. And it's so easy to get into their people. It's like a walk in the park to me, but I'm willing to do it. It's up to them to make that decision, because it's loaded down there.

And it's not only -- it's just not -- which you probably know more than anybody does. You take what's his name, the guy that ratted out John Gotti? Sam "The Bull". What was he into? Ecstasy. He got busted for that up in Phoenix. There's a bunch of young American kids working for him like he was some big shot. He was nothing.

There's a lot of talk who he was, but he was nobody. I met him many, many times when him and John would come to Florida. He was nobody. I don't even think the man was made.

Q That reminds me. I don't know if I finished going through the list of where you lived. I know at some point you lived in Cottage Grove, Oregon?

A Right.

Q And then how long did you live there for?

A Three years.

Q [redacted]

A For my wife's health, right.

Q And again, the FBI hadn't asked you to move?

A No. Plus I have a daughter and granddaughter and great-granddaughter there, and most of it was for my wife's health. It's easier out there for her breathing.

Q Can you read the entry on page 67? It looks like it's the second one that's dated June 4, '96. It starts "Called Chuck".

A Called Chuck and he said he will look into things. He said that Dallas would put me on only on a COD basis.

Q What does that mean to you?

A That means for everything that you would do they would pay you that. That's like being a stool pigeon, you know? That's what they do with these informants, you know? Here's $1,000, go do this. I know what that is.

Q And so that's very different from -- let me finish the question.

A Right.

Q That's very different from the arrangement that you had had under the 1994 agreement?

A Or the '91 agreement, too. Yeah. Completely different.

Q Could you keep reading that?

A COD basis. I said that I can't do that without a car and money to spend. He said he can understand that. He said he talked to Kent and he will look for something.

Q Do you know who Kent is?

A Yeah. He's an agent. He used to be an agent in Arizona. Now he's a prosecutor in Palm Beach, Florida.

Q Do you know his last name?

A No, I do not. I used to know it, but, you know, you meet so many of them you can't remember them all.

Q Can you finish reading that?

A He said he will talk to Pete and see if there is any --

Q He will talk to Kent?

A -- attorneys that will look into this and he will let me know. He said he will call me later.

See, they were all getting very fed up because I was trying to deal directly with the Bureau

and they knew all about what I was trying to do because they were involved talking to Washington, and I never wanted to sue. I mean, it took a long time for me to make that decision. I thought we could have worked things out with the Bureau.

Q And by this time, June of '96, you knew that your property had been lost, right?

A Right. I think so, but I have to see when I was told.

Q I think your declaration indicates it was April of '96 you knew that, right?

A Yeah. Right.

Q And this is Chuck Goodwin you're talking to?

A That is correct.

Q And he said he would talk to Pete McCann and see if there's an attorney that will look into this?

A Right.

Q So Chuck was actually trying to help you out by hooking you up with an attorney, right?

A Right.

Q Did that ever pan out?

A No, because I went to Gerry Spence and Gerry Spence recommended Mr. Heideman. He wanted to take my case on, but he was too busy at that time.

Q Do you remember what time that was that you

spoke to Spence?

A Yes. We have it somewhere. I thought we had it at home. It's a letter that recommended Mr. Heideman.

Q Could you read the next entry on page 67?

A Called John Donahue. Told him about Florida. He can't believe it. He said he was in Tampa and --

Q Is that everything?

A Yeah. And everything is going good for that on that case. He said he will call me back. John called and said he will call Jim Fellis and see what he said. He said he will call me.

Q Do you know who Jim Fellis is?

A No. Do you?

MR. SCHWARTZ: Let me check how we're doing on time.

MS. MOORE: I've got a watch. It's five of 2:00.

MR. HEIDEMAN: Madam Court Reporter, do you need a break while we're at a stop for a moment? Does anybody?

I will need one, but not yet, so you can keep going for a while if you'd like.

THE WITNESS: Maybe I could keep my water

filled so I can lose that weight.

(Discussion held off the record.)

BY MR. SCHWARTZ:

Q Can you turn to page 68 and look at the last entry? It's June 11, '96. 68.

A 6/11/96?

Q Right.

A Mike called and said he, I think, asked not to put in for the money yet. He has not put in for the money yet. He is waiting for the right time. He said that I should get in touch with someone in Washington, Esposito, and tell them when I'm in Florida. He says that I shall not wait to do something. He said that he told the guys in Boston that my contract is over in L.A. and that they can pay me. I asked if he would put it in a lump sum so I can get on with --

Q Is it "so I can get out of here"?

A Out of here. Right. He said he will. I said that someone out there was bad-mouthing me and he said he did not talk to Tim or Scottie or Andy. He said that he would let me know what he put in for the money.

Q Is that last line "he will let me know *when* he put in for the money"?

A Right. Yes, sir.

MR. HEIDEMAN: When or what? I heard you say, Mr. Patton, what and I heard counsel say when, and I don't know which it is.

THE WITNESS: He said he would --

MR. HEIDEMAN: Maybe I can help by looking at it. It looks to me like it says "he said that he will let me know" -- and then this word, what is that next word right there? Is that when or what or something?

THE WITNESS: When.

MR. HEIDEMAN: When. When he put in for the money. Okay.

BY MR. SCHWARTZ:

Q In one of the middle sentences in that entry, this is a conversation with Mike Wacks, right?

A Right. Mm-hmm.

Q Yes?

A Yes.

Q The sentence, "He said that he told the guys in Boston that my contract is over in L.A. and they can pay me," do you know what that's talking about?

A No. I had a very bad habit, which I should have went further with these conversations to have him explain what he was saying. Most of the time when you

talked to Mike he was drunk anyway, so you never knew what was truth and what was not truth. He's a very, very heavy drinker.

Is he still married? Mike still married?

MS. MOORE: I don't know.

THE WITNESS: You? You must know.

MR. SCHWARTZ: I'm not going to talk about that on the record.

BY MR. SCHWARTZ:

Q Could you read the top entry on 69? It's June 11, '96.

A Pete called and said that he has not heard from the guys from Boston and that he will try to get them today. I told him that I talked to Mike and he said that he has not put in for any money and he is waiting for the thing from Boston.

Q Let me stop you there. Do you know what that is about Boston?

A No, I do not.

Q Did you deal with any agents from Boston?

A Fred Robbins.

Q And he came down with Pete McCann on the Donald Eugene Webb matter?

A Correct. Yes.

Q Did you keep in contact with Fred after --

A Yes.
Q But you don't know what this reference is about money and Boston?
A No. Right.
Q All right. Please continue reading.
A Where did I stop at?
Q You stopped at "things from Boston".
A Pete said that Mike is full of shit. They sent him the letters on 4/96 and Mike told him that he was going to put in for the money. He said that he will call Esposito and ask him if he will call me.
Q Do you know the reference to the letter on 4/96? Is that that letter about praising the agents, or do you know what that letter is?
A No, I do not.
Q Okay. Please continue.
A Pete said that he and Fred will take care of the things in Florida for me, not to worry about that. He said that a guy from Boston was going to call Pat and call and find out what was going on. He said he would call me on 6/12/96 to let me know what they said.

I mean, these guys were really trying hard, Pete, Fred, and Chuck and John Donahue, to try to get this resolved. They tried very, very hard. I give

them a lot of credit.

Q Do you remember getting a letter from Neal Divers after you were --

A What?

Q After you were interviewed down in Florida by Clyde Merryman and Steve Morris.

A Yes. Mm-hmm.

Q Then you got a letter that Divers signed off on saying that your claim for your lump sum is denied and that if you want to submit a claim for your lost property, you should submit forms under the Federal Tort Claims Act?

A Correct.

Q Did you respond to Neal Divers about that letter?

A No, I did not.

Q Did you ask anyone in the FBI why does this letter talk about the lump sum from Miami, the personal property, but it doesn't talk about the payment under the 1994 agreement?

A No. I never asked anyone. There wasn't too many people I think that liked Divers.

Q Could you turn to page 70 of Exhibit L?

A Mm-hmm. What do you want to know?

Q You don't need to read the whole thing, but

if you look at both of those top paragraphs, there's a reference to a Whity?

A Who?

Q Do you see the reference to Whity, W-H-I-T-Y?

A That's Whity Merryman.

Q Oh, okay. That's his nickname.

A Right.

Q The second paragraph there, let me read this and tell me if it's -- well, why don't you go ahead and read it.

A Pete told me that Whity told him that Espo told Whity to get this thing done by the 1st of August, and if he had any problems with California, L.A., for the persons to call Esposito.

Q Now that's a reference to a conversation on July 19, '96, right?

A That is correct.

Q If you look at page 71, the first date there is June 20, right?

A 6/20, 21, 22 and 23. No calls.

Q Right. So pages 70 and 71 don't seem to be in order, right?

A I don't know if they're in order or not.

Q Do you know if they came from the same pad?

A Yeah. They came from the same pad. Because you've got a 24 and here's a 24 again right after where I said no calls. I called Pete and he told me to call Esposito at 1-202-324-4260. I called Espo and told him about Miami and California and contact. He said he will look into it and let me know on Friday. He said they will do the right thing for me.

He said he will call me back at 9:15. He said he was going to call Mike in Boston and Chuck. Bill Esposito said that he has a SA on it, and he will talk to him and see what is going on.

Q And SA is special agent, right?

A Right. And that was Merryman.

Q You don't know why page 70 seems to have dates that are a little bit out of order compared to 71, do you?

A I think they're all in order. Where do you see where they're not in order?

Q Well, if you look at the first entry on page 70, it's dated June 24 --

A '96.

Q Right. And then the first entry on 71 is June 20 through the 23rd.

A Them are the dates where I didn't get any calls. I just added that in there.

Q Okay. I see. And then if you look again on page 70, you have that second paragraph, there's a July call, right?

A 7/19/96?

Q Right.

A Yeah.

Q You don't know why that's out of chronological order, do you?

A Well, it's just the way that I do things. It was something that I wrote in there to keep my head up on the thing with Espo. Here's when I called Gerry Spence, but I don't have --

MR. HEIDEMAN: As it relates to Spence, I'm going to ask counsel to agree that any reference that may be in these documents that as we've already told you were produced to us last night and we reviewed them and stamped them and turned them over, obviously inside review, we inadvertently missed the fact that there was a reference to any communication with any other lawyers, whether it's Mr. Spence or us -- maybe there's some references in here to us -- I would like to ask counsel to stipulate that any references that may be in this Exhibit L that have not been redacted as it relates to communications with counsel may by consent be redacted.

Secondly, a stipulation that the inclusion, the inadvertent inclusion and failure to redact, which of course would have created a privilege log, we would have told you about it, but the inadvertent discovery by us and failure to redact, I request a stipulation that it does not constitute any waiver of the attorney/client privilege.

And if you would consent to those two matters, I would be appreciative.

MR. SCHWARTZ: Well, we'll have to talk about that, because I'm not sure that any call to an attorney is necessarily privileged. It has to be a confidential communication. So I don't know. I don't think it's going to be a big deal, but I'm not willing to stipulate at this point without knowing what the circumstances of the call are, because apparently Mr. Spence did not agree to be his attorney. So I don't know what the conversation, whether it was actually privileged or not.

MR. HEIDEMAN: I believe it was privileged because he consulted with Mr. Spence to become his attorney, and I believe therefore we should agree since presumably that's not an issue in this case as to any lawyers he may have spoken with including us or what our communications would be, I renew my request

for the two stipulations.

Otherwise, I'm going to ask that we either recess so we can do another review with the client of this document to see if anything needs to be redacted. I don't want to waste anyone's time to do that, so you already have the document.

If any of us find something hereafter, that is, after the stipulation would go in, to effect, if that stipulation you feel prejudices you, I have no objection to you reserving the right to reraise the issue directly with us and, if necessary, with the Court, but I would request at least a week and continue going and not have to take the time to recess the stipulation on the two I hope you'll agree minor points but important points I've raised about my client's document turnover.

MS. MOORE: Well, how much is in there that does mention an attorney or attorney communications with Mr. Patton? How much is in there?

MR. HEIDEMAN: Maybe we can go off the record for the moment. We can take our five-minute recess, a 10-minute recess, not more than 10 minutes and let us confer with the client, do another quick cursory review and see if this is an issue. But I'm duty bound to make the request that I've made.

MS. MOORE: Why don't we do that, and then after 10 minutes, Mr. Schwartz will resume his questioning.

MR. HEIDEMAN: That's fine.

MS. MOORE: And I seriously doubt that whatever is in there is relevant to the case, but again, we need to discuss this, you know, before making a stipulation.

MR. HEIDEMAN: That's good. Sure. All right. We're in a 10-minute recess. Thank you.

(Whereupon, a short recess was taken.)

MR. HEIDEMAN: Can we agree that my request for a stipulation will be considered by counsel without prejudice to our continuing? Can we reserve on that and do something here?

MS. MOORE: Well, why don't we have you go through it carefully and let us know what else, if anything, there is, and then we will let you know our position on that.

MR. HEIDEMAN: Okay.

MS. MOORE: Meanwhile he can continue his questioning. I doubt it's going to touch on attorney/client communications.

MR. HEIDEMAN: Right. That's agreeable. Thank you.

BY MR. SCHWARTZ:
Q Could you look at page 74 of Exhibit L?
A I've got these all backwards. I don't know what I just did. This is all backwards.
All right. I'm there.
Q Okay. The bottom entry on 7/11/96.
A Mm-hmm.
Q Can you read that?
A Pete called and said that he talked to Fred and Fred was mailing the check to Larry in Texas today and I should hear --
Q Is that "have it", "have"?
A I should have it on Friday or Monday or Tuesday.
Q Do you recall the $2,500 you got for the Donald Webb --
A Mm-hmm
Q -- services came out of the Boston office?
A I have no idea where it came from, sir.
Q Do you know what check this is referring to in this entry you just read?
A Well, it didn't come to me as a check. It came to me in cash.
Q The $2,500 came in cash?
A Right.

Q Do you think this reference is about the $2,500?

A Yes.

Q Could you continue reading the entry on top of page 75?

A Mm-hmm. Pete said he talked to Whity in Washington, and he said that they agreed with us on the contents about they owe me to July 15.

Q Let me stop you for a second. Is that "they agreed with us on the contracts"?

A Mm-hmm.

Q Could you read it again, because I don't think it came out clearly the first time?

A They agreed with us on the contract and they owe me to July 15. He said Whity was going to talk to Espo today if he was in. I asked him when he thinks that will be done. He said in a week or two. He said that they had someone from California and Washington and they all agreed.

He said he told Whity that I was still willing to work for the B -- that's the Bureau -- and Whity said he will look into it. He told Whity about Florida and he wants --

Q Is that "was shocked"?

A Was shocked about hearing that. He told him

that Rick should have done something about it, and Whity said he will look into that now. Pete said if he hears something, he will call me on Friday.

Q And the part about "he was shocked", do you recall if that's about the property and the storage? That's what it was referring to?

A And the $150. He was totally shocked. It's just like I told you that the man sat in the interview with my daughter and my wife and me crying. He said I don't believe that the Bureau would do this.

Q You could turn to page 76, the entry that's dated July 17, '96.

A Mm-hmm.

Q Can you read that?

A Fred called and said that he was trying to get the check cut. As soon as he gets it, he will send it to Barry and call me and tell me if it is on its way. We talked a little bit about the *Ds*.

Q Do you know what that is? The *Ds*?

A Dallas. And I told him that they are not dumb people. I said if agents in Miami want to talk to me, I will talk, tell him what I know.

Q Do you know what that reference is to "a little bit about the *Ds* and I told him they are not dumb people"? What was that conversation about?

A I can't remember what the actual conversation was.
Q Can you read the next entry on page 76? It's dated July 18.
A Yeah. Pete called and asked what was the number on the contract. I gave that to him. He said that he will call Whity and ask for $28,125 plus lump sum.
Q Now do you know where that figure came from, $28,125?
A I have no idea.
Q Was it a multiple of the amount that you would have been paid under the contract?
A I have no idea, sir. He will call me back on what they say today or tomorrow. I told him what was said with Fred. Pete called and said that he talked to Whity and he thinks that Whity agrees with him on the matter, that it would be a letter --
Q A little more?
A A little more. He said I am on the first --
Q This is very hard to read, right, this passage?
A Yeah. It is.
Q I'm going to ask if you could try to make a better copy of this page.

A Okay.

MR. HEIDEMAN: Well, we'll do two things. We'll not only try to make a better copy after he gets home but secondly, we'll then type out the text and have him read the typewritten text and give you both the copy and the typewritten text, which we could if you wish once you receive it and approve it cause it to be attached hereto as the next exhibit so it's all in a logical place.

MR. SCHWARTZ: That's fine. I appreciate that.

MR. HEIDEMAN: We'll call that Exhibit M then once received, tendered to you, approved and transmitted for us. So let's be sure. You want the portion that is 7/18/96, if I'm reading right, on Group Exhibit L, page 00076, correct, on the bottom?

MR. SCHWARTZ: Right. Right. I'm going to thumb through it real quickly just because I may have missed others that are hard to read.

THE WITNESS: You know, Mr. Schwartz, under this 1994 contract, I was always willing and able to work for them. When I went to Dallas, I thought I was going to work, and from there, I always was willing and able to do whatever they wanted and I did it. And I just feel that who do you believe in this country

but our government? Is there anybody else that you can believe?

MR. SCHWARTZ: That's a good question.

THE WITNESS: Well, you should have the answer. You work for them.

MR. SCHWARTZ: I don't have an answer for you.

THE WITNESS: Okay.

BY MR. SCHWARTZ:

Q Could you look at page 77?

A Mm-hmm.

Q The first entry. If it's too hard to read, I definitely don't want you to guess at what it says.

A Yeah. It is very hard to read.

Q Yes. But if you want to take a shot at it?

A Pete called and said that he talked to Whity, and he said that I should have my money in California by the 31st of July. Whity told --

Q Let me just stop you there. Do you know what "my money from California" is referring to?

A $30,000.

Q Now, at this point in time, at least we haven't seen a reference to $30,000, right?

A No.

Q We saw a reference to $28,000 and change,

right?

A Mm-hmm.

Q So, at this point in time, do you know if the figure $30,000 had been decided upon?

A Well, I think that was between Esposito and whoever he talked to in California.

Q Okay.

A That's only my opinion. I don't know that for a fact.

Q Right. Okay. Please go ahead.

A It's pretty hard from there on.

MR. SCHWARTZ: Yes. So, with this page as well, this entry, if we could try to get a better copy?

MS. MOORE: Sure.

MR. HEIDEMAN: Why don't we call that Exhibit M-1 once we receive a better copy. And if you wish any portion of it typed out for him to review the typewritten portion to be sure it's the same, please tell us; otherwise, I won't offer that again. We'll just provide a better copy.

MR. SCHWARTZ: Yes. The prior page that we needed a better copy on --

MR. HEIDEMAN: Page 76 at the bottom.

MR. SCHWARTZ: Right.

MR. HEIDEMAN: We're going to call that Exhibit M and this next one M-1, but if you want a different numbering system, it's up to you.

MR. SCHWARTZ: Well, why don't we call the better copy of page 76 M-1 and then the better copy of page 77 M-2?

(Exhibits M-1 and M-2 were reserved for exhibits to be submitted and received after the hearing concludes.)

MR. HEIDEMAN: All right. We agree.

BY MR. SCHWARTZ:

Q Could you read the bottom entry on page 77?

A Larry Sandri called and said he had the money from Boston. He called at 2:30 and said for me to meet him at IHOP at 3:30. He met and he gave me $2,500 and I signed a receipt. I told him that there would be some money coming from California or Washington next week.

Q Let me stop you there. This is Larry Sandri that met you at the IHOP and gave you the $2,500?

A Right.

Q Do you know if that was on the date that this entry is made?

A That is correct.

Q Earlier I know you said that you had met Larry Sandri and another agent and talked about whether there were cases to work on?

A Correct.

Q Does this change your recollection about it?

A No.

Q So you met him then at least three times, right?

A Or more.

Q Okay. All right. Could you continue? Thanks.

A From California to Washington next week. He said he will call me as soon as he gets it. He told me some things about his case and they had to get a bigger warehouse. He talked a little bit about the things in Florida. He said he can't believe it. I told him that someone was working on it. I didn't know who knew what about what. I told him to say hello to Vick. He said he will.

Q Do you know who Vick is?

A Well, yeah.

Q Is it Vinny?

A Vinny.

Q And you mentioned him earlier, but you don't remember his last name, right?

A No. I got it here somewhere. I mean, it was on one of these pages that we just read. This doesn't tell you the last name. It just explains --

Q Okay. Could you continue reading that?

A He said he can't believe it. I told him that someone was working on it. I didn't know he knew about Florida. I told him to say hello to Vick. He said he will. I left him about 4:07 and went home. I called Pete and left a message on his answering machine that I got the money from Boston.

Q Could you turn to page 78? There's an entry in the middle of the page. It looks like it's dated 7/29/96.

A Talked to John and he said he was in court last week in New York on a kiddie porn case. I told him about our cases in California that Pat turned down. He said that he has not talked to Mike yet. I told him to call Pete and give him the number again. He said he will try to call him.

Q Do you know what the reference to give him? Is that the numbers again?

A Right.

Q Do you know what the numbers are?

A I don't remember at this time.

Q Do you think it's the numbers, the amount of

money you were getting under the contract?
A I don't remember, sir.
Q And who was this a conversation with?
A John Donahue.
(Pause.)
Q Could you turn to page 79?
A I don't have a 79. Oh, here it is.
Q The middle. The long entry that's dated July 30, '96.
A Pete called me and said for me to call a SA in Chicago. He said that they know this SA Chuck and Pete knew him. I asked Pete about Whity getting the things out of California.
Q Now let me stop you there. Do you know what that means? "I asked Pete about Whity getting the things out of California."
A The money.
Q Okay. That's the money that you were owed under the agreement?
A No. The $30,000.
Q You mean you're talking about a lump sum that was promised you?
A Yeah.
Q Now, when you say the $30,000, just to be clear now, at this point in time, this is July 30, you

did not know what the figure was going to be, right?

A No.

Q Okay. Please continue.

A I asked Pete about Whity getting the things out of California. He said he will immediately call Whity. He said that he would be disappointed if this was not done by tomorrow. He said he will tell Whity about three things in Chicago. He says that he will call Dallas and call me back.

Pete called back and said that he talked to Dallas Alby and told him that he should not provide where I am.

Q What's the word after "he talked to Dallas"? It begins with an *A*. See that? The second to the last line in that entry. Do you know what I'm referring to?

A I'm trying to.

Q Okay.

A He said that he will call Dallas and call me back. Pete called back and said that he talked to Dallas Alby and told him that he should not provide where I am.

Q What was the word again? Alby?

A Well, that's probably an abbreviation for who the SAC was there at the time.

Q But not Jim Adams?

A No.

Q Now, again, I don't want you to guess. You're not sure what that is, right?

A I'm not sure.

Q Okay. And later in the sentence, "and told him that he"?

A Should not provide where I am.

Q Okay. What does that mean?

A I don't know.

Q Could you read the next entry, July 30, '96, page 79?

A Called Chuck and he said to make sure that the money I'm to get from California does not include Florida. He said he will talk to Pete about it and for me to talk to Pete about it. I asked him to talk to Kent about New Orleans, Jax or Oklahoma, Jacksonville or Orlando. Then I could look for D.W., Donald Webb. He said okay, he will ask around. He said that he was going to Washington and he will call me on Friday.

Q Now the reference to New Orleans and Jacksonville and -- what was the last one?

A Orlando.

Q Orlando. Do you know what that's a

reference to?

A Yeah. Go to work there.

Q So you were talking to?

A Chuck Goodwin.

Q Chuck about where you might go to find work?

A Right. Mm-hmm.

Q The first part of that entry, "he said to make sure that the money I'm to get from California" --

A California does not include Florida.

Q What does that mean?

A The money that I was supposed to get from Florida for my storage and the --

Q Now, the money you were supposed to get from California, was that both the lump sum and the payment under the '94 agreement?

A Correct. See, under the '94 agreement, I still thought he was willing to work under that agreement because it was never terminated, and why it was never terminated, it wasn't until 2002, but I was willing to go anywhere they wanted me to go.

Q But none of that panned out, right?

A No, but that's not my fault. My fault was I took their word for it that I would work for them anywhere they wanted me to go. With the knowledge I

have about organized crime and drugs and everything else, I could be the best person they could ever have working.

I worked very hard for them, which you know. You've read what I've done for them. I worked hard, I was honest. Never had no problems with anybody until this contract thing come up. And that's not right. It should not be that way. Who am I going to trust besides them?

Do I go on the other side now? Go back to the other side? That's impossible. You can't do that. And it's a shame that the American people have so much belief in our government and it turns out to be like this. It's a dirty, rotten shame. Who else are you supposed to believe? You don't want to answer that, right?

Q Correct. Could you turn to page 80?

A And what would you like on there?

Q The long entry dated 7/31/96.

A I called Jim Robertson in Chicago and he talked about the SUP I got.

Q Now do you know who Jim Robertson is?

A He's an agent out of Chicago.

Q And what's the SUP?

A The SUP I got. Sums that I got.

Q I'm sorry. My hearing --
A I don't really remember. It was an abbreviation of something.
Q Okay.
A I told him that I don't know what help I will do for them on this case. I told them that if it was the California case, I could help.
Q Now let me stop you there. Do you know what that means? "If it was the California case, I could help."
A Well, he's asking me for help. Jim Robertson is asking me for help on a case in Chicago against Rocky Infelise and some of the other crews that they had.
Q Right. And what's Rocky's last name?
A Infelise.
Q With an *I*?
A No. With an *E*. Enfelise.
Q Do you know how to spell that?
A No, I don't, because I know him as Rocky.
Q Now, the sentence "I told him", is it "that if it was a California case, I could help him"?
A Right.
Q And again, I'm not sure we got to that, what that means.

A The California case was with regards to the San Diego case.
Q Okay. So this is not the reference --
A Because the ones in San Diego, they were Donald Angelini; John DeFonz, who became the boss; Sam Carlisi; and Dominic Cortina, but he got a separate trial.
Q So this is unrelated to the work you did with the Los Angeles division?
A Correct. This is related to the San Diego case.
Q Could you finish reading this entry?
A But I don't want to hurt the case out in California. He said he understood that and he said that he will talk to the ASUSA about what we talked about and get back to Chuck or Pete. I gave him Pete's numbers and he said that he will call them on Monday. I said we should get together soon so I can see where I can help them. He said he thinks that would be a good thing to do.
Q Thank you. Can you turn to page 81?
A Okay.
Q And read the top entry, which is dated August 1, '96?
A I called Pete and he said that he talked to

Chuck the day I talked to Chicago, and he said that he told me that the sum of $28,000 to $30,000 was for California and Florida. I said that's not what I understand. He said he has a call on a bombing and he will call me tomorrow. He said Whity was waiting for California to call him.

Q The reference to a bombing, it just means he was busy on something else? Is that what it was?

A He got a call that he had to leave his office.

Q Right. That had nothing to do with you?

A No.

Q So you're talking to Pete --

A This is Mark. Let's go down here to '96. 8/6/96. Called Mark and we talked about California and Florida. He said it's time for me to get an attorney. You have to look out for yourself. He said he will come --

Q "Call me" is that?

A Call me later.

Q Right. Getting back to the first entry on page 81 where it says -- I'm going to read it from the beginning, because it seems like you're talking to Pete about what Chuck said.

A Right. Yes.

Q It says, "I called Pete and he said that he talked to Chuck the day I talked to," it looks like Chuck, right?
A Chuck. Right.
Q "And he said" or "he say that he told me that the sum of $28,000 to $30,000 was for California and Florida." So am I correct that Chuck Goodwin had a conversation with you and told you that you were going to get paid $28,000 to $30,000 and that was going to be for California and Florida?
A No. It was California only.
Q Well, what does the reference mean and your understanding again?
A That it was for California only.
Q But somebody told you it was for California and Florida, right, and then you said that that was not what you understood?
A I believe it says California, not Florida. That's the way I abbreviate not, Florida.
Q So you think it says $28,000 to $30,000 was for California, not Florida?
A Right.
Q The next sentence says "I said that" --
A That's not what I understood.
Q And why is that not what you understood?

A Because I thought it was going to be more at that time for California.

Q The symbol between California?

A So then you see as you go on, see, you always stop before you go any further. "He said Whity was waiting for California to call him." So that's the sentence where it tells you he's waiting for California where Florida has nothing to do with it. It's just California.

Q I just want to make sure the record is clear. The line on page 81, an entry dated August 1, '96, the fourth line down starts "$28,000 to $30,000 was for Cal," which is abbreviated C-A-L.

A Not Florida.

Q And that symbol between C-A-L and F-L is a not?

A Right.

MR. HEIDEMAN: But it looks like what we would call an ampersand or an and sign.

THE WITNESS: Right.

MR. HEIDEMAN: But is that not the way you do -- show us another example of --

THE WITNESS: Here's another.

MR. SCHWARTZ: Okay.

MR. HEIDEMAN: He's pointing to 8/6/96,

third entry up from the bottom, same page.

Maybe, counsel, you could move to that and inquire. I'm not trying to direct him. I'm trying to make sure we don't have an inadvertent misunderstanding here.

THE WITNESS: Called Mark and we talked about California, not Florida. He said it's time for me to get in with him. You have to look out for yourself. He says he will call me later.

BY MR. SCHWARTZ:

Q How sure are you that that symbol -- now let me again refer to page 81 of Exhibit L. The entry is dated August 1, '96.

A Uh-huh.

Q It's the fourth line of that entry.

A Right.

Q The symbol between Cal and F-L for Florida, how sure are you that that stands for the word not?

A Because not would be too big of a writing for me to put in, so I abbreviate not. That's the way of my abbreviation to understand.

Q So you're positive that that stands for not?

A Yes, sir. And it's the same thing down here through the but when I talked to Mark.

MR. HEIDEMAN: And what do you use then as a

symbol for and, A-N-D, because I think all the lawyers at the table when we write an ampersand and we don't use the squirly curly que ampersand we put something that looks like a cross, but it -- right. And to us, that means and, but you're answering the question that that doesn't mean and, it means not, so can you explain the discrepancy?

THE WITNESS: Right. Well, that's just the way I do it.

BY MR. SCHWARTZ:

Q And you're absolutely sure of that?

A I'm positive. And probably if you go through a lot of this, you're going to see that as not.

(Pause.)

Q Can you turn to page 82?

A Okay.

Q The long entry that's dated August 6, '96?

A I talked to Chuck, and he said that he was doing all he can about the money.

Q Does that say "the money thing"?

A On the money thing.

Q Thing?

A Right. I asked him if Pete was mad at me. He said he talks to Pete every day and Pete is not mad

at me. He said that he's talking to Kent in Washington and --

Q Are you sure that's Kent? Could it be Keith?

A Could be Keith.

Q Okay. But you're not sure?

A No. In Washington. He did not have anything for me, but he will look around. I told Chuck that I talked to Jim Robertson and I told him what was said. He said that he has not heard from Jim Robertson. I told him that Jim said he will call Chuck on Monday, but Chuck said he has not heard from him. I told Chuck that I gave Jim Robertson Pete's phone number.

Chuck said I ought to go into business when I get the money, and then when they need me, they can bring me in on cases. He said he will call me when he hears something.

Q This is a conversation with Chuck Goodwin?

A Right.

Q And he says that you should go into business when you get the money?

A Right.

Q Do you know what money he's talking about?

A Yes. The money from California.

Q Right. "And then when they need me, they can bring me in on cases."
A Right.
Q "They" being the FBI?
A Right.
Q Can you try to read the next entry on page 82?
A I talked to Scottie in California.
Q Let me just stop you. This one, can you tell the date on that one?
A 8/6/96.
Q Thanks.
A I talked to Scottie in California and he said he did not get the money yet. I said -- no. Did I get the money yet? I said no. He said that they dropped Ori and he said that he talked to Lloyd and Lloyd was a sick man. The SACs from New Jersey are coming out next week.
Q Could you keep reading? I think it continues.
A I'm trying to find 83. When you guys took it over there, it got all out of line.
To talk to Lloyd and Pipes on Ori's case. He said he saw Ori and --
Q Is that "the Marshal"?

A Yeah. The Marshal coming out of Frankie's. He said that Marshal is no longer with the Marshal service. He was the Marshal that was driving around, a United States Marshal. He was driving around an organized crime figure -- and Ori was supposed to bring him to California for me to wire him, you know, get him on a conversation about how he was living because his son lives out in California.
[redacted]
Marshal was supposed to be the chauffeur. So we were planning to get him on tape. We had surveillance, 24 hour monitoring. Ori came by himself and said the Marshal would be coming.
Q Was that around the time of this note, or was that when you were still in Los Angeles?
A That's still in Los Angeles.
Q Right. Could you finish reading that one, that entry?
A He said the Marshal is no longer with the Marshal service. He said he will call me when he can. He said that Ori gave him a phony tape. It was Ori talking out --
Q "Only" is that?
A It was Ori talking only. See, I think he tried to get Ori to wire up to meet with this Marshal

and the guy never showed up. He probably was scared. Most people don't like to be wired up. You've got to be a certain type of person to be wired up. It takes a lot of confidence when you're wired up.

Q Right. Could you read on page 83 the first entry dated August 12, '96?

A Pete called and said that he talked to Whity and Whity said that he had --

Q Oh, let me stop you. The entry at the middle of the page. It has 9:40 a.m. next to it.

A Okay.

Q Thank you.

A Called Pete and he said he did not hear from Whity and he will call him and call me back. He said the last time he talked to Whity, he said he was Whity -- he said he was Whity --

Q Is that "waiting"?

A Waiting for California to shit or get off the pot.

Q Meaning that he was waiting for the Los Angeles division to make some kind of a decision?

A Right.

Q And what was that decision about as far as you know?

A I have no idea. Pete called and said that

he talked to Whity and Whity said that he has not heard from California. He said that Parsons left California and that Tim McNally was in for the job. He said that Tim was a friend of his. He said that he will talk to Whity tomorrow and tell him what is going on.

I asked him if he heard from the SA in Chicago and if the subpoena is still in force. He says he will call him tomorrow and see what he has to say. He said he was going to call me tomorrow.

Q Thank you.

A So see, this is something that, Mr. Schwartz, I'm trying to say. See, a lot of people called and they used to call through Chuck or through Pete or John to get me. Then they would have me call these agents in Chicago. They had vacations going on, and they'd pick my brain to see who these people were and who they were connected with, and that's what I did, because I was under contract. I had to do what I was told to do, and I did it. And this is all the way up until '96, and it goes on further.

Q Can you go to page 84?

A I'd hate to be the person that has to put these back together. Eighty-four.

Q The top entry does not have a date. It

doesn't look like it's a continuation of 83, but if you can go ahead and try to read that one? If you can't read it, just --

A No, I can't.

Q Okay. I see a name. It looks like it says Jim or Tim Rose at the end of the first line?

A Ruby.

Q Oh, okay. Ruby. Do you know who that is?

A (Nonverbal response.)

MR. SCHWARTZ: Counsel, this looks like this page got cut off a little bit along the right side.

MR. HEIDEMAN: What's the page number? I'm sorry.

MR. SCHWARTZ: It's Exhibit L, page 84.

MR. HEIDEMAN: So let's agree that we will provide a better copy, and it will become Exhibit M-3.

MR. SCHWARTZ: Okay.

(0xhibit M-3 was reserved for an exhibit to be submitted and received after the hearing concludes.)

MR. HEIDEMAN: And for purposes of ease, with your permission, counsel, we will send those copies simultaneously to you and the court reporter. After you have reviewed it, if it's an acceptable

copy, you could simply let the court reporter and us know that as we transmitted it as Exhibits M-1, M-2, or M-3 or any other ones, they are acceptable for inclusion in the record or you want another better copy.

MR. SCHWARTZ: Okay.

MR. HEIDEMAN: Is that agreeable?

MR. SCHWARTZ: That sounds good.

MR. HEIDEMAN: Thank you, counsel.

MR. SCHWARTZ: I'm going to try to speed it up here a little bit.

THE WITNESS: What time is it?

MR. HEIDEMAN: 3:18. Does anybody need a break? Otherwise, we've agreed to break at 4:00, but does anybody need a break now?

(No response.)

MR. HEIDEMAN: Okay. Thank you.

BY MR. SCHWARTZ:

Q Can you turn to page 84 and read the bottom entry dated August 16, '96?

A Pete called and we talked about his mother-in-law. Said he had talked to Whity about the money and they talked about the $150,000 from Florida. Pete said -- and then there's no more there.

Q Right. If you go to page 85, it looks like

it continues.

A He said Whity and the assistant director under Esposito were going to talk to Espo on Monday and they were going to talk to Espo about California and doing what they said --

Q Does that say "not doing what they said"? "California not doing"?

A Yeah. Not doing what they said they would do and tell Espo about the $150,000. We came to a -- I don't know what that is. $75,000 for everything, and he said that was fair, and he will call Whity and the assistant director under Esposito and then tell what we appear to --

Q Now let me stop you there. This $75,000 for everything, do you remember this discussion?

A Mm-hmm.

Q Is that a yes?

A Yes.

Q Is that a discussion that you had with Pete McCann?

A Mm-hmm.

Q Is that yes?

A Yes.

Q And the two of you, it looks like you came to an agreement between you and Pete that you would

accept $75,000 for everything, is that right?

A Everything. See, you always cut off things. Let's go back. You said about the $150,000.

MR. HEIDEMAN: You're referring again to Exhibit L, 85. Go ahead.

THE WITNESS: Right. About the $150,000. We came to an agreement for $75,000. Half of the $150,000 makes $75,000 in the school I went to for everything, and Pete said that was fair and he will call Whity and the assistant director under Espo and tell them what we agreed to and he would --

BY MR. SCHWARTZ:

Q Is that "recommend"?

A Recommend that we get this done now. He said he will call me after he talks to them and let me know. I asked him if I was to go on to high or too high. He said that he thought it was fair and he was surprised at amount I wanted. Pete said that Chuck told him that I did not have to be -- I don't know what that is.

Q Okay. Now let me -- again, I don't want you to think I'm putting words in your mouth.

A You're not.

Q I'm just asking you the line that says "we came to an agreement to $75,000 for everything."

A Right. But here --

Q Let me ask my question.

A Okay.

Q What was "everything" referring to?

A The $150,000 for Florida.

Q Anything else?

A No.

Q So it did not refer to the monthly payments under the contract?

A No. Nothing. Just half of the $150,000 that I was promised orally it looks like.

Q Can you turn to page 86?

A Eighty-six is not in here.

Q I'm going to hand you mine.

A Okay.

Q If you can read the bottom entry? It looks like it's dated 8/23/96.

A Pete called me back and said that he did not get Whity and that he thinks he talked to Whity AS and gave him his home number and for him to tell Whity to call Pete at home tonight. He said he told Whity about our agreement on the 70 and they all agreed. He said he did not know if it was coming out of California or Miami or Washington, but it should be done he said.

Q Let me stop you there. Is the reference to the 70, is that $70,000 you think?
A Yeah.
Q And was that a figure that you had discussed with Pete?
A The 75, right.
Q Well, yes. Here it says 70.
A Seventy. Right. So it's just instead of him saying 75 he said 70.
Q And is it your recollection that that was going to be just to cover the $150,000 lump sum from Miami?
A Yes, sir.
Q If you look at the following part, he says he didn't know if it was going to come from California.
A Right. Or Miami or Washington.
Q Right. Now do you have any idea why payment for the lump sum from Miami would be paid out of California?
A I have no idea.
Q That doesn't make you think that you were talking about settling everything?
A No. I never was going to settle for $75,000 for everything. No possible way.

Q Could you continue where you left off?
A But it should be done. He said that the only thing that he thinks can be holding it up is the money owed in Miami. He said he will call me tomorrow after he talks to Whity. He said that Whity is no -- whatever. From there, I can't read.
MR. SCHWARTZ: Thank you.
MR. HEIDEMAN: Counsel, since it's almost 3:30, I just wanted to raise one question.
MR. SCHWARTZ: Okay.
MR. HEIDEMAN: You're welcome to continue going as you are. But if there are any issues, questions that you intended to raise in this deposition, wanted to raise in this deposition that related to any aspect of this case other than that which arises out of the Group Exhibit L document that we tendered to you this morning, if there are any other such questions, if you would kindly before we recess today address those so that what may be reserved in accordance with what we said earlier in the deposition would be questions that relate to or arise from the Group Exhibit L document? That is our request and would be appreciated.
MR. SCHWARTZ: Okay. Your request is noted, but it's hard to separate out the two because the

notes obviously relate to the issues that we discussed earlier and are shedding more light on it, so I'll try to do that, but, you know, there's not a fine definition, a fine dividing line between the two.

MR. HEIDEMAN: And I agree that there's not. I'm simply saying you clearly have come to the deposition well prepared to cover all kinds of things. I'm hoping that before we recess today you will have covered all of those things and then perhaps leave for any post-recess resumption by telephone or written depositions or otherwise issues that arise out of the documents without intending to preclude you from addressing the substance of what's in the documents.

I hope my point is clear, and I thank you for your courtesy in trying to get out of the way all of the other preprepared questions if at all possible.

THE WITNESS: I need to take a couple minutes break.

MR. HEIDEMAN: All right. Thank you. We are in a five-minute recess.

(Whereupon, a short recess was taken.)

BY MR. SCHWARTZ:

Q Okay. Because we're short on time, can you turn to page 132 of Exhibit L?

A You mean that first one or second one?

Q Okay. Actually, let me ask you to turn to page 128 first.
A Okay.
Q And there's an entry. The big entry.
A Whity called?
Q Right. That's dated 10/28/96.
A Whity called with another agent on the line. I don't remember his name. They talked about the California contract, and they didn't believe the contract is in force because I am --
Q Is it "actually"?
A Actually not doing anything for the Bureau, Federal Government, but they asked me what my expenses were here. I said approximately $2,000, and they said they will -- that they will --
Q "That they said well, how about"?
A Said well, what about $2,000 a month for eight months, which comes to $16,000, and I said no, I am not going for that. As far as I am concerned, the contract is still in force until I receive something in writing because that is what the contract says. I said a contract is a contract. As far as I am concerned, I am owed $32,000 on the contract, which is less than what the contract reads. They kept pushing the $2,000 per month, and I said okay, if you want to

go with $2,000, what is the lump sum going to be? They say that they don't know that it's --

Q Is it "they said they don't know that"?

A Right. That's what I said I think.

Q Go ahead, please.

A Now we've got to go to 29?

Q Right.

A Up to the people --

Q I don't know if you read the last part of the bottom of 128. Looks like it says "It is strictly."

A It is strictly up to the people they work for. I told them I got $25,000 from Maryland. They said okay, how about if we settle for $25,000? I said no, I would not settle for that. They asked what I would settle for. I said $40,000. That is $32,000 for the contract, $8,000 lump sum. They said they didn't know if that could be done -- that could --

Q "If they could"?

A If they could do that, but they would bring it upstairs and see what they say. They asked me about the Florida thing. I told them about the $150,000 I was promised plus also the storage, loss of the storage. I explained all about the money problems in Florida and the promise that was made about the

Bureau taking care of the storage.

The other agent on the line asked me how much I would take for all three things. I said I would have to think about that and talk it over with my family. I said let's get the California thing done first, then we can work on the Florida thing. Whity said that was like an alternative investigation in Florida.

I told them who all knew about this. They asked the attorney's name and I told them. They asked who was with me when I was told, and I told them it was Special Agent Malynda Irby. They said let's find out about the storage thing like three months ago. I asked them when I would have a answer on this California thing. They said they or Pete McCann will call me by noon tomorrow.

The conversation then got very heated because they constantly were saying that I did not do anything for the last months for the government. As far as they were concerned, if you don't work, you don't get paid. I told them that I know who told them because they knew there is a disagreement between California and me.

I know they told you that I had a verbal cancellation of the contract. However, I said that is

an outright lie and would be willing for me and the agent likewise taking a lie detector test, and if I fail, they wouldn't have to pay me. If he fails, then he gets fired. They said wait a minute. We don't have to go that far. We have your word.

Q Is it "We took your word"?

A We have your word and we know all the good you have done for the Bureau, and you should keep in good standing with the Bureau. They mentioned if I considered going into the witness protection program, they would give you a new ID and give you a job. I said I never had that thought and never would have that thought. They kept saying you want to stay in good graces because we might have some work for you. Whity said that sometimes people understand what they are doing, are told.

Q Can you go now to 132?

A I think I want to get a photocopy of this. I think I want to get a book. I'm going to have somebody write me a book so I can send you a book.

Q Can you look at the bottom entry? It says 11/1.

A 11/1. Pete called and said he talked to Whity and there is an offer for $30,000. He thinks you should take it because that is the final and only

offer, and if I don't receive it --

Q Is that "accept it"?

A Accept it I can get in line with all the others and sue for it. This is for L.A. only. He said he could call Whity and tell him our conversation, sign off, and I will have a check in hand. Pete thought the amount was low but said your back is against the wall and you will have no other choice but to sue.

Whity is supposed to call me when the check will be cut, when I should have it in hand. Pete says he will call and discuss this with Chuck and that if Pete has another option, he'll call and let me know. He said he will call me later anyway. He has two calls in for Prillamen.

Q Do you know who Prillamen is?

A He was the deputy director.

Q And this is a conversation you had with Pete McCann?

A That's correct.

Q And he had talked to Whity, and Whity was Clyde Merryman, correct?

A Right.

Q And Clyde Merryman was an FBI official at FBI headquarters?

A He was assigned to this case by Esposito.

MR. HEIDEMAN: When it says "L.A. only", what does that mean?

THE WITNESS: $30,000.

MR. HEIDEMAN: For what?

THE WITNESS: For the lump sum. For me to leave. $30,000.

MR. HEIDEMAN: What do you mean, "leave"? You mean going to Dallas?

THE WITNESS: Yeah.

BY MR. SCHWARTZ:

Q If you look back, Mr. Patton --

A Pete called and said he talked to Whity and their offer is $30,000.

Q Just so the record is clear, when there's a reference to L.A. in these notes that you've just read, that refers to your claim about not having received your monthly payment under the 1994 agreement and the lump sum you say you were promised, correct?

A No. It's just the lump sum I was promised.

Q Well, let me put it this way. The reference to L.A. does not include the $150,000 lump sum you said that Miami had promised you, nor does it refer to your personal property claim, correct?

A Right.

Q And if you go back to page 129, which you read a minute or two ago?

A Yeah. What about it?

Q There's a discussion. It says fourth line down, "They asked what I would settle for. I said $40,000. That is $32,000 for the contract and $8,000 lump sum." Do you see that?

A Mm-hmm.

Q Is that a yes?

A Yes.

Q And this is a note of conversation that you had on October 28, 1996?

A Right.

MR. HEIDEMAN: What was that settlement for if you were willing to settle?

THE WITNESS: Just for the money coming from, you know, the money I was promised from Mike Wacks to me to go on to the same case where the cases were over. The contract wasn't over, so it had nothing to do with the contract. The contract was still in force.

BY MR. SCHWARTZ:

Q Mr. Patton, referring again to that entry on page 129 where you said "I said $40,000. That is $32,000 for the contract and $8,000 lump sum," the

contract you're referring to is the 1994 agreement with the Los Angeles division, correct?

A No.

Q Okay. Then what is that contract?

A It's been so far long ago I can't remember that. It had nothing to do with this contract.

Q That's your sworn testimony is that the reference to the contract you're positive is not the 1994 agreement with the Los Angeles division?

A You're correct.

Q And you don't know what contract this is talking about?

MR. HEIDEMAN: Excuse me. You said with the Los Angeles division. You mean the whole contract or the work that was done in Los Angeles?

MR. SCHWARTZ: Thank you.

MR. HEIDEMAN: I think that's the confusing issue.

MR. SCHWARTZ: I appreciate your pointing that out.

BY MR. SCHWARTZ:

Q You're saying that the reference to $32,000 for the contract is not the 1994 agreement that's Exhibit B?

A No. It's not for our contract, but I

include 202. This is '74.
Q So it's not for that contract that's Exhibit B?
A No.
Q But you don't know what contract it's for?
A I don't believe it was meant for a contract. I believe it was meant for the lump sum that they owed me for leaving there after the work was done.
Q Well, your notes do distinguish between the contract and the lump sum, correct?
A Yeah. You're right.
Q And if you go back to page 128, which is the earlier part of that --
A $75,000. That's as to the $150,000. I settled for half of that.
Q If you'd go back to page 128? Do you have that handy?
A 128. What?
Q If you look at the beginning of that long entry dated 10/28/96?
A Mm-hmm. Right.
Q Second line. They talked about the California contract.
A Mm-hmm.
Q That is Exhibit B, isn't it?

A I guess it is. They talked about the California contract. They didn't believe the contract is in force is what they're saying. They're not saying about any money about it.

Q Right.

A They're just saying they don't believe it's in force, and my position was it's still in force until I get something in writing stating that it's not in force.

Q Now, if you look at a couple of lines down there, it says, "But they asked me what my expenses were here, and I said approximately $2,000" --

A Right.

Q -- "and they said well, how about $2,000 a month for eight months, which comes to $16,000."

A Right.

Q Now the eight months --

A And I said no.

Q You said no. Do you know where they came up with eight months from?

A I have no idea.

Q Well, I think we established earlier that the last payment you had received under the 1994 agreement was in February of '96?

A Right.

Q So if you count from February of '96 to the date of this conversation, October 28, '96 --

A That's six months. You're talking six months.

Q Well, if we count --

A From two to 10 is six months, right?

Q Two to 10 is eight months, isn't it?

A Yeah. Two to 10 is eight months.

Q Right. So you were talking about the 1994 agreement when you proposed that you would get $2,000 a month under the agreement as part of the settlement, correct?

A No. If you see what I say in here, I said no, I will not agree with that.

Q Well, correct. They had proposed that, correct?

A Right.

Q Okay. They had proposed that they would pay you $2,000 a month under the --

A Yes. But this was for --

Q Let me finish.

A No, but wait a minute. Let me say something, too. You stop at a sentence and then you don't want to go no further. I said no, I am not going for that. As far as I am concerned, the

contract is still in force until I receive something in writing because that is what the contract says. I said a contract is a contract.

As far as I am concerned, I am owed $32,000 on the contract, which is less than what the contract reads. They kept pushing $2,000 per month, and I said okay, if you want to go with the $2,000, what is the lump sum going to be? They said they don't know that.

Q And you said I am owed $32,000. That would be eight months times $4,000 a month, right?

A Right.

Q and you used the $4,000 figure because that was the services figure, right?

A Correct.

Q You weren't claiming that you should be paid expenses, the expenses part, correct?

A That is right. At that time, because I was planning not to go into a suit. I was trying to negotiate with them. Esposito tried as hard as he can and he couldn't get no further up. And that's when they all told me I better get a lawyer and just go do what I got to do, which you will read in many of the letters.

Q And now getting back to page 132 of Exhibit L.

A What about it?
Q You're still sure that when it says Pete called -- and this is --
A Right.
Q -- the November 1 entry.
A And offered $30,000.
Q And he thinks you should take it, that that $30,000 was for --
A That's what I got.
Q Let me figure --
A The lump sum.
Q Right. Let me finish. That was for the monthly amount that you were claiming under the contract plus the lump sum?
A No. No. It was the $30,000 that I got from leaving California, and that's what we finally agreed to, the $30,000, and that's what I got, $30,000.
Q Can you go to page 133?
A Yeah. What about it? I got it.
Q The entry that starts in the middle of the page, November 1, '95. Can you read that?
A Yeah. It says, "Whity called and said he understood that I agreed about the $30,000." That's what we were talking about. "I said yes, I guess that's the only thing I could do. He admitted that

California made a big mistake, but who is to know if you would have gotten this much of the lump sum?

"Maybe if you went another route you might get more, but who knows how long that could take? I told him that I still wanted to stay friends with the Bureau and would still be open to working with them. I mentioned New Orleans, and he said that might be good place for you. He said he will go upstairs because Prillamen leaves early on Friday and he wants to get this done.

"He will find out exactly when I will receive my money. After he finds out, he will call Pete and he will give us a date. He said they will try to put" -- then it goes on to the next page.

Q Do you have that next page?

A I'm going to look for it. "Have some work for you. Whity said that sometimes people misunderstand what they are told."

Q Was that page 134 you were reading from?

A 131. I should go to 132, right?

Q No. You should go to 134.

A 134?

Q Right. Because I think the last part you read --

A All things together, but he --

Q Let me just stop you for a second. I think the last part you read was from page 131.

A Can only make all things together, but he stayed in and said let's get this done first and then go on with the Florida thing. He said I have to pat myself on the back for that because you never know how long that would take.

Q Now you weren't very happy with the $30,000, correct?

A With what $30,000? That I got from California?

Q Correct.

A No, I wasn't happy with it. When I got 25 from Annapolis, I should have got 100 from them for all the work I did out there.

MR. HEIDEMAN: Counsel, we're at 4:00. I'm not trying to cut you off. If you have a few more minutes of important relevant things that need to be done today since we may never reconvene, please do them now if you can.

MR. SCHWARTZ: Okay. We'll stop now, because I don't want the witness to rush. You know, we hadn't finished going through it, but I'll go through it and we'll wait for --

MS. MOORE: The copies.

MR. SCHWARTZ: -- the copies. So we'll end the deposition for now and reserve the right to continue it at a later time if necessary.

(Whereupon, in the presence of counsel, reading and signature were waived. At 4:00 p.m, the deposition was adjourned, to reconvene sine die.)

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

I have read the foregoing pages 1 through 208, and they are a true and accurate record of my testimony therein recorded, and any changes and/or corrections appear on the attached errata sheet signed by me.

______________________________________

THOMAS PATTON

Subscribed and sworn to before me

this _____ day of ___________, 200_

___________________________________

Notary Public

My Commission expires: __________________________

JURISDICTION: ___United States Dept of Justice______

Before me, the undersigned authority, personally appeared___Thomas Patton____ who, after being duly sworn states that he/she has read the foregoing deposition transcript, and states that he/she wishes to make the following changes or corrections to this transcript for the following reasons:

PAGE LINE CHANGEREASON FOR CHANGE

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

The witness states that the deposition transcript, pages 1 through 208, is otherwise true and accurate.

______________________________

Thomas Patton

SWORN AND SUBSCRIBED before me on the ______ day of ___________, A.D. 19__.

__________________________

Notary Public

My Commission Expires: __________________

CERTIFICATE OF COURT REPORTER/NOTARY PUBLIC

I, Bernadette Herboso, the officer before whom the foregoing testimony was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me and thereafter reduced to typewriting; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto; nor am I financially or otherwise interested in the outcome of the action.

______________________________

Court Reporter/Notary Public

My Commission Expires: 11/14/2008