# EXHIBIT A

# Patton v. United States

# Case No. 01-161C

DEFENDANT'S EXHIBIT 20



gap between Patton 172 and 204, and, Faye, if that's not intentional, then --

MS. EISEN: That must only be in that package, because it's good in our package.

MR. HEIDEMAN: Okay. So I'll give it back to you.

MS. EISEN: Yes.

MR. HEIDEMAN: Give me a different one that you think is complete, and then I'm finished with this explanation. Ted, thank you for your patience.

Yes, this one that we'll give you starts again with these phone records at Patton 000173 and then runs through Patton 000215 of phone records. We'll be glad to explain this again, but I wanted you to know what you have.

MR. SCHWARTZ: Thank you. Counsel, how come these records were not produced earlier when they were originally requested?

MR. HEIDEMAN: We received them from Mr. Patton. Some of them, by the way, I believe have been produced. If we had them before, they were produced. We received them from Mr. Patton upon his arrival here in preparation for the deposition and direct response to your subpoena.

MR. SCHWARTZ: You have not produced any of

these records before.

MS. MOORE: Yes. Actually you haven't produced any documents at all.

MR. HEIDEMAN: I believe phone records were produced.

MS. MOORE: No, no. We've asked for them many times for the past three years in about five different letters. We haven't seen one phone record, nothing, not one document even.

MR. HEIDEMAN: We received these particular documents last evening after Mr. Patton got off the airplane. We stayed last night and reviewed them, Bates stamped them, and we're producing them at the outset of the deposition.

MR. SCHWARTZ: Okay. All right. That's fair enough.

THE REPORTER: Would you raise your right hand, please?

Whereupon,

THOMAS J. PATTON

having been duly sworn, was called as a witness and was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. SCHWARTZ:

Q Could you state your full name for the

notified that you were going to be deposed?

A I don't understand that question.

Q You said earlier I think that you started looking for documents after you were notified that you were going to be deposed.

A Correct.

Q My question is before you were notified that you were going to be deposed, had you looked for documents relating to this case?

A I've looked for them probably over how many years has this case been going on.

Q Had you found any documents before finding these documents that were delivered today?

A Well, if I found any, they would have been sent to my attorney.

Q And had you sent your attorney any documents before handing these documents to him when you arrived in Washington, D.C.?

A I probably have to the best of my recollection.

Q What type of documents did you give your attorney?

A I believe I gave him all the 302s.

Q What is a 302?

A A 302 is when you're being interviewed by

FBI agents.

Q Had you given your attorney any phone records?

A To the best of my recollection, I believe that at one time, we did send the records to the best of my recollection. Is my recollection right? I don't remember.

Q Do you remember giving any other types of records to your attorney before you gave him these records that are here today?

A I believe he could probably answer that better than I can.

Q You don't have any recollection of any other records?

A I believe we gave most of the records up, right, Rich? We gave whatever I had up at that certain time.

Q Well, what type of records did you give your attorney?

A Like 302s and conversations and whatever I had and whatever Ms. Moore asked for.

Q What's your date of birth, sir?

A 2-10-38.

Q Do you recall the first time you had any contact with agents from the FBI's Los Angeles

Q Now, under this agreement, which is Exhibit B, you were going to get $4,000 a month for services, correct?
A That is correct.
Q And under the agreement, you were required to cooperate fully with the FBI?
A That is correct.
Q And you would get $1,030 per month during the term of the agreement for rental of a vehicle and securing appropriate insurance under paragraph 2?
A Yes.
Q The FBI had arranged for the rental of a vehicle for you, correct?
A That is correct.
Q Do you recall what the rental charge was for this vehicle?
A I believe this is the actual charge, to the best of my recollection.
MR. SCHWARTZ: I'll show you what I'm going to mark as Exhibit C, which is on the letterhead of Enterprise Rent-A-Car Leasing. It's dated November 7, 1994. It actually consists of two November 7, 1994, letters.
//
//

(The document referred to was marked for identification as Exhibit C.)

BY MR. SCHWARTZ:

Q Do you recognize Exhibit C?

A No. This is the first time I've ever seen this.

Q Well, according to paragraph 3, Enterprise was going to charge $1,029.70 a month.

A Correct.

Q For a Lincoln Town Car.

A Mm-hmm.

Q Recall you have to respond verbally as opposed to --

A Yes. To the best of my recollection, I believe it was $1,030.

Q And did you rent a Lincoln Town Car?

A Yes, I did.

Q From Enterprise?

A [redacted]

Q Under Exhibit B, which is the Agreement.

A Mm-hmm.

Q You were going to get $320 a month for utilities and phones, correct?

A Yes.

Q And that was to cover the utilities and phones at the apartment in Marina Del Rey that you were living in?

A Yes, but I never got them bills. Them were paid by someone else. I never received the bills. Whoever paid them I have no idea.

Q The agreement at least contemplated that you were going to be paying the bills, correct?

A Yes, that I would be paying the bills, but I never got the bills. The money was taken out of the money that I was supposed to be receiving, and whoever paid it, I have no idea. You'd have to ask someone back there.

Q The FBI was also paying the monthly charge for the apartment, correct?

A [redacted]

Q And that, as you said before, was sort of a cover company?

A Correct.

Q But it was not coming out of your pocket?

A No, it was not.

Q And your wife and son were living with you

at that apartment?

A That is correct.

Q Under the agreement, which is Exhibit B, you were to get $300 a month for furniture rental.

A That is correct.

Q And that was to put furniture --

A In the apartment.

Q The one in Marina Del Rey?

A Yes, sir.

Q You were also under the agreement to get $1,600 a month for travel and entertainment expenses incurred in furtherance of investigation-related activities, correct?

A That is correct, and that would cover not only my expenses but Scott Garriola's, too.

Q So, under the agreement, you were to pay for entertainment-related expenses that Scott Garriola incurred?

A Yes, because we worked together.

Q If you turn to the third page of Exhibit B.

A Mm-hmm.

Q Two paragraphs above your signature, it says the representative for the FBI contracting officer for this agreement is Special Agent Michael F. Wacks, correct?

A That is correct.
Q And you understood that he was the representative for the contracting officer?
A Yes.
Q You were never advised that any other agent took over from Mike Wacks as the representative for the contracting officer?
A No.
Q When you were paid under this agreement, Exhibit B, you were paid in cash, correct?
A That is correct.
Q And there would be at least two FBI agents from Los Angeles that would witness the payment?
A Not always.
Q Was there sometimes only one agent?
A Yes.
Q And that would be typically Mike Wacks?
A Mike Wacks or Scott Garriola.
Q And Scott Garriola was also with the Los Angeles division of the FBI?
A That is correct, and I believe he still is.
Q Do you remember the name Andy Stefanak?
A Yes, I do.
Q He was also an FBI Los Angeles agent?
A Yes.

the $30,000 in November of '96?

A No. When they paid me the $30,000, it was the one agent. Stan I believe was his name if it's coming back to my recollection.

Q Is it Larry Sandri?

A Sandri. That's the name. Larry Sandri. And when he came to give me the $30,000, that was negotiated between Pete McCann and L.A. office.

Q Was Larry Sandri one of the agents you spoke to before November of '96 about doing work for the Dallas division?

A It was not before. I was asked where I wanted to be transferred, and I had very good rapport with Pete McCann and Chuck Goodwin, and they said that Dallas would be a very good area for you because there's a lot of good work there and would you be willing to go there, and I said sure, so then Mike Wacks asked me where would I want to be transferred to, and I said Dallas, and then everything started from there.

Q Did you or your wife have any family in the Dallas area?

A I have a sister that lives in Garland, Texas.

Q And she was living there as of February of

'96?

A Yes.

Q And you ended up moving to Garland, correct?

A That is correct.

Q And getting back now to the two agents, you described one as a tall, black-haired, middle-aged --

A That's Sandri.

Q And the other one was a shorter, older agent. Those were two agents that you had met with to talk about doing work?

A Yes, sir.

Q So you met Sandri at that point?

A Right.

Q And then later in November of '96, he was present when you were paid the $30,000?

A Yes.

Q Do you remember any other conversations with agents from the Dallas division?

A Just while I was there, I would have many conversations with them, dates and everything. That's my recollection. I can't remember.

Q Do you think those are in the records that your attorney delivered today?

A They might be. I'm not sure.

Q Do you remember taking any notes of

conversations that you had with Dallas agents?

A I believe I did. I usually did take notes, a lot of notes, which I was taught by the FBI to do that.

Q And did you keep those notes?

A Yes, I did.

Q And as far as you know, they have not been lost or destroyed?

A No.

Q So you had a face-to-face meeting with these two agents that you described prior to November of '96?

A That is correct. They were more or less picking my brain to see which road to take to infiltrate these people, and I explained what I would have done, how I would have done it.

Q And you said this was relating to stolen heavy equipment?

A Heavy equipment, yes.

Q Was this a --

A Ongoing case.

Q Was it a La Cosa Nostra case?

A No, it was not, not to my knowledge.

Q Was it a drug trafficking case?

A No, it was not.

Q And it was not a money laundering case?
A You'd have to talk to them about that. All I know, it was a stolen heavy equipment.
Q Getting back to the meeting that you had with Pete McCann, do you remember where you met him?
A Yes. I met him in the hotel, and there was him and Fred Robertson and a retired FBI agent named Vinny, which I don't know his last name.
Q And this was to discuss Donald Eugene Webb?
A Right. And Webb's partner, who worked with us in Florida -- what was his name right now -- Latch.
Q Frank Latch?
A Frankie Latch.
Q Do you know what Webb was wanted for?
A Murder. Killing a police officer in Pennsylvania.
Q So it was not a La Cosa Nostra investigation?
A No, it was not.
Q And it wasn't money laundering?
A No.
Q Or drug trafficking?
A No.
Q You were paid $2,500 for your services at that meeting?

A I never knew I was getting paid anything for it. I did it as a favor to Pete McCann and Chuck Goodwin. I was notified later that they were going to send to me for my time spent with them.

MR. HEIDEMAN: Can we take a break, please?

MR. SCHWARTZ: One second.

MR. HEIDEMAN: No, I need to take a break now, please.

MR. SCHWARTZ: I want to ask one more question, please.

MR. HEIDEMAN: I'm sorry. I need to go to the restroom. I need to take a break.

MR. SCHWARTZ: You can hold it for a moment.

MS. MOORE: You have to have another counsel here then.

MR. HEIDEMAN: Counsel, I'm very sorry.

MS. MOORE: I mean, nobody should be leaving.

MR. HEIDEMAN: I'm very sorry. I need to take a break to go to the restroom.

MS. MOORE: Okay. We'll take a five-minute break.

MR. HEIDEMAN: Thank you.

(Whereupon, a short recess was taken.)

MR. SCHWARTZ: Read back the last question.

(Whereupon, the reporter played back the previous question.)

BY MR. SCHWARTZ:

Q Mr. Patton, I think you were saying that you had met with Agents McCann and Robertson --

A Robinson.

Q Robinson. As a favor to McCann and to Chuck Goodwin, correct?

A That is correct.

Q And you had not expected to get paid for that?

A No, I did not.

Q But you were paid $2,500 for that?

A That is correct.

MR. HEIDEMAN: Excuse me. Counsel, you're talking about monies other than under the agreement that is Exhibit B? Monies that he's been paid other than under the agreement, Exhibit B?

MR. SCHWARTZ: I don't understand the question.

MR. HEIDEMAN: You started the deposition by introducing Exhibit A and B and C, and under B, you gave him a copy of the agreement. You asked him some things about the compensation under the agreement. So is your question now are you talking about

Q And it says Mr. Patton was paid approximately $9,250 per month under this contract from November 24, 1994 until February of 1996. Do you see that?

A Yes, I do.

Q And that's actually a mistake. It should be $7,250, correct?

A Right.

Q The next sentence says Mr. Patton has not been paid under this contract since February 1996 and accordingly is owed approximately $342,250, and then it says $9,250 times 37 months as of the date of this filing plus interest thereon at the legal rate. Do you see that?

A Yes.

Q Is it correct that as of the writing of this letter by your attorney, you had not been paid under the contract since February of 1996?

A That is correct.

MR. SCHWARTZ: I'm going to mark as Exhibit E a declaration of Thomas J. Patton dated October 19, 2001.

(The document referred to was marked for identification as Exhibit E.)

THE WITNESS: Well, I was told by Michael Wacks that there would be a lump sum given to me at a further date when they got the paperwork done.

BY MR. SCHWARTZ:

Q When did he tell you that?

A He told me that the week before he said that our work was going to be done in L.A.

Q Now he did tell you orally that your services were no longer needed in Los Angeles, correct?

A Orally, right. And I kept asking him, I needed it in writing. According to my contract, it says that all parties will hereby acknowledge that they have read, understood and will abide by the foregoing statement, and it says that, you know, because I've had this contact before in Annapolis. They would, you know, give me a copy to say the contract was terminated.

I asked for it many, many times to Mike Wacks before I left there, and he said we're working on it, we're working on it, but it's best that we don't do it because we can just transfer it to Dallas, and they won't have to wait six to eight months for Washington to approve it.

Q And you had this conversation about a week

before you left?

A Yes.

Q Why did you ask for the termination in writing?

A Because it says in your contract that's how it's supposed to be done. See, that was probably my biggest fault is I put too much trust in the FBI agents and found out that they're not all very trustworthy.

Q And your recollection is that Michael Wacks also told you you would get a $30,000 lump sum at some point?

A Yes.

Q Was that an oral agreement that you had with him?

A It was his statement to me. It was not an oral agreement. I didn't agree to the amount. It's up to them to come up with the amount. He said that's what he would put in for.

MR. SCHWARTZ: I'm going to mark as the next in order a July 14, 1999, letter from your attorney, Mr. Heideman.

(The document referred to was marked for identification as Exhibit F.)

put it across. It was discussed between Pete McCann and me. I did not negotiate it, which this statement in my thinking was is what Mike Wacks told me that he was trying to get from the L.A. office, and that's where I say in here Mr. Patton and Pete McCann. Mike told me Pete McCann would make the request for me, and he had many conversations with Mike Wacks, and Mike Wacks agreed to that statement.

Q Let me now ask you to turn to your declaration, which is Exhibit E.

A Okay.

Q If you look on the page that you're at now, paragraph 27.

A Okay.

Q It says, "While I was in Dallas, I negotiated and received a single lump sum payment for $30,000 as a final payment for the services I provided the agency in Los Angeles."

A That is correct.

Q And you would agree with that statement?

A Yes.

Q Before, I think you said that you had talked to Michael Wacks about the $30,000 before you left Los Angeles.

A Left Los Angeles. That is correct. He

Q That's fine.

A Because you are getting to a point where you're mixing words.

MR. SCHWARTZ: Is five minutes okay?

THE WITNESS: That's fine.

MR. SCHWARTZ: Okay.

MR. HEIDEMAN: We're in recess by agreement.

(Whereupon, a short recess was taken.)

BY MR. SCHWARTZ:

Q Mr. Patton, when you were in Los Angeles working under the 1994 agreement --

A Yes, sir.

Q You were paid on a monthly basis, correct?

A Correct.

Q And you were paid timely, correct?

A Well, it wasn't always timely. There would be days when, you know, they'd be busy and they'd meet me the following day, you know, but I got it every month.

Q Right. Do you agree with the statement on page 47 of Exhibit F, which we were just looking at, that the $30,000 payment does not relate to the 1994 contract? Do you see where I am?

A No, I don't. The last payment?

Q Right. That paragraph, the second sentence