in that paragraph. It says the lump sum was negotiated by you and Agent McCann for services rendered in L.A., and then the last part says, "and it does not relate to the 1994 contract." Do you agree that the $30,000 payment did not relate to the 1994 contract?

A No, I think it does relate to the '94 contract.

Q Now, prior to receiving that payment in November of 1996, you had discussions with FBI officials about the fact that you had not been receiving your monthly payment under the 1994 agreement, correct?

A I don't understand the question.

Q I'll try to rephrase it.

MR. HEIDEMAN: Excuse me. Can we go off the record?

(Discussion held off the record.)

MR. HEIDEMAN: Could you repeat the question? Because I didn't hear it. I'm sorry.

MR. SCHWARTZ: There is no question pending.

BY MR. SCHWARTZ:

Q In November of 1996, you received a $30,000 payment, correct?

A That is correct.

Q Before that time, you were aware that the FBI had not been making the normal monthly payment under the 1994 agreement, correct?

A That is correct.

Q And you talked to FBI officials about that?

A Right.

Q And you were unhappy with that?

A I was very unhappy about it.

Q Who did you talk to about that?

A Esposito.

Q Anybody else?

A Cordes, Divers.

Q When you say "Cordes," that's Jack Cordes?

A Yes.

Q And you spoke with him directly?

A Yes.

Q Who was the other person you mentioned?

A Divers.

Q Neil Divers?

A Neil Divers.

Q You spoke to him directly about it?

A Right.

Q Do you remember what Esposito had to say about that?

A Esposito said he was looking into it.

Q And you complained to Pete McCann about that?

A Yes, I did, and then Mr. Esposito and everybody else that I could reach out to.

Q And that was approximately April of 1996, correct?

A Approximately. I don't know the exact date. It should be somewhere where I found out about it.

Q And at that point, you also complained about the fact that you hadn't been getting your monthly payment under the contract?

A That is correct.

Q And you understood that it was the FBI's position that the contract had been terminated orally, correct?

A I never had that under -- no one told me orally that it was terminated.

Q Mike Wacks didn't tell you the contract was terminated?

A Never. Never.

Q Scott Garriola didn't tell you the contract was terminated?

A Never.

Q When you received the $30,000 --

A Mm-hmm.

Q You signed a receipt, correct?

A That is correct.

Q Let me back up. Did you talk to Michael Wacks about not having received the monthly payment?

A Yes.

Q What did Mike Wacks say about it?

A He just said it's out of his hands.

Q Did he say anything else about it?

A No.

Q Did you understand what he meant when he said it was "out of his hands"?

A No, I did not.

Q And you didn't ask him to explain that?

A No.

MR. SCHWARTZ: I'll mark as Exhibit G the receipt dated November 14, '96.

(The document referred to was marked for identification as Exhibit G.)

BY MR. SCHWARTZ:

Q That's the receipt you signed when you got the $30,000, correct?

A That is correct.

Q And it states, "I acknowledge receipt of $30,000, which represents full and final payment for

services rendered," correct?

A Right.

Q And what did you understand by the phrase "full and final payment for services rendered?"

A For the L.A. office. L.A. office, that Mike Wacks promised me the $30,000.

Q Now it doesn't say that obviously, correct?

A No.

Q But you had an understanding that was different from what the words of the receipt said, correct?

A That is correct. And I questioned it at the time, and they said no, this is just the money that they give you to go forward.

Q Who said that?

A Sandri.

Q Didn't Sandri tell you that from the FBI's point of view that this was the last payment you were going to be getting?

A No, he never told me that.

Q Now, at this point in time, this is November of 1996?

A Correct.

Q You were aware that that personal property storage in Miami had been lost, correct?

that there were certain documents attached to various pleadings, plus my recollection was that there was an exchange of documentation between you and Ms. Kalik, I think, I think if I remember correctly early in the case. We don't need to spend time on this now.

MR. SCHWARTZ: Yes, let's talk about this --

MR. HEIDEMAN: I just want to make sure. I mean, there was an implication that somebody said we'd never given you anything, and I think that that's --

MS. MOORE: Yes, it is my recollection. I don't want to get into an argument.

MR. HEIDEMAN: Of course.

MS. MOORE: But just to clarify what I said before or confirm actually. Yes, there might have been documents attached to pleadings, but thereafter, we requested by many letters additional documents, which I never got any documents in response to any of the letters.

MR. HEIDEMAN: Okay. Well, we're going to go back after the depo, because --

MS. MOORE: If you find something that you sent me, give me a cover letter or a copy of it with the documents.

MR. HEIDEMAN: Fine. Of course, we will.

MS. MOORE: But I didn't get anything until

today.

MR. HEIDEMAN: Thank you. We'll address that afterward right away.

MS. MOORE: Okay.

BY MR. SCHWARTZ:

Q Okay. Do you know how the $30,000 figure came about?

A No, I do not.

Q As of the date that you received the $30,000 --

A Mm-hmm.

Q You were not working on any matters with the FBI, correct?

A No, I was -- reask me that question, please?

Q At the time you received the $30,000 --

A Mm-hmm.

Q You were not working on any matters with the FBI?

A No, I was not.

Q And you moved from Garland, Texas, shortly after receiving that money, correct?

A That's correct.

Q Where did you move to?

A To Niceville, Florida.

Q How did you decide to move to Niceville?

A Just, you know, we always liked Florida, so I moved there.

Q The FBI did not tell you to go to Niceville, correct?

A No, they did not.

Q They had nothing to do with that?

A No.

Q Did you tell Mike Wacks that you had moved to Niceville?

A Yes.

Q When did you tell him?

A Probably before I even moved.

Q How did you tell him?

A Over the phone.

Q Do you have notes of that conversation?

A Yes, there probably is in there.

Q Sorry. Did you finish your answer?

A Yes.

Q So if you had a conversation with him about the move, would it be in the notes that your attorneys provided?

A It's probably in the notes, yes. To the best of my recollection, it's probably in there.

Q If it's not in the notes, would that indicate to you that you did not have that

conversation?

A No.

Q Did you take notes pretty diligently when you had conversations with FBI agents?

A A biggest percentage, but not 100 percent.

Q Did you notify anybody else in the FBI that you were moving to Niceville?

A Pete McCann and Chuck Goodwin and John Donahue, because they always knew where I was in case they needed me for anything.

Q When you spoke to Mike Wacks, what information did you give him about your move?

A Just that I was moving. There was no information I would have to give him other than moving so he would be able to contact me if he needs me for anything.

Q Did you give him a phone number?

A Yes.

Q Did you give him an address?

A Yes.

Q How long did you live in Niceville for?

A I believe three years.

Q And where did you move next?

A Tucson, Arizona.

Q Why did you decide to move to Tucson?

A For my wife's health.
Q So your move to Tucson had nothing to do with the FBI, correct?
A No.
Q Is that correct?
A That is correct.
MR. HEIDEMAN: Excuse me. I'm going to object to the form of the question only because you've said "had nothing to do with the FBI."
BY MR. SCHWARTZ:
Q The FBI did not ask you to move to Tucson, correct?
A No, they did not.
Q Who did you notify, if anybody, in the FBI that you had moved to Tucson?
A Probably Chuck Goodwin, Pete McCann, John Donahue.
Q Anybody else?
A To the best of my recollection, no.
Q You had a meeting in Baltimore in 1999 concerning an alleged threat against FBI agent Joe Pistone, correct?
A That is correct.
Q And that came about because you overheard a conversation in a restaurant?

A In a restaurant, right.

Q Where was that restaurant?

A It was in Destin, Florida, which is, you know, right over the bridge from Niceville in Destin, Florida.

Q And you contacted John Donahue about that?

A Yes, I did.

Q He was retired at the time?

A Yes.

Q And then at least as far as you know, he then contacted other FBI agents, correct?

A To the best of my knowledge, yes.

Q John Donahue was deposed in this matter, in this lawsuit, correct? Do you remember being on the telephone when John Donahue gave a deposition?

A Before that?

Q No, I'm talking about within the last couple of years in connection with this lawsuit that John Donahue gave a deposition?

A Yes. To my understanding, yes, he did do that.

Q Do you remember you were on the phone at the time?

A That is correct.

Q Do you recall him testifying that you had a

lot of concern about who you're going to work with in the FBI in connection with this Joe Pistone matter?

A Right. When I went up to Baltimore to meet in Baltimore with the agents in Baltimore about this situation, they asked me who would I like to work with, and I said Mark Tillio, who is an FBI agent who I worked with before in Annapolis, and I brought him out to California on cases that he worked with agents out in California.

Q Do you remember you had asked John Donahue not to reveal your identity for the meeting?

A Yes.

Q And that was because you had concern about who you were going to work with, correct?

A That is correct.

Q And you didn't want to meet any other agents without John Donahue being present, correct?

A That is right.

Q John Donahue said at his deposition that you came to that meeting voluntarily, is that correct?

A That is correct.

Q You were paid for your expenses?

A I was paid strictly just for a ticket.

Q Does $1,325 ring a bell?

A Yes.

polygraph examinations, or you might have no idea whether or not since you've already had testimony on the record about an FBI agent, although retired, advising the witness that he shouldn't give an exam whether or not that was a factor, so if you can try to withdraw and rephrase your question.

MR. SCHWARTZ: I'm going to do that.

MR. HEIDEMAN: Assuming you need to press this.

MR. SCHWARTZ: That's fine.

MR. HEIDEMAN: But I don't want there to be any waiver, and I'd ask you to be very careful and therefore rephrase before proceeding.

MR. SCHWARTZ: That's fine.

MR. HEIDEMAN: Thank you.

BY MR. SCHWARTZ:

Q You said earlier that you initially agreed to give a polygraph, correct?

A That is correct.

Q At some point, did you change your mind about that?

A John Donahue changed my mind.

Q And you changed your --

A I took his advice.

Q And then you said you would not give a

polygraph?

A I did not say I would not. I said I am taking John Donahue's advice and not to take a polygraph.

Q And that's what you told the agents that you had met with in Baltimore?

A That is correct.

MR. HEIDEMAN: But so the record is clear, I think I would have no objection if you chose to ask him did he confer with counsel at any time about that issue, because I know the answer to that. So if you choose to ask him if he conferred without getting into what was discussed with counsel or what the advice was, I'm sure he would be glad to answer that question if you choose to ask it.

MR. SCHWARTZ: Thank you for the offer.

MR. HEIDEMAN: Thank you.

BY MR. SCHWARTZ:

Q Under the agreement, which is Exhibit B, if you look at the first page, paragraph 3.

A Which one did you say? B?

Q B, which is the agreement, 1994 agreement.

A Okay.

Q Look at the first page of that. In paragraph 3, it indicates that it's your

BY MR. SCHWARTZ:

Q Sir, did you report --

MS. MOORE: Did he file tax returns.

MR. SCHWARTZ: Okay.

BY MR. SCHWARTZ:

Q Did you file any tax returns where you reported the money you received from the FBI?

MR. HEIDEMAN: I'm going to object, and yes, I am objecting.

MR. SCHWARTZ: Sir, you need to answer the question.

THE WITNESS: I'm listening to my attorney.

MR. SCHWARTZ: Your attorney made an objection, but unless he instructs you not to answer, you need to answer the question.

THE WITNESS: I will take my Fifth Amendment.

MR. SCHWARTZ: Okay.

BY MR. SCHWARTZ:

Q Did you understand the contract to require you to report the monies you were receiving from the FBI on your taxes?

A The only thing that I can say about that that might ease your mind is that I asked many times for 1099s. Since I was supposedly an employee for

your singular question as to his filing of tax returns. That's the only question you've asked about that issue at this time.

BY MR. SCHWARTZ:

Q Just to make sure I cover what I intended to cover, did you report the monies you were receiving from the FBI under the 1994 agreement on your taxes?

MR. HEIDEMAN: Same objection, and let that be continuing.

BY MR. SCHWARTZ:

Q Are you going to answer that, or are you going to assert your rights under the Fifth Amendment?

A I'm going to assert my rights under the Fifth Amendment.

Q When you moved from Los Angeles to Garland, Texas, you tried to find work with the Dallas division, correct?

A Yes.

Q At some point in time, you came to learn that someone in the Los Angeles division had bad-mouthed you?

A That is correct.

Q How did you learn that?

A From Pete McCann. He told me that I was being bad-mouthed out of L.A.

Q Did Pete McCann indicate how he knew that?

A No, he did not.

Q Did you understand that it was Michael Wacks that had bad-mouthed you?

A No, I do not, no.

Q As far as you knew, had somebody spoken to Adams, who was in charge of the Dallas division, about you?

A I have no idea.

Q Do you know who in the Dallas division was on the receiving end of this bad-mouthing?

A No, I do not.

Q But the bottom line is that you were not able to find any work with the Dallas division, correct?

A That is correct.

Q Were you upset when you were told by Pete McCann that you had been bad-mouthed?

A Yes, because I thought I did a very good job out there. They were just too lazy to do the work that Scott Garriola and I did. They didn't want to do the paperwork. We did a lot of cases that should have been put in -- other than the Denti case and the Ori case, there should have been a lot more, but they didn't want to do the paperwork on it. It was too

much work for them.

Q When you say "they," are you talking about Michael Wacks mainly?

A That's correct, because he's the contact officer.

Q Right. Were you unhappy with Michael Wacks after you had moved out of Los Angeles?

A No, I'm still not unhappy with him. I gave him a gift for his wedding, so he must have been --

Q Do you remember when that was?

A It was while I was out there. I don't remember the day he got married.

Q Do you remember talking to Chuck Goodwin also about the fact you were unhappy having been bad-mouthed to the Dallas division?

A Yes. I probably told Esposito that, too. I probably told every FBI agent I know that I was unhappy that someone was bad-mouthing, because I was never bad-mouthed by any office I ever worked in. I was always praised for the work that I did, which is in my Rule 35. Read it.

Q You're still on terms with Chuck Goodwin, correct?

A Yes.

Q You don't have any reason to think he would

lie about you, correct?

A No, I don't think he would ever lie about me.

Q The same with Pete McCann?

A The same with Pete McCann.

Q Since you moved out of Los Angeles in February of 1996, I want to find out what kind of work you've done unrelated to the FBI.

A I haven't done any.

Q So you've been out of work since February of 1996?

A That is correct.

Q Do you have any source of income?

A Just my family helping us. And I have social security.

Q The monies you had been receiving under the 1994 agreement, which was $7,250 a month, that was a significant amount of money to you, correct?

A No, it was not to me. Not being in the business I was before I came over. That was pennies to me. I'd spend that for lunch. That was not a lot of money to me.

Q Well, at the time that you were working under the 1994 agreement with the Los Angeles division --

A It was fair.

Q Did you have any other income at that time?

A No, I did not.

Q So the $7,250 a month was all the income you had?

A That's it.

Q Was your wife working at the time?

A No.

Q So you were relying on that income for your daily expenses, correct?

A While I was in L.A.?

Q Correct.

A Yes.

Q And after you moved from Los Angeles and the payments stopped, that was a significant issue for you because you no longer had any income, correct?

A That is correct. But that has nothing to do with why I filed the suit against the FBI. It's because they did not do what they said they were going to do.

Q Let me just get back to where you've lived, and we went through some of that before. I think you said you lived in the Destin area for about three years?

A Right. Approximately three years.



AUG-14-2006 10:35 CDC FBILH 310 996 3375 P.18