moved to Gainesville, Florida.

MR. SCHWARTZ: Okay.

THE WITNESS: To help my daughter so she could finish college. She had two children, so we went and moved down there to help her.

BY MR. SCHWARTZ:

Q And you were living in Gainesville at the time, and then you moved to Los Angeles to work on a case?

A That is correct.

Q When you moved to Cottage Grove, Oregon --

A Right.

Q That was not at the FBI's request, correct?

A No.

Q Why did you move to Cottage Grove?

A Because my daughter and grandchildren were up there.

Q And did you notify anybody in the FBI that you had moved to Cottage Grove?

A Yes, I did. I notified Chuck Goodwin, Pete McCann, John Donahue, because we would be sending birthday cards and Christmas cards. We've always had a good rapport.

Q Anybody else that you notified?

A Yes. I sent Christmas cards to Scott

Q I'm going to get back to a question I asked a second ago. Your position in the lawsuit is that the contract with the Los Angeles division, the 1994 agreement, was not properly terminated, correct?

A That is correct.

Q Because it was not terminated in writing?

A Because that's what it says.

Q My question is now did you give up any opportunities you had for other jobs because you were relying on the fact that you believed that 1994 agreement was still in effect?

A No, I did not give up any opportunities for any other jobs.

MR. HEIDEMAN: I'm going to object to the form of the question because he's already said he couldn't get another job because of his criminal record.

BY MR. SCHWARTZ:

Q Other than the meetings you had in the Dallas area with Pete McCann on the Webb matter and the meeting you had in Baltimore in 1999 on the Joe Pistone matter --

A Mm-hmm.

Q Did you do any other work for the FBI after you moved out of Los Angeles?

him to go over every word, so let's take three minutes if we can. It's only one and a quarter pages.

MR. SCHWARTZ: We can go off the record.

(Whereupon, a short recess was taken.)

BY MR. SCHWARTZ:

Q Mr. Patton, did you finish reviewing --

A Yes.

Q -- Charlie Goodwin's declaration, which is Exhibit -- what's the exhibit number on that?

A H.

Q Is there anything else in here that is not accurate?

A No, I think that's the only thing that I can see in here that I think that he misstated.

Q Other than the "Cherry Nose" Brown matter and the Baltimore meeting and the Dallas meeting with Pete McCann, did you perform any other services for the FBI after you --

A No, I did not.

Q Let me just finish the last part of my sentence. Other than the "Cherry Nose" Brown matter, the meeting in Baltimore in 1999, and the meeting in the Dallas area in 1996, have you performed any other services for the FBI since you left Los Angeles in February of 1996?

MR. HEIDEMAN: Do you mean has he been asked to perform services or has he performed services. Those are two separate questions.

MR. SCHWARTZ: Okay.

MS. MOORE: The question stands. He said did you perform any other services. It was clear.

MR. SCHWARTZ: Right. That's the question. Did you perform any other services?

THE WITNESS: No. Conversations. I mean, FBI agents would call me and ask me if I knew anything, but, you know, nothing. I did no work if that's the question, if I understand your question.

MR. SCHWARTZ: That's what I asked.

THE WITNESS: Right. No, I did not.

MR. SCHWARTZ: Thank you.

BY MR. SCHWARTZ:

Q Do you remember being interviewed in August of 1997 while you were living in Florida by two FBI agents?

A Yes.

Q Clyde Merryman was one?

A And Steve Morris.

Q Right.

A Right. And they sat in the thing and cried like children because they thought that I was so

the monthly payment under the 1994 agreement, correct?

A Well, he didn't come down for that. He came down for this, for the Miami thing and the storage. That's what he came for. He never brought up the contract or anything else, so we did not discuss the contract.

Q So when you were interviewed in Florida by Merryman and Morris --

A Merryman and Morris.

Q You didn't discuss the 1994 agreement, correct?

A No, he never brought it up, and we never discussed it. He was sent down there by Esposito to intervene, him and Morris. Esposito is the one that sent them down.

Q Your last payment under the 1994 agreement was in February of '96, correct?

A Correct.

Q You didn't receive a payment in March of '96?

A No.

Q Or April of '96?

A No.

Q So you were on notice at that point that the FBI was not making the payments, correct?

A Yes. And if you look at the phone records from '97 to '98, you'll see that I was trying to deal with it myself without going to attorneys to deal directly with Washington through the people in Washington that I knew.

Q I think you testified earlier that before you received that $30,000 in November of '96, you had talked to Clyde Merryman. He was one of the agents you had talked to about the fact that you had not been paid under the 1994 agreement, correct?

A I don't think I testified to that.

Q I apologize if I'm misremembering. Who did you talk to prior to November of 1996? Who did you talk to in the FBI about the fact that you had not received your monthly payment?

A Pete McCann, Chuck Goodwin, Donahue, Esposito, Divers. I'm trying to count. Coulson, Danny Coulson.

Q And what was Danny Coulson's position?

A He was I believe one of the deputy directors or in that category.

Q And you knew him from some investigation?

A Right. From Baltimore.

Q And isn't it the case that they told you that the FBI's perspective was the contract was

over, that was not sufficient in your mind?

A No, it's not, because it wasn't my first contract. I had a contract before, and I know what they do.

Q After you moved out of Los Angeles in February of '96, did any FBI official affirmatively tell you yes, the contract is ongoing?

A No.

Q Let me get back to the kind of work you were doing in Los Angeles under the 1994 agreement. We went over some of them earlier on. You were undercover, and so was Scott Garriola.

A Mm-hmm.

Q Is that a yes?

A Yes.

Q And you were posing as jewel thieves, correct?

A Correct.

Q And you and Scott Garriola met just about every day, correct?

A No.

Q How often did you guys meet?

A Three to four times a week.

Q Did you speak with him every day?

A Every day.

Q And you met with a lot of subjects of the FBI investigation?

A Right. Sometimes on my own and sometimes with him.

Q What kinds of things would you do with Agent Garriola? For example, sometimes you would go to a restaurant and meet the subjects there?

A Right.

Q Can you give me other examples of things you did?

A Well, we'd follow people. You know, you do what you do undercover. It's not easy to explain if you never did it.

Q Can you just give me a little bit more details about the nature of the work?

A We worked very hard. We talked to a lot of people, and, you know, we followed people, you know, surveillance, certain stuff that we had to do, and we would do it. He's a very good agent, and he never did this work before until he worked with me.

Q You recorded numerous conversations with subjects?

A That is correct.

Q Do you have any ball park estimate? Was it in the hundreds?

A Yes.

Q How did you go about recording conversations?

A I'd wear a body mic, and then we'd have the car wired up, too.

Q Was it risky in your view to be wearing a body mic when you were meeting with subjects?

A It's always risky. I mean, they were a threat always. I've had them in both places that I work. If they ever found out who I was, they would have killed me. No, I've had them.

Q After you left Los Angeles in February of '96, you were not working undercover anymore, correct?

A No.

Q Is that correct?

A That is correct.

Q And you weren't recording conversations with subjects, correct?

A No, I was not.

Q And you were not meeting with subjects of investigations, correct?

A No, I was not.

Q After you left Los Angeles in February of '96, you didn't think the FBI was going to be paying you when you weren't actually performing services, did

you?

A Yes, I did, because they did not terminate the contract.

Q Did you think the FBI intended that the contract was going to continue even though you weren't performing any services?

A Yes.

Q Do you have an understanding of why the FBI would intend to continue to pay you even though you weren't performing services?

A Well, if they go by their rules and regulations, you know, yes, I believe that they are obligated to pay me under the contract just like you're under contract for your job. I mean, if they tell you stay home for the month, you're still going to get your check, right? Under your contract?

Q Well, I understand, though, your position that under the contract, because it wasn't terminated in writing, that you were owed the monthly payment, correct?

A Right. That is correct.

Q Did you have an understanding that the FBI intended to pay you even though you weren't performing services?

A Yes.

Q And that was based on the fact that it hadn't been terminated in writing?

A That is correct.

Q Is it based on any other facts?

A No.

Q If you turn to the agreement, which is Exhibit B.

A Mm-hmm.

Q If you look at the third page, paragraph 14.

A Mm-hmm.

Q It says, "This agreement shall commence on the date of acceptance by Mr. Patton as signified by his signature and shall continue as long as the FBI deems that Mr. Patton's services are required." Do you see that?

A Mm-hmm.

Q Is that a yes?

A Yes.

Q What was your understanding of the meaning --

A But you didn't finish the paragraph, sir.

Q That's correct. I just want to focus on this first sentence right now.

A Okay.

Q Did you have an understanding as to what was



266A

Q Do you think you have a copy at home of the other letter or letters that you think you've sent?

A It's possible. I will look for them, and if I do have them, I will forward them on to my counsel.

Q Was it your practice to make a copy of the letter that you were sending out?

A Yes.

Q By the date of this letter, which is Exhibit J --

A Mm-hmm.

Q -- this is October --

A Twenty.

Q -- 20, 1997 -- you had not received your monthly payment under the 1994 agreement for roughly a year and a half, correct?

A That's correct.

Q Is there any reason you didn't include a mention of that in this letter, which is Exhibit J?

A It was never brought up, and we never got into that conversation.

Q You mentioned a minute or two ago that you said that you were willing to work with the FBI and still feel that way. Do you remember when you were interviewed down in Florida by Clyde Merryman and Steve Morris that you indicated to them also that you

were willing to work with the FBI?

A Yes.

Q And they indicated to you that they remained open to that idea, but they first had to resolve these issues about your claim for your personal property and the lump sum payment from Miami?

A Yes.

(The document referred to was marked for identification as Exhibit K.)

BY MR. SCHWARTZ:

Q I want to show you what I marked as Exhibit K, which is a different agreement with the FBI. This one I believe has your signature of May 28, 1991. This is the agreement you originally had with Miami, correct?

A That is correct.

Q If you look at paragraph 12.

A All right. Mm-hmm.

Q Actually, let me ask you a different question. This agreement was eventually terminated in writing by the Baltimore division, correct?

A That's correct.

Q And in your mind, the fact that this agreement had been terminated in writing was

Q You mentioned earlier regarding "Cherry Nose" Brown that you had traveled around Arizona somewhat?

A Mm-hmm.

Q Can you give me some more details about that?

A Yes. I went from Tucson to up around the Phoenix/Mesa area, Scottsdale area.

Q You were living in Tucson at the time?

A That's right.

Q Why did you go to the Mesa area?

A Well, because I figured he wasn't living in Tucson. I could maybe spot his car. It was a green El Dorado somewhere up in that area.

Q Did you have any information that he was in fact living in the Mesa area?

A No, I did not.

Q And you didn't spot him in the Mesa area, correct?

A No, I did not.

Q And after looking in Mesa, you looked in Scottsdale?

A In Scottsdale, right.

Q And did you have any information indicating he was living in Scottsdale?

A No, I did not.

Q Did you have any information that he was in Arizona?

A Just by what Chuck Goodwin told me.

Q Do you remember what Chuck said?

A That his information by the Chicago office was that he was in Arizona.

Q Did you look anywhere else?

A No.

Q How much time did you spend looking for "Cherry Nose" Brown?

A Probably a month.

Q Is that one continuous month?

A Yes. Every day.

Q Where were you living at the time?

A In Tucson.

Q Did you go home every night?

A Yes. It's not that far away. I mean, you can go from Tucson to Phoenix in 35 minutes.

Q You didn't talk to Mike Wacks about this, did you?

A No, I did not.

Q Did you incur any expenses in connection with this?

A Just out of my own pocket, gas.

whatever page I'm told it goes through, whether or not all of that is or is not your handwriting?

THE WITNESS: It's all my handwriting.

MR. HEIDEMAN: Okay. So all the batch of pages that start with 59 and continue straight through to --

MS. EISEN: Through 172.

MR. HEIDEMAN: I'm sorry, Faye?

MS. EISEN: 172.

MR. HEIDEMAN: 172, you're telling us all of these come out of your files?

THE WITNESS: Right.

MR. HEIDEMAN: And they constitute your handwriting, is that correct?

THE WITNESS: That is correct.

MR. HEIDEMAN: Okay. If when we go through any pages you see a notation made by your wife or somebody else, please tell opposing counsel that it's not your handwriting.

THE WITNESS: I will notify him. Right.

MR. HEIDEMAN: Okay?

THE WITNESS: I will notify him.

MR. HEIDEMAN: Thank you very much.

Counsel, I hope that's helpful.

MR. SCHWARTZ: It is.

MR. HEIDEMAN: I interrupted.

MR. SCHWARTZ: Yes.

BY MR. SCHWARTZ:

Q Just comparing page 59, for example, to page 62, it just seems like it's two different people writing, so I want to make sure that that's not your wife or someone else.

A No, that's me. It's all my handwriting.

Q Did you keep a continuous log in a yellow pad of the conversations?

A Yes.

Q Do you know how many pads of notes you had of these conversations?

A No, I do not, not to my recollection at this time.

Q And the notes are dated. Were they written at the time that you had the conversations?

A Yes, sir.

Q If you look at 59 again, the first entry of 2-27-96.

A Right.

Q Is that supposed to be crossed out, 2-27? Is that the date, or is that a crossed out date?

A That's just a mistake. No, that was the date.

see if there's someone there and let me know.

Q Did you use an abbreviation for morning?

A Yes.

Q What's your abbreviation?

A M-O-N.

Q Oh, okay. Do you know what letter you're referencing there? "He got the letter and thanked me for it."

A Well, I sent a letter to the SAC praising him for the hard work he did.

Q And this is Scott Garriola, right?

A Yes. And that was, to the best of my recollection, to Tim McNally.

Q Do you know what that last two lines are about? "He said he will call in the morning."

A He didn't trust Ori, and later on, which I don't know if it's in these notes somewhere, while he [redacted] You know about that probably. You do know about it.

Q [redacted] L.A. division, he was a subject, right?

A Right.

Q Can you turn to page 64?

A Mm-hmm.

Q And the second entry dated 5/13/96.

A Right. Called Mike and he said he will talk to Pat about the money and he said that J.B. died. That's Joe Bett died. He said he don't think the contract is in force. He says he will call me on Tuesday or Wednesday.

Q And that's a conversation with Mike Wacks, right?

A That is correct.

Q Can you read the last entry on page 64?

A Pete called and asked if I heard from Mike. I said no. He said that he is not going to call Mike anymore and that he will call Bill Esposito in Washington and have him call me. He says that he will call me after he talks to Bill. He said that Mike don't know what he is doing. He said that the things in Florida were never in Rick Delahey's name.

I said I didn't want to give anyone trouble. He said you don't just let them run over you. You have to stand up for your rights. He told me that someone in L.A. is bad-mouthing me. He didn't know who it was. He said he knew someone in Houston, and he will call him and see if there is something there.

Q Could you read the last entry on page 65?

A Pete called and said he talked to --

MR. HEIDEMAN: What date?

MR. SCHWARTZ: Thanks. It's May.

THE WITNESS: May 24, '96.

MR. SCHWARTZ: Right.

THE WITNESS: Pete called and said he talked to Mr. Esposito and that Esposito was going to look into the Florida and California things and he will get back to Pete Tuesday or Wednesday. Pete said that Chuck was talking to Kurt in Washington about getting me somewhere. He said that the $2,500 from W.A. to give me has nothing to do with California and it was for me to do that.

BY MR. SCHWARTZ:

Q Does this refresh your recollection at all about you having complained about not receiving payments under the contract?

A Yes. I told you that I did complain to Pete and to Esposito and to Chuck and to John Donahue.

Q Right.

A I'm sorry I didn't bring it up to Merryman. I should have brought it up to him. I'm sorry now, but he was down there strictly for the California thing and the $150,000 thing. He never brought up the contract to me, so we never got into that discussion. The man sat in a room with tears in his eyes the whole time, him and Morrisey.