MR. SCHWARTZ: Thanks. It's May.

THE WITNESS: May 24, '96.

MR. SCHWARTZ: Right.

THE WITNESS: Pete called and said he talked to Mr. Esposito and that Esposito was going to look into the Florida and California things and he will get back to Pete Tuesday or Wednesday. Pete said that Chuck was talking to Kurt in Washington about getting me somewhere. He said that the $2,500 from W.A. to give me has nothing to do with California and it was for me to do that.

BY MR. SCHWARTZ:

Q Does this refresh your recollection at all about you having complained about not receiving payments under the contract?

A Yes. I told you that I did complain to Pete and to Esposito and to Chuck and to John Donahue.

Q Right.

A I'm sorry I didn't bring it up to Merryman. I should have brought it up to him. I'm sorry now, but he was down there strictly for the California thing and the $150,000 thing. He never brought up the contract to me, so we never got into that discussion. The man sat in a room with tears in his eyes the whole time, him and Morrisey.

They said we cannot believe that you were treated this way for all the work that you've done for the FBI. I didn't have to do all that work, go to Baltimore and do that work. Take depositions and go to the grand jury. I didn't have to go to San Diego and take depositions and go to the grand jury and have people indicted and put in jail.

I didn't have to do that. My life wasn't threatened. But I turned my life around and I put all my belief in the Bureau. My whole life was in the Bureau to help them out, but it seems like I must have been mistaken. I'm sorry it came out this way, but that's the way I guess things work. It wasn't that way on the outside. Your word was your bond.

Q Did anybody in the FBI tell you that from the FBI's perspective, that $30,000 payment you had gotten in November was a settlement of your claim about not having gotten more monthly payments under the 1994 agreement?

A No one ever told me that. No one ever told me that. That's the third time you asked me that question and it's the same answer. They never told me that. And it states right in here about the $30,000 that I think we just read, didn't we? That it had nothing to do with California?

A Right.

Q And then how long did you live there for?

A Three years.

Q [redacted]

A For my wife's health, right.

Q And again, the FBI hadn't asked you to move?

A No. Plus I have a daughter and granddaughter and great-granddaughter there, and most of it was for my wife's health. It's easier out there for her breathing.

Q Can you read the entry on page 67? It looks like it's the second one that's dated June 4, '96. It starts "Called Chuck".

A Called Chuck and he said he will look into things. He said that Dallas would put me on only on a COD basis.

Q What does that mean to you?

A That means for everything that you would do they would pay you that. That's like being a stool pigeon, you know? That's what they do with these informants, you know? Here's $1,000, go do this. I know what that is.

Q And so that's very different from -- let me finish the question.

A Right.

Q That's very different from the arrangement that you had had under the 1994 agreement?

A Or the '91 agreement, too. Yeah. Completely different.

Q Could you keep reading that?

A COD basis. I said that I can't do that without a car and money to spend. He said he can understand that. He said he talked to Kent and he will look for something.

Q Do you know who Kent is?

A Yeah. He's an agent. He used to be an agent in Arizona. Now he's a prosecutor in Palm Beach, Florida.

Q Do you know his last name?

A No, I do not. I used to know it, but, you know, you meet so many of them you can't remember them all.

Q Can you finish reading that?

A He said he will talk to Pete and see if there is any --

Q He will talk to Kent?

A --- attorneys that will look into this and he will let me know. He said he will call me later.

See, they were all getting very fed up because I was trying to deal directly with the Bureau

filled so I can lose that weight.

(Discussion held off the record.)

BY MR. SCHWARTZ:

Q Can you turn to page 68 and look at the last entry? It's June 11, '96. 68.

A 6/11/96?

Q Right.

A Mike called and said he, I think, asked not to put in for the money yet. He has not put in for the money yet. He is waiting for the right time. He said that I should get in touch with someone in Washington, Esposito, and tell them when I'm in Florida. He says that I shall not wait to do something. He said that he told the guys in Boston that my contract is over in L.A. and that they can pay me. I asked if he would put it in a lump sum so I can get on with --

Q Is it "so I can get out of here"?

A Out of here. Right. He said he will. I said that someone out there was bad-mouthing me and he said he did not talk to Tim or Scottie or Andy. He said that he would let me know what he put in for the money.

Q Is that last line "he will let me know *when* he put in for the money"?

them a lot of credit.

Q Do you remember getting a letter from Neal Divers after you were --

A What?

Q After you were interviewed down in Florida by Clyde Merryman and Steve Morris.

A Yes. Mm-hmm.

Q Then you got a letter that Divers signed off on saying that your claim for your lump sum is denied and that if you want to submit a claim for your lost property, you should submit forms under the Federal Tort Claims Act?

A Correct.

Q Did you respond to Neal Divers about that letter?

A No, I did not.

Q Did you ask anyone in the FBI why does this letter talk about the lump sum from Miami, the personal property, but it doesn't talk about the payment under the 1994 agreement?

A No. I never asked anyone. There wasn't too many people I think that liked Divers.

Q Could you turn to page 70 of Exhibit L?

A Mm-hmm. What do you want to know?

Q You don't need to read the whole thing, but

Q Do you think this reference is about the $2,500?

A Yes.

Q Could you continue reading the entry on top of page 75?

A Mm-hmm. Pete said he talked to Whity in Washington, and he said that they agreed with us on the contents about they owe me to July 15.

Q Let me stop you for a second. Is that "they agreed with us on the contracts"?

A Mm-hmm.

Q Could you read it again, because I don't think it came out clearly the first time?

A They agreed with us on the contract and they owe me to July 15. He said Whity was going to talk to Espo today if he was in. I asked him when he thinks that will be done. He said in a week or two. He said that they had someone from California and Washington and they all agreed.

He said he told Whity that I was still willing to work for the B -- that's the Bureau -- and Whity said he will look into it. He told Whity about Florida and he wants --

Q Is that "was shocked"?

A Was shocked about hearing that. He told him

A I can't remember what the actual conversation was.

Q Can you read the next entry on page 76? It's dated July 18.

A Yeah. Pete called and asked what was the number on the contract. I gave that to him. He said that he will call Whity and ask for $28,125 plus lump sum.

Q Now do you know where that figure came from, $28,125?

A I have no idea.

Q Was it a multiple of the amount that you would have been paid under the contract?

A I have no idea, sir. He will call me back on what they say today or tomorrow. I told him what was said with Fred. Pete called and said that he talked to Whity and he thinks that Whity agrees with him on the matter, that it would be a letter --

Q A little more?

A A little more. He said I am on the first --

Q This is very hard to read, right, this passage?

A Yeah. It is.

Q I'm going to ask if you could try to make a better copy of this page.

reference to?

A Yeah. Go to work there.

Q So you were talking to?

A Chuck Goodwin.

Q Chuck about where you might go to find work?

A Right. Mm-hmm.

Q The first part of that entry, "he said to make sure that the money I'm to get from California" --

A California does not include Florida.

Q What does that mean?

A The money that I was supposed to get from Florida for my storage and the --

Q Now, the money you were supposed to get from California, was that both the lump sum and the payment under the '94 agreement?

A Correct. See, under the '94 agreement, I still thought he was willing to work under that agreement because it was never terminated, and why it was never terminated, it wasn't until 2002, but I was willing to go anywhere they wanted me to go.

Q But none of that panned out, right?

A No, but that's not my fault. My fault was I took their word for it that I would work for them anywhere they wanted me to go. With the knowledge I

Q It says, "I called Pete and he said that he talked to Chuck the day I talked to," it looks like Chuck, right?
A Chuck. Right.
Q "And he said" or "he say that he told me that the sum of $28,000 to $30,000 was for California and Florida." So am I correct that Chuck Goodwin had a conversation with you and told you that you were going to get paid $28,000 to $30,000 and that was going to be for California and Florida?
A No. It was California only.
Q Well, what does the reference mean and your understanding again?
A That it was for California only.
Q But somebody told you it was for California and Florida, right, and then you said that that was not what you understood?
A I believe it says California, not Florida. That's the way I abbreviate not, Florida.
Q So you think it says $28,000 to $30,000 was for California, not Florida?
A Right.
Q The next sentence says "I said that" --
A That's not what I understood.
Q And why is that not what you understood?

A Because I thought it was going to be more at that time for California.

Q The symbol between California?

A So then you see as you go on, see, you always stop before you go any further. "He said Whity was waiting for California to call him." So that's the sentence where it tells you he's waiting for California where Florida has nothing to do with it. It's just California.

Q I just want to make sure the record is clear. The line on page 81, an entry dated August 1, '96, the fourth line down starts "$28,000 to $30,000 was for Cal," which is abbreviated C-A-L.

A Not Florida.

Q And that symbol between C-A-L and F-L is a not?

A Right.

MR. HEIDEMAN: But it looks like what we would call an ampersand or an and sign.

THE WITNESS: Right.

MR. HEIDEMAN: But is that not the way you do -- show us another example of --

THE WITNESS: Here's another.

MR. SCHWARTZ: Okay.

MR. HEIDEMAN: He's pointing to 8/6/96,

third entry up from the bottom, same page.

Maybe, counsel, you could move to that and inquire. I'm not trying to direct him. I'm trying to make sure we don't have an inadvertent misunderstanding here.

THE WITNESS: Called Mark and we talked about California, not Florida. He said it's time for me to get in with him. You have to look out for yourself. He says he will call me later.

BY MR. SCHWARTZ:

Q How sure are you that that symbol -- now let me again refer to page 81 of Exhibit L. The entry is dated August 1, '96.

A Uh-huh.

Q It's the fourth line of that entry.

A Right.

Q The symbol between Cal and F-L for Florida, how sure are you that that stands for the word not?

A Because not would be too big of a writing for me to put in, so I abbreviate not. That's the way of my abbreviation to understand.

Q So you're positive that that stands for not?

A Yes, sir. And it's the same thing down here through the but when I talked to Mark.

MR. HEIDEMAN: And what do you use then as a

symbol for and, A-N-D, because I think all the lawyers at the table when we write an ampersand and we don't use the squirly curly que ampersand we put something that looks like a cross, but it -- right. And to us, that means and, but you're answering the question that that doesn't mean and, it means not, so can you explain the discrepancy?

THE WITNESS: Right. Well, that's just the way I do it.

BY MR. SCHWARTZ:

Q And you're absolutely sure of that?

A I'm positive. And probably if you go through a lot of this, you're going to see that as not.

(Pause.)

Q Can you turn to page 82?

A Okay.

Q The long entry that's dated August 6, '96?

A I talked to Chuck, and he said that he was doing all he can about the money.

Q Does that say "the money thing"?

A On the money thing.

Q Thing?

A Right. I asked him if Pete was mad at me. He said he talks to Pete every day and Pete is not mad

at me. He said that he's talking to Kent in Washington and --

Q Are you sure that's Kent? Could it be Keith?

A Could be Keith.

Q Okay. But you're not sure?

A No. In Washington. He did not have anything for me, but he will look around. I told Chuck that I talked to Jim Robertson and I told him what was said. He said that he has not heard from Jim Robertson. I told him that Jim said he will call Chuck on Monday, but Chuck said he has not heard from him. I told Chuck that I gave Jim Robertson Pete's phone number.

Chuck said I ought to go into business when I get the money, and then when they need me, they can bring me in on cases. He said he will call me when he hears something.

Q This is a conversation with Chuck Goodwin?

A Right.

Q And he says that you should go into business when you get the money?

A Right.

Q Do you know what money he's talking about?

A Yes. The money from California.

Q Okay. Actually, let me ask you to turn to page 128 first.

A Okay.

Q And there's an entry. The big entry.

A Whity called?

Q Right. That's dated 10/28/96.

A Whity called with another agent on the line. I don't remember his name. They talked about the California contract, and they didn't believe the contract is in force because I am --

Q Is it "actually"?

A Actually not doing anything for the Bureau, Federal Government, but they asked me what my expenses were here. I said approximately $2,000, and they said they will -- that they will --

Q "That they said well, how about"?

A Said well, what about $2,000 a month for eight months, which comes to $16,000, and I said no, I am not going for that. As far as I am concerned, the contract is still in force until I receive something in writing because that is what the contract says. I said a contract is a contract. As far as I am concerned, I am owed $32,000 on the contract, which is less than what the contract reads. They kept pushing the $2,000 per month, and I said okay, if you want to

go with $2,000, what is the lump sum going to be? They say that they don't know that it's --

Q Is it "they said they don't know that"?

A Right. That's what I said I think.

Q Go ahead, please.

A Now we've got to go to 29?

Q Right.

A Up to the people --

Q I don't know if you read the last part of the bottom of 128. Looks like it says "It is strictly."

A It is strictly up to the people they work for. I told them I got $25,000 from Maryland. They said okay, how about if we settle for $25,000? I said no, I would not settle for that. They asked what I would settle for. I said $40,000. That is $32,000 for the contract, $8,000 lump sum. They said they didn't know if that could be done -- that could --

Q "If they could"?

A If they could do that, but they would bring it upstairs and see what they say. They asked me about the Florida thing. I told them about the $150,000 I was promised plus also the storage, loss of the storage. I explained all about the money problems in Florida and the promise that was made about the

Bureau taking care of the storage.

The other agent on the line asked me how much I would take for all three things. I said I would have to think about that and talk it over with my family. I said let's get the California thing done first, then we can work on the Florida thing. Whity said that was like an alternative investigation in Florida.

I told them who all knew about this. They asked the attorney's name and I told them. They asked who was with me when I was told, and I told them it was Special Agent Malynda Irby. They said let's find out about the storage thing like three months ago. I asked them when I would have a answer on this California thing. They said they or Pete McCann will call me by noon tomorrow.

The conversation then got very heated because they constantly were saying that I did not do anything for the last months for the government. As far as they were concerned, if you don't work, you don't get paid. I told them that I know who told them because they knew there is a disagreement between California and me.

I know they told you that I had a verbal cancellation of the contract. However, I said that is

an outright lie and would be willing for me and the agent likewise taking a lie detector test, and if I fail, they wouldn't have to pay me. If he fails, then he gets fired. They said wait a minute. We don't have to go that far. We have your word.

Q Is it "We took your word"?

A We have your word and we know all the good you have done for the Bureau, and you should keep in good standing with the Bureau. They mentioned if I considered going into the witness protection program, they would give you a new ID and give you a job. I said I never had that thought and never would have that thought. They kept saying you want to stay in good graces because we might have some work for you. Whity said that sometimes people understand what they are doing, are told.

Q Can you go now to 132?

A I think I want to get a photocopy of this. I think I want to get a book. I'm going to have somebody write me a book so I can send you a book.

Q Can you look at the bottom entry? It says 11/1.

A 11/1. Pete called and said he talked to Whity and there is an offer for $30,000. He thinks you should take it because that is the final and only

offer, and if I don't receive it --

Q Is that "accept it"?

A Accept it I can get in line with all the others and sue for it. This is for L.A. only. He said he could call Whity and tell him our conversation, sign off, and I will have a check in hand. Pete thought the amount was low but said your back is against the wall and you will have no other choice but to sue.

Whity is supposed to call me when the check will be cut, when I should have it in hand. Pete says he will call and discuss this with Chuck and that if Pete has another option, he'll call and let me know. He said he will call me later anyway. He has two calls in for Prillamen.

Q Do you know who Prillamen is?

A He was the deputy director.

Q And this is a conversation you had with Pete McCann?

A That's correct.

Q And he had talked to Whity, and Whity was Clyde Merryman, correct?

A Right.

Q And Clyde Merryman was an FBI official at FBI headquarters?

A He was assigned to this case by Esposito.

MR. HEIDEMAN: When it says "L.A. only", what does that mean?

THE WITNESS: $30,000.

MR. HEIDEMAN: For what?

THE WITNESS: For the lump sum. For me to leave. $30,000.

MR. HEIDEMAN: What do you mean, "leave"? You mean going to Dallas?

THE WITNESS: Yeah.

BY MR. SCHWARTZ:

Q If you look back, Mr. Patton --

A Pete called and said he talked to Whity and their offer is $30,000.

Q Just so the record is clear, when there's a reference to L.A. in these notes that you've just read, that refers to your claim about not having received your monthly payment under the 1994 agreement and the lump sum you say you were promised, correct?

A No. It's just the lump sum I was promised.

Q Well, let me put it this way. The reference to L.A. does not include the $150,000 lump sum you said that Miami had promised you, nor does it refer to your personal property claim, correct?

A Right.