Q And if you go back to page 129, which you read a minute or two ago?

A Yeah. What about it?

Q There's a discussion. It says fourth line down, "They asked what I would settle for. I said $40,000. That is $32,000 for the contract and $8,000 lump sum." Do you see that?

A Mm-hmm.

Q Is that a yes?

A Yes.

Q And this is a note of conversation that you had on October 28, 1996?

A Right.

MR. HEIDEMAN: What was that settlement for if you were willing to settle?

THE WITNESS: Just for the money coming from, you know, the money I was promised from Mike Wacks to me to go on to the same case where the cases were over. The contract wasn't over, so it had nothing to do with the contract. The contract was still in force.

BY MR. SCHWARTZ:

Q Mr. Patton, referring again to that entry on page 129 where you said "I said $40,000. That is $32,000 for the contract and $8,000 lump sum," the

contract you're referring to is the 1994 agreement with the Los Angeles division, correct?

A No.

Q Okay. Then what is that contract?

A It's been so far long ago I can't remember that. It had nothing to do with this contract.

Q That's your sworn testimony is that the reference to the contract you're positive is not the 1994 agreement with the Los Angeles division?

A You're correct.

Q And you don't know what contract this is talking about?

MR. HEIDEMAN: Excuse me. You said with the Los Angeles division. You mean the whole contract or the work that was done in Los Angeles?

MR. SCHWARTZ: Thank you.

MR. HEIDEMAN: I think that's the confusing issue.

MR. SCHWARTZ: I appreciate your pointing that out.

BY MR. SCHWARTZ:

Q You're saying that the reference to $32,000 for the contract is not the 1994 agreement that's Exhibit B?

A No. It's not for our contract, but I

A I guess it is. They talked about the California contract. They didn't believe the contract is in force is what they're saying. They're not saying about any money about it.

Q Right.

A They're just saying they don't believe it's in force, and my position was it's still in force until I get something in writing stating that it's not in force.

Q Now, if you look at a couple of lines down there, it says, "But they asked me what my expenses were here, and I said approximately $2,000" --

A Right.

Q -- "and they said well, how about $2,000 a month for eight months, which comes to $16,000."

A Right.

Q Now the eight months --

A And I said no.

Q You said no. Do you know where they came up with eight months from?

A I have no idea.

Q Well, I think we established earlier that the last payment you had received under the 1994 agreement was in February of '96?

A Right.

contract is still in force until I receive something in writing because that is what the contract says. I said a contract is a contract.

As far as I am concerned, I am owed $32,000 on the contract, which is less than what the contract reads. They kept pushing $2,000 per month, and I said okay, if you want to go with the $2,000, what is the lump sum going to be? They said they don't know that.

Q And you said I am owed $32,000. That would be eight months times $4,000 a month, right?

A Right.

Q and you used the $4,000 figure because that was the services figure, right?

A Correct.

Q You weren't claiming that you should be paid expenses, the expenses part, correct?

A That is right. At that time, because I was planning not to go into a suit. I was trying to negotiate with them. Esposito tried as hard as he can and he couldn't get no further up. And that's when they all told me I better get a lawyer and just go do what I got to do, which you will read in many of the letters.

Q And now getting back to page 132 of Exhibit L.

A What about it?

Q You're still sure that when it says Pete called -- and this is --

A Right.

Q -- the November 1 entry.

A And offered $30,000.

Q And he thinks you should take it, that that $30,000 was for --

A That's what I got.

Q Let me figure --

A The lump sum.

Q Right. Let me finish. That was for the monthly amount that you were claiming under the contract plus the lump sum?

A No. No. It was the $30,000 that I got from leaving California, and that's what we finally agreed to, the $30,000, and that's what I got, $30,000.

Q Can you go to page 133?

A Yeah. What about it? I got it.

Q The entry that starts in the middle of the page, November 1, '95. Can you read that?

A Yeah. It says, "Whity called and said he understood that I agreed about the $30,000." That's what we were talking about. "I said yes, I guess that's the only thing I could do. He admitted that

California made a big mistake, but who is to know if you would have gotten this much of the lump sum?

"Maybe if you went another route you might get more, but who knows how long that could take? I told him that I still wanted to stay friends with the Bureau and would still be open to working with them. I mentioned New Orleans, and he said that might be good place for you. He said he will go upstairs because Prillamen leaves early on Friday and he wants to get this done.

"He will find out exactly when I will receive my money. After he finds out, he will call Pete and he will give us a date. He said they will try to put" -- then it goes on to the next page.

Q Do you have that next page?

A I'm going to look for it. "Have some work for you. Whity said that sometimes people misunderstand what they are told."

Q Was that page 134 you were reading from?

A 131. I should go to 132, right?

Q No. You should go to 134.

A 134?

Q Right. Because I think the last part you read --

A All things together, but he --