# EXHIBIT B

# Patton v. United States

# Case No. 01-161C

UNITED STATES DEPARTMENT OF JUSTICE

| | | |
|---|---|---|
| THOMAS J. PATTON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 01-161C |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Deposition of:

THOMAS J. PATTON

a witness of lawful age, taken on behalf of the Defendant, pursuant to notice, in the offices of the Law Firm of Richard Heideman, 1146 19th Street, N.W., Washington, D.C., on Thursday, June 8, 2006, at 10:00 a.m., before Bernadette Herboso, Notary Public in and for the District of Columbia, when were present:

APPEARANCES:

On behalf of Plaintiff:

RICHARD HEIDEMAN, Esquire
Heideman, Nudelman & Kalik, PC
1146 19th Street, N.W.
Washington, D.C. 20535
(202) 462-8990

On behalf of Defendant:

TED G. SCHWARTZ, Esquire
Federal Bureau of Investigation
935 Pennsylvania Avenue, N.W.
Washington, D.C. 20535
(310) 966-3421

APPEARANCES: (Cont'd.)

Also for the Defendant:

LAUREN S. MOORE, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-6288

## C O N T E N T S

WITNESS:

Thomas J. Patton


| | PAGE |
|---|---|
| EXAMINATION BY COUNSEL FOR DEFENDANT | 9 |
| FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT | 109 |

# E X H I B I T S

| EXHIBITS | IDENTIFIED | DESCRIPTION |
|---|---|---|
| A | 13 | Deposition notice |
| B | 19 | Agreement |
| C | 23 | Enterprise rental car leasing |
| D | 40 | Letter Heideman law firm |
| E | 41 | Declaration of Patton |
| F | 45 | 07-14-99 letter |
| G | 58 | 11-14-96 receipt |
| H | 90 | Declaration of Goodwin |
| I | 95 | 302/Report of Interview |
| J | 96 | 10-20-97 letter to Merryman |
| K | 115 | 5-28-91 agreement |
| L | 128 | Handwritten notes |
| M-1 | Reserved p. 165 | Revised copy page 00076 |
| M-2 | Reserved p. 165 | Revised copy page 00077 |
| M-3 | Reserved p. 185 | Revised copy page 00084 |

P R O C E E D I N G S

(10:00 a.m.)

MR. HEIDEMAN: All counsel will be introducing themselves in a moment. I also want to introduce our associate, Faye Eisen. Although I am licensed generally before the Court and therefore practicing in this particular matter, my other partners, Noel Nudelman and Tracy Kalik, appeared or participated from time to time with consent of counsel.

We would request the same professional courtesy for Faye Eisen so that she can assist and perhaps even from time to time will sit in without me in the room if I need to step out for some other ongoing matters, although it's our intention that of course one of the four members of our law firm will be in the deposition at all times. If that would be agreeable with counsel.

MS. MOORE: Is Faye a member of the Claims Court?

MR. HEIDEMAN: Faye is not a member of the Claims Court. She is, however, a member of the Maryland Bar.

MR. SCHWARTZ: That's fine. She does need to sign the confidentiality orders. I don't know.

Has she done that yet?

MS. EISEN: No.

MR. HEIDEMAN: No, but we'll be glad to do that, and you have my pledge that that will done.

MR. SCHWARTZ: Okay. That's fine. And just have the court reporter sign it before we start.

MR. HEIDEMAN: Fine.

MS. MOORE: Do you have another copy of it?

MR. SCHWARTZ: I do.

MS. MOORE: Then we can have Faye sign it because the court reporter signed this.

MR. HEIDEMAN: Thank you. And thank you for your courtesy. One other thing before you start on the witness. You requested that Mr. Patton do another search of records and bring with him specific things. He has done that, and we've Bates stamped them. Did they get all finished this morning?

MS. EISEN: Yes.

MR. HEIDEMAN: Okay. We've Bates stamped them. I'm going to hand you a packet that starts with Patton 00001 and runs through Patton 000215. What they constitute are certain business cards on the first page that he had of various agents that he met with. He'll be glad to answer questions about that.

On Patton 02 is an e-mail communication he

had with a particular agent. Patton 03 is a photograph provided to him someone at the FBI wanted him to identify and assist in locating, which he did.

MR. SCHWARTZ: Why don't we hold off on that for now.

MR. HEIDEMAN: Let me just finish.

MR. SCHWARTZ: How far are you going to go with that? Because I don't want to take up too much time going page by page.

MR. HEIDEMAN: Just two seconds.

MR. SCHWARTZ: Go ahead.

MR. HEIDEMAN: Starting with page Patton 04 are phone records from a certain time period through a certain time period covering the relevant time periods. And then starting with Patton 57 is another business card, and 58 is a receipt, and 59 through Patton 000172 are various handwritten notes of Mr. Patton over the course of relevant time periods that I understand were contemporaneous notes that he took even if they were in anticipation of potential litigation. That's not an allegation. It's just simply my information.

And then lastly we jump to Patton 204 through 215. There are some additional phone records that have been faxed into us. There appears to be a

gap between Patton 172 and 204, and, Faye, if that's not intentional, then --

MS. EISEN: That must only be in that package, because it's good in our package.

MR. HEIDEMAN: Okay. So I'll give it back to you.

MS. EISEN: Yes.

MR. HEIDEMAN: Give me a different one that you think is complete, and then I'm finished with this explanation. Ted, thank you for your patience.

Yes, this one that we'll give you starts again with these phone records at Patton 000173 and then runs through Patton 000215 of phone records. We'll be glad to explain this again, but I wanted you to know what you have.

MR. SCHWARTZ: Thank you. Counsel, how come these records were not produced earlier when they were originally requested?

MR. HEIDEMAN: We received them from Mr. Patton. Some of them, by the way, I believe have been produced. If we had them before, they were produced. We received them from Mr. Patton upon his arrival here in preparation for the deposition and direct response to your subpoena.

MR. SCHWARTZ: You have not produced any of

these records before.

MS. MOORE: Yes. Actually you haven't produced any documents at all.

MR. HEIDEMAN: I believe phone records were produced.

MS. MOORE: No, no. We've asked for them many times for the past three years in about five different letters. We haven't seen one phone record, nothing, not one document even.

MR. HEIDEMAN: We received these particular documents last evening after Mr. Patton got off the airplane. We stayed last night and reviewed them, Bates stamped them, and we're producing them at the outset of the deposition.

MR. SCHWARTZ: Okay. All right. That's fair enough.

THE REPORTER: Would you raise your right hand, please?

Whereupon,

THOMAS J. PATTON

having been duly sworn, was called as a witness and was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. SCHWARTZ:

Q Could you state your full name for the

record, please?

A Thomas J. Patton, P-A-T-T-O-N.

Q Mr. Patton, do you understand the oath that you just took is the same type of oath that you would take if your were testifying in a court of law?

A That is correct.

Q Even though we're in an informal setting here, the oath that you took has the same importance and meaning.

A Yes, sir.

Q Now the court reporter here is going to be transcribing what is said here into a booklet, which you'll have a chance to review.

A Mm-hmm.

Q It's important because it's being transcribed that you respond to questions verbally as opposed to uh-huhs, mm-hmms. Do you understand that?

A Yes, sir.

Q Also it's important so that we have a clear record that we don't talk over each other, so please wait until I finish my question before you respond, and I'll do the same. I'll wait until you finish your answer before I ask the question. Is that okay?

A Yes, sir.

Q If I ask a question that you don't

understand, please let me know that you don't understand it.

A Yes.

Q If you answer the question, I'm going to assume that you understood what the question was, okay?

A Yes, sir.

Q If you need a break at some point, you can let me know, okay?

A Yes, sir.

MR. HEIDEMAN: And on administrative detail, logistical notes, we have lots of coffee, water, soft drinks. There are restrooms on the floor. We have bagels and we also have muffins. And lastly, if anybody needs any kind of a break or to have a confidential meeting, we have other conference rooms and offices, private offices, available for that should that be needed.

MR. SCHWARTZ: Thank you.

MS. MOORE: We're well provided for.

MR. HEIDEMAN: Thank you.

BY MR. SCHWARTZ:

Q Mr. Patton, I may ask you a question that requires you to estimate something. I am entitled to your best estimate. I don't want you to guess,

however.

A I will never guess.

Q Okay. And just as an example, if I ask you how long this table is that we're sitting at, you could give me an estimate of that.

A Sure.

Q But if I ask you how long is the table in my house, that would be a guess because you have no information.

A Yes, sir.

Q Are you on any medication at this time?

A No, I am not.

Q Is there any reason you cannot give your best testimony today?

A No, there is none.

Q Have you reviewed any documents in preparation for this deposition?

A Yes, I have.

Q What documents did you review?

A Just the ones that you've asked me to bring.

Q All right. And that's the packet that your attorney gave us this morning, which is Bates stamped Patton 1 through Patton 215?

A Yes, sir.

Q When did you gather the documents that were

produced this morning?

A As soon as I was notified that I was coming for a deposition, I started going through everything that I had.

MR. SCHWARTZ: I'm going to mark as Exhibit A Defendant's notice to take the deposition of Mr. Thomas Patton.

(The document referred to was marked for identification as Exhibit A.)

BY MR. SCHWARTZ:

Q Have you seen this document before, Mr. Patton?

A Yes, I have.

Q Did you go through the requests for documents Nos. 1 through 15?

A Yes.

Q And did you produce all the documents that you had that were responsive to those requests?

A Yes, I did.

Q Prior to being notified that you were going to be deposed, had you looked for documents relating to this case?

A For many years.

Q Had you found any documents prior to being

notified that you were going to be deposed?
A I don't understand that question.
Q You said earlier I think that you started looking for documents after you were notified that you were going to be deposed.
A Correct.
Q My question is before you were notified that you were going to be deposed, had you looked for documents relating to this case?
A I've looked for them probably over how many years has this case been going on.
Q Had you found any documents before finding these documents that were delivered today?
A Well, if I found any, they would have been sent to my attorney.
Q And had you sent your attorney any documents before handing these documents to him when you arrived in Washington, D.C.?
A I probably have to the best of my recollection.
Q What type of documents did you give your attorney?
A I believe I gave him all the 302s.
Q What is a 302?
A A 302 is when you're being interviewed by

FBI agents.
Q Had you given your attorney any phone records?
A To the best of my recollection, I believe that at one time, we did send the records to the best of my recollection. Is my recollection right? I don't remember.
Q Do you remember giving any other types of records to your attorney before you gave him these records that are here today?
A I believe he could probably answer that better than I can.
Q You don't have any recollection of any other records?
A I believe we gave most of the records up, right, Rich? We gave whatever I had up at that certain time.
Q Well, what type of records did you give your attorney?
A Like 302s and conversations and whatever I had and whatever Ms. Moore asked for.
Q What's your date of birth, sir?
A 2-10-38.
Q Do you recall the first time you had any contact with agents from the FBI's Los Angeles

division?

A Do I remember the dates?

Q Well, do you remember that happening for the first time you had some contact with Los Angeles agents?

A Yes, I had contact with them. They used to pick me up at the airport when I was going out to do a deposition in a grand jury case in San Diego, California. That's the first time I met Mike Wacks and Fred I don't remember his last name. I'm sorry.

Q Do you remember roughly when that was?

A No, I do not.

Q Do you remember the first time that you started actually working with the Los Angeles division of the FBI?

A Well, I did a thing for them even before I was under contract. They had a thing against a person named Moore, and they asked me if I would do it, and I did it.

Q Do you remember the first name of this person, Moore?

A No, I do not.

Q What was the nature of that work?

A It was a Chinese scam, some type of a money laundering scam.

Q Did you work with Mike Wacks on that?
A Yes, I did.
Q Do you remember around when that was?
A No, I do not.
Q But that was before you were under contract?
A That is correct.
Q Did you come out to Los Angeles to do that work?
A Yes, I did.
Q Do you remember any other details about that?
A Well, just that, you know, they wanted me to go in there and discuss stuff with them, and I did it. I did whatever they asked. For all the years since I came over, whatever the FBI ever asked me I did for them.
Q Did you record any conversations with Moore?
A No. They did not want to wire up.
Q Do you remember meeting with someone named [redacted]

[redacted] that correct? Is that what you're stating to me?

Q Well, please don't interpret my questions as being statements. The way the deposition works is I ask the questions. If you don't understand it, you can ask me to clarify. But in this context, I ask the questions and you give the answers or respond to them, okay? Do you recall coming out to Los Angeles to meet with Joe Denti before you were under contract?

A No, I did not. I never did that. I was under contract when I met Joe Denti.

Q Did you know Joe Denti before you had any connection to the Los Angeles division?

A No, I did not. Never heard of him.

Q Do you remember when you were first under contract with the Los Angeles division?

A I believe it was in 1994, to the best of my recollection.

MR. SCHWARTZ: I'll mark as Exhibit B --

THE WITNESS: Could I see that, please?

MR. SCHWARTZ: I'll show it to you in a second. A document entitled "Agreement", and it appears to have your signature of November 11, 1994.

//

(The document referred to was marked for identification as Exhibit B.)

THE WITNESS: That's correct.

BY MR. SCHWARTZ:

Q So your testimony is prior to November 11, 1994, you did not meet with Joe Denti?

A No, I did not.

MR. HEIDEMAN: Excuse me for just one moment. Mr. Patton?

THE WITNESS: Yes.

MR. HEIDEMAN: In answering any question, if you're absolutely sure, then you may answer absolutely sure. If, however, it is possible that a timeline might be off, you can certainly answer whatever is the truth and to the best of your recollection. Do you understand the distinction that I'm making?

THE WITNESS: Yes.

MR. HEIDEMAN: I'm not instructing you how to answer any question, I'm just listening here. You've been asked a direct question, did you meet with this person before a certain date, and you've said no.

THE WITNESS: No.

MR. HEIDEMAN: Thank you.

//

BY MR. SCHWARTZ:

Q Do you remember the circumstances when you first did meet Joe Denti?

A Yes, I do.

Q What were the circumstances?

A We went to a restaurant in L.A. called Matty's.

Q On Melrose Avenue?

A Yes. And that's the first time I met Joe Denti.

Q You sent him a bottle of wine?

A Yes, I did.

Q You were with Scott Garriola at the time?

A Yes. That is correct.

Q And he was an FBI agent?

A Correct. Working with me as an undercover.

Q Right. And he was posing as your nephew, correct?

A That's correct.

Q And you were working undercover as well?

A Yes.

Q You were using the name Tom Piazzi?

A Piazzi.

Q Before you signed this agreement, which is Exhibit B, you had conversations with Michael Wacks

about your willingness to come to Los Angeles to work on this investigation?

A Yes.

Q And you knew that Joe Denti was a subject of the investigation?

A No, I did not.

Q What did you know about the nature of the investigation?

A Just that it was going to be organized crime figures, for me to try to infiltrate with organized crime figures.

Q And your best recollection is that before the date you signed this agreement, you didn't know that Joe Denti was a subject?

A No, I did not.

Q Do you remember negotiating this agreement that's Exhibit B?

A Did I negotiate it?

Q Correct.

A No, I did not negotiate it. It was done by Mike Wacks and Fred I don't know his last name. They did all the negotiations.

Q And Fred is an FBI agent?

A Yes. And there was Stan, Fred, and Mike Wacks that did the negotiations.

Q Now, under this agreement, which is Exhibit B, you were going to get $4,000 a month for services, correct?
A That is correct.
Q And under the agreement, you were required to cooperate fully with the FBI?
A That is correct.
Q And you would get $1,030 per month during the term of the agreement for rental of a vehicle and securing appropriate insurance under paragraph 2?
A Yes.
Q The FBI had arranged for the rental of a vehicle for you, correct?
A That is correct.
Q Do you recall what the rental charge was for this vehicle?
A I believe this is the actual charge, to the best of my recollection.
MR. SCHWARTZ: I'll show you what I'm going to mark as Exhibit C, which is on the letterhead of Enterprise Rent-A-Car Leasing. It's dated November 7, 1994. It actually consists of two November 7, 1994, letters.
//
//

(The document referred to was marked for identification as Exhibit C.)

BY MR. SCHWARTZ:

Q Do you recognize Exhibit C?

A No. This is the first time I've ever seen this.

Q Well, according to paragraph 3, Enterprise was going to charge $1,029.70 a month.

A Correct.

Q For a Lincoln Town Car.

A Mm-hmm.

Q Recall you have to respond verbally as opposed to --

A Yes. To the best of my recollection, I believe it was $1,030.

Q And did you rent a Lincoln Town Car?

A Yes, I did.

Q From Enterprise?

[redacted]

Q Under Exhibit B, which is the Agreement.

A Mm-hmm.

Q You were going to get $320 a month for utilities and phones, correct?

A Yes.

Q And that was to cover the utilities and phones at the apartment in Marina Del Rey that you were living in?

A Yes, but I never got them bills. Them were paid by someone else. I never received the bills. Whoever paid them I have no idea.

Q The agreement at least contemplated that you were going to be paying the bills, correct?

A Yes, that I would be paying the bills, but I never got the bills. The money was taken out of the money that I was supposed to be receiving, and whoever paid it, I have no idea. You'd have to ask someone back there.

Q The FBI was also paying the monthly charge for the apartment, correct?

[redacted]

Q And that, as you said before, was sort of a cover company?

A Correct.

Q But it was not coming out of your pocket?

A No, it was not.

Q And your wife and son were living with you

at that apartment?
A That is correct.
Q Under the agreement, which is Exhibit B, you were to get $300 a month for furniture rental.
A That is correct.
Q And that was to put furniture --
A In the apartment.
Q The one in Marina Del Rey?
A Yes, sir.
Q You were also under the agreement to get $1,600 a month for travel and entertainment expenses incurred in furtherance of investigation-related activities, correct?
A That is correct, and that would cover not only my expenses but Scott Garriola's, too.
Q So, under the agreement, you were to pay for entertainment-related expenses that Scott Garriola incurred?
A Yes, because we worked together.
Q If you turn to the third page of Exhibit B.
A Mm-hmm.
Q Two paragraphs above your signature, it says the representative for the FBI contracting officer for this agreement is Special Agent Michael F. Wacks, correct?