A That is correct.

Q And you understood that he was the representative for the contracting officer?

A Yes.

Q You were never advised that any other agent took over from Mike Wacks as the representative for the contracting officer?

A No.

Q When you were paid under this agreement, Exhibit B, you were paid in cash, correct?

A That is correct.

Q And there would be at least two FBI agents from Los Angeles that would witness the payment?

A Not always.

Q Was there sometimes only one agent?

A Yes.

Q And that would be typically Mike Wacks?

A Mike Wacks or Scott Garriola.

Q And Scott Garriola was also with the Los Angeles division of the FBI?

A That is correct, and I believe he still is.

Q Do you remember the name Andy Stefanak?

A Yes, I do.

Q He was also an FBI Los Angeles agent?

A Yes.

Q On occasion, do you recall if he would make a payment to you under the contract?

A He would come with Mike or with Scottie, but he never handed me the money. Either Scottie or Mike would hand me the money.

Q If you turn to again the last page of Exhibit B, which is the agreement, at the top, it says confidentiality, paragraph 13.

A Mm-hmm.

Q "Mr. Patton will in no way reveal the confidential and sensitive nature of this investigation or identify any undercover FBI agent to any unauthorized personnel persons."

A That is correct.

Q When it says "this investigation," what investigation did you understand this to be referring to?

A To the best of my recollection, it was any investigations we were doing. It was not just one. Any investigations we were doing. When we were [redacted] and some other people, it was not involved. It was mostly involved with kiddie porn and other activities that they were involved in.

[redacted]

A Yes, sir.

[redacted]

A Uh-huh.

Q That's a yes?

A Yes, sir.

Q Were they connected to Joe Denti's organization at all?

A No, they were not.

Q Were they part of La Cosa Nostra?

[redacted] claimed, which there are probably many, many tapes of him claiming, to have contacts with organized crime figures back in the east.

[redacted] trafficking as far as you know?

A No, not to my knowledge.

Q Was he involved in money laundering?

A No, not to my knowledge.

Q When I use the term "La Cosa Nostra", most people would understand that as mafia, Italian mafia, is that correct?

A That is correct in certain circles. In Chicago, it's not called the mafia. It is called the organization.

Q Was Joe Denti connected to a La Cosa Nostra crime family as far as you know?
A Yes, sir.
Q What was the connection?
A I believe he was connected to the Bonanno family.
Q Not the Genovese family?
A I don't believe so. It could be possible, but to the best of my recollection, I believe it was the Bonanno.
Q Let me move to the time after you left Los Angeles.
A Yes, sir.
Q Well, you got to Los Angeles in February of 1996, is that correct?
A That is correct.
Q And in March of 1996, you met with FBI agent Pete McCann and FBI agent John Robertson relating to the Donald Eugene Webb fugitive matter?
A That is correct.
Q And how did that come about?
A Well, I was notified by Chuck Goodwin that they wanted to talk to me about Donald Webb. Donald Webb was on the 10 most wanted list, and he was living in south Florida, and one of our organizations was

hiding him out. Sam Urbano was hiding him out in a condominium in Kendall, Florida.

Q How did Chuck Goodwin learn that you had information about Webb?

A Through conversations that we had.

Q You and Chuck Goodwin?

A Me and Chuck.

Q Do you remember when the conversations took place?

A No, because I had a lot of conversations with Chuck Goodwin. You know, my agreement with the federal government, original agreement, was just to help out just with Miami organized crime, but since I had so much trust in the FBI at that time and still do in a lot of them, that they asked me to help them on a lot of other cases throughout the country, and I agreed to do that.

Q Do you remember was there a large gap of time between the time you talked to Chuck Goodwin about Donald Webb and the time that Pete McCann and John Robertson came down to talk to you about it?

A To the best of my recollection, I can't remember that. That's too many years ago.

Q Did McCann and Robertson come to where you were living at that time?

A No, I met them in Dallas, Texas, because I was supposed to be transferred to Dallas, Texas, from L.A.

Q What do you mean you were "supposed to be transferred"?

A Well, there was some contacts made for me to go to Dallas, Texas, to work undercover for them involving heavy equipment, stolen heavy equipment, and they thought that I would be a good person to infiltrate the company that was doing that.

Q Who is "they?" Who thought that you would be good for that?

A The SAC in Dallas, Texas.

Q Was that Adams?

A Right.

Q Do you remember his first name?

A Not at this present moment I do not.

Q Did you talk to Adams before you moved to the Dallas area?

A I believe Pete McCann talked to him. I didn't talk to him direct.

Q Were you in contact with Pete McCann before you left, before you moved out of Los Angeles?

A Oh, yes.

Q Do you remember when you first were

contacted by Pete McCann?

A Well, I met Pete McCann when I first went to Annapolis, Maryland, because he had the contact to get the rental cars that we would use as undercover cars up in Pennsylvania, so Chuck Goodwin and I would drive up there to pick up the cars, and Pete would always meet us there because he was stationed in New Castle, Pennsylvania.

Q So your recollection is that it was Pete McCann that told you there was some work in Dallas for you?

A Yes.

Q Did you ever talk to any agent in the Dallas division before you moved out to that area?

A Yes, I met with -- I can't think of his name right now. I can't think of his name at this present time. I'm sorry.

Q But it was an agent with the Dallas division?

A Two of them.

Q Do you remember what they looked like?

A Yes. One was a tall, black-haired, middle-aged agent, and the other one was a shorter, older agent.

Q Are these the same two agents that paid you

the $30,000 in November of '96?

A No. When they paid me the $30,000, it was the one agent. Stan I believe was his name if it's coming back to my recollection.

Q Is it Larry Sandri?

A Sandri. That's the name. Larry Sandri. And when he came to give me the $30,000, that was negotiated between Pete McCann and L.A. office.

Q Was Larry Sandri one of the agents you spoke to before November of '96 about doing work for the Dallas division?

A It was not before. I was asked where I wanted to be transferred, and I had very good rapport with Pete McCann and Chuck Goodwin, and they said that Dallas would be a very good area for you because there's a lot of good work there and would you be willing to go there, and I said sure, so then Mike Wacks asked me where would I want to be transferred to, and I said Dallas, and then everything started from there.

Q Did you or your wife have any family in the Dallas area?

A I have a sister that lives in Garland, Texas.

Q And she was living there as of February of

'96?

A Yes.

Q And you ended up moving to Garland, correct?

A That is correct.

Q And getting back now to the two agents, you described one as a tall, black-haired, middle-aged --

A That's Sandri.

Q And the other one was a shorter, older agent. Those were two agents that you had met with to talk about doing work?

A Yes, sir.

Q So you met Sandri at that point?

A Right.

Q And then later in November of '96, he was present when you were paid the $30,000?

A Yes.

Q Do you remember any other conversations with agents from the Dallas division?

A Just while I was there, I would have many conversations with them, dates and everything. That's my recollection. I can't remember.

Q Do you think those are in the records that your attorney delivered today?

A They might be. I'm not sure.

Q Do you remember taking any notes of

conversations that you had with Dallas agents?

A I believe I did. I usually did take notes, a lot of notes, which I was taught by the FBI to do that.

Q And did you keep those notes?

A Yes, I did.

Q And as far as you know, they have not been lost or destroyed?

A No.

Q So you had a face-to-face meeting with these two agents that you described prior to November of '96?

A That is correct. They were more or less picking my brain to see which road to take to infiltrate these people, and I explained what I would have done, how I would have done it.

Q And you said this was relating to stolen heavy equipment?

A Heavy equipment, yes.

Q Was this a --

A Ongoing case.

Q Was it a La Cosa Nostra case?

A No, it was not, not to my knowledge.

Q Was it a drug trafficking case?

A No, it was not.

Q And it was not a money laundering case?

A You'd have to talk to them about that. All I know, it was a stolen heavy equipment.

Q Getting back to the meeting that you had with Pete McCann, do you remember where you met him?

A Yes. I met him in the hotel, and there was him and Fred Robertson and a retired FBI agent named Vinny, which I don't know his last name.

Q And this was to discuss Donald Eugene Webb?

A Right. And Webb's partner, who worked with us in Florida -- what was his name right now -- Latch.

Q Frank Latch?

A Frankie Latch.

Q Do you know what Webb was wanted for?

A Murder. Killing a police officer in Pennsylvania.

Q So it was not a La Cosa Nostra investigation?

A No, it was not.

Q And it wasn't money laundering?

A No.

Q Or drug trafficking?

A No.

Q You were paid $2,500 for your services at that meeting?

A I never knew I was getting paid anything for it. I did it as a favor to Pete McCann and Chuck Goodwin. I was notified later that they were going to send to me for my time spent with them.

MR. HEIDEMAN: Can we take a break, please?

MR. SCHWARTZ: One second.

MR. HEIDEMAN: No, I need to take a break now, please.

MR. SCHWARTZ: I want to ask one more question, please.

MR. HEIDEMAN: I'm sorry. I need to go to the restroom. I need to take a break.

MR. SCHWARTZ: You can hold it for a moment.

MS. MOORE: You have to have another counsel here then.

MR. HEIDEMAN: Counsel, I'm very sorry.

MS. MOORE: I mean, nobody should be leaving.

MR. HEIDEMAN: I'm very sorry. I need to take a break to go to the restroom.

MS. MOORE: Okay. We'll take a five-minute break.

MR. HEIDEMAN: Thank you.

(Whereupon, a short recess was taken.)

MR. SCHWARTZ: Read back the last question.

(Whereupon, the reporter played back the previous question.)

BY MR. SCHWARTZ:

Q Mr. Patton, I think you were saying that you had met with Agents McCann and Robertson --

A Robinson.

Q Robinson. As a favor to McCann and to Chuck Goodwin, correct?

A That is correct.

Q And you had not expected to get paid for that?

A No, I did not.

Q But you were paid $2,500 for that?

A That is correct.

MR. HEIDEMAN: Excuse me. Counsel, you're talking about monies other than under the agreement that is Exhibit B? Monies that he's been paid other than under the agreement, Exhibit B?

MR. SCHWARTZ: I don't understand the question.

MR. HEIDEMAN: You started the deposition by introducing Exhibit A and B and C, and under B, you gave him a copy of the agreement. You asked him some things about the compensation under the agreement. So is your question now are you talking about

compensation he was paid, this $2,500 separate from money paid under the agreement? That's what I'm trying to ask you.

MR. SCHWARTZ: Counsel, I'm not sure why you're asking that. I hope you're not trying to coach the witness.

MR. HEIDEMAN: You know, Mr. Schwartz, I'm a licensed attorney just like you. I'm not coaching anybody. I'm asking a question while we're all here. The witness is here. He flew in special for this. None of us are going to want to have to do this another time. I thought it would be helpful to you if I inquired now.

I certainly could have done it off the record at a future break, but you're at this point. You jumped from the agreement to Dallas to one meeting and this $2,500, and your question was relating to the $2,500 in terms of money paid, and I'm asking you do you not intend to ask about monies paid under the agreement?

MR. SCHWARTZ: I'm still not following your confusion.

MR. HEIDEMAN: Never mind. I withdraw my question.

MS. MOORE: I'm sure he'll get to those

questions if he deems they're necessary.

MR. HEIDEMAN: That's fine. That's fine.

MS. MOORE: I mean, he has his agenda, so you have to respect that.

MR. HEIDEMAN: That's fine. Of course.

(The document referred to was marked for identification as Exhibit D.)

BY MR. SCHWARTZ:

Q I've marked as Exhibit D a document on the letterhead of your attorney, Mr. Heideman, dated April 19, 1999, correct?

A Yes.

Q If you turn to page 11 of that document.

A Yes.

Q In the middle of that page, actually there's a heading for monies paid to and/or owed and/or claimed by Mr. Patton, correct?

A Pardon me?

Q Do you see the heading No. 4? It says monies paid to and/or owed and/or claimed by Mr. Patton.

A Yes.

Q And under C, it says 1994 contract.

A Mm-hmm.

Q And it says Mr. Patton was paid approximately $9,250 per month under this contract from November 24, 1994 until February of 1996. Do you see that?

A Yes, I do.

Q And that's actually a mistake. It should be $7,250, correct?

A Right.

Q The next sentence says Mr. Patton has not been paid under this contract since February 1996 and accordingly is owed approximately $342,250, and then it says $9,250 times 37 months as of the date of this filing plus interest thereon at the legal rate. Do you see that?

A Yes.

Q Is it correct that as of the writing of this letter by your attorney, you had not been paid under the contract since February of 1996?

A That is correct.

MR. SCHWARTZ: I'm going to mark as Exhibit E a declaration of Thomas J. Patton dated October 19, 2001.

(The document referred to was marked for identification as Exhibit E.)

BY MR. SCHWARTZ:

Q Do you recognize that document?

A I do.

Q Do you recall signing it?

A Yes, I do.

Q And you knew it was signed under penalty of perjury?

A Yes.

Q And it's accurate?

MR. HEIDEMAN: Excuse me. With your permission, I'd like Mr. Patton to reread this before answering the question.

MR. SCHWARTZ: That's fine.

MR. HEIDEMAN: Of course, the document speaks for itself on its face, but since you've asked him an additional question about it, I'd like the witness to be able to read it before answering.

MR. SCHWARTZ: Actually, let me strike that. That's a fair point, but let me strike my last question then, because I don't want to take the time to read the whole thing.

MR. HEIDEMAN: Well, he's already on page 2, and it's on the record, and the Judge is going to see the record, and unless you have objections, let's let the man read it so he can then answer questions about

it.

MR. SCHWARTZ: Okay then. Let him read it.

MR. HEIDEMAN: Thank you.

(Pause.)

BY MR. SCHWARTZ:

Q Did you review that document prior to the --

A Yes.

Q Did you review it prior to the deposition?

A No, I did not.

Q Is it accurate?

A I believe it's accurate. To the best of my recollection, it's accurate.

Q Let me ask you a question that's not about that declaration for a moment.

A Okay.

Q You moved out of Los Angeles at the end of February of '96, correct?

A Right.

Q At that time, you were not owed $30,000 under the contract, correct? And when I say "the contract", I mean the 1994 agreement, which is Exhibit B.

MR. HEIDEMAN: Objection to the form of the question.

MR. SCHWARTZ: You can answer.

THE WITNESS: Well, I was told by Michael Wacks that there would be a lump sum given to me at a further date when they got the paperwork done.

BY MR. SCHWARTZ:

Q When did he tell you that?

A He told me that the week before he said that our work was going to be done in L.A.

Q Now he did tell you orally that your services were no longer needed in Los Angeles, correct?

A Orally, right. And I kept asking him, I needed it in writing. According to my contract, it says that all parties will hereby acknowledge that they have read, understood and will abide by the foregoing statement, and it says that, you know, because I've had this contact before in Annapolis. They would, you know, give me a copy to say the contract was terminated.

I asked for it many, many times to Mike Wacks before I left there, and he said we're working on it, we're working on it, but it's best that we don't do it because we can just transfer it to Dallas, and they won't have to wait six to eight months for Washington to approve it.

Q And you had this conversation about a week

before you left?

A Yes.

Q Why did you ask for the termination in writing?

A Because it says in your contract that's how it's supposed to be done. See, that was probably my biggest fault is I put too much trust in the FBI agents and found out that they're not all very trustworthy.

Q And your recollection is that Michael Wacks also told you you would get a $30,000 lump sum at some point?

A Yes.

Q Was that an oral agreement that you had with him?

A It was his statement to me. It was not an oral agreement. I didn't agree to the amount. It's up to them to come up with the amount. He said that's what he would put in for.

MR. SCHWARTZ: I'm going to mark as the next in order a July 14, 1999, letter from your attorney, Mr. Heideman.

(The document referred to was marked for identification as Exhibit F.)

BY MR. SCHWARTZ:

Q If you see on the bottom, there are numbers starting with 43.

A Yes.

Q If you would turn to page 47. By the way, do you recall having seen this document before?

A I probably have.

Q If you look towards the middle of that page, there's a paragraph that starts, "The last payment of any kind...". Do you see that?

A Yes.

Q It says, "The last payment of any kind received by Mr. Patton was for $30,000 in November 1996, attached hereto as Exhibit D and incorporated by reference. This lump sum, however, was negotiated by Mr. Patton and S.A. Pete McCann for services rendered in L.A., and it does not relate to the 1994 contract." Do you see that?

A Yes, I see it.

Q Do you agree with that statement?

A Well, it wasn't me and Pete McCann. It was between Pete McCann, Bill Esposito, who was deputy director of the FBI, and the Los Angeles office.

Q Were you involved in the negotiation?

A No, I was not.

Q So then this statement in your attorney's letter is not accurate?

A Well, it's accurate to a point. I believe it's accurate.

Q Well, just focusing on the part that says that it was negotiated by you and Pete McCann.

MR. HEIDEMAN: Excuse me. Specifically which page of this exhibit?

THE WITNESS: Forty-seven.

MR. HEIDEMAN: And which line, counsel, since you're inquiring about whether something I submitted was accurate or inaccurate?

MR. SCHWARTZ: It's the paragraph that starts, "The last payment of any kind...".

MR. HEIDEMAN: Yes, in III, last paragraph.

MR. SCHWARTZ: Right.

MR. HEIDEMAN: All right. I'm with you.

BY MR. SCHWARTZ:

Q And then my question now is the part where it says that the lump sum was negotiated by Mr. Patton and Pete McCann, that's not accurate. Correct, Mr. Patton?

A No. Negotiating, the word "negotiating" is very confusing to me the way that you are putting it, okay? I disagree with the way that you are trying to

put it across. It was discussed between Pete McCann and me. I did not negotiate it, which this statement in my thinking was is what Mike Wacks told me that he was trying to get from the L.A. office, and that's where I say in here Mr. Patton and Pete McCann. Mike told me Pete McCann would make the request for me, and he had many conversations with Mike Wacks, and Mike Wacks agreed to that statement.

Q Let me now ask you to turn to your declaration, which is Exhibit E.

A Okay.

Q If you look on the page that you're at now, paragraph 27.

A Okay.

Q It says, "While I was in Dallas, I negotiated and received a single lump sum payment for $30,000 as a final payment for the services I provided the agency in Los Angeles."

A That is correct.

Q And you would agree with that statement?

A Yes.

Q Before, I think you said that you had talked to Michael Wacks about the $30,000 before you left Los Angeles.

A Left Los Angeles. That is correct. He

brought that to me.

Q So when it says, "While I was in Dallas, I negotiated and received a single lump sum payment," is it correct that you were in Dallas when you negotiated and received it?

A I received it in Dallas, but I didn't negotiate it in Dallas. I was told that was what I was going to get. I did none of the negotiations. That was all done between Pete McCann, Bill Esposito, and the Los Angeles office.

Q Did you have a conversation with Bill Esposito about it?

A Many conversations.

Q Do you remember talking to an agent named Clyde Merryman about it?

A Yes, I did.

Q And at one point, you had a conversation with both of them at the same time?

A You mean on a conference call-type thing?

Q Right.

A No, I don't believe there was a conference call. To the best of my recollection, I don't believe so.

Q These discussions that you had about the $30,000, they were before the $30,000 was actually

paid in November, correct?

A That is correct.

Q And if you turn to paragraph 35 of your declaration.

A Mm-hmm.

Q That says, "It was not until April 1996 when I began to attempt to recover my personal possessions from storage that I learned that the FBI was denying its obligations for the promises made by SA Leahy and SA Irby and that it was refusing to continue to honor my 1994 contract."

A That is correct.

Q And when you refer to "my 1994 contract" in your declaration, you were referring to Exhibit B, which was the agreement that you signed November 11, '94, correct?

A Well, that was a misstatement, and it should have said the 1991 contract, the written agreement in 1991 that ran through August of 1993.

Q So your declaration is inaccurate?

A It's accurate, but the date is not accurate.

Q Well, you had a 1994 contract, correct?

A Yes. But that had nothing to do with Miami or my source. They had nothing to do with that. That was strictly Miami's office, which you do have a