letter where he took it over. Leahy took my stuff over, put his own locks on there and everything else.

Q And that wasn't part of your 1991 contract with Miami, was it?

A It was his verbal contract. It was never put in writing, which a lot of things the FBI does not put in writing, which you know. It's a lot of verbal. We'll do this for you. You do this for us, we'll do this for you. That's their way of doing business.

Q Right. But just focusing on what's in your declaration in paragraph 35.

A Mm-hmm.

Q Because you earlier went through your declaration and you said it was accurate, correct?

A Mm-hmm.

Q Is that correct?

A Right. The only thing I'm disputing on here is that what you're trying to put across is where I'm saying that it was the 1994 contract. That's what I'm getting out of you, is that correct? Where Leahy and Irby and that is refusing to continue to honor the '94 contract. They had nothing to do with the '94 contract. That was California. So the date there is wrong.

Q Well, when you signed this declaration, you

reviewed it carefully, correct?
A To the best of my knowledge, I did. I'm not an attorney.
Q And you think now that it should say 1991 contract?
A That is right.
Q Your 1991 contract was with the Miami division, correct?
A Right. And then it was transferred to the Annapolis office.
Q And paragraph 35 talks about your attempt to recover personal possessions from storage?
A Mm-hmm.
Q That pertains to an oral agreement that you had, that you claimed you had with Agent Leahy, correct?
A It's not an oral agreement, sir. It's in writing where he takes it over, and you have a copy of it.
Q Do you think that's what your 1991 contract was? Is that what you're referring to as the 1991 contract?
A Right. You're trying to cross strings here, and I'm not understanding you, and I think I'm going to take a break right now.

Q That's fine.

A Because you are getting to a point where you're mixing words.

MR. SCHWARTZ: Is five minutes okay?

THE WITNESS: That's fine.

MR. SCHWARTZ: Okay.

MR. HEIDEMAN: We're in recess by agreement.

(Whereupon, a short recess was taken.)

BY MR. SCHWARTZ:

Q Mr. Patton, when you were in Los Angeles working under the 1994 agreement --

A Yes, sir.

Q You were paid on a monthly basis, correct?

A Correct.

Q And you were paid timely, correct?

A Well, it wasn't always timely. There would be days when, you know, they'd be busy and they'd meet me the following day, you know, but I got it every month.

Q Right. Do you agree with the statement on page 47 of Exhibit F, which we were just looking at, that the $30,000 payment does not relate to the 1994 contract? Do you see where I am?

A No, I don't. The last payment?

Q Right. That paragraph, the second sentence

in that paragraph. It says the lump sum was negotiated by you and Agent McCann for services rendered in L.A., and then the last part says, "and it does not relate to the 1994 contract." Do you agree that the $30,000 payment did not relate to the 1994 contract?

A No, I think it does relate to the '94 contract.

Q Now, prior to receiving that payment in November of 1996, you had discussions with FBI officials about the fact that you had not been receiving your monthly payment under the 1994 agreement, correct?

A I don't understand the question.

Q I'll try to rephrase it.

MR. HEIDEMAN: Excuse me. Can we go off the record?

(Discussion held off the record.)

MR. HEIDEMAN: Could you repeat the question? Because I didn't hear it. I'm sorry.

MR. SCHWARTZ: There is no question pending.

BY MR. SCHWARTZ:

Q In November of 1996, you received a $30,000 payment, correct?

A That is correct.

Q Before that time, you were aware that the FBI had not been making the normal monthly payment under the 1994 agreement, correct?
A That is correct.
Q And you talked to FBI officials about that?
A Right.
Q And you were unhappy with that?
A I was very unhappy about it.
Q Who did you talk to about that?
A Esposito.
Q Anybody else?
A Cordes, Divers.
Q When you say "Cordes," that's Jack Cordes?
A Yes.
Q And you spoke with him directly?
A Yes.
Q Who was the other person you mentioned?
A Divers.
Q Neil Divers?
A Neil Divers.
Q You spoke to him directly about it?
A Right.
Q Do you remember what Esposito had to say about that?
A Esposito said he was looking into it.

Q Do you remember what Jack Cordes said about it?
A They were all looking into it. It came down. He was deputy director at the time, Esposito. And see, when I was in Maryland, he was the SAC in Maryland and he was the SAC in San Diego, and his wife was an agent there at that time. She was pregnant at the time. I mean, Esposito and I have a long ways, a long period of time of being involved in cases.
Q Did you speak to any other agents about it that you recall?
A Yes. Pete McCann, Chuck Goodwin.
Q To switch gears a little bit, when you were working with Pete McCann in connection with the Donald Eugene Webb matter --
A Mm-hmm.
Q You found out that your personal possessions that had been in storage in the Miami area had been lost, correct?
A That is correct. And how that came about is --
Q Well, let me just ask the questions.
A Okay.
Q You were very upset about that naturally.
A Very upset. Still am to this day.

Q And you complained to Pete McCann about that?

A Yes, I did, and then Mr. Esposito and everybody else that I could reach out to.

Q And that was approximately April of 1996, correct?

A Approximately. I don't know the exact date. It should be somewhere where I found out about it.

Q And at that point, you also complained about the fact that you hadn't been getting your monthly payment under the contract?

A That is correct.

Q And you understood that it was the FBI's position that the contract had been terminated orally, correct?

A I never had that under -- no one told me orally that it was terminated.

Q Mike Wacks didn't tell you the contract was terminated?

A Never. Never.

Q Scott Garriola didn't tell you the contract was terminated?

A Never.

Q When you received the $30,000 --

A Mm-hmm.

Q You signed a receipt, correct?
A That is correct.
Q Let me back up. Did you talk to Michael Wacks about not having received the monthly payment?
A Yes.
Q What did Mike Wacks say about it?
A He just said it's out of his hands.
Q Did he say anything else about it?
A No.
Q Did you understand what he meant when he said it was "out of his hands"?
A No, I did not.
Q And you didn't ask him to explain that?
A No.
MR. SCHWARTZ: I'll mark as Exhibit G the receipt dated November 14, '96.
(The document referred to was marked for identification as Exhibit G.)
BY MR. SCHWARTZ:
Q That's the receipt you signed when you got the $30,000, correct?
A That is correct.
Q And it states, "I acknowledge receipt of $30,000, which represents full and final payment for

services rendered," correct?

A Right.

Q And what did you understand by the phrase "full and final payment for services rendered?"

A For the L.A. office. L.A. office, that Mike Wacks promised me the $30,000.

Q Now it doesn't say that obviously, correct?

A No.

Q But you had an understanding that was different from what the words of the receipt said, correct?

A That is correct. And I questioned it at the time, and they said no, this is just the money that they give you to go forward.

Q Who said that?

A Sandri.

Q Didn't Sandri tell you that from the FBI's point of view that this was the last payment you were going to be getting?

A No, he never told me that.

Q Now, at this point in time, this is November of 1996?

A Correct.

Q You were aware that that personal property storage in Miami had been lost, correct?

A I don't know the exact date when I found out that it was.

Q If you look at your declaration, paragraph 35 of your declaration. Paragraph 35.

A Paragraph 35?

Q Right.

A It wasn't until April of 1996.

Q Right.

A That's when I found out my stuff was gone.

Q Right. And November of 1996 when you received the $30,000.

A Mm-hmm.

Q You were obviously aware that the property had been lost?

A Yes, and very unhappy about it.

Q Right. You also were claiming that you had been promised a lump sum by the Miami division of $150,000, correct?

A That is correct.

Q And by signing this receipt, you did not mean to be giving up your claim about the $150,000 lump sum from Miami?

A No.

Q And you were not intending to give up your claim about your personal property, correct?

A No.
Q It's not correct?
A It is correct. I was not giving up anything.
Q And those two points, the storage facility property and the $150,000 lump sum --
A Mm-hmm. Correct.
Q Those were issues in your mind?
A And plus my contract with the L.A. office.
Q I want to make sure the record is clear, so please let me finish my question before you answer. At the time you signed the receipt on November 14, '96, you had a claim about your personal property in storage and a claim about the $150,000 lump sum, correct?
A I don't believe we had a claim. I don't believe I hired an attorney. I was negotiating with Esposito and Washington, D.C., directly at that time.
Q So it was not a formal claim at that point?
A No, it was not a formal claim.
Q But those were two issues that you were concerned about and you wanted to get reimbursed or paid by the FBI, correct?
A That is correct.
Q And by signing this receipt, you did not

intend to give up your rights on those two issues, correct?

A No, I was not giving up any rights.

Q You were not giving up your claims about the storage property or --

A The lump sum.

Q The lump sum.

A Or the contract, the '94 contract.

Q What did the term "final payment" mean to you, if anything, in the receipt?

A Well, the way I knew about this $30,000 is I was notified by Pete McCann that they were negotiating, Bill Esposito, Pete McCann and whoever was -- I think it was Tim McNally was the SAC out there at that time I think to the best of my recollection. I think he became the SAC at that time. That was negotiated between them, and then they told me what I was going to receive, and someone from Dallas would contact me, and that's who contacted me is these two.

Sandri contacted me, and then both of them came to my house with the $30,000. So this in my eyes did not represent the contract or the oral agreement by Irby and Leahy or on the storage and the $150,000. This has nothing to do with that. This is just what

they were supposed to give me, which you know that Annapolis gave me $25,000 when I left there, and I was there, you know.

Q And that was after the contract was terminated, right?

A That is correct. And there's a receipt signed to that, too.

Q Do you have a copy of that? Is that in the packet of information that you gave to your attorney that your attorney gave to us?

A Yes.

MS. EISEN: I don't believe it is in the packet. I think it's been attached to prior pleadings, but I can double-check if we received it.

MR. HEIDEMAN: What's the date of the document you're referring to, Mr. Schwartz?

MR. SCHWARTZ: I don't know. Mr. Patton referred to a receipt he said he received I guess when he was paid by Baltimore. That's okay. We can move on. We can talk about that later.

MR. HEIDEMAN: Okay. But while we're at this point, Ms. Eisen appropriately made a comment that I just want to address since at the beginning of the deposition there were some discussions about document turnover, and, Ms. Moore, my recollection is

that there were certain documents attached to various pleadings, plus my recollection was that there was an exchange of documentation between you and Ms. Kalik, I think, I think if I remember correctly early in the case. We don't need to spend time on this now.

MR. SCHWARTZ: Yes, let's talk about this --

MR. HEIDEMAN: I just want to make sure. I mean, there was an implication that somebody said we'd never given you anything, and I think that that's --

MS. MOORE: Yes, it is my recollection. I don't want to get into an argument.

MR. HEIDEMAN: Of course.

MS. MOORE: But just to clarify what I said before or confirm actually. Yes, there might have been documents attached to pleadings, but thereafter, we requested by many letters additional documents, which I never got any documents in response to any of the letters.

MR. HEIDEMAN: Okay. Well, we're going to go back after the depo, because --

MS. MOORE: If you find something that you sent me, give me a cover letter or a copy of it with the documents.

MR. HEIDEMAN: Fine. Of course, we will.

MS. MOORE: But I didn't get anything until

today.

MR. HEIDEMAN: Thank you. We'll address that afterward right away.

MS. MOORE: Okay.

BY MR. SCHWARTZ:

Q Okay. Do you know how the $30,000 figure came about?

A No, I do not.

Q As of the date that you received the $30,000 --

A Mm-hmm.

Q You were not working on any matters with the FBI, correct?

A No, I was -- reask me that question, please?

Q At the time you received the $30,000 --

A Mm-hmm.

Q You were not working on any matters with the FBI?

A No, I was not.

Q And you moved from Garland, Texas, shortly after receiving that money, correct?

A That's correct.

Q Where did you move to?

A To Niceville, Florida.

Q How did you decide to move to Niceville?

A Just, you know, we always liked Florida, so I moved there.

Q The FBI did not tell you to go to Niceville, correct?

A No, they did not.

Q They had nothing to do with that?

A No.

Q Did you tell Mike Wacks that you had moved to Niceville?

A Yes.

Q When did you tell him?

A Probably before I even moved.

Q How did you tell him?

A Over the phone.

Q Do you have notes of that conversation?

A Yes, there probably is in there.

Q Sorry. Did you finish your answer?

A Yes.

Q So if you had a conversation with him about the move, would it be in the notes that your attorneys provided?

A It's probably in the notes, yes. To the best of my recollection, it's probably in there.

Q If it's not in the notes, would that indicate to you that you did not have that

conversation?

A No.

Q Did you take notes pretty diligently when you had conversations with FBI agents?

A A biggest percentage, but not 100 percent.

Q Did you notify anybody else in the FBI that you were moving to Niceville?

A Pete McCann and Chuck Goodwin and John Donahue, because they always knew where I was in case they needed me for anything.

Q When you spoke to Mike Wacks, what information did you give him about your move?

A Just that I was moving. There was no information I would have to give him other than moving so he would be able to contact me if he needs me for anything.

Q Did you give him a phone number?

A Yes.

Q Did you give him an address?

A Yes.

Q How long did you live in Niceville for?

A I believe three years.

Q And where did you move next?

A Tucson, Arizona.

Q Why did you decide to move to Tucson?

A For my wife's health.
Q So your move to Tucson had nothing to do with the FBI, correct?
A No.
Q Is that correct?
A That is correct.
MR. HEIDEMAN: Excuse me. I'm going to object to the form of the question only because you've said "had nothing to do with the FBI."
BY MR. SCHWARTZ:
Q The FBI did not ask you to move to Tucson, correct?
A No, they did not.
Q Who did you notify, if anybody, in the FBI that you had moved to Tucson?
A Probably Chuck Goodwin, Pete McCann, John Donahue.
Q Anybody else?
A To the best of my recollection, no.
Q You had a meeting in Baltimore in 1999 concerning an alleged threat against FBI agent Joe Pistone, correct?
A That is correct.
Q And that came about because you overheard a conversation in a restaurant?

A In a restaurant, right.
Q Where was that restaurant?
A It was in Destin, Florida, which is, you know, right over the bridge from Niceville in Destin, Florida.
Q And you contacted John Donahue about that?
A Yes, I did.
Q He was retired at the time?
A Yes.
Q And then at least as far as you know, he then contacted other FBI agents, correct?
A To the best of my knowledge, yes.
Q John Donahue was deposed in this matter, in this lawsuit, correct? Do you remember being on the telephone when John Donahue gave a deposition?
A Before that?
Q No, I'm talking about within the last couple of years in connection with this lawsuit that John Donahue gave a deposition?
A Yes. To my understanding, yes, he did do that.
Q Do you remember you were on the phone at the time?
A That is correct.
Q Do you recall him testifying that you had a

lot of concern about who you're going to work with in the FBI in connection with this Joe Pistone matter?

A Right. When I went up to Baltimore to meet in Baltimore with the agents in Baltimore about this situation, they asked me who would I like to work with, and I said Mark Tillio, who is an FBI agent who I worked with before in Annapolis, and I brought him out to California on cases that he worked with agents out in California.

Q Do you remember you had asked John Donahue not to reveal your identity for the meeting?

A Yes.

Q And that was because you had concern about who you were going to work with, correct?

A That is correct.

Q And you didn't want to meet any other agents without John Donahue being present, correct?

A That is right.

Q John Donahue said at his deposition that you came to that meeting voluntarily, is that correct?

A That is correct.

Q You were paid for your expenses?

A I was paid strictly just for a ticket.

Q Does $1,325 ring a bell?

A Yes.

Q That's what you were paid?

A Right.

Q And at that meeting, you offered to perform services for the FBI, including wearing a wire in exchange for entering into a new agreement with the FBI?

A I never said anything about a new agreement. I said I'm still under contract. I'd be willing to take whoever you want, but I asked for Mark to be the agent, which they all knew who he is, to come down, and I'd be able to introduce him to the people in the restaurant.

Q Mark was not actually at the meeting, correct?

A No, he was not.

Q Do you know why that is?

A I have no idea.

Q The agents who were at that meeting asked you to take a polygraph, correct?

A Right. I agreed to do it.

Q You agreed to do it?

A Yes.

Q Do you remember John Donahue testifying at his deposition that he recommended that you not do it?

A Right. I agreed to do it, and John Donahue

told me no, you're not going to do it.

Q And then didn't you have a conversation with your lawyer after the meeting, and then you contacted the agents and said you were not going to give a polygraph?

MR. HEIDEMAN: Excuse me just one second. I'm going to instruct you that anything at any time you ever discussed with me or any other attorney who represented you is covered by the attorney/client privilege. I'm instructing you not to waive that privilege, although it's yours to waive, but I don't want there to be an unintentional waiver.

So I'm instructing you that anything you've ever discussed with me or any other attorney is covered by the attorney/client privilege, and therefore, without further discussing that with me out of the presence of opposing counsel and off the record, I believe you should not answer any question that relates to communications you've had with any of your attorneys, including, but not limited to, me or members of our law firm.

So any question that's asked, including the last one, that you desire to answer, let's be sure we take a break so that you answer properly and that there is no unintentional waiver of the

attorney/client privilege. Do you understand?

THE WITNESS: Now I understand.

MR. HEIDEMAN: Thank you.

BY MR. SCHWARTZ:

Q I don't want to know what you talked about with your attorney, but do you recall having a conversation with your attorney after being asked to take a polygraph?

A I'd rather go outside and ask my attorney how I should answer that.

Q Well, unless your attorney instructs you not to answer. I'm not asking you what you talked about with your attorney. I'm just asking you if you did talk to your attorney.

MR. HEIDEMAN: The nature of the particular question, Mr. Schwartz, as tied to this particular sequence can only lead to him answering questions did he consult with his attorneys and essentially you getting at whatever his attorney may have told him without you having any idea either what the attorney told him or whether the conversation took place, but it would lead to some inferences that may not be at all relevant to this case or may not be accurate.

For example, you have no idea if any particular lawyer might have a policy in relation to

polygraph examinations, or you might have no idea whether or not since you've already had testimony on the record about an FBI agent, although retired, advising the witness that he shouldn't give an exam whether or not that was a factor, so if you can try to withdraw and rephrase your question.

MR. SCHWARTZ: I'm going to do that.

MR. HEIDEMAN: Assuming you need to press this.

MR. SCHWARTZ: That's fine.

MR. HEIDEMAN: But I don't want there to be any waiver, and I'd ask you to be very careful and therefore rephrase before proceeding.

MR. SCHWARTZ: That's fine.

MR. HEIDEMAN: Thank you.

BY MR. SCHWARTZ:

Q You said earlier that you initially agreed to give a polygraph, correct?

A That is correct.

Q At some point, did you change your mind about that?

A John Donahue changed my mind.

Q And you changed your --

A I took his advice.

Q And then you said you would not give a

polygraph?
A I did not say I would not. I said I am taking John Donahue's advice and not to take a polygraph.
Q And that's what you told the agents that you had met with in Baltimore?
A That is correct.
MR. HEIDEMAN: But so the record is clear, I think I would have no objection if you chose to ask him did he confer with counsel at any time about that issue, because I know the answer to that. So if you choose to ask him if he conferred without getting into what was discussed with counsel or what the advice was, I'm sure he would be glad to answer that question if you choose to ask it.
MR. SCHWARTZ: Thank you for the offer.
MR. HEIDEMAN: Thank you.
BY MR. SCHWARTZ:
Q Under the agreement, which is Exhibit B, if you look at the first page, paragraph 3.
A Which one did you say? B?
Q B, which is the agreement, 1994 agreement.
A Okay.
Q Look at the first page of that. In paragraph 3, it indicates that it's your