responsibility to report the monies you were being given by the FBI on your taxes, correct?

MR. HEIDEMAN: I'm going to object. The document speaks for itself.

MR. SCHWARTZ: You can answer that.

THE WITNESS: I don't know what this tax thing has to do with our deposition. This is what we were contracting. It has nothing to do with my taxes.

BY MR. SCHWARTZ:

Q Sir, did you report the money you received on your tax return?

MR. HEIDEMAN: Excuse me. Let me interrupt and object. As the witness just said and as is implied from his answer and my objection, Exhibit B was introduced, it has paragraph 3, it says whatever it says. We can all read it into the record, but it's in the record. The witness objects to any questions regarding his tax filing.

MR. SCHWARTZ: Are you instructing him not to answer?

MR. HEIDEMAN: I'm waiting for your next question.

MR. SCHWARTZ: Well, the witness needs to answer the question.

MR. HEIDEMAN: Please repeat the question.

BY MR. SCHWARTZ:

Q Sir, did you report --

MS. MOORE: Did he file tax returns.

MR. SCHWARTZ: Okay.

BY MR. SCHWARTZ:

Q Did you file any tax returns where you reported the money you received from the FBI?

MR. HEIDEMAN: I'm going to object, and yes, I am objecting.

MR. SCHWARTZ: Sir, you need to answer the question.

THE WITNESS: I'm listening to my attorney.

MR. SCHWARTZ: Your attorney made an objection, but unless he instructs you not to answer, you need to answer the question.

THE WITNESS: I will take my Fifth Amendment.

MR. SCHWARTZ: Okay.

BY MR. SCHWARTZ:

Q Did you understand the contract to require you to report the monies you were receiving from the FBI on your taxes?

A The only thing that I can say about that that might ease your mind is that I asked many times for 1099s. Since I was supposedly an employee for

[redacted] they refused to give me one. They said you have to do that on your own. And I would never have filed unlawfully or any other way, because I was waiting for the Bureau to give me and which I believe that's how it was supposed to have been done.

Q Who did you talk to about that?

A Michael Wacks.

Q Anybody else?

A Scott Garriola.

Q So you asked Michael Wacks and Scott Garriola for 1099 forms?

A Yes, I did.

Q And that was so you could report them on your taxes?

A Correct.

Q And just to be clear, in response to an earlier question, I think you said you're going to assert the Fifth or taking the Fifth. I just want to clarify, that means you're refusing to respond based on your rights under the Fifth Amendment to the Constitution? Is that what you meant?

A That is correct.

MR. HEIDEMAN: And that's specifically as to

your singular question as to his filing of tax returns. That's the only question you've asked about that issue at this time.

BY MR. SCHWARTZ:

Q Just to make sure I cover what I intended to cover, did you report the monies you were receiving from the FBI under the 1994 agreement on your taxes?

MR. HEIDEMAN: Same objection, and let that be continuing.

BY MR. SCHWARTZ:

Q Are you going to answer that, or are you going to assert your rights under the Fifth Amendment?

A I'm going to assert my rights under the Fifth Amendment.

Q When you moved from Los Angeles to Garland, Texas, you tried to find work with the Dallas division, correct?

A Yes.

Q At some point in time, you came to learn that someone in the Los Angeles division had bad-mouthed you?

A That is correct.

Q How did you learn that?

A From Pete McCann. He told me that I was being bad-mouthed out of L.A.

Q Did Pete McCann indicate how he knew that?
A No, he did not.
Q Did you understand that it was Michael Wacks that had bad-mouthed you?
A No, I do not, no.
Q As far as you knew, had somebody spoken to Adams, who was in charge of the Dallas division, about you?
A I have no idea.
Q Do you know who in the Dallas division was on the receiving end of this bad-mouthing?
A No, I do not.
Q But the bottom line is that you were not able to find any work with the Dallas division, correct?
A That is correct.
Q Were you upset when you were told by Pete McCann that you had been bad-mouthed?
A Yes, because I thought I did a very good job out there. They were just too lazy to do the work that Scott Garriola and I did. They didn't want to do the paperwork. We did a lot of cases that should have been put in -- other than the Denti case and the Ori case, there should have been a lot more, but they didn't want to do the paperwork on it. It was too

much work for them.

Q When you say "they," are you talking about Michael Wacks mainly?

A That's correct, because he's the contact officer.

Q Right. Were you unhappy with Michael Wacks after you had moved out of Los Angeles?

A No, I'm still not unhappy with him. I gave him a gift for his wedding, so he must have been --

Q Do you remember when that was?

A It was while I was out there. I don't remember the day he got married.

Q Do you remember talking to Chuck Goodwin also about the fact you were unhappy having been bad-mouthed to the Dallas division?

A Yes. I probably told Esposito that, too. I probably told every FBI agent I know that I was unhappy that someone was bad-mouthing, because I was never bad-mouthed by any office I ever worked in. I was always praised for the work that I did, which is in my Rule 35. Read it.

Q You're still on terms with Chuck Goodwin, correct?

A Yes.

Q You don't have any reason to think he would

lie about you, correct?
A No, I don't think he would ever lie about me.
Q The same with Pete McCann?
A The same with Pete McCann.
Q Since you moved out of Los Angeles in February of 1996, I want to find out what kind of work you've done unrelated to the FBI.
A I haven't done any.
Q So you've been out of work since February of 1996?
A That is correct.
Q Do you have any source of income?
A Just my family helping us. And I have social security.
Q The monies you had been receiving under the 1994 agreement, which was $7,250 a month, that was a significant amount of money to you, correct?
A No, it was not to me. Not being in the business I was before I came over. That was pennies to me. I'd spend that for lunch. That was not a lot of money to me.
Q Well, at the time that you were working under the 1994 agreement with the Los Angeles division --

A It was fair.
Q Did you have any other income at that time?
A No, I did not.
Q So the $7,250 a month was all the income you had?
A That's it.
Q Was your wife working at the time?
A No.
Q So you were relying on that income for your daily expenses, correct?
A While I was in L.A.?
Q Correct.
A Yes.
Q And after you moved from Los Angeles and the payments stopped, that was a significant issue for you because you no longer had any income, correct?
A That is correct. But that has nothing to do with why I filed the suit against the FBI. It's because they did not do what they said they were going to do.
Q Let me just get back to where you've lived, and we went through some of that before. I think you said you lived in the Destin area for about three years?
A Right. Approximately three years.

Q All right. So you moved around late November of '96.
A Mm-hmm.
Q From Garland to Niceville.
A Right.
Q And then you think about three years later you moved out of Niceville to?
A Right. Gainesville, Florida.
Q Did you move to Arizona first, or you moved first to Gainesville?
A No, I came from Gainesville to -- I mean -- I'm sorry. From Niceville to Tucson.
Q Okay. So around --
A I don't remember.
Q August of '99. Does that sound about right?
A I don't remember the date, sir.
Q How long did you live in the Tucson area?
A Three years.
Q And then where did you move to?
A To Cottage Grove, Oregon.
MR. HEIDEMAN: Excuse me. I think there's some confusion. What about Gainesville? Because that was part of a question.
THE WITNESS: I moved from Gainesville. I'm sorry. How that came up, when I left Annapolis, I

moved to Gainesville, Florida.

MR. SCHWARTZ: Okay.

THE WITNESS: To help my daughter so she could finish college. She had two children, so we went and moved down there to help her.

BY MR. SCHWARTZ:

Q And you were living in Gainesville at the time, and then you moved to Los Angeles to work on a case?

A That is correct.

Q When you moved to Cottage Grove, Oregon --

A Right.

Q That was not at the FBI's request, correct?

A No.

Q Why did you move to Cottage Grove?

A Because my daughter and grandchildren were up there.

Q And did you notify anybody in the FBI that you had moved to Cottage Grove?

A Yes, I did. I notified Chuck Goodwin, Pete McCann, John Donahue, because we would be sending birthday cards and Christmas cards. We've always had a good rapport.

Q Anybody else that you notified?

A Yes. I sent Christmas cards to Scott

Garriola, and he would send pictures of his sons and stuff. I mean, I had a good rapport with everybody.

Q Let me back up a little bit. When you were living in Garland, were you using the name Tom Patton at the time?

A Yes.

Q You were not using the name Tom Piazzi?

A No.

Q Did you give up any job opportunities after you moved from Los Angeles because you thought you were under contract with the FBI?

A That is correct.

Q What job opportunities did you give up?

A What do you mean by "job opportunities"?

Q In other words --

A I could not get a job because of my record.

Q When you say your "record," you mean your criminal record?

A Right. I went out and tried to get jobs, and when they asked you if you've ever been arrested, I'm not going to lie. I'm not going to lie on anything.

Q What type of jobs did you try to get?

A Selling cars or, you know, used car lots, new car lots.

Q I'm going to get back to a question I asked a second ago. Your position in the lawsuit is that the contract with the Los Angeles division, the 1994 agreement, was not properly terminated, correct?

A That is correct.

Q Because it was not terminated in writing?

A Because that's what it says.

Q My question is now did you give up any opportunities you had for other jobs because you were relying on the fact that you believed that 1994 agreement was still in effect?

A No, I did not give up any opportunities for any other jobs.

MR. HEIDEMAN: I'm going to object to the form of the question because he's already said he couldn't get another job because of his criminal record.

BY MR. SCHWARTZ:

Q Other than the meetings you had in the Dallas area with Pete McCann on the Webb matter and the meeting you had in Baltimore in 1999 on the Joe Pistone matter --

A Mm-hmm.

Q Did you do any other work for the FBI after you moved out of Los Angeles?

A Yes, I did that thing for Chuck Goodwin and the Chicago office trying to find -- and that was in 2002 -- in trying to --

THE WITNESS: Is that right there? Do you have that there?

MR. HEIDEMAN: Which one?

THE WITNESS: The thing that Chuck Goodwin e-mailed me?

MS. EISEN: It's in the package I believe.

MR. HEIDEMAN: It's in the packet. It's one of the top pages. Maybe two or three or four.

BY MR. SCHWARTZ:

Q Can you tell me what it is you did for Chuck Goodwin in 2002?

A Well, Chuck Goodwin called me up in the morning and said we got a phone call from an FBI agent in Chicago that a most wanted person was down in the Tucson area. Do I think that I could try to locate him in the area? I said well, Chuck, I'll do what I can. I said, you know, I do know who the guy is. Why don't you, you know, fax me his picture, because it's been many years since I've been in Chicago, so he faxed me the picture, and it's right there in the record.

And then I went looking for him from Tucson

all the way to Scottsdale. I spotted him one time in November I believe it was. Okay. Just a second.

THE WITNESS: Is the phone thing in here when I called him?

MS. MOORE: Do you have a separate copy for him? Okay. You might want to show him that.

THE WITNESS: On November 5, I called Chuck Goodwin at his office in Cincinnati, Ohio, and told him that I spotted him at a place called Rocky's Restaurant. He was in a green El Dorado, and Chuck said okay, I will forward this on further, and that was it.

BY MR. SCHWARTZ:

Q That was November 5, 2002?

A That is correct. That's when I called him. He faxed this to me on November 2. Or was it 2001? I believe it's 2001. I'm sorry. I misspoke. I believe it was 2001.

Q So that was a call on November 5, 2001?

A To Chuck Goodwin, right. Now he called me on 11-2-01 and asked me if I could help the Chicago office try to locate this "Cherry Nose" Brown.

Q Do you know what "Cherry Nose" Brown was wanted for?

A No, I do not.

Q And you didn't know he was wanted before this call?

A No. How would I know that? I have no contacts in Chicago.

THE WITNESS: Here you are, ma'am.

MS. MOORE: Thank you.

MR. SCHWARTZ: What's the next exhibit? I'm going to mark as Exhibit H a declaration from Charles L. Goodwin, FBI.

MR. HEIDEMAN: You said Exhibit H?

MR. SCHWARTZ: H, right.

(The document referred to was marked for identification as Exhibit H.)

BY MR. SCHWARTZ:

Q Have you seen that before, Mr. Patton?

A Yes, I have.

Q Go ahead and read it, please.

(Pause.)

A What's your question?

Q Is there anything in the declaration that is not accurate?

A Yes. In paragraph 4, he said, "In or around September of 2001, he received a call from me in which he stated that he may have seen a fugitive." How

would I know someone is a fugitive? That's a misstatement. I don't say that he lied. I don't think he remembered. I'm not calling him a liar.

Q You don't think that you had heard on the news or maybe --

A No, I mean, I can't afford to have cable. I have just local antenna.

MS. MOORE: Let counsel finish the question, please. He was mentioning several media. It could be newspaper or other things other than the news on TV.

THE WITNESS: No.

BY MR. SCHWARTZ:

Q Do you think you had heard from talking with some other agent that --

A No.

Q Let me finish, because sometimes I pause. I apologize. Do you think you had heard form any other agent that "Cherry Nose" Brown was a fugitive?

A No, I would have not.

Q Is there anything else in Mr. Goodwin's declaration that's not accurate?

MR. HEIDEMAN: I'm going to ask that we just take a few-minute recess so he can read it carefully. Since you're asking him whether or not the declaration of this FBI agent is accurate in every respect, I want

him to go over every word, so let's take three minutes if we can. It's only one and a quarter pages.

MR. SCHWARTZ: We can go off the record.

(Whereupon, a short recess was taken.)

BY MR. SCHWARTZ:

Q Mr. Patton, did you finish reviewing --

A Yes.

Q -- Charlie Goodwin's declaration, which is Exhibit -- what's the exhibit number on that?

A H.

Q Is there anything else in here that is not accurate?

A No, I think that's the only thing that I can see in here that I think that he misstated.

Q Other than the "Cherry Nose" Brown matter and the Baltimore meeting and the Dallas meeting with Pete McCann, did you perform any other services for the FBI after you --

A No, I did not.

Q Let me just finish the last part of my sentence. Other than the "Cherry Nose" Brown matter, the meeting in Baltimore in 1999, and the meeting in the Dallas area in 1996, have you performed any other services for the FBI since you left Los Angeles in February of 1996?

MR. HEIDEMAN: Do you mean has he been asked to perform services or has he performed services. Those are two separate questions.

MR. SCHWARTZ: Okay.

MS. MOORE: The question stands. He said did you perform any other services. It was clear.

MR. SCHWARTZ: Right. That's the question. Did you perform any other services?

THE WITNESS: No. Conversations. I mean, FBI agents would call me and ask me if I knew anything, but, you know, nothing. I did no work if that's the question, if I understand your question.

MR. SCHWARTZ: That's what I asked.

THE WITNESS: Right. No, I did not.

MR. SCHWARTZ: Thank you.

BY MR. SCHWARTZ:

Q Do you remember being interviewed in August of 1997 while you were living in Florida by two FBI agents?

A Yes.

Q Clyde Merryman was one?

A And Steve Morris.

Q Right.

A Right. And they sat in the thing and cried like children because they thought that I was so

mistreated by the Bureau. They were very upset about it.

Q Have you seen the 302 on that?

A I have not.

Q I'm going to see if I can find that. Actually, before I give you this, do you remember that you were paid the $30,000 in November of '96, correct?

A Correct.

Q And then, at some point after that, you contacted some officials with the FBI to talk about the lump sum from Miami.

A Mm-hmm.

Q And your personal property, correct?

A That is correct.

Q And you wanted reimbursement for the personal property and you wanted the $150,000 lump sum?

A Correct.

Q And the two agents were sent down to Florida to interview you about those issues, correct?

A Correct.

Q I'm going to show you exhibit -- well, since you say you never saw the report of your interview?

A I never reviewed it, no.

Q Okay.

(The document referred to was marked for identification as Exhibit I.)

MR. HEIDEMAN: Please may I have a copy of Exhibit I that you just marked?

MR. SCHWARTZ: You know what, I'm going to hold off on that for now since I'm not asking the witness about it. In fact, I may even strike that and change it.

MR. HEIDEMAN: So the record is clear then, if you would please give me copy of Exhibit I that you've identified, whether you use it or not, that would be helpful.

MR. SCHWARTZ: Well, I'll give you the document, but I don't want to get confused on the lettering, so we may end up changing the number. I'll just give you the document.

MR. HEIDEMAN: Or my suggestion would be leave it as I, and the next one would be J.

(Pause.)

MR. SCHWARTZ: Okay. I'm going to take you up on your suggestion. We'll mark as J a handwritten letter dated 10-20-97 to Clyde Merryman, which I believe is from you.

THE WITNESS: From me, right?

MR. SCHWARTZ: From you, yes.
MR. HEIDEMAN: Thank you.
(The document referred to was marked for identification as Exhibit J.)
BY MR. SCHWARTZ:
Q That is a letter you wrote, correct?
A That is correct.
Q And it's a two-page letter?
A Yes.
Q And you see the third page of the exhibit has the envelope?
A There's no envelope on here unless it's stuck together.
Q And Clyde Merryman was one of the agents that came down to Florida?
A Right.
Q Could you go ahead and review that letter?
(Pause.)
A Okay. What is your question?
Q In this letter, you complain about how the issues of your personal possessions and monies promised from Miami have been handled, correct?
A Right.
Q You did not complain about not being paid

the monthly payment under the 1994 agreement, correct?

A Well, he didn't come down for that. He came down for this, for the Miami thing and the storage. That's what he came for. He never brought up the contract or anything else, so we did not discuss the contract.

Q So when you were interviewed in Florida by Merryman and Morris --

A Merryman and Morris.

Q You didn't discuss the 1994 agreement, correct?

A No, he never brought it up, and we never discussed it. He was sent down there by Esposito to intervene, him and Morris. Esposito is the one that sent them down.

Q Your last payment under the 1994 agreement was in February of '96, correct?

A Correct.

Q You didn't receive a payment in March of '96?

A No.

Q Or April of '96?

A No.

Q So you were on notice at that point that the FBI was not making the payments, correct?

A Yes. And if you look at the phone records from '97 to '98, you'll see that I was trying to deal with it myself without going to attorneys to deal directly with Washington through the people in Washington that I knew.

Q I think you testified earlier that before you received that $30,000 in November of '96, you had talked to Clyde Merryman. He was one of the agents you had talked to about the fact that you had not been paid under the 1994 agreement, correct?

A I don't think I testified to that.

Q I apologize if I'm misremembering. Who did you talk to prior to November of 1996? Who did you talk to in the FBI about the fact that you had not received your monthly payment?

A Pete McCann, Chuck Goodwin, Donahue, Esposito, Divers. I'm trying to count. Coulson, Danny Coulson.

Q And what was Danny Coulson's position?

A He was I believe one of the deputy directors or in that category.

Q And you knew him from some investigation?

A Right. From Baltimore.

Q And isn't it the case that they told you that the FBI's perspective was the contract was

terminated?

A No, they never told me that, because when I found out, and in your letter, which Ms. Moore sent to my attorney and he sent it to me, it was Divers stating in 2002, July of 2002 I think.

THE WITNESS: Is that when it was?

MS. EISEN: It was in the year 2002 if I'm on the right letter.

THE WITNESS: Right. That they were terminating it at that date.

BY MR. SCHWARTZ:

Q And that was the date that there was a written termination from your point of view?

A Right. That's correct.

Q Your understanding of the contract was that an oral termination was not sufficient?

A There was never an oral termination. You keep asking me that question, sir, and I'm answering it to you truthfully. No one ever gave me an oral that said that the contract was over.

Q Well, was it your understanding that under the contract, that would have been sufficient?

A No. because the contract reads that it has to be in writing. I know how to read.

Q So if somebody had told you the contract was

over, that was not sufficient in your mind?

A No, it's not, because it wasn't my first contract. I had a contract before, and I know what they do.

Q After you moved out of Los Angeles in February of '96, did any FBI official affirmatively tell you yes, the contract is ongoing?

A No.

Q Let me get back to the kind of work you were doing in Los Angeles under the 1994 agreement. We went over some of them earlier on. You were undercover, and so was Scott Garriola.

A Mm-hmm.

Q Is that a yes?

A Yes.

Q And you were posing as jewel thieves, correct?

A Correct.

Q And you and Scott Garriola met just about every day, correct?

A No.

Q How often did you guys meet?

A Three to four times a week.

Q Did you speak with him every day?

A Every day.