Q And you met with a lot of subjects of the FBI investigation?
A Right. Sometimes on my own and sometimes with him.
Q What kinds of things would you do with Agent Garriola? For example, sometimes you would go to a restaurant and meet the subjects there?
A Right.
Q Can you give me other examples of things you did?
A Well, we'd follow people. You know, you do what you do undercover. It's not easy to explain if you never did it.
Q Can you just give me a little bit more details about the nature of the work?
A We worked very hard. We talked to a lot of people, and, you know, we followed people, you know, surveillance, certain stuff that we had to do, and we would do it. He's a very good agent, and he never did this work before until he worked with me.
Q You recorded numerous conversations with subjects?
A That is correct.
Q Do you have any ball park estimate? Was it in the hundreds?

A Yes.
Q How did you go about recording conversations?
A I'd wear a body mic, and then we'd have the car wired up, too.
Q Was it risky in your view to be wearing a body mic when you were meeting with subjects?
A It's always risky. I mean, they were a threat always. I've had them in both places that I work. If they ever found out who I was, they would have killed me. No, I've had them.
Q After you left Los Angeles in February of '96, you were not working undercover anymore, correct?
A No.
Q Is that correct?
A That is correct.
Q And you weren't recording conversations with subjects, correct?
A No, I was not.
Q And you were not meeting with subjects of investigations, correct?
A No, I was not.
Q After you left Los Angeles in February of '96, you didn't think the FBI was going to be paying you when you weren't actually performing services, did

you?

A Yes, I did, because they did not terminate the contract.

Q Did you think the FBI intended that the contract was going to continue even though you weren't performing any services?

A Yes.

Q Do you have an understanding of why the FBI would intend to continue to pay you even though you weren't performing services?

A Well, if they go by their rules and regulations, you know, yes, I believe that they are obligated to pay me under the contract just like you're under contract for your job. I mean, if they tell you stay home for the month, you're still going to get your check, right? Under your contract?

Q Well, I understand, though, your position that under the contract, because it wasn't terminated in writing, that you were owed the monthly payment, correct?

A Right. That is correct.

Q Did you have an understanding that the FBI intended to pay you even though you weren't performing services?

A Yes.

Q And that was based on the fact that it hadn't been terminated in writing?

A That is correct.

Q Is it based on any other facts?

A No.

Q If you turn to the agreement, which is Exhibit B.

A Mm-hmm.

Q If you look at the third page, paragraph 14.

A Mm-hmm.

Q It says, "This agreement shall commence on the date of acceptance by Mr. Patton as signified by his signature and shall continue as long as the FBI deems that Mr. Patton's services are required." Do you see that?

A Mm-hmm.

Q Is that a yes?

A Yes.

Q What was your understanding of the meaning --

A But you didn't finish the paragraph, sir.

Q That's correct. I just want to focus on this first sentence right now.

A Okay.

Q Did you have an understanding as to what was

meant by "shall continue as long as the FBI deems that Mr. Patton's services are required"?

A Yes.

Q What was your understanding?

A That until they terminated in writing, I'm still under contract.

Q But the second sentence in that paragraph talks about a termination by deliverance of a written notice to terminate, correct?

A Right. By both parties.

Q Right.

A Either party by deliverance of a written notice to terminate.

Q Right. But just focusing on the first sentence in paragraph 14.

A Mm-hmm.

Q Did you have an understanding of what was meant by "shall continue as long as the FBI deems that Mr. Patton's services are required"?

A Do I understand what it means?

Q Did you have an understanding of what that meant?

A Yes, I have an understanding of what it means, but you keep saying that. Let's go on with it and read the next sentence.

Q Just focusing on the first sentence, what was your understanding of --

A Well, this is the third time, sir, we're focusing on it, and I gave you my answer three times. Until it is in writing either by me or by them, the contract is in force. And I can show probably a thing by the person that wrote up these contracts that certifies it, Mr. Hill, from the Academy, John Hill. Have you ever heard that name?

Q That's an FBI agent?

A Yes, he's an instructor at the academy.

THE WITNESS: Do we have that letter?

MS. EISEN: I don't think so. I don't know.

THE WITNESS: No? Okay.

BY MR. SCHWARTZ:

Q Can you explain to me what the letter is about?

A It's about how a contract is supposed to be written and how it's supposed to be terminated.

Q And where did you get that from?

A Off the internet.

Q Was that recently?

A It's been a while. I don't remember the date.

Q Is it a few months ago?

A No, it's probably a couple years ago.

Q After you filed the lawsuit?

A No, before I filed the lawsuit. I didn't want to file a lawsuit. I thought we could have negotiated this thing without going through all this, but I guess the government doesn't work that way. They'd rather have you sue them. And I'm very, very sorry, and I should ask my lawyer if I can say this first.

THE WITNESS: Can we have a minute?

MR. HEIDEMAN: Yes. Why don't we take a lunch recess at this time.

MR. SCHWARTZ: You know what?

MR. HEIDEMAN: It's already 12:30, and we've been going two and a half hours. I do give time for lunch. We'll break for 30 minutes.

MS. MOORE: Okay. Let Ted speak. He might have a few more questions to finish his line of questions, and that certainly would make sense, so let's find out from him.

Did you say 30 minutes for lunch?

MR. HEIDEMAN: I did.

MS. MOORE: Fine. That's good.

MR. SCHWARTZ: Yes. That's fine.

MS. MOORE: There are a lot of places close

by.

MR. SCHWARTZ: Yes. Let's try to be --

THE WITNESS: I don't need any. It doesn't make any difference.

MR. SCHWARTZ: Let's try to be back in 30 minutes.

THE WITNESS: No, I don't even need the full 30 because I don't eat.

MR. SCHWARTZ: Okay. So 30 minutes we're going to start up again.

MR. HEIDEMAN: I thought that's what I proposed.

MR. SCHWARTZ: Right. But sometimes people propose 30 minutes and then come in around 45 minutes.

MS. EISEN: Well, where is a fast place?

MR. SCHWARTZ: We're off the record.

(Whereupon, at 12:30 p.m., the deposition in the above-entitled matter was recessed, to reconvene at 1:00 p.m. this same day, Thursday, June 8, 2006.)

//

//

//

//

//

//

A F T E R N O O N   S E S S I O N

(1:00 p.m.)

MR. SCHWARTZ: Thank you for returning so promptly.

Whereupon,

THOMAS J. PATTON

having been previously duly sworn, was recalled as a witness herein and was examined and testified further as follows:

FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. SCHWARTZ:

Q Mr. Patton, I asked you earlier about whether you had reported the payments by the FBI under the 1994 agreement on your tax returns, and you asserted your Fifth Amendment right not to respond. I want to ask a related question, which is did you file any tax returns for the period covering 1994 -- well, let me ask that first. Did you file a tax return for that period?

MR. HEIDEMAN: I'm going to advise counsel that all questions relating to this particular line are covered by the answer that the witness has already given you specifically and only as it relates to tax issues.

//

BY MR. SCHWARTZ:

Q Okay. So you're asserting your Fifth Amendment right not to respond to any questions about the filing of tax returns?

A Yes, sir.

Q Okay. If you look at Exhibit J again, which is your handwritten letter to Clyde Merryman.

A Mm-hmm. Mm-hmm.

Q Did you at any time write a letter to an FBI official complaining about the fact that you weren't getting your monthly payment under the 1994 agreement?

A Yes, I did.

Q And do you have a copy of that?

A No, I do not.

Q Who was it sent to?

A I don't remember, sir. I'm sorry.

Q Do you think it was to Clyde Merryman?

A No, it was another official.

Q Do you have a copy of that somewhere?

A No, I do not.

Q You didn't keep a copy?

A No, I don't believe so. To the best of my recollection, I don't have a copy.

MR. HEIDEMAN: And is this a different letter you're referring to than Exhibit J, counsel?

MR. SCHWARTZ: Right.

BY MR. SCHWARTZ:

Q Do you know when you sent it?

A No, I do not.

Q What did you say in the letter?

A I don't remember, sir.

Q What kind of response did you get?

A I don't believe I got any.

Q Do you know if in fact it was received at the FBI?

A I believe it was.

Q And what do you base that on?

A Well, I can't base it on anything. You have to understand one thing. When I came over to the FBI, I made a 180-degree turn in my life. I was shot nine times, four in the head, five in the body. I made a decision to go with the FBI and to protect my family and protect me. I had so much trust in the FBI that I took anything they told me for gospel.

After learning that their word is not their bond, I still have respect for the FBI, and I'm willing to work whenever they want me to work. So whenever they call me and ask me about anything, I give them the best of my knowledge of all I've known for all the years I was involved with organized crime.

Q Getting back to the letter, is it correct that you don't have any information indicating that it was actually received at the FBI?
A No, I don't believe I --
MR. HEIDEMAN: Objection. He answered the question saying he believed it was received.
BY MR. SCHWARTZ:
Q Was that your earlier response?
A Right. Mm-hmm.
Q What's the basis for that belief?
A I think by a phone call by who I mailed it to, which I don't remember at this present moment. I believe that he called me and told me he received it, but I don't believe that he ever responded to it in writing.
Q And you think you sent just one letter or more than one?
A I might have sent more than one.
Q And you don't remember who those --
A No.
Q Let me finish my question. You don't remember who other letters might have been sent to?
A No, sir.
Q And you don't remember when they were sent?
A No.

Q Exhibit J, which is your October 20, '97, letter to Clyde Merryman, do you have a copy of that?
A Right. Right here.
Q Do you have a copy of that at home?
A No, I do not.
MR. HEIDEMAN: However, in light of your inquiry, I'm going to ask the witness on the record that when you go home tonight you make another search through all boxes and all records you have for any additional records that haven't been provided that you may find that relate to the issues in controversy in this case or that has been requested under anything that's been sent to you before,
Make another search and advise us immediately of anything that you find so that we can properly put a number on it and provide it to counsel. They're entitled to that under the rules of the Court.
THE WITNESS: Okay.
MR. HEIDEMAN: Do you understand?
THE WITNESS: Yes, sir.
MR. HEIDEMAN: Thank you.
BY MR. SCHWARTZ:
Q Do you think you have a copy at home of Exhibit J?
A It's a possibility I might.

Q Do you think you have a copy at home of the other letter or letters that you think you've sent?
A It's possible. I will look for them, and if I do have them, I will forward them on to my counsel.
Q Was it your practice to make a copy of the letter that you were sending out?
A Yes.
Q By the date of this letter, which is Exhibit J --
A Mm-hmm.
Q -- this is October --
A Twenty.
Q -- 20, 1997 -- you had not received your monthly payment under the 1994 agreement for roughly a year and a half, correct?
A That's correct.
Q Is there any reason you didn't include a mention of that in this letter, which is Exhibit J?
A It was never brought up, and we never got into that conversation.
Q You mentioned a minute or two ago that you said that you were willing to work with the FBI and still feel that way. Do you remember when you were interviewed down in Florida by Clyde Merryman and Steve Morris that you indicated to them also that you

were willing to work with the FBI?

A Yes.

Q And they indicated to you that they remained open to that idea, but they first had to resolve these issues about your claim for your personal property and the lump sum payment from Miami?

A Yes.

(The document referred to was marked for identification as Exhibit K.)

BY MR. SCHWARTZ:

Q I want to show you what I marked as Exhibit K, which is a different agreement with the FBI. This one I believe has your signature of May 28, 1991. This is the agreement you originally had with Miami, correct?

A That is correct.

Q If you look at paragraph 12.

A All right. Mm-hmm.

Q Actually, let me ask you a different question. This agreement was eventually terminated in writing by the Baltimore division, correct?

A That's correct.

Q And in your mind, the fact that this agreement had been terminated in writing was

significant to how the Los Angeles agreement should be terminated, correct?

A That is correct.

Q Now, if you look at paragraph 12 of Exhibit K, the last sentence says, "It may be terminated at any time by either party by deliverance of written notice to terminate."

A That is correct.

Q That's the same language that was in your agreement with the Los Angeles division, correct?

A Los Angeles. Correct. Mm-hmm.

Q Actually, let me ask you this. Did you ever sit down and compare the two agreements to sort out the issue of whether the Los Angeles agreement had to be terminated in writing?

A Yes.

Q So you sat down and compared the two?

A Many, many times.

Q When did you do that?

A I've done it from the day that I left L.A.

Q Now if you look at the 1994 agreement.

A Mm-hmm.

Q Exhibit B, the first sentence in paragraph 14.

A Wait a minute. I have to find it. B.

Okay. Go ahead.

Q Look at paragraph 14 in B. It's on that page that you're open to already.

A Okay.

Q We talked about this before.

A Right.

Q And I asked you questions about the first sentence.

A Right. "This agreement shall commence on the date of acceptance by Mr. Patton and specified by his signature and shall continue as long as the FBI deems that Mr. Patton's services are required."

Q Right.

A "It may be terminated at any time by either party by deliverance of a written notice of termination."

Q Right. Now let's look at paragraph 12 of the 1991 agreement.

A Okay. That says the exact same thing.

Q Could you read paragraph 12, please?

A "It may be renewed thereafter for..." --

Q Sir, I'm sorry. Could you start at the beginning of paragraph 12?

MR. HEIDEMAN: I'm going to object to taking the time to read it into the record. The document

speaks for itself, but counsel, I defer to you.

MR. SCHWARTZ: Thank you.

MR. HEIDEMAN: He's now reading from paragraph No. 12 from Exhibit K.

BY MR. SCHWARTZ:

Q All right. Could you go ahead and read that?

A "This agreement shall commence on the date of acceptance by Mr. Patton as specified by his signature and will continue until 9-30-91. It may be renewed thereafter for an agreed upon period for the time continuing upon the written agreement of the parties. It may be terminated at any time by either party by deliverance of a written notice to terminate."

Q If you look at the two paragraphs, between the two contracts --

A Mm-hmm.

Q They're not identical, correct?

A To me, it seems like it's the exact same.

Q Well, if you look at paragraph 14 on Exhibit B.

A Right.

Q It has that language that we went over before, "and shall continue as long as the FBI deems

that Mr. Patton's services are required."

A Mm-hmm.

Q There's no similar language like that in Exhibit K, is there?

MR. HEIDEMAN: I'm going to object, counsel, because the next sentence that you didn't read on Exhibit B says, "It may be terminated at any time by either party by deliverance of a written notice to terminate," and I quote.

MR. SCHWARTZ: That's not really an objection. That's a statement.

MR. HEIDEMAN: It is an objection because (a) the documents speak for themselves, (b) you asked us to take a short lunch hour, which we all agreed to, so that we could use the time properly, and reading documents that are in the record doesn't seem to me to be a proper use of time. And if you're going to ask him a question, please do it in the context of the entire paragraph, because it's one numbered 14 paragraph in Exhibit B. Thank you, counsel.

BY MR. SCHWARTZ:

Q Mr. Patton, my question was there is no similar language in Exhibit K to the phrase "and shall continue as long as the FBI deems that Mr. Patton's services are required," correct?

A What paragraph was that?
Q In paragraph 12 of Exhibit K, there's no similar language, correct?
A To me, it's almost the same. You tell me where the difference is.
Q Well, let me ask you this. The phrase "shall continue as long as the FBI deems that Mr. Patton's services are required," does that mean anything to you?
A Well, I thought by being with the FBI that I would be working with the FBI the rest of my life until I was too old to do it.
Q What gave you that impression?
A Just by, you know, conversations and me making a 180-degree turn in my life and trying to do the right thing for the United States government, which I think I did, and I did it honestly and truthfully and worked very hard.
Q Let me ask you this. Did you ever before today ever notice that paragraph 12 --
A No.
Q Let me finish my question. Did you ever notice that paragraph 12 in Exhibit K is different from paragraph 14 in Exhibit B?
A No, I have never noticed that.

Q You mentioned earlier regarding "Cherry Nose" Brown that you had traveled around Arizona somewhat?

A Mm-hmm.

Q Can you give me some more details about that?

A Yes. I went from Tucson to up around the Phoenix/Mesa area, Scottsdale area.

Q You were living in Tucson at the time?

A That's right.

Q Why did you go to the Mesa area?

A Well, because I figured he wasn't living in Tucson. I could maybe spot his car. It was a green El Dorado somewhere up in that area.

Q Did you have any information that he was in fact living in the Mesa area?

A No, I did not.

Q And you didn't spot him in the Mesa area, correct?

A No, I did not.

Q And after looking in Mesa, you looked in Scottsdale?

A In Scottsdale, right.

Q And did you have any information indicating he was living in Scottsdale?

A No, I did not.
Q Did you have any information that he was in Arizona?
A Just by what Chuck Goodwin told me.
Q Do you remember what Chuck said?
A That his information by the Chicago office was that he was in Arizona.
Q Did you look anywhere else?
A No.
Q How much time did you spend looking for "Cherry Nose" Brown?
A Probably a month.
Q Is that one continuous month?
A Yes. Every day.
Q Where were you living at the time?
A In Tucson.
Q Did you go home every night?
A Yes. It's not that far away. I mean, you can go from Tucson to Phoenix in 35 minutes.
Q You didn't talk to Mike Wacks about this, did you?
A No, I did not.
Q Did you incur any expenses in connection with this?
A Just out of my own pocket, gas.

Q Other than gas, any other expenses?
A No.
Q You were never advised that anyone other than Michael Wacks was the representative for the contracting officer under the 1994 agreement, correct?
A That's correct.
Q The 1991 agreement, which we were just looking at, says in paragraph 13, "This document constitutes the full and complete agreement between Mr. Patton and the FBI," correct?
A Mm-hmm. Right.
Q You did have a claim in this case, though, that you had an agreement with the FBI or with Agent Leahy about a lump sum payment, correct?
A That is correct.
Q So your understanding was in this case that the language of the agreement really didn't mean what it said, right?
A Well, I took his word for it. You have to understand when you come over and work for them, who else are you going to trust? You sure can't go back to the people you used to be with, so you put everything in their hands to protect your family, for you to work for them, and for you to do whatever you want to do.

I changed my life 180 degrees around. I've never had a traffic violation. Never had no problems with nothing. I've just changed my whole life, and I'm glad that I did it, and I'd be willing if they asked me today to go anywhere in the United States and work for them, I would do it.

Q I appreciate that. I want to just focus on the real specific questions right now.

A Okay. Well, I'm answering your question I think, sir.

Q Getting back to the first sentence in paragraph 13 about the document being a full and complete agreement, your understanding was that should not be read literally, correct?

MR. HEIDEMAN: Objection to the form of the question. That actually calls for a legal conclusion, but he can answer. In fact, the document just speaks for itself. It says what it says. This is a document between the Federal Bureau of Investigations and a U.S. citizen.

I don't know, counsel. With all due respect, since the lunch break, it seems like we're dragging here, and you must have your own purpose, but this document and the last document speaks for itself. Argument about what the language is just doesn't seem

to be productive, and I'd ask you kindly to move on.

MR. SCHWARTZ: I need a response on this one.

MR. HEIDEMAN: Then you'll have to read the question back.

MR. SCHWARTZ: All right. Do you understand the question, sir?

MR. HEIDEMAN: Well, I've interrupted, so let's read the question back if you want an answer to that specific question. Counsel, I'm please asking you to move on once you have this answer that you seem to need.

MR. SCHWARTZ: I'll give the question again.

BY MR. SCHWARTZ:

Q Would you agree that with respect to the first sentence in paragraph 13 of Exhibit K that you did not intend for that language to be taken literally?

MR. HEIDEMAN: Objection. He's previously answered that this agreement was in full force and effect, and the document speaks for itself.

MR. SCHWARTZ: You can answer the question.

THE WITNESS: Yes, sir. I thought it was in full effect.

//