BY MR. SCHWARTZ:

Q I know that's what your counsel just said, but my question is did you understand that sentence to be taken literally, that it really was the full and complete agreement between you and the FBI?

A Right.

MR. HEIDEMAN: I'm now going to object on the grounds that it calls for a legal conclusion. I instruct him not to answer if this is the only way we can get you counsel after 24 minutes into this postlunch break to move on.

MR. SCHWARTZ: And what's the basis for your objection?

MR. HEIDEMAN: I've stated it three times. Please, counsel, let's move on. The document speaks for itself.

MR. SCHWARTZ: Right. My question is not what the document says but whether he understood it to be taken literally.

BY MR. SCHWARTZ:

Q Did you literally think that this was the full and complete agreement?

A Yes.

Q But you also said you had an agreement with Agent Leahy with the FBI that you would be owed

$150,000, correct?

A That's what he told me.

Q So you had an agreement?

A With him.

Q Right.

A An oral agreement.

Q Right.

A And I asked him to put it in writing, and he said it doesn't have to be in writing. My word is my bond.

Q You didn't think he was going to be paying the $150,000 out of his own pocket, right?

A No.

Q So it was an agreement that he made on behalf of the FBI with you?

A Right.

Q So you had another agreement with the FBI when this document was signed, right?

A I had an oral agreement.

Q Okay. So this written agreement was not the full and complete agreement between you and the FBI?

A Yes, I thought it was the full agreement, but he said you do what we ask you to do and I promise you you'll get $150,000, you know, for doing what you're doing.

Q And who told you that?

A Leahy.

Q I'm going to turn now to the documents that your attorney delivered this morning and ask you about some of them.

A Okay.

MR. SCHWARTZ: Let's mark this as the next in order, L.

(The document referred to was marked for identification as Exhibit L.)

MR. SCHWARTZ: I have only this one copy. Do you have a copy for the witness?

MR. HEIDEMAN: Yes. In fact, before you mark your page, since during the deposition Ms. Moore has taken the time to review the documents and has made some markings on it, we have a second complete clean set that what I suggest we do for your consideration, counsel, assuming there are no missing pages, and if there are, they are unintentional, but as I look at them, it appears to be 0001 through 000215, so assuming it's a full and complete set, and I trust that it is -- if it isn't, it's by a clerical error -- why don't we perhaps mark this as a group exhibit, whatever is the next number. I think it's L,

but maybe I kept it wrong.

MR. SCHWARTZ: L is correct.

MR. HEIDEMAN: And then we could go L-1 for page 1 and L-183 for page 183. It would probably save some time and give you a clean package to work from without you having to tear apart Ms. Moore's notes.

MR. SCHWARTZ: That was my plan. Thank you. Here's Exhibit L.

MR. HEIDEMAN: And by the way, I recognize, as I said off the record, first of all, Ms. Moore in our office has had nothing but excellent cooperation from the beginning of the case. Of course, we've lost many aspects of this case, and so she's done a very good job, and maybe we haven't done as good a job, but the Judge has ruled however the Judge has ruled.

I recognize in the spirit of that cooperation I want to make this comment. We gave you this what is now marked as Group Exhibit L first thing this morning when everyone arrived. I know you will need to go over it in greater detail than you've had an opportunity to do here during the deposition.

And we of course will cooperate fully with you as it relates to ever page of the turnover and as it relates to whatever you may need to do about further inquiry as a result of something you may learn

that you didn't know or didn't have the time to pursue, so I don't mean to suggest therefore that I would expect that you don't have the opportunity to continue that review even after we recess today.

And if there's a need to reconvene hopefully by teleconference, but if we need to reconvene in some other way, we will appropriately deal with that as fellow officers of the Court. And I didn't ask my client about that before I said it, but as an officer of the Court, I'm saying it, and I'm sure my client will fully make himself available. Again, I would hope it could be by teleconference continuation of the deposition, but that may not be feasible.

MS. MOORE: Thank you. When we finish looking it, we'll let you know if we think it necessary to ask further questions at that time.

MR. HEIDEMAN: Thank you. And similarly, as soon as Mr. Patton goes back through all the records that he has, knowing of course he has moved many times and knowing of course his possessions we know he lost, whether there were records in that, I honestly don't know, but once he's gone back through all the records that he has, if he has any more records that are produced to us, we will give them to you. There's no privilege log at this time. To my knowledge, we've

not withheld any document that's been given to us.

MS. MOORE: Okay.

MR. HEIDEMAN: But if something does occur, we'll tell you immediately. And if that affects the timetable that's already in this case, we certainly will address with you in an appropriate, cooperative manner how there should be some adjustments so that no one is disadvantaged by this.

MS. MOORE: Okay. Okay.

MR. HEIDEMAN: Thank you.

MS. MOORE: Thank you very much.

MR. SCHWARTZ: Thank you.

BY MR. SCHWARTZ:

Q If you could just turn to Exhibit L-59.

A Volume L. Okay. Now?

Q L, this big one here.

A Now what page?

Q 59.

A Is that 0059?

Q Right.

MR. HEIDEMAN: While he's looking, if I could ask counsel a question without boxing you in or binding you? Do you think you've covered the questions you anticipate covering in this deposition other than in relation to these documents?

MR. SCHWARTZ: Not necessarily.

MR. HEIDEMAN: Okay. Thank you. In light of your answer, if there's any way to do all of the other issues today so that in the event this has to be continued after a recess where we're dealing with the matters that arise out of the documents produced today, that would be our request. Thank you.

MR. SCHWARTZ: All right.

BY MR. SCHWARTZ:

Q You're at 59?
A Yes, sir.
Q Do you recognize it?
A Yes.
Q Where did you find this document?
A In my files.
Q Was it on a yellow pad?
A Yes, sir.
Q And the same with page 60?
A Yes, sir.
Q Is this your handwriting on pages 59 and 60?
A Yes, sir.

MR. HEIDEMAN: May I interrupt, counsel? To save us all time, please tell us whether or not the pages starting from, in Group Exhibit L-59, all the way through these handwritten pages that go to

whatever page I'm told it goes through, whether or not all of that is or is not your handwriting?

THE WITNESS: It's all my handwriting.

MR. HEIDEMAN: Okay. So all the batch of pages that start with 59 and continue straight through to --

MS. EISEN: Through 172.

MR. HEIDEMAN: I'm sorry, Faye?

MS. EISEN: 172.

MR. HEIDEMAN: 172, you're telling us all of these come out of your files?

THE WITNESS: Right.

MR. HEIDEMAN: And they constitute your handwriting, is that correct?

THE WITNESS: That is correct.

MR. HEIDEMAN: Okay. If when we go through any pages you see a notation made by your wife or somebody else, please tell opposing counsel that it's not your handwriting.

THE WITNESS: I will notify him. Right.

MR. HEIDEMAN: Okay?

THE WITNESS: I will notify him.

MR. HEIDEMAN: Thank you very much.

Counsel, I hope that's helpful.

MR. SCHWARTZ: It is.

MR. HEIDEMAN: I interrupted.

MR. SCHWARTZ: Yes.

BY MR. SCHWARTZ:

Q Just comparing page 59, for example, to page 62, it just seems like it's two different people writing, so I want to make sure that that's not your wife or someone else.

A No, that's me. It's all my handwriting.

Q Did you keep a continuous log in a yellow pad of the conversations?

A Yes.

Q Do you know how many pads of notes you had of these conversations?

A No, I do not, not to my recollection at this time.

Q And the notes are dated. Were they written at the time that you had the conversations?

A Yes, sir.

Q If you look at 59 again, the first entry of 2-27-96.

A Right.

Q Is that supposed to be crossed out, 2-27? Is that the date, or is that a crossed out date?

A That's just a mistake. No, that was the date.

Q Okay.
A I believe it will be in the phone records.
Q And you still have the originals of all these notes, correct?
A Yes.
Q At home?
A Mm-hmm.
MR. SCHWARTZ: During the lunch break, I started to skim some of these, and some of them are hard to read, and I'm going to have to ask the witness to read a few of them.
BY MR. SCHWARTZ:
Q If you look at page 63, there's an entry in the middle. 5/7/96, Scottie called.
A Yes, sir. Right. Because he didn't trust Ori and he was going to give him a lie test. He said that he was working with Vick on some things. He said that they are giving Ori $6,500 a month, but he has not given him the money because Ori has not met with them. He said that he got the letter and thanked me for it. He said he will call Saturday in the morning to see if there was someone there and let me know.
Q That second to the last sentence, "He will call", what does that say again?
A He will call on Saturday in the morning to

see if there's someone there and let me know.

Q Did you use an abbreviation for morning?

A Yes.

Q What's your abbreviation?

A M-O-N.

Q Oh, okay. Do you know what letter you're referencing there? "He got the letter and thanked me for it."

A Well, I sent a letter to the SAC praising him for the hard work he did.

Q And this is Scott Garriola, right?

A Yes. And that was, to the best of my recollection, to Tim McNally.

Q Do you know what that last two lines are about? "He said he will call in the morning."

A He didn't trust Ori, and later on, which I don't know if it's in these notes somewhere, while he [redacted] You know about that probably. You do know about it.

[redacted] L.A. division, he was a subject, right?

A Right.

Q Can you turn to page 64?

A Mm-hmm.

Q And the second entry dated 5/13/96.

A Right. Called Mike and he said he will talk to Pat about the money and he said that J.B. died. That's Joe Bett died. He said he don't think the contract is in force. He says he will call me on Tuesday or Wednesday.

Q And that's a conversation with Mike Wacks, right?

A That is correct.

Q Can you read the last entry on page 64?

A Pete called and asked if I heard from Mike. I said no. He said that he is not going to call Mike anymore and that he will call Bill Esposito in Washington and have him call me. He says that he will call me after he talks to Bill. He said that Mike don't know what he is doing. He said that the things in Florida were never in Rick Delahey's name.

I said I didn't want to give anyone trouble. He said you don't just let them run over you. You have to stand up for your rights. He told me that someone in L.A. is bad-mouthing me. He didn't know who it was. He said he knew someone in Houston, and he will call him and see if there is something there.

Q Could you read the last entry on page 65?

A Pete called and said he talked to --

MR. HEIDEMAN: What date?

MR. SCHWARTZ: Thanks. It's May.

THE WITNESS: May 24, '96.

MR. SCHWARTZ: Right.

THE WITNESS: Pete called and said he talked to Mr. Esposito and that Esposito was going to look into the Florida and California things and he will get back to Pete Tuesday or Wednesday. Pete said that Chuck was talking to Kurt in Washington about getting me somewhere. He said that the $2,500 from W.A. to give me has nothing to do with California and it was for me to do that.

BY MR. SCHWARTZ:

Q Does this refresh your recollection at all about you having complained about not receiving payments under the contract?

A Yes. I told you that I did complain to Pete and to Esposito and to Chuck and to John Donahue.

Q Right.

A I'm sorry I didn't bring it up to Merryman. I should have brought it up to him. I'm sorry now, but he was down there strictly for the California thing and the $150,000 thing. He never brought up the contract to me, so we never got into that discussion. The man sat in a room with tears in his eyes the whole time, him and Morrisey.

They said we cannot believe that you were treated this way for all the work that you've done for the FBI. I didn't have to do all that work, go to Baltimore and do that work. Take depositions and go to the grand jury. I didn't have to go to San Diego and take depositions and go to the grand jury and have people indicted and put in jail.

I didn't have to do that. My life wasn't threatened. But I turned my life around and I put all my belief in the Bureau. My whole life was in the Bureau to help them out, but it seems like I must have been mistaken. I'm sorry it came out this way, but that's the way I guess things work. It wasn't that way on the outside. Your word was your bond.

Q Did anybody in the FBI tell you that from the FBI's perspective, that $30,000 payment you had gotten in November was a settlement of your claim about not having gotten more monthly payments under the 1994 agreement?

A No one ever told me that. No one ever told me that. That's the third time you asked me that question and it's the same answer. They never told me that. And it states right in here about the $30,000 that I think we just read, didn't we? That it had nothing to do with California?

Q I think that was a reference to the $2,500 you had gotten.

A No. The $30,000.

MR. HEIDEMAN: What page, Mr. Patton, are you referring to so the record is clear?

THE WITNESS: I have to find it.

BY MR. SCHWARTZ:

Q Look on the bottom of 65, that May 24, '96, entry. The last sentence there. Is that what you were thinking of? That Pete McCann said that the $2,500 had nothing to do with California?

A Right. No. That had nothing to do with California. That was for the work I did for them in Dallas.

Q Right. Can you read page 66? The May 28 entry?

A Right. Scottie called me and said that Ori was not doing anything for him. He says that Ori only lied to him about being made. I asked him who was mad.

Q Is that bad-mouthing?

A Bad-mouthing me in California and he said that the only one that might do that is Pat Marshall. Pat or Stan.

Q Yes. Now who are Pat and Stan?

A Pat Marshall was the supervisor of the spot we were in.
Q And who was Stan?
A Stan was another agent that was involved with our cases.
Q What was your relationship with Stan?
A Very good.
Q Did you work on a matter with him separate from the matter you worked on with Scott Garriola?
A No. I had Mark Tillio come out and work with him on what they were working on.
Q What was it that they were working on?
A I have no idea. That was not discussed with me.
Q And Mark Tillio I think you said before was an agent?
A Yeah. He's here in Washington, D.C., in the District. You know, he's not in headquarters.
Q And was that separate from the Joe Denti investigation?
A Yes.
Q But you don't know what it was?
A I think to the best of my knowledge, to the best of my recollection, it had something to do with bookmaking people, which is legal now in the United

States, bookmaking, and so is extortion with money laundering.

But there is so much work, Mr. Schwartz, that I could be doing for the FBI right now and they're not interested in sitting down to talk about [redacted] from Mexico. And it's so easy to get into their people. It's like a walk in the park to me, but I'm willing to do it. It's up to them to make that decision, because it's loaded down there.

And it's not only -- it's just not -- which you probably know more than anybody does. You take what's his name, the guy that ratted out John Gotti? Sam "The Bull". What was he into? Ecstasy. He got busted for that up in Phoenix. There's a bunch of young American kids working for him like he was some big shot. He was nothing.

There's a lot of talk who he was, but he was nobody. I met him many, many times when him and John would come to Florida. He was nobody. I don't even think the man was made.

Q That reminds me. I don't know if I finished going through the list of where you lived. I know at some point you lived in Cottage Grove, Oregon?

A Right.

Q And then how long did you live there for?

A Three years.

Q [redacted]

A For my wife's health, right.

Q And again, the FBI hadn't asked you to move?

A No. Plus I have a daughter and granddaughter and great-granddaughter there, and most of it was for my wife's health. It's easier out there for her breathing.

Q Can you read the entry on page 67? It looks like it's the second one that's dated June 4, '96. It starts "Called Chuck".

A Called Chuck and he said he will look into things. He said that Dallas would put me on only on a COD basis.

Q What does that mean to you?

A That means for everything that you would do they would pay you that. That's like being a stool pigeon, you know? That's what they do with these informants, you know? Here's $1,000, go do this. I know what that is.

Q And so that's very different from -- let me finish the question.

A Right.

Q That's very different from the arrangement that you had had under the 1994 agreement?
A Or the '91 agreement, too. Yeah. Completely different.
Q Could you keep reading that?
A COD basis. I said that I can't do that without a car and money to spend. He said he can understand that. He said he talked to Kent and he will look for something.
Q Do you know who Kent is?
A Yeah. He's an agent. He used to be an agent in Arizona. Now he's a prosecutor in Palm Beach, Florida.
Q Do you know his last name?
A No, I do not. I used to know it, but, you know, you meet so many of them you can't remember them all.
Q Can you finish reading that?
A He said he will talk to Pete and see if there is any --
Q He will talk to Kent?
A -- attorneys that will look into this and he will let me know. He said he will call me later.
See, they were all getting very fed up because I was trying to deal directly with the Bureau

and they knew all about what I was trying to do because they were involved talking to Washington, and I never wanted to sue. I mean, it took a long time for me to make that decision. I thought we could have worked things out with the Bureau.

Q And by this time, June of '96, you knew that your property had been lost, right?

A Right. I think so, but I have to see when I was told.

Q I think your declaration indicates it was April of '96 you knew that, right?

A Yeah. Right.

Q And this is Chuck Goodwin you're talking to?

A That is correct.

Q And he said he would talk to Pete McCann and see if there's an attorney that will look into this?

A Right.

Q So Chuck was actually trying to help you out by hooking you up with an attorney, right?

A Right.

Q Did that ever pan out?

A No, because I went to Gerry Spence and Gerry Spence recommended Mr. Heideman. He wanted to take my case on, but he was too busy at that time.

Q Do you remember what time that was that you

spoke to Spence?

A Yes. We have it somewhere. I thought we had it at home. It's a letter that recommended Mr. Heideman.

Q Could you read the next entry on page 67?

A Called John Donahue. Told him about Florida. He can't believe it. He said he was in Tampa and --

Q Is that everything?

A Yeah. And everything is going good for that on that case. He said he will call me back. John called and said he will call Jim Fellis and see what he said. He said he will call me.

Q Do you know who Jim Fellis is?

A No. Do you?

MR. SCHWARTZ: Let me check how we're doing on time.

MS. MOORE: I've got a watch. It's five of 2:00.

MR. HEIDEMAN: Madam Court Reporter, do you need a break while we're at a stop for a moment? Does anybody?

I will need one, but not yet, so you can keep going for a while if you'd like.

THE WITNESS: Maybe I could keep my water

filled so I can lose that weight.

(Discussion held off the record.)

BY MR. SCHWARTZ:

Q Can you turn to page 68 and look at the last entry? It's June 11, '96. 68.

A 6/11/96?

Q Right.

A Mike called and said he, I think, asked not to put in for the money yet. He has not put in for the money yet. He is waiting for the right time. He said that I should get in touch with someone in Washington, Esposito, and tell them when I'm in Florida. He says that I shall not wait to do something. He said that he told the guys in Boston that my contract is over in L.A. and that they can pay me. I asked if he would put it in a lump sum so I can get on with --

Q Is it "so I can get out of here"?

A Out of here. Right. He said he will. I said that someone out there was bad-mouthing me and he said he did not talk to Tim or Scottie or Andy. He said that he would let me know what he put in for the money.

Q Is that last line "he will let me know *when* he put in for the money"?

A Right. Yes, sir.

MR. HEIDEMAN: When or what? I heard you say, Mr. Patton, what and I heard counsel say when, and I don't know which it is.

THE WITNESS: He said he would --

MR. HEIDEMAN: Maybe I can help by looking at it. It looks to me like it says "he said that he will let me know" -- and then this word, what is that next word right there? Is that when or what or something?

THE WITNESS: When.

MR. HEIDEMAN: When. When he put in for the money. Okay.

BY MR. SCHWARTZ:

Q In one of the middle sentences in that entry, this is a conversation with Mike Wacks, right?

A Right. Mm-hmm.

Q Yes?

A Yes.

Q The sentence, "He said that he told the guys in Boston that my contract is over in L.A. and they can pay me," do you know what that's talking about?

A No. I had a very bad habit, which I should have went further with these conversations to have him explain what he was saying. Most of the time when you

talked to Mike he was drunk anyway, so you never knew what was truth and what was not truth. He's a very, very heavy drinker.

Is he still married? Mike still married?

MS. MOORE: I don't know.

THE WITNESS: You? You must know.

MR. SCHWARTZ: I'm not going to talk about that on the record.

BY MR. SCHWARTZ:

Q Could you read the top entry on 69? It's June 11, '96.

A Pete called and said that he has not heard from the guys from Boston and that he will try to get them today. I told him that I talked to Mike and he said that he has not put in for any money and he is waiting for the thing from Boston.

Q Let me stop you there. Do you know what that is about Boston?

A No, I do not.

Q Did you deal with any agents from Boston?

A Fred Robbins.

Q And he came down with Pete McCann on the Donald Eugene Webb matter?

A Correct. Yes.

Q Did you keep in contact with Fred after --

A Yes.

Q But you don't know what this reference is about money and Boston?

A No. Right.

Q All right. Please continue reading.

A Where did I stop at?

Q You stopped at "things from Boston".

A Pete said that Mike is full of shit. They sent him the letters on 4/96 and Mike told him that he was going to put in for the money. He said that he will call Esposito and ask him if he will call me.

Q Do you know the reference to the letter on 4/96? Is that that letter about praising the agents, or do you know what that letter is?

A No, I do not.

Q Okay. Please continue.

A Pete said that he and Fred will take care of the things in Florida for me, not to worry about that. He said that a guy from Boston was going to call Pat and call and find out what was going on. He said he would call me on 6/12/96 to let me know what they said.

I mean, these guys were really trying hard, Pete, Fred, and Chuck and John Donahue, to try to get this resolved. They tried very, very hard. I give