them a lot of credit.

Q Do you remember getting a letter from Neal Divers after you were --

A What?

Q After you were interviewed down in Florida by Clyde Merryman and Steve Morris.

A Yes. Mm-hmm.

Q Then you got a letter that Divers signed off on saying that your claim for your lump sum is denied and that if you want to submit a claim for your lost property, you should submit forms under the Federal Tort Claims Act?

A Correct.

Q Did you respond to Neal Divers about that letter?

A No, I did not.

Q Did you ask anyone in the FBI why does this letter talk about the lump sum from Miami, the personal property, but it doesn't talk about the payment under the 1994 agreement?

A No. I never asked anyone. There wasn't too many people I think that liked Divers.

Q Could you turn to page 70 of Exhibit L?

A Mm-hmm. What do you want to know?

Q You don't need to read the whole thing, but

if you look at both of those top paragraphs, there's a reference to a Whity?
A Who?
Q Do you see the reference to Whity, W-H-I-T-Y?
A That's Whity Merryman.
Q Oh, okay. That's his nickname.
A Right.
Q The second paragraph there, let me read this and tell me if it's -- well, why don't you go ahead and read it.
A Pete told me that Whity told him that Espo told Whity to get this thing done by the 1st of August, and if he had any problems with California, L.A., for the persons to call Esposito.
Q Now that's a reference to a conversation on July 19, '96, right?
A That is correct.
Q If you look at page 71, the first date there is June 20, right?
A 6/20, 21, 22 and 23. No calls.
Q Right. So pages 70 and 71 don't seem to be in order, right?
A I don't know if they're in order or not.
Q Do you know if they came from the same pad?

A Yeah. They came from the same pad. Because you've got a 24 and here's a 24 again right after where I said no calls. I called Pete and he told me to call Esposito at 1-202-324-4260. I called Espo and told him about Miami and California and contact. He said he will look into it and let me know on Friday. He said they will do the right thing for me.

He said he will call me back at 9:15. He said he was going to call Mike in Boston and Chuck. Bill Esposito said that he has a SA on it, and he will talk to him and see what is going on.

Q And SA is special agent, right?

A Right. And that was Merryman.

Q You don't know why page 70 seems to have dates that are a little bit out of order compared to 71, do you?

A I think they're all in order. Where do you see where they're not in order?

Q Well, if you look at the first entry on page 70, it's dated June 24 --

A '96.

Q Right. And then the first entry on 71 is June 20 through the 23rd.

A Them are the dates where I didn't get any calls. I just added that in there.

Q Okay. I see. And then if you look again on page 70, you have that second paragraph, there's a July call, right?
A 7/19/96?
Q Right.
A Yeah.
Q You don't know why that's out of chronological order, do you?
A Well, it's just the way that I do things. It was something that I wrote in there to keep my head up on the thing with Espo. Here's when I called Gerry Spence, but I don't have --
MR. HEIDEMAN: As it relates to Spence, I'm going to ask counsel to agree that any reference that may be in these documents that as we've already told you were produced to us last night and we reviewed them and stamped them and turned them over, obviously inside review, we inadvertently missed the fact that there was a reference to any communication with any other lawyers, whether it's Mr. Spence or us -- maybe there's some references in here to us -- I would like to ask counsel to stipulate that any references that may be in this Exhibit L that have not been redacted as it relates to communications with counsel may by consent be redacted.

Secondly, a stipulation that the inclusion, the inadvertent inclusion and failure to redact, which of course would have created a privilege log, we would have told you about it, but the inadvertent discovery by us and failure to redact, I request a stipulation that it does not constitute any waiver of the attorney/client privilege.

And if you would consent to those two matters, I would be appreciative.

MR. SCHWARTZ: Well, we'll have to talk about that, because I'm not sure that any call to an attorney is necessarily privileged. It has to be a confidential communication. So I don't know. I don't think it's going to be a big deal, but I'm not willing to stipulate at this point without knowing what the circumstances of the call are, because apparently Mr. Spence did not agree to be his attorney. So I don't know what the conversation, whether it was actually privileged or not.

MR. HEIDEMAN: I believe it was privileged because he consulted with Mr. Spence to become his attorney, and I believe therefore we should agree since presumably that's not an issue in this case as to any lawyers he may have spoken with including us or what our communications would be, I renew my request

for the two stipulations.

Otherwise, I'm going to ask that we either recess so we can do another review with the client of this document to see if anything needs to be redacted. I don't want to waste anyone's time to do that, so you already have the document.

If any of us find something hereafter, that is, after the stipulation would go in, to effect, if that stipulation you feel prejudices you, I have no objection to you reserving the right to reraise the issue directly with us and, if necessary, with the Court, but I would request at least a week and continue going and not have to take the time to recess the stipulation on the two I hope you'll agree minor points but important points I've raised about my client's document turnover.

MS. MOORE: Well, how much is in there that does mention an attorney or attorney communications with Mr. Patton? How much is in there?

MR. HEIDEMAN: Maybe we can go off the record for the moment. We can take our five-minute recess, a 10-minute recess, not more than 10 minutes and let us confer with the client, do another quick cursory review and see if this is an issue. But I'm duty bound to make the request that I've made.

MS. MOORE: Why don't we do that, and then after 10 minutes, Mr. Schwartz will resume his questioning.

MR. HEIDEMAN: That's fine.

MS. MOORE: And I seriously doubt that whatever is in there is relevant to the case, but again, we need to discuss this, you know, before making a stipulation.

MR. HEIDEMAN: That's good. Sure. All right. We're in a 10-minute recess. Thank you.

(Whereupon, a short recess was taken.)

MR. HEIDEMAN: Can we agree that my request for a stipulation will be considered by counsel without prejudice to our continuing? Can we reserve on that and do something here?

MS. MOORE: Well, why don't we have you go through it carefully and let us know what else, if anything, there is, and then we will let you know our position on that.

MR. HEIDEMAN: Okay.

MS. MOORE: Meanwhile he can continue his questioning. I doubt it's going to touch on attorney/client communications.

MR. HEIDEMAN: Right. That's agreeable. Thank you.

BY MR. SCHWARTZ:

Q Could you look at page 74 of Exhibit L?

A I've got these all backwards. I don't know what I just did. This is all backwards.

All right. I'm there.

Q Okay. The bottom entry on 7/11/96.

A Mm-hmm.

Q Can you read that?

A Pete called and said that he talked to Fred and Fred was mailing the check to Larry in Texas today and I should hear --

Q Is that "have it", "have"?

A I should have it on Friday or Monday or Tuesday.

Q Do you recall the $2,500 you got for the Donald Webb --

A Mm-hmm

Q -- services came out of the Boston office?

A I have no idea where it came from, sir.

Q Do you know what check this is referring to in this entry you just read?

A Well, it didn't come to me as a check. It came to me in cash.

Q The $2,500 came in cash?

A Right.

Q Do you think this reference is about the $2,500?

A Yes.

Q Could you continue reading the entry on top of page 75?

A Mm-hmm. Pete said he talked to Whity in Washington, and he said that they agreed with us on the contents about they owe me to July 15.

Q Let me stop you for a second. Is that "they agreed with us on the contracts"?

A Mm-hmm.

Q Could you read it again, because I don't think it came out clearly the first time?

A They agreed with us on the contract and they owe me to July 15. He said Whity was going to talk to Espo today if he was in. I asked him when he thinks that will be done. He said in a week or two. He said that they had someone from California and Washington and they all agreed.

He said he told Whity that I was still willing to work for the B -- that's the Bureau -- and Whity said he will look into it. He told Whity about Florida and he wants --

Q Is that "was shocked"?

A Was shocked about hearing that. He told him

that Rick should have done something about it, and Whity said he will look into that now. Pete said if he hears something, he will call me on Friday.

Q And the part about "he was shocked", do you recall if that's about the property and the storage? That's what it was referring to?

A And the $150. He was totally shocked. It's just like I told you that the man sat in the interview with my daughter and my wife and me crying. He said I don't believe that the Bureau would do this.

Q You could turn to page 76, the entry that's dated July 17, '96.

A Mm-hmm.

Q Can you read that?

A Fred called and said that he was trying to get the check cut. As soon as he gets it, he will send it to Barry and call me and tell me if it is on its way. We talked a little bit about the *Ds*.

Q Do you know what that is? The *Ds*?

A Dallas. And I told him that they are not dumb people. I said if agents in Miami want to talk to me, I will talk, tell him what I know.

Q Do you know what that reference is to "a little bit about the *Ds* and I told him they are not dumb people"? What was that conversation about?

A I can't remember what the actual conversation was.

Q Can you read the next entry on page 76? It's dated July 18.

A Yeah. Pete called and asked what was the number on the contract. I gave that to him. He said that he will call Whity and ask for $28,125 plus lump sum.

Q Now do you know where that figure came from, $28,125?

A I have no idea.

Q Was it a multiple of the amount that you would have been paid under the contract?

A I have no idea, sir. He will call me back on what they say today or tomorrow. I told him what was said with Fred. Pete called and said that he talked to Whity and he thinks that Whity agrees with him on the matter, that it would be a letter --

Q A little more?

A A little more. He said I am on the first --

Q This is very hard to read, right, this passage?

A Yeah. It is.

Q I'm going to ask if you could try to make a better copy of this page.

A Okay.

MR. HEIDEMAN: Well, we'll do two things. We'll not only try to make a better copy after he gets home but secondly, we'll then type out the text and have him read the typewritten text and give you both the copy and the typewritten text, which we could if you wish once you receive it and approve it cause it to be attached hereto as the next exhibit so it's all in a logical place.

MR. SCHWARTZ: That's fine. I appreciate that.

MR. HEIDEMAN: We'll call that Exhibit M then once received, tendered to you, approved and transmitted for us. So let's be sure. You want the portion that is 7/18/96, if I'm reading right, on Group Exhibit L, page 00076, correct, on the bottom?

MR. SCHWARTZ: Right. Right. I'm going to thumb through it real quickly just because I may have missed others that are hard to read.

THE WITNESS: You know, Mr. Schwartz, under this 1994 contract, I was always willing and able to work for them. When I went to Dallas, I thought I was going to work, and from there, I always was willing and able to do whatever they wanted and I did it. And I just feel that who do you believe in this country

but our government? Is there anybody else that you can believe?

MR. SCHWARTZ: That's a good question.

THE WITNESS: Well, you should have the answer. You work for them.

MR. SCHWARTZ: I don't have an answer for you.

THE WITNESS: Okay.

BY MR. SCHWARTZ:

Q Could you look at page 77?

A Mm-hmm.

Q The first entry. If it's too hard to read, I definitely don't want you to guess at what it says.

A Yeah. It is very hard to read.

Q Yes. But if you want to take a shot at it?

A Pete called and said that he talked to Whity, and he said that I should have my money in California by the 31st of July. Whity told --

Q Let me just stop you there. Do you know what "my money from California" is referring to?

A $30,000.

Q Now, at this point in time, at least we haven't seen a reference to $30,000, right?

A No.

Q We saw a reference to $28,000 and change,

right?

A Mm-hmm.

Q So, at this point in time, do you know if the figure $30,000 had been decided upon?

A Well, I think that was between Esposito and whoever he talked to in California.

Q Okay.

A That's only my opinion. I don't know that for a fact.

Q Right. Okay. Please go ahead.

A It's pretty hard from there on.

MR. SCHWARTZ: Yes. So, with this page as well, this entry, if we could try to get a better copy?

MS. MOORE: Sure.

MR. HEIDEMAN: Why don't we call that Exhibit M-1 once we receive a better copy. And if you wish any portion of it typed out for him to review the typewritten portion to be sure it's the same, please tell us; otherwise, I won't offer that again. We'll just provide a better copy.

MR. SCHWARTZ: Yes. The prior page that we needed a better copy on --

MR. HEIDEMAN: Page 76 at the bottom.

MR. SCHWARTZ: Right.

MR. HEIDEMAN: We're going to call that Exhibit M and this next one M-1, but if you want a different numbering system, it's up to you.

MR. SCHWARTZ: Well, why don't we call the better copy of page 76 M-1 and then the better copy of page 77 M-2?

(Exhibits M-1 and M-2 were reserved for exhibits to be submitted and received after the hearing concludes.)

MR. HEIDEMAN: All right. We agree.

BY MR. SCHWARTZ:

Q Could you read the bottom entry on page 77?

A Larry Sandri called and said he had the money from Boston. He called at 2:30 and said for me to meet him at IHOP at 3:30. He met and he gave me $2,500 and I signed a receipt. I told him that there would be some money coming from California or Washington next week.

Q Let me stop you there. This is Larry Sandri that met you at the IHOP and gave you the $2,500?

A Right.

Q Do you know if that was on the date that this entry is made?

A That is correct.

Q Earlier I know you said that you had met Larry Sandri and another agent and talked about whether there were cases to work on?

A Correct.

Q Does this change your recollection about it?

A No.

Q So you met him then at least three times, right?

A Or more.

Q Okay. All right. Could you continue? Thanks.

A From California to Washington next week. He said he will call me as soon as he gets it. He told me some things about his case and they had to get a bigger warehouse. He talked a little bit about the things in Florida. He said he can't believe it. I told him that someone was working on it. I didn't know who knew what about what. I told him to say hello to Vick. He said he will.

Q Do you know who Vick is?

A Well, yeah.

Q Is it Vinny?

A Vinny.

Q And you mentioned him earlier, but you don't remember his last name, right?

A No. I got it here somewhere. I mean, it was on one of these pages that we just read. This doesn't tell you the last name. It just explains --

Q Okay. Could you continue reading that?

A He said he can't believe it. I told him that someone was working on it. I didn't know he knew about Florida. I told him to say hello to Vick. He said he will. I left him about 4:07 and went home. I called Pete and left a message on his answering machine that I got the money from Boston.

Q Could you turn to page 78? There's an entry in the middle of the page. It looks like it's dated 7/29/96.

A Talked to John and he said he was in court last week in New York on a kiddie porn case. I told him about our cases in California that Pat turned down. He said that he has not talked to Mike yet. I told him to call Pete and give him the number again. He said he will try to call him.

Q Do you know what the reference to give him? Is that the numbers again?

A Right.

Q Do you know what the numbers are?

A I don't remember at this time.

Q Do you think it's the numbers, the amount of

money you were getting under the contract?

A I don't remember, sir.

Q And who was this a conversation with?

A John Donahue.

(Pause.)

Q Could you turn to page 79?

A I don't have a 79. Oh, here it is.

Q The middle. The long entry that's dated July 30, '96.

A Pete called me and said for me to call a SA in Chicago. He said that they know this SA Chuck and Pete knew him. I asked Pete about Whity getting the things out of California.

Q Now let me stop you there. Do you know what that means? "I asked Pete about Whity getting the things out of California."

A The money.

Q Okay. That's the money that you were owed under the agreement?

A No. The $30,000.

Q You mean you're talking about a lump sum that was promised you?

A Yeah.

Q Now, when you say the $30,000, just to be clear now, at this point in time, this is July 30, you

did not know what the figure was going to be, right?

A No.

Q Okay. Please continue.

A I asked Pete about Whity getting the things out of California. He said he will immediately call Whity. He said that he would be disappointed if this was not done by tomorrow. He said he will tell Whity about three things in Chicago. He says that he will call Dallas and call me back.

Pete called back and said that he talked to Dallas Alby and told him that he should not provide where I am.

Q What's the word after "he talked to Dallas"? It begins with an *A*. See that? The second to the last line in that entry. Do you know what I'm referring to?

A I'm trying to.

Q Okay.

A He said that he will call Dallas and call me back. Pete called back and said that he talked to Dallas Alby and told him that he should not provide where I am.

Q What was the word again? Alby?

A Well, that's probably an abbreviation for who the SAC was there at the time.

Q But not Jim Adams?
A No.
Q Now, again, I don't want you to guess. You're not sure what that is, right?
A I'm not sure.
Q Okay. And later in the sentence, "and told him that he"?
A Should not provide where I am.
Q Okay. What does that mean?
A I don't know.
Q Could you read the next entry, July 30, '96, page 79?
A Called Chuck and he said to make sure that the money I'm to get from California does not include Florida. He said he will talk to Pete about it and for me to talk to Pete about it. I asked him to talk to Kent about New Orleans, Jax or Oklahoma, Jacksonville or Orlando. Then I could look for D.W., Donald Webb. He said okay, he will ask around. He said that he was going to Washington and he will call me on Friday.
Q Now the reference to New Orleans and Jacksonville and -- what was the last one?
A Orlando.
Q Orlando. Do you know what that's a

reference to?

A Yeah. Go to work there.

Q So you were talking to?

A Chuck Goodwin.

Q Chuck about where you might go to find work?

A Right. Mm-hmm.

Q The first part of that entry, "he said to make sure that the money I'm to get from California" --

A California does not include Florida.

Q What does that mean?

A The money that I was supposed to get from Florida for my storage and the --

Q Now, the money you were supposed to get from California, was that both the lump sum and the payment under the '94 agreement?

A Correct. See, under the '94 agreement, I still thought he was willing to work under that agreement because it was never terminated, and why it was never terminated, it wasn't until 2002, but I was willing to go anywhere they wanted me to go.

Q But none of that panned out, right?

A No, but that's not my fault. My fault was I took their word for it that I would work for them anywhere they wanted me to go. With the knowledge I

have about organized crime and drugs and everything else, I could be the best person they could ever have working.

I worked very hard for them, which you know. You've read what I've done for them. I worked hard, I was honest. Never had no problems with anybody until this contract thing come up. And that's not right. It should not be that way. Who am I going to trust besides them?

Do I go on the other side now? Go back to the other side? That's impossible. You can't do that. And it's a shame that the American people have so much belief in our government and it turns out to be like this. It's a dirty, rotten shame. Who else are you supposed to believe? You don't want to answer that, right?

Q Correct. Could you turn to page 80?

A And what would you like on there?

Q The long entry dated 7/31/96.

A I called Jim Robertson in Chicago and he talked about the SUP I got.

Q Now do you know who Jim Robertson is?

A He's an agent out of Chicago.

Q And what's the SUP?

A The SUP I got. Sums that I got.

Q I'm sorry. My hearing --

A I don't really remember. It was an abbreviation of something.

Q Okay.

A I told him that I don't know what help I will do for them on this case. I told them that if it was the California case, I could help.

Q Now let me stop you there. Do you know what that means? "If it was the California case, I could help."

A Well, he's asking me for help. Jim Robertson is asking me for help on a case in Chicago against Rocky Infelise and some of the other crews that they had.

Q Right. And what's Rocky's last name?

A Infelise.

Q With an *I*?

A No. With an *E*. Enfelise.

Q Do you know how to spell that?

A No, I don't, because I know him as Rocky.

Q Now, the sentence "I told him", is it "that if it was a California case, I could help him"?

A Right.

Q And again, I'm not sure we got to that, what that means.

A The California case was with regards to the San Diego case.
Q Okay. So this is not the reference --
A Because the ones in San Diego, they were Donald Angelini; John DeFonz, who became the boss; Sam Carlisi; and Dominic Cortina, but he got a separate trial.
Q So this is unrelated to the work you did with the Los Angeles division?
A Correct. This is related to the San Diego case.
Q Could you finish reading this entry?
A But I don't want to hurt the case out in California. He said he understood that and he said that he will talk to the ASUSA about what we talked about and get back to Chuck or Pete. I gave him Pete's numbers and he said that he will call them on Monday. I said we should get together soon so I can see where I can help them. He said he thinks that would be a good thing to do.
Q Thank you. Can you turn to page 81?
A Okay.
Q And read the top entry, which is dated August 1, '96?
A I called Pete and he said that he talked to

Chuck the day I talked to Chicago, and he said that he told me that the sum of $28,000 to $30,000 was for California and Florida. I said that's not what I understand. He said he has a call on a bombing and he will call me tomorrow. He said Whity was waiting for California to call him.

Q The reference to a bombing, it just means he was busy on something else? Is that what it was?

A He got a call that he had to leave his office.

Q Right. That had nothing to do with you?

A No.

Q So you're talking to Pete --

A This is Mark. Let's go down here to '96. 8/6/96. Called Mark and we talked about California and Florida. He said it's time for me to get an attorney. You have to look out for yourself. He said he will come --

Q "Call me" is that?

A Call me later.

Q Right. Getting back to the first entry on page 81 where it says -- I'm going to read it from the beginning, because it seems like you're talking to Pete about what Chuck said.

A Right. Yes.