Q It says, "I called Pete and he said that he talked to Chuck the day I talked to," it looks like Chuck, right?
A Chuck. Right.
Q "And he said" or "he say that he told me that the sum of $28,000 to $30,000 was for California and Florida." So am I correct that Chuck Goodwin had a conversation with you and told you that you were going to get paid $28,000 to $30,000 and that was going to be for California and Florida?
A No. It was California only.
Q Well, what does the reference mean and your understanding again?
A That it was for California only.
Q But somebody told you it was for California and Florida, right, and then you said that that was not what you understood?
A I believe it says California, not Florida. That's the way I abbreviate not, Florida.
Q So you think it says $28,000 to $30,000 was for California, not Florida?
A Right.
Q The next sentence says "I said that" --
A That's not what I understood.
Q And why is that not what you understood?

A Because I thought it was going to be more at that time for California.

Q The symbol between California?

A So then you see as you go on, see, you always stop before you go any further. "He said Whity was waiting for California to call him." So that's the sentence where it tells you he's waiting for California where Florida has nothing to do with it. It's just California.

Q I just want to make sure the record is clear. The line on page 81, an entry dated August 1, '96, the fourth line down starts "$28,000 to $30,000 was for Cal," which is abbreviated C-A-L.

A Not Florida.

Q And that symbol between C-A-L and F-L is a not?

A Right.

MR. HEIDEMAN: But it looks like what we would call an ampersand or an and sign.

THE WITNESS: Right.

MR. HEIDEMAN: But is that not the way you do -- show us another example of --

THE WITNESS: Here's another.

MR. SCHWARTZ: Okay.

MR. HEIDEMAN: He's pointing to 8/6/96,

third entry up from the bottom, same page.

Maybe, counsel, you could move to that and inquire. I'm not trying to direct him. I'm trying to make sure we don't have an inadvertent misunderstanding here.

THE WITNESS: Called Mark and we talked about California, not Florida. He said it's time for me to get in with him. You have to look out for yourself. He says he will call me later.

BY MR. SCHWARTZ:

Q How sure are you that that symbol -- now let me again refer to page 81 of Exhibit L. The entry is dated August 1, '96.

A Uh-huh.

Q It's the fourth line of that entry.

A Right.

Q The symbol between Cal and F-L for Florida, how sure are you that that stands for the word not?

A Because not would be too big of a writing for me to put in, so I abbreviate not. That's the way of my abbreviation to understand.

Q So you're positive that that stands for not?

A Yes, sir. And it's the same thing down here through the but when I talked to Mark.

MR. HEIDEMAN: And what do you use then as a

symbol for and, A-N-D, because I think all the lawyers at the table when we write an ampersand and we don't use the squirly curly que ampersand we put something that looks like a cross, but it -- right. And to us, that means and, but you're answering the question that that doesn't mean and, it means not, so can you explain the discrepancy?

THE WITNESS: Right. Well, that's just the way I do it.

BY MR. SCHWARTZ:

Q And you're absolutely sure of that?

A I'm positive. And probably if you go through a lot of this, you're going to see that as not.

(Pause.)

Q Can you turn to page 82?

A Okay.

Q The long entry that's dated August 6, '96?

A I talked to Chuck, and he said that he was doing all he can about the money.

Q Does that say "the money thing"?

A On the money thing.

Q Thing?

A Right. I asked him if Pete was mad at me. He said he talks to Pete every day and Pete is not mad

at me. He said that he's talking to Kent in Washington and --

Q Are you sure that's Kent? Could it be Keith?

A Could be Keith.

Q Okay. But you're not sure?

A No. In Washington. He did not have anything for me, but he will look around. I told Chuck that I talked to Jim Robertson and I told him what was said. He said that he has not heard from Jim Robertson. I told him that Jim said he will call Chuck on Monday, but Chuck said he has not heard from him. I told Chuck that I gave Jim Robertson Pete's phone number.

Chuck said I ought to go into business when I get the money, and then when they need me, they can bring me in on cases. He said he will call me when he hears something.

Q This is a conversation with Chuck Goodwin?

A Right.

Q And he says that you should go into business when you get the money?

A Right.

Q Do you know what money he's talking about?

A Yes. The money from California.

Q Right. "And then when they need me, they can bring me in on cases."
A Right.
Q "They" being the FBI?
A Right.
Q Can you try to read the next entry on page 82?
A I talked to Scottie in California.
Q Let me just stop you. This one, can you tell the date on that one?
A 8/6/96.
Q Thanks.
A I talked to Scottie in California and he said he did not get the money yet. I said -- no. Did I get the money yet? I said no. He said that they dropped Ori and he said that he talked to Lloyd and Lloyd was a sick man. The SACs from New Jersey are coming out next week.
Q Could you keep reading? I think it continues.
A I'm trying to find 83. When you guys took it over there, it got all out of line.
To talk to Lloyd and Pipes on Ori's case. He said he saw Ori and --
Q Is that "the Marshal"?

A Yeah. The Marshal coming out of Frankie's. He said that Marshal is no longer with the Marshal service. He was the Marshal that was driving around, a United States Marshal. He was driving around an organized crime figure -- and Ori was supposed to bring him to California for me to wire him, you know, get him on a conversation about how he was living because his son lives out in California.
[redacted]
Marshal was supposed to be the chauffeur. So we were planning to get him on tape. We had surveillance, 24 hour monitoring. Ori came by himself and said the Marshal would be coming.

Q Was that around the time of this note, or was that when you were still in Los Angeles?

A That's still in Los Angeles.

Q Right. Could you finish reading that one, that entry?

A He said the Marshal is no longer with the Marshal service. He said he will call me when he can. He said that Ori gave him a phony tape. It was Ori talking out --

Q "Only" is that?

A It was Ori talking only. See, I think he tried to get Ori to wire up to meet with this Marshal

and the guy never showed up. He probably was scared. Most people don't like to be wired up. You've got to be a certain type of person to be wired up. It takes a lot of confidence when you're wired up.

Q Right. Could you read on page 83 the first entry dated August 12, '96?

A Pete called and said that he talked to Whity and Whity said that he had --

Q Oh, let me stop you. The entry at the middle of the page. It has 9:40 a.m. next to it.

A Okay.

Q Thank you.

A Called Pete and he said he did not hear from Whity and he will call him and call me back. He said the last time he talked to Whity, he said he was Whity -- he said he was Whity --

Q Is that "waiting"?

A Waiting for California to shit or get off the pot.

Q Meaning that he was waiting for the Los Angeles division to make some kind of a decision?

A Right.

Q And what was that decision about as far as you know?

A I have no idea. Pete called and said that

he talked to Whity and Whity said that he has not heard from California. He said that Parsons left California and that Tim McNally was in for the job. He said that Tim was a friend of his. He said that he will talk to Whity tomorrow and tell him what is going on.

I asked him if he heard from the SA in Chicago and if the subpoena is still in force. He says he will call him tomorrow and see what he has to say. He said he was going to call me tomorrow.

Q Thank you.

A So see, this is something that, Mr. Schwartz, I'm trying to say. See, a lot of people called and they used to call through Chuck or through Pete or John to get me. Then they would have me call these agents in Chicago. They had vacations going on, and they'd pick my brain to see who these people were and who they were connected with, and that's what I did, because I was under contract. I had to do what I was told to do, and I did it. And this is all the way up until '96, and it goes on further.

Q Can you go to page 84?

A I'd hate to be the person that has to put these back together. Eighty-four.

Q The top entry does not have a date. It

doesn't look like it's a continuation of 83, but if you can go ahead and try to read that one? If you can't read it, just --

A No, I can't.

Q Okay. I see a name. It looks like it says Jim or Tim Rose at the end of the first line?

A Ruby.

Q Oh, okay. Ruby. Do you know who that is?

A (Nonverbal response.)

MR. SCHWARTZ: Counsel, this looks like this page got cut off a little bit along the right side.

MR. HEIDEMAN: What's the page number? I'm sorry.

MR. SCHWARTZ: It's Exhibit L, page 84.

MR. HEIDEMAN: So let's agree that we will provide a better copy, and it will become Exhibit M-3.

MR. SCHWARTZ: Okay.

(0xhibit M-3 was reserved for an exhibit to be submitted and received after the hearing concludes.)

MR. HEIDEMAN: And for purposes of ease, with your permission, counsel, we will send those copies simultaneously to you and the court reporter. After you have reviewed it, if it's an acceptable

copy, you could simply let the court reporter and us know that as we transmitted it as Exhibits M-1, M-2, or M-3 or any other ones, they are acceptable for inclusion in the record or you want another better copy.

MR. SCHWARTZ: Okay.

MR. HEIDEMAN: Is that agreeable?

MR. SCHWARTZ: That sounds good.

MR. HEIDEMAN: Thank you, counsel.

MR. SCHWARTZ: I'm going to try to speed it up here a little bit.

THE WITNESS: What time is it?

MR. HEIDEMAN: 3:18. Does anybody need a break? Otherwise, we've agreed to break at 4:00, but does anybody need a break now?

(No response.)

MR. HEIDEMAN: Okay. Thank you.

BY MR. SCHWARTZ:

Q Can you turn to page 84 and read the bottom entry dated August 16, '96?

A Pete called and we talked about his mother-in-law. Said he had talked to Whity about the money and they talked about the $150,000 from Florida. Pete said -- and then there's no more there.

Q Right. If you go to page 85, it looks like

it continues.

A He said Whity and the assistant director under Esposito were going to talk to Espo on Monday and they were going to talk to Espo about California and doing what they said --

Q Does that say "not doing what they said"? "California not doing"?

A Yeah. Not doing what they said they would do and tell Espo about the $150,000. We came to a -- I don't know what that is. $75,000 for everything, and he said that was fair, and he will call Whity and the assistant director under Esposito and then tell what we appear to --

Q Now let me stop you there. This $75,000 for everything, do you remember this discussion?

A Mm-hmm.

Q Is that a yes?

A Yes.

Q Is that a discussion that you had with Pete McCann?

A Mm-hmm.

Q Is that yes?

A Yes.

Q And the two of you, it looks like you came to an agreement between you and Pete that you would

accept $75,000 for everything, is that right?

A Everything. See, you always cut off things. Let's go back. You said about the $150,000.

MR. HEIDEMAN: You're referring again to Exhibit L, 85. Go ahead.

THE WITNESS: Right. About the $150,000. We came to an agreement for $75,000. Half of the $150,000 makes $75,000 in the school I went to for everything, and Pete said that was fair and he will call Whity and the assistant director under Espo and tell them what we agreed to and he would --

BY MR. SCHWARTZ:

Q Is that "recommend"?

A Recommend that we get this done now. He said he will call me after he talks to them and let me know. I asked him if I was to go on to high or too high. He said that he thought it was fair and he was surprised at amount I wanted. Pete said that Chuck told him that I did not have to be -- I don't know what that is.

Q Okay. Now let me -- again, I don't want you to think I'm putting words in your mouth.

A You're not.

Q I'm just asking you the line that says "we came to an agreement to $75,000 for everything."

A Right. But here --
Q Let me ask my question.
A Okay.
Q What was "everything" referring to?
A The $150,000 for Florida.
Q Anything else?
A No.
Q So it did not refer to the monthly payments under the contract?
A No. Nothing. Just half of the $150,000 that I was promised orally it looks like.
Q Can you turn to page 86?
A Eighty-six is not in here.
Q I'm going to hand you mine.
A Okay.
Q If you can read the bottom entry? It looks like it's dated 8/23/96.
A Pete called me back and said that he did not get Whity and that he thinks he talked to Whity AS and gave him his home number and for him to tell Whity to call Pete at home tonight. He said he told Whity about our agreement on the 70 and they all agreed. He said he did not know if it was coming out of California or Miami or Washington, but it should be done he said.

Q Let me stop you there. Is the reference to the 70, is that $70,000 you think?
A Yeah.
Q And was that a figure that you had discussed with Pete?
A The 75, right.
Q Well, yes. Here it says 70.
A Seventy. Right. So it's just instead of him saying 75 he said 70.
Q And is it your recollection that that was going to be just to cover the $150,000 lump sum from Miami?
A Yes, sir.
Q If you look at the following part, he says he didn't know if it was going to come from California.
A Right. Or Miami or Washington.
Q Right. Now do you have any idea why payment for the lump sum from Miami would be paid out of California?
A I have no idea.
Q That doesn't make you think that you were talking about settling everything?
A No. I never was going to settle for $75,000 for everything. No possible way.

Q Could you continue where you left off?

A But it should be done. He said that the only thing that he thinks can be holding it up is the money owed in Miami. He said he will call me tomorrow after he talks to Whity. He said that Whity is no -- whatever. From there, I can't read.

MR. SCHWARTZ: Thank you.

MR. HEIDEMAN: Counsel, since it's almost 3:30, I just wanted to raise one question.

MR. SCHWARTZ: Okay.

MR. HEIDEMAN: You're welcome to continue going as you are. But if there are any issues, questions that you intended to raise in this deposition, wanted to raise in this deposition that related to any aspect of this case other than that which arises out of the Group Exhibit L document that we tendered to you this morning, if there are any other such questions, if you would kindly before we recess today address those so that what may be reserved in accordance with what we said earlier in the deposition would be questions that relate to or arise from the Group Exhibit L document? That is our request and would be appreciated.

MR. SCHWARTZ: Okay. Your request is noted, but it's hard to separate out the two because the

notes obviously relate to the issues that we discussed earlier and are shedding more light on it, so I'll try to do that, but, you know, there's not a fine definition, a fine dividing line between the two.

MR. HEIDEMAN: And I agree that there's not. I'm simply saying you clearly have come to the deposition well prepared to cover all kinds of things. I'm hoping that before we recess today you will have covered all of those things and then perhaps leave for any post-recess resumption by telephone or written depositions or otherwise issues that arise out of the documents without intending to preclude you from addressing the substance of what's in the documents.

I hope my point is clear, and I thank you for your courtesy in trying to get out of the way all of the other preprepared questions if at all possible.

THE WITNESS: I need to take a couple minutes break.

MR. HEIDEMAN: All right. Thank you. We are in a five-minute recess.

(Whereupon, a short recess was taken.)

BY MR. SCHWARTZ:

Q Okay. Because we're short on time, can you turn to page 132 of Exhibit L?

A You mean that first one or second one?

Q Okay. Actually, let me ask you to turn to page 128 first.
A Okay.
Q And there's an entry. The big entry.
A Whity called?
Q Right. That's dated 10/28/96.
A Whity called with another agent on the line. I don't remember his name. They talked about the California contract, and they didn't believe the contract is in force because I am --
Q Is it "actually"?
A Actually not doing anything for the Bureau, Federal Government, but they asked me what my expenses were here. I said approximately $2,000, and they said they will -- that they will --
Q "That they said well, how about"?
A Said well, what about $2,000 a month for eight months, which comes to $16,000, and I said no, I am not going for that. As far as I am concerned, the contract is still in force until I receive something in writing because that is what the contract says. I said a contract is a contract. As far as I am concerned, I am owed $32,000 on the contract, which is less than what the contract reads. They kept pushing the $2,000 per month, and I said okay, if you want to

go with $2,000, what is the lump sum going to be? They say that they don't know that it's --

Q Is it "they said they don't know that"?

A Right. That's what I said I think.

Q Go ahead, please.

A Now we've got to go to 29?

Q Right.

A Up to the people --

Q I don't know if you read the last part of the bottom of 128. Looks like it says "It is strictly."

A It is strictly up to the people they work for. I told them I got $25,000 from Maryland. They said okay, how about if we settle for $25,000? I said no, I would not settle for that. They asked what I would settle for. I said $40,000. That is $32,000 for the contract, $8,000 lump sum. They said they didn't know if that could be done -- that could --

Q "If they could"?

A If they could do that, but they would bring it upstairs and see what they say. They asked me about the Florida thing. I told them about the $150,000 I was promised plus also the storage, loss of the storage. I explained all about the money problems in Florida and the promise that was made about the

Bureau taking care of the storage.

The other agent on the line asked me how much I would take for all three things. I said I would have to think about that and talk it over with my family. I said let's get the California thing done first, then we can work on the Florida thing. Whity said that was like an alternative investigation in Florida.

I told them who all knew about this. They asked the attorney's name and I told them. They asked who was with me when I was told, and I told them it was Special Agent Malynda Irby. They said let's find out about the storage thing like three months ago. I asked them when I would have a answer on this California thing. They said they or Pete McCann will call me by noon tomorrow.

The conversation then got very heated because they constantly were saying that I did not do anything for the last months for the government. As far as they were concerned, if you don't work, you don't get paid. I told them that I know who told them because they knew there is a disagreement between California and me.

I know they told you that I had a verbal cancellation of the contract. However, I said that is

an outright lie and would be willing for me and the agent likewise taking a lie detector test, and if I fail, they wouldn't have to pay me. If he fails, then he gets fired. They said wait a minute. We don't have to go that far. We have your word.

Q Is it "We took your word"?

A We have your word and we know all the good you have done for the Bureau, and you should keep in good standing with the Bureau. They mentioned if I considered going into the witness protection program, they would give you a new ID and give you a job. I said I never had that thought and never would have that thought. They kept saying you want to stay in good graces because we might have some work for you. Whity said that sometimes people understand what they are doing, are told.

Q Can you go now to 132?

A I think I want to get a photocopy of this. I think I want to get a book. I'm going to have somebody write me a book so I can send you a book.

Q Can you look at the bottom entry? It says 11/1.

A 11/1. Pete called and said he talked to Whity and there is an offer for $30,000. He thinks you should take it because that is the final and only

offer, and if I don't receive it --

Q Is that "accept it"?

A Accept it I can get in line with all the others and sue for it. This is for L.A. only. He said he could call Whity and tell him our conversation, sign off, and I will have a check in hand. Pete thought the amount was low but said your back is against the wall and you will have no other choice but to sue.

Whity is supposed to call me when the check will be cut, when I should have it in hand. Pete says he will call and discuss this with Chuck and that if Pete has another option, he'll call and let me know. He said he will call me later anyway. He has two calls in for Prillamen.

Q Do you know who Prillamen is?

A He was the deputy director.

Q And this is a conversation you had with Pete McCann?

A That's correct.

Q And he had talked to Whity, and Whity was Clyde Merryman, correct?

A Right.

Q And Clyde Merryman was an FBI official at FBI headquarters?

A He was assigned to this case by Esposito.

MR. HEIDEMAN: When it says "L.A. only", what does that mean?

THE WITNESS: $30,000.

MR. HEIDEMAN: For what?

THE WITNESS: For the lump sum. For me to leave. $30,000.

MR. HEIDEMAN: What do you mean, "leave"? You mean going to Dallas?

THE WITNESS: Yeah.

BY MR. SCHWARTZ:

Q If you look back, Mr. Patton --

A Pete called and said he talked to Whity and their offer is $30,000.

Q Just so the record is clear, when there's a reference to L.A. in these notes that you've just read, that refers to your claim about not having received your monthly payment under the 1994 agreement and the lump sum you say you were promised, correct?

A No. It's just the lump sum I was promised.

Q Well, let me put it this way. The reference to L.A. does not include the $150,000 lump sum you said that Miami had promised you, nor does it refer to your personal property claim, correct?

A Right.

Q And if you go back to page 129, which you read a minute or two ago?

A Yeah. What about it?

Q There's a discussion. It says fourth line down, "They asked what I would settle for. I said $40,000. That is $32,000 for the contract and $8,000 lump sum." Do you see that?

A Mm-hmm.

Q Is that a yes?

A Yes.

Q And this is a note of conversation that you had on October 28, 1996?

A Right.

MR. HEIDEMAN: What was that settlement for if you were willing to settle?

THE WITNESS: Just for the money coming from, you know, the money I was promised from Mike Wacks to me to go on to the same case where the cases were over. The contract wasn't over, so it had nothing to do with the contract. The contract was still in force.

BY MR. SCHWARTZ:

Q Mr. Patton, referring again to that entry on page 129 where you said "I said $40,000. That is $32,000 for the contract and $8,000 lump sum," the

contract you're referring to is the 1994 agreement with the Los Angeles division, correct?

A No.

Q Okay. Then what is that contract?

A It's been so far long ago I can't remember that. It had nothing to do with this contract.

Q That's your sworn testimony is that the reference to the contract you're positive is not the 1994 agreement with the Los Angeles division?

A You're correct.

Q And you don't know what contract this is talking about?

MR. HEIDEMAN: Excuse me. You said with the Los Angeles division. You mean the whole contract or the work that was done in Los Angeles?

MR. SCHWARTZ: Thank you.

MR. HEIDEMAN: I think that's the confusing issue.

MR. SCHWARTZ: I appreciate your pointing that out.

BY MR. SCHWARTZ:

Q You're saying that the reference to $32,000 for the contract is not the 1994 agreement that's Exhibit B?

A No. It's not for our contract, but I