include 202. This is '74.

Q So it's not for that contract that's Exhibit B?

A No.

Q But you don't know what contract it's for?

A I don't believe it was meant for a contract. I believe it was meant for the lump sum that they owed me for leaving there after the work was done.

Q Well, your notes do distinguish between the contract and the lump sum, correct?

A Yeah. You're right.

Q And if you go back to page 128, which is the earlier part of that --

A $75,000. That's as to the $150,000. I settled for half of that.

Q If you'd go back to page 128? Do you have that handy?

A 128. What?

Q If you look at the beginning of that long entry dated 10/28/96?

A Mm-hmm. Right.

Q Second line. They talked about the California contract.

A Mm-hmm.

Q That is Exhibit B, isn't it?

A I guess it is. They talked about the California contract. They didn't believe the contract is in force is what they're saying. They're not saying about any money about it.

Q Right.

A They're just saying they don't believe it's in force, and my position was it's still in force until I get something in writing stating that it's not in force.

Q Now, if you look at a couple of lines down there, it says, "But they asked me what my expenses were here, and I said approximately $2,000" --

A Right.

Q -- "and they said well, how about $2,000 a month for eight months, which comes to $16,000."

A Right.

Q Now the eight months --

A And I said no.

Q You said no. Do you know where they came up with eight months from?

A I have no idea.

Q Well, I think we established earlier that the last payment you had received under the 1994 agreement was in February of '96?

A Right.

Q So if you count from February of '96 to the date of this conversation, October 28, '96 --

A That's six months. You're talking six months.

Q Well, if we count --

A From two to 10 is six months, right?

Q Two to 10 is eight months, isn't it?

A Yeah. Two to 10 is eight months.

Q Right. So you were talking about the 1994 agreement when you proposed that you would get $2,000 a month under the agreement as part of the settlement, correct?

A No. If you see what I say in here, I said no, I will not agree with that.

Q Well, correct. They had proposed that, correct?

A Right.

Q Okay. They had proposed that they would pay you $2,000 a month under the --

A Yes. But this was for --

Q Let me finish.

A No, but wait a minute. Let me say something, too. You stop at a sentence and then you don't want to go no further. I said no, I am not going for that. As far as I am concerned, the

contract is still in force until I receive something in writing because that is what the contract says. I said a contract is a contract.

As far as I am concerned, I am owed $32,000 on the contract, which is less than what the contract reads. They kept pushing $2,000 per month, and I said okay, if you want to go with the $2,000, what is the lump sum going to be? They said they don't know that.

Q And you said I am owed $32,000. That would be eight months times $4,000 a month, right?

A Right.

Q and you used the $4,000 figure because that was the services figure, right?

A Correct.

Q You weren't claiming that you should be paid expenses, the expenses part, correct?

A That is right. At that time, because I was planning not to go into a suit. I was trying to negotiate with them. Esposito tried as hard as he can and he couldn't get no further up. And that's when they all told me I better get a lawyer and just go do what I got to do, which you will read in many of the letters.

Q And now getting back to page 132 of Exhibit L.

A What about it?
Q You're still sure that when it says Pete called -- and this is --
A Right.
Q -- the November 1 entry.
A And offered $30,000.
Q And he thinks you should take it, that that $30,000 was for --
A That's what I got.
Q Let me figure --
A The lump sum.
Q Right. Let me finish. That was for the monthly amount that you were claiming under the contract plus the lump sum?
A No. No. It was the $30,000 that I got from leaving California, and that's what we finally agreed to, the $30,000, and that's what I got, $30,000.
Q Can you go to page 133?
A Yeah. What about it? I got it.
Q The entry that starts in the middle of the page, November 1, '95. Can you read that?
A Yeah. It says, "Whity called and said he understood that I agreed about the $30,000." That's what we were talking about. "I said yes, I guess that's the only thing I could do. He admitted that

California made a big mistake, but who is to know if you would have gotten this much of the lump sum?

"Maybe if you went another route you might get more, but who knows how long that could take? I told him that I still wanted to stay friends with the Bureau and would still be open to working with them. I mentioned New Orleans, and he said that might be good place for you. He said he will go upstairs because Prillamen leaves early on Friday and he wants to get this done.

"He will find out exactly when I will receive my money. After he finds out, he will call Pete and he will give us a date. He said they will try to put" -- then it goes on to the next page.

Q Do you have that next page?

A I'm going to look for it. "Have some work for you. Whity said that sometimes people misunderstand what they are told."

Q Was that page 134 you were reading from?

A 131. I should go to 132, right?

Q No. You should go to 134.

A 134?

Q Right. Because I think the last part you read --

A All things together, but he --

Q Let me just stop you for a second. I think the last part you read was from page 131.

A Can only make all things together, but he stayed in and said let's get this done first and then go on with the Florida thing. He said I have to pat myself on the back for that because you never know how long that would take.

Q Now you weren't very happy with the $30,000, correct?

A With what $30,000? That I got from California?

Q Correct.

A No, I wasn't happy with it. When I got 25 from Annapolis, I should have got 100 from them for all the work I did out there.

MR. HEIDEMAN: Counsel, we're at 4:00. I'm not trying to cut you off. If you have a few more minutes of important relevant things that need to be done today since we may never reconvene, please do them now if you can.

MR. SCHWARTZ: Okay. We'll stop now, because I don't want the witness to rush. You know, we hadn't finished going through it, but I'll go through it and we'll wait for --

MS. MOORE: The copies.

MR. SCHWARTZ: -- the copies. So we'll end the deposition for now and reserve the right to continue it at a later time if necessary.

(Whereupon, in the presence of counsel, reading and signature were waived. At 4:00 p.m, the deposition was adjourned, to reconvene sine die.)

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

I have read the foregoing pages 1 through 208, and they are a true and accurate record of my testimony therein recorded, and any changes and/or corrections appear on the attached errata sheet signed by me.

_______________________________________

THOMAS PATTON

Subscribed and sworn to before me

this _____ day of ___________, 200_

____________________________________

Notary Public

My Commission expires: ___________________________

JURISDICTION: United States Dept of Justice

Before me, the undersigned authority, personally appeared Thomas Patton who, after being duly sworn states that he/she has read the foregoing deposition transcript, and states that he/she wishes to make the following changes or corrections to this transcript for the following reasons:

PAGE LINE CHANGEREASON FOR CHANGE

The witness states that the deposition transcript, pages 1 through 208, is otherwise true and accurate.

Thomas Patton

SWORN AND SUBSCRIBED before me on the ______ day of ___________, A.D. 19__.

Notary Public

My Commission Expires: __________________

CERTIFICATE OF COURT REPORTER/NOTARY PUBLIC

I, Bernadette Herboso, the officer before whom the foregoing testimony was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me and thereafter reduced to typewriting; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto; nor am I financially or otherwise interested in the outcome of the action.

____________________________

Court Reporter/Notary Public

My Commission Expires: 11/14/2008