# In the United States Court of Federal Claims

No. 01-161 C
Filed December 6, 2006
TO BE PUBLISHED

| | |
|---|---|
| THOMAS PATTON,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Contract to serve as cooperating witness for FBI, breach of contract, termination, objective intent to abandon, clause requiring termination of contract to be in writing |

Richard D. Heideman, Heideman, Nudelman, and Kalik, P.C., Washington, D.C. for plaintiff.

Lauren S. Moore, Trial Attorney, Kathryn A. Bleecker, Assistant Director, David M. Cohen, Director, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C. for defendant. Ted G. Schwartz, Assistant General Counsel, Department of Justice, Federal Bureau of Investigation, of counsel.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

This breach-of-contract matter is before the Court following a four-day trial held in Washington, D.C. Rule 52(a) of the Rules of the United States Court of Federal Claims ("RCFC") governs "actions tried upon the facts," and provides that findings of fact may be "based on oral or documentary evidence . . . and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witness." RCFC 52(a). In order to determine the facts surrounding the termination of plaintiff's contract by the Federal Bureau of Investigation (the "FBI"), the Court heard testimony from nine witnesses who were familiar with the plaintiff's service to the FBI, the procedures of the FBI relating to cooperating witnesses ("CWs"), or both. The witnesses included plaintiff Thomas J. Patton and his wife Ruth Patton; retired Special Agents ("SAs") John F. Donohue, Peter McCann, Lawrence Sandri, and Michael Wacks; Charles

Goodwin, SA in Charge of the Honolulu, Hawaii office of the FBI; Supervisory SA Stephen L. Morris; and Neil Divers, Unit Chief, Informant Unit (retired).

## *BACKGROUND*

### I. Procedural History

In his initial complaint, plaintiff asserted three claims against the FBI for breach of contract. Plaintiff alleged that the FBI breached (1) a 1990 oral contract in which it promised to pay plaintiff a $150,000 bonus for his work in Miami, (2) a 1990 implied-in-fact contract in which it promised to take over the payment of rental fees on plaintiff's leased storage unit in Florida, and (3) a 1994 personal services contract (the "1994 Contract").

Judge Bodhan A. Futey dismissed the claim for $150,000 under the alleged 1990 oral contract on February 12, 2002, finding that the statute of limitations as to that claim had run. *Patton v. United States*, No. 01-161C, slip op., at 8 (Fed. Cl. Feb. 12, 2002) (docket entry 24). The case was transferred to the undersigned on September 9, 2004. This Court dismissed plaintiff's claim for breach of the alleged implied-in-fact contract as it related to payment of the storage fees, finding that the statute of limitations as to that claim had also run. *Patton v. United States*, 64 Fed. Cl. 768 (2005). This Court conducted a trial from October 16–19, 2006, in Washington, D.C., on plaintiff's claim that the FBI breached the 1994 Contract.

### II. Facts[1]

In 1989, a group of individuals, including plaintiff, was indicted on charges that included loan sharking, extortion, and money laundering. Defendant's Exhibit admitted at trial ("DX") 2 ¶ 1; Trial Transcript ("Tr.") at 212:12–16. In 1987, plaintiff had been shot nine times while getting out of his car in front of his house, *id.* at 212:19–213:1, and had been indicted in Florida. *Id.* at 213:4–8. Plaintiff testified that, after the 1989 federal indictment, "things were just getting bigger and bigger, and I was getting information I was going to be indicted in many more states around the country, so I sat down and talked to my family." *Id.* at 214:17–20. Plaintiff decided not to enter the witness protection program because it would require him to terminate all contact with his family, *id.* at 215:1–12, and so he decided to work for the FBI as a CW.[2] *Id.* at

---

[1] This recitation of facts constitutes the Court's principal findings of fact in accord with RCFC 52(a). Other findings of fact and rulings on questions of mixed fact and law are set out in the Analysis section at pages 8–15, *infra*.

[2] A CW agrees to testify on behalf of the Government, and works for the FBI under contract (whether written or not) to do so, whereas an informant delivers and is paid for information, but may not testify for the Government. Tr. at 58:20–59:1. The distinction was important to plaintiff—he was proud to be a CW, but unwilling to work as an informant. *Id.* at 842:6–9.

214:21–23. On March 23, 1990, plaintiff entered into a plea agreement with the United States, under which he pleaded guilty to "the collection of an extension of credit by extortionate means." DX 2 ¶ 1(A). That same year, plaintiff began working for the Miami office of the FBI as a CW. *Id.* at 212:7–9.

Plaintiff worked for the FBI without a written contract until the end of May 1991, when he signed an agreement (the "1991 Contract") with the FBI. Plaintiff's Exhibit admitted at trial ("PX") 9. Under the 1991 Contract, plaintiff agreed to cooperate with the FBI in an investigation regarding "Interstate Transportation of Stolen Property, Racketeering, Loan Sharking, the operation of an Illegal Gambling Business, Obstruction of Justice and other violations of Federal Law." *Id.* at 1. In return for his cooperation and testimony, the FBI agreed to pay plaintiff $3,000 per month. *Id.* § 2. The 1991 Contract was to continue until September 30, 1991, but could be renewed "upon the written agreement of the parties." *Id.* § 12. It could also be terminated by either party "by deliverance of written notice to terminate." *Id.*

The FBI assisted in moving plaintiff from Florida to Maryland in September 1991, Tr. at 157:9, in part because of threats against him in Florida, *id.* at 64:25–65:2, and in part to assist SA Goodwin and the Annapolis office of the Baltimore division of the FBI in investigating an organized crime case involving money laundering through pizza parlors and bingo halls. *Id.* at 65:22–23, 70:12–16. SA Richard Leahy had been plaintiff's contracting officer[3] in Florida, *id.* at 81:22–82:3; upon moving to the Annapolis office, SA Goodwin became plaintiff's contracting officer. *Id.* at 58:5. When SA Goodwin was transferred to the Washington, D.C. office, plaintiff was reassigned to SA George Chmiel. *Id.* at 72:7–8. Plaintiff continued to work under the 1991 Contract in Annapolis, receiving $3,000 per month,[4] even after September 30, 1991. *Id.* at 82:10. The FBI always paid plaintiff in cash, and he signed a receipt for each payment. *Id.* at 281:22. The parties did not sign a written extension of the 1991 Contract, *id.* at 87:15–88:10, 283:16–21, but plaintiff continued to work as a CW without any diminution in the quality of his work. *Id.* at 89:13.

While working for the Annapolis office, plaintiff assisted two other FBI offices with investigations, but continued to receive his monthly compensation from the Baltimore division.[5]

---

[3]A CW's contracting officer is the agent responsible for making payments to the CW. Tr. at 1107:21–22.

[4] After plaintiff suffered a heart attack, his monthly compensation was raised to $3,300 per month, Tr. at 252:1–3, although no addendum to the 1991 Contract was ever signed. *Id.* at 260:22, 25.

[5] Although the FBI is "one governmental agency," Tr. at 375:17–19, each office operates with, and must account for, its own budget. For example, the $30,000 lump sum that was paid to plaintiff in November 1996 (*see* page 5 *infra*) was charged against the CW budget of the Dallas office, although the payment related to plaintiff's service to the Los Angeles office. In order to

*Id.* at 263:22. The FBI informed plaintiff on July 29, 1993, that it was terminating the 1991 Contract, PX 10, and on August 10, 1993, plaintiff received a letter confirming the termination of the 1991 Contract, *id.*, and a $25,000 bonus payment for which he signed a receipt.[6] PX 11. The bonus payment was in addition to amounts paid to plaintiff on a monthly basis under the 1991 Contract. Tr. at 113:23–114:7. Of the bonus, $10,000 came from the Baltimore office, $10,000 from the San Diego office, and $5,000 from a third office. Tr. at 115:2–12.

When the 1991 Contract was terminated, plaintiff and his wife moved to Gainesville, Florida. *Id.* at 158:21–23. Thereafter, the Los Angeles division of the FBI expressed interest in working with plaintiff, and he and his wife moved to Marina del Rey, California. *Id.* at 159:13, 816:2. Plaintiff began working as a CW in the Los Angeles office prior to signing a new contract, *id.* at 816:19–817:1, but signed the 1994 Contract on November 11, 1994, to "provide the FBI with information concerning criminal activity on the part of the La Cosa Nostra (LCN) and Drug Trafficking and Money Laundering Organizations." Joint Exhibit admitted at trial ("JX") 1, at 1. In return, the FBI was to pay plaintiff $4,000 per month, as well as additional amounts for certain of plaintiff's expenses, including a rental car, auto insurance, an apartment, utilities, furniture rental, and entertainment expenses. *Id.* § 2. Plaintiff paid for some of the covered expenses himself, the FBI reimbursing him in cash, while the FBI paid other expenses directly. Together, plaintiff's compensation, the expenses reimbursed by the FBI, and the expenses paid directly by the FBI summed to $7,250 per month under the 1994 Contract. The 1994 Contract was to continue in force as long as the FBI felt it needed plaintiff's services and, although it did not specify a termination date, could be "terminated at any time by either party by deliverance of a written notice to terminate." *Id.* § 14.

In Los Angeles, plaintiff worked undercover with SA Scott Garriola, Tr. at 1109:19–20, posing as a "jewelry thief and fence with organized crime connections throughout the United States." DX 7, at 150–51. While in Los Angeles, plaintiff investigated Joseph Denti and the Genovese family with respect to criminal activities involving child pornography, stolen property,

---

permit the Dallas office to make the $30,000 payment, its fiscal year 1997 budget was increased by $30,000. DX 8, at 1.

[6] The receipt stated:

> I, Thomas J. Patton, have been advised that the lump sum payment of $25,000 represents a full and final settlement for services rendered. I fully understand that such compensation must be reported as income when filing my Federal income tax forms or other appropriate tax forms. Additionally, I understand that the compensation should be listed as income from other source [sic] for personal services rendered through a private enterprise or similar general term applicable to my position and station in life.

PX 11.

money laundering, and drug-running. Tr. at 821:4–19. SA Michael Wacks was plaintiff's contracting officer in the Los Angeles office. *Id.* at 1107:18. Beginning in October 1995, SA Wacks began to tell plaintiff that the 1994 Contract would be terminated in or around February 1996. *Id.* at 1109:10–11. He gave plaintiff four months' notice because, in his experience, CWs generally "put everything off until the last minute, and I was afraid that Tommy would do the same thing, and that he would find himself out on the street because we were going to take away his apartment, his car and everything that was given to him under the contract." *Id.* at 1112:3–7.

The Los Angeles office asked plaintiff where he wanted to go after the California investigation ended. *Id.* at 911:23, 1116:17–24. Plaintiff had a sister in Texas, *id.* at 912:4, so, sometime in the beginning or middle of January 1996, he drove the rental car provided him by the FBI to Dallas, Texas, to try to find a place to live. *Id.* at 835:14–22. After he found housing in Garland, Texas (near Dallas), he returned to finish his work in Los Angeles. *Id.* at 835:22–836:10. In mid-February, plaintiff turned the rental car over to SA Garriola, *id.* at 836:22, and the FBI paid for plaintiff and his wife to move to Texas. *Id.* at 827:5. At that point, the FBI made what it believed to be its final monthly payment to plaintiff under the 1994 Contract and thereafter stopped paying his expenses. *Id.* at 837:8–9, 838:20–22.

Although the Dallas office did not offer plaintiff a new CW contract, he was offered work on a cash-on-delivery basis, which would have effectively changed his status from CW to informant. Plaintiff testified that he refused because "I'm not a stool pigeon. I don't do that kind of work." *Id.* at 842:6–9.

Between January and March 1996, SA Goodwin informed SA McCann that plaintiff had seen Donald Eugene Webb, a fugitive on the FBI's Ten Most Wanted list, in South Florida, and had information that could potentially help in the FBI's search for Webb. *Id.* at 369:4–11, 373:22–25. SAs McCann and Fred Roberson flew to Dallas in March 1996, *id.* at 368:6–17, where they met and, over two or three days, debriefed plaintiff in a hotel in the Dallas area. *Id.* at 382:17, 387:8. Plaintiff indicated to SA McCann that he was still under contract with the FBI, *id.* at 380:24–381:1, and that he had photographs of himself with Webb in storage in Florida. *Id.* at 390:25. In addition, he had turned over to SA Leahy of the Miami office his phone book which had contact information for a number of Webb's associates. *Id.* at 389:14–17, 391:5. Plaintiff told SA McCann that he was willing to work with the FBI on the Webb matter, and even volunteered to relocate to Florida. *Id.* at 402:13.

When SA McCann contacted SA Leahy about plaintiff's phone book, he was informed that it had been destroyed. *Id.* at 392:16. Further, when Jeff Favitta of the FBI went to Miami to retrieve the photographs of Webb from plaintiff's household goods in storage, he learned that plaintiff's belongings were gone, and the photographs had been destroyed. *Id.* at 395:18–21. When plaintiff heard that his belongings were gone, he was disheartened, *id.* at 531:11–12, and started to complain about the FBI's responsibility for the loss of his goods in storage, about the fact that the FBI had not paid him the $150,000 bonus he felt it had promised him at the termination of his Florida work, and about the fact that he had not been paid under the 1994 Contract since February 1996. *Id.* at 447:4–17. He began to negotiate with the FBI for

compensation, largely through SA McCann, who acted as a middleman in plaintiff's negotiations. *Id.* at 446:25–447:1. During the period in which he was negotiating with the FBI, plaintiff continually complained about the fact that payments under the 1994 Contract had ceased, that he was owed $150,000 from Florida, and that he was entitled to be compensated for his lost property. *Id.* at 448:13–15.

In the meantime, in approximately May 1996, plaintiff was paid $2,500 for the information he had supplied to the FBI regarding Webb. *Id.* at 452:9–10. Although he and SA McCann both assumed that plaintiff would help in the FBI's investigation of Webb, Tr. at 398:17–399:13, after discovering that the photographs and phone book were gone, the FBI did not call on plaintiff for further assistance in that investigation.

After several months of negotiation, the FBI agreed to pay plaintiff a lump sum of $30,000 as "his final payment for all the California operation." *Id.* at 422:2–3. Plaintiff accepted the money, believing that it was the best and final offer the FBI would make, and that, if he did not accept it, he could "get in line with all the others [and] sue for it." JX 3, at Patton 000132; *see also id.* at Patton 000134. It is uncontroverted that the $30,000 payment was related solely to his work in California, and not to plaintiff's complaints about the $150,000 Florida bonus or his lost personal possessions.

The Dallas office received an email from FBI headquarters informing it of the agreement and telling it to deliver the $30,000 payment to plaintiff. Tr. at 710:23–24. In addition, SA Wacks had heard that plaintiff was complaining that he had never received a written notice of termination of the 1994 Contract, so SA Wacks called the Dallas office and requested that plaintiff be given a written confirmation that this was his final payment on the 1994 Contract.[7] Tr. at 1126:5–14. On November 14, 1996, SA Lawrence Sandri and SA Keith Jescavage delivered $30,000 in cash to plaintiff at his apartment. *Id.* at 714:1–5, 716:2. Plaintiff signed a receipt, *id.* at 716:5, acknowledging "receipt of $30,000.00, which represents full and final payment for services rendered." JX 2. Upon being told that "the lump sum payment represents a full and final payment for services rendered," plaintiff said that, in his opinion, "this payment was for services provided to the 'California Investigation[.]'" DX 9.

In late 1996, plaintiff moved to Niceville, Florida. Tr. at 172:23–25. In August 1997, SA Morris and Supervisory SA Clyde Merryman met with plaintiff in Florida to discuss his complaints regarding the lost storage and the unpaid bonus. JX 8, at 1. During that meeting, neither plaintiff nor the FBI agents mentioned the 1994 Contract. Tr. at 773:1–10.

---

[7] SA Wacks testified that he did not believe that the 1994 Contract needed to be terminated in writing, and, furthermore, he considered it rude and unhelpful to the CW to issue a termination of the CW's contract in writing. Tr. at 1108:25–1109:4. After deciding that plaintiff should be given written notice of termination, however, SA Wacks made no attempt to confirm that written notice of termination had in fact been given plaintiff, or in what form it had been given. Tr. 1139:19–20.

Even after the payment of the $30,000, plaintiff stayed in contact by telephone with several active and retired FBI agents with whom he had worked. *See generally* JX 3; PX 12. Some of the calls were social, some related to his complaints about the unpaid bonus and the loss of his personal possessions, and some related to work he suggested he could do for the FBI. Tr. at 923:19–924:1, 1026:17–21; *see generally* JX 3.

On October 7, 1998, plaintiff, through counsel, submitted an informal request to the FBI, seeking damages for the loss of his stored property, the $150,000 bonus, and amounts allegedly due and owing since February 1996 under the 1994 Contract. JX 5.

In 1999 at a bar near Destin, Florida, plaintiff overheard a conversation among what appeared to him to be organized crime figures. Based on what he heard, he believed that they were planning the murder of FBI agent Joseph Pistone; he reported the conversation to SA Donohue, who was concerned that plaintiff's information might be true. SA Donohue alerted agents he knew in the Tampa office, and eventually plaintiff flew to Baltimore, where he was met by FBI agents at a hotel near Baltimore/Washington International Airport. Tr. at 123:9–124:10. Plaintiff indicated that he was willing to work for the FBI, *id.* at 124:25, and was asked if he would be willing to take a polygraph exam. *Id.* at 125:3. Initially plaintiff was amenable, but SA Donohue advised him that the FBI's request was insulting and he should refuse, so he refused to take the polygraph. *Id.* at 125:10–126:6. The FBI chose not to use his services, but reimbursed him for the cost of his airfare to and lodging in Baltimore. *Id.* at 124:17–19.

Later that year, plaintiff moved to the city in which he currently resides.[8] *Id.* at 176:4–5. Plaintiff filed this suit on March 22, 2001. Compl. (docket entry 1). In spite of the pending suit, in November 2001, SA Goodwin emailed plaintiff a picture of William "Cherry Nose" Brown, *id.* at 588:7–16; PX 14, though "whether or not Chicago called me and I called Mr. Patton or Mr. Patton called me, I cannot recall," Tr. at 589:20–22. Plaintiff began searching for Brown, and at one point reported that he had seen Brown driving a green El Dorado, although SA Goodwin testified that he was unsure whether plaintiff had actually seen the fugitive or was mistaken. *Id.* at 592:18–593:5. Brown was arrested in another part of the country in early 2002. *Id.* at 593:14–16. On July 24, 2002, the FBI sent plaintiff a letter stating, "While it remains the government's position that it is legally and factually unnecessary to do so, we are sending this letter to confirm that the [1994 Contract] has been terminated." PX 15.

---

[8] Fearing reprisal for his work with the FBI and the testimony he has given against various organized crime figures, the plaintiff requested that his current residence not be placed on the public record. The Court granted his request, and will not indicate the city or state in which he currently resides.

***DISCUSSION***

**I. Jurisdiction**

Pursuant to the Tucker Act, the Court of Federal Claims has jurisdiction to render judgment upon "any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including a dispute concerning termination of a contract." 28 U.S.C. § 1491(a)(2) (2000); *Alliant Techsystems, Inc. v. United States,* 178 F.3d 1260, 1264 (Fed. Cir. 1999); *Remediation Constructors, Inc. v. United States*, 68 Fed. Cl. 162, 164–65 (2005); *CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 579 (2004), *aff'd*, 163 Fed. Appx. 853 (Fed. Cir. 2005). A prerequisite to such jurisdiction is the submission of a claim to the contracting officer and a final decision by the contracting officer on that claim. *Alliant Techsystems*, 178 F.3d at 1264; *Info. Sys. & Networks Corp. v. United States*, 68 Fed. Cl. 336, 341 (2005).

On July 14, 1999, plaintiff submitted a formal written claim to contracting officer Jack R. Cordes, Jr., certified pursuant to Federal Acquisition Regulation, 48 C.F.R. § 33.207 (1999) as promulgated under the Contract Disputes Act of 1978 (the "CDA"), Pub. L. No. 95-563, 92 Stat. 2383 (codified as amended at 41 U.S.C. §§ 601-613 (2000)), seeking compensation for breach of the 1994 Contract. JX 6; Compl. ¶ 10. The contracting officer failed to issue a decision. Compl. ¶ 11. Failure by a contracting officer to issue a decision or notify a contractor when the decision will be issued within 60 days of receipt of a certified claim "will be deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the appeal or suit on the claim as otherwise provided in this Act." 41 U.S.C. § 605(c)(2), (3), (5).

Under the CDA, a contractor may appeal the decision of the contracting officer to the United States Court of Federal Claims. *Id.* § 609(a)(1). The appeal "shall be filed within twelve months from the date of the receipt by the contractor of the decision of the contracting officer concerning the claim." *Id.* § 609(a)(3). The Court of Appeals for the Federal Circuit has held that because the limitations period begins to run upon *receipt* of a decision, the limitations period is only triggered by a written decision, not by a deemed denial. *Pathman Constr. Co. v. United States*, 817 F.2d 1573, 1576 (Fed. Cir. 1987). Congress designed the "deemed denied" provision of the CDA "to enable the contractor to obtain a judicial determination of its claim . . . without awaiting the decision of a contracting officer who has failed to render a decision within the specified time limits. . . . The contractor's right to institute suit under the 'deemed denied' provision is permissive, not mandatory." *Id.* at 1577. Because no written decision was issued, plaintiff was not subject to a one-year deadline for commencing this action.

Plaintiff has satisfied the jurisdictional prerequisites by submitting a claim for compensation for breach of the 1994 Contract to the contracting officer and receiving a deemed denial of his claim. Accordingly, the Court has jurisdiction over plaintiff's claim pursuant to 28 U.S.C. § 1491(a)(2) (2000).

**II. Analysis**

Plaintiff argues that this case involves a simple breach of contract. According to plaintiff, in order to terminate the 1994 Contract, pursuant to its own terms and clear language, the FBI was required to give him written notice of termination, which it did not do until July 24, 2002. In addition, plaintiff contends that his belief that the 1994 Contract had not been terminated until July 24, 2002, was reasonable based on the following factors: (1) the pattern and practice of the FBI, including the transfer of his 1991 written contract from Miami to Annapolis; (2) the $25,000 bonus payment and written notice of termination plaintiff received in 1993; and (3) his belief in SA McCann's statement that the 1994 Contract could not be terminated without written notice. Plaintiff further argues that the $30,000 payment he received on November 14, 1996, represented a bonus solely for work he did on the Joseph Denti investigation. Finally, plaintiff argues, he continued to perform under the 1994 Contract after February 1996, and was willing and able to do more, had the FBI asked for his further assistance.

Defendant argues that plaintiff's receipt of the $30,000 lump sum payment terminated the 1994 Contract. Defendant asserts that a writing was not necessary to terminate the contract but, even if it were, the receipt plaintiff signed upon receiving the lump sum payment served as the requisite written notification of termination. Defendant argues that plaintiff understood that the payment was in full and final satisfaction of any claims plaintiff may have had to additional payments under the 1994 Contract. Defendant also contends that after receiving the $30,000 payment, plaintiff did not mention the 1994 Contract for two more years, in spite of continuing to complain about the unpaid $150,000 bonus and the loss of his household goods. In addition, defendant contends that plaintiff performed no services under the 1994 Contract after receiving the $30,000 payment. Therefore, defendant argues, plaintiff's actions belie his assertion that he believed the 1994 Contract was still in force after November 14, 1996.

Plaintiff is correct that the FBI did not terminate the 1994 Contract in writing until its letter of July 24, 2002, in spite of its apparent intent as early as July 1996 to give written notice to plaintiff. *See* DX 7, at 149. Defendant asserts that the language of the receipt—that the $30,000 "represents *full and final payment* for services rendered," JX 2 (emphasis added)—effectively served as a written notice of termination. However, the receipt's language is ambiguous and susceptible to multiple interpretations; it is not evident that the plain language of the receipt refers to a termination of the 1994 Contract, as opposed to, for example, a bonus for services rendered up to that point. The language of the receipt plaintiff signed in 1996 is similar to the language of the receipt plaintiff signed in 1993 upon receiving his prior $25,000 bonus. *That* receipt read that the payment represented "a *full and final settlement* for services rendered." PX 11 (emphasis added). If anything, the 1993 receipt is more indicative of a termination of the 1991 Contract than the 1996 receipt is of the 1994 Contract. Moreover, on the same day that plaintiff signed the receipt for the $25,000, he also received a written notice of the termination of the 1991 Contract. In evaluating a contract, its "language . . . must be afforded the meaning derived from the contract by a reasonably intelligent person acquainted with the contemporary circumstances." *Firestone Tire & Rubber Co. v. United States*, 195 Ct. Cl. 21, 30, 444 F.2d 547, 551 (1971) (citing *Hol-Gar Mfg. Corp., v. United States*, 169 Ct. Cl. 384, 388, 351 F. 2d 972,

975 (1965); *Deloro Smelting and Refining Co. v. United States*, 161 Ct. Cl. 489, 495, 317 F. 2d 382, 386 (1963)). An intelligent person in plaintiff's position could reasonably believe that, just as the receipt in 1993 had not, alone, served as a written termination of the 1991 Contract, the 1996 receipt similarly would not, standing alone, constitute a written termination of the 1994 Contract. The Court finds that the receipt signed by plaintiff on November 14, 1996, did not constitute "written notice to terminate" as contemplated by section 14 of the 1994 Contract.

Defendant argues that the 1994 Contract was terminated upon the payment to plaintiff of the $30,000 even without a written notice of termination, because it would be a "mistake to assume that the contract must be terminated by some clear-cut agreement of a formal nature." *Kraemer Mills Inc. v. United States*, 162 Ct. Cl. 367, 372, 319 F.2d 535, 538 (1963). Absent a clear-cut writing, termination would be indicated by "the subsequent conduct of the parties [which] showed clearly that neither party expected any of the work to go on further." *Enright v. United States*, 73 Ct. Cl. 416, 427, 54 F.2d 182, 187 (1931). Although these cases state the general rule that a contract can be terminated by means other than a formal writing, neither case appears to involve a contract containing a clause requiring that any termination be in writing. Unlike those contracts, the 1994 Contract was to continue "as long as the FBI deems that Mr. Patton [sic] services are required," and could be terminated by either party at any time "by deliverance of a *written notice* to terminate." JX 1 ¶ 14 (emphasis added). Giving plaintiff written notice would be consistent not only with the language of the 1994 Contract, but with plaintiff's prior experience with the FBI's termination of the 1991 Contract. *See* PX 10 ("This letter will serve as a written confirmation of the previous conversation . . . where you were advised that your continued assistance and services under the [1991 Contract] would no longer be required.").

Although the Court of Appeals for the Federal Circuit has not dealt with the question of the effectiveness of the attempted oral termination of a contract containing a clause requiring any termination to be in writing,[9] the Court of Federal Claims has addressed the issue. In *Gambino v.*

---

[9] The Federal Circuit has dealt with the oral *modification* (as opposed to termination) of contracts. In *Mil-Spec Contractors, Inc. v. United States*, 835 F.2d 865 (Fed. Cir. 1987), the court held that "where the pertinent regulations required that contract modifications be written, an oral modification that had not been reduced to writing and signed by both parties was ineffective." *Mil-Spec*, 835 F.2d at 868 (citing *SCM Corp. v. United States*, 219 Ct. Cl. 459, 464, 595 F.2d 595, 598 (1979)). In *Mil-Spec*, the provision of the Federal Acquisition Regulation applicable to the contract at issue required that any bilateral modification of the contract be executed on a specific form. *Id.* The case does not speak, however, to a *contract term* requiring a written modification, much less requiring written termination.

In *National Surety Corporation v. United States*, 118 F.3d 1542 (Fed. Cir. 1997), the Federal Circuit analyzed the alleged oral modification of a contract that included multiple provisions requiring that modifications to the surety contract be made or confirmed in writing. Though it cited *Mil-Spec*, the court responded to the Government's claim that it had "implicitly"

*United States*, 47 Fed. Cl. 275 (2000), the Government argued that the FBI had orally terminated a CW contract with a termination provision similar to that of the 1994 Contract.[10] Judge Christine O. C. Miller held in that case that a purported "oral termination was inoperative." *Gambino*, 47 Fed. Cl. at 279. In *Gambino*, however, there was no allegation that the parties' conduct demonstrated that they understood that the contract had been terminated orally; to the contrary, after being told the operation was over and his contract would not be renewed, Mr. Gambino continued to reside in close proximity to the office of his supervising agent, to perform services for the FBI, and to receive payment for those services; the difference was that, after the alleged oral termination, he was not acting as part of an undercover operation. *Id.* at 277. Furthermore, he communicated frequently with his supervising agent and, when that agent was transferred, was assigned a new supervising agent. *Id.* at 277–78. Unlike the present case, neither the conduct of the FBI nor of Mr. Gambino indicated that the parties understood that the contract had been terminated orally.

Clauses requiring any contract termination to be in writing have not been uniformly treated as determinative under the case law. *See, e.g.*, *Berry v. Carnaco Transp.*, No. 92-36844, No. 93-35301, 1994 WL 697571, at *1 (9th Cir. Dec. 13, 1994) ("In Oregon, if there is an agreement that a termination be in writing, that fact does not preclude a termination by oral notice."). Rather, "[i]n the absence of statute, such a self-imposed limitation does not limit the power of the parties subsequently to contract," RESTATEMENT (SECOND) OF CONTRACTS § 283 cmt. b (1981), even where such subsequent contracting is for the termination of the contract.[11]

---

modified the contract, by stating that the parties "did not even attempt to properly modify the contract." *National Sur. Corp.*, 118 F.3d at 1546.

[10] The *Gambino* termination clause read:

> 14. This agreement shall commence on the date of acceptance by GAMBINO as signified by his signature, and shall continue as long as the FBI deems that GAMBINO's services are required. It [sic] extension beyond 9/30/94 is contingent upon congressional approval of the necessary funding. It may be terminated at any time by either party by deliverance of written notice to terminate.

*Gambino*, 279 Fed. Cl. at 279.

[11] The proposition that a contract containing a clause requiring that any termination be in writing may be terminated orally has been modified by statute in New York. N.Y. GEN. OBL. LAW § 15-301(4) (McKinney 2006) ("If a written agreement . . . contains a provision for termination . . . on written notice by one or either party, the requirement that such notice be in writing cannot be waived except by a writing signed by the party against whom enforcement of the waiver is sought or by his agent."). The Uniform Commercial Code ( the "U.C.C.") enforces contracts' no-oral-modification clauses, U.C.C. § 2-209(2) (1998) ("A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or

*See, e.g.,* JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 7.14 (1993); E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 7.6 (2003).

Because the 1994 Contract's requirement that termination be in writing is not necessarily determinative of the outcome in this case, the Court must look beyond plaintiff's allegation that this case involves a simple breach of contract; rather, the Court must look to general principles of contract law in order to determine whether, in this case, the parties understood that the 1994 Contract had been terminated by means other than "deliverance of written notice to terminate." Whether plaintiff and the FBI intended to terminate the 1994 Contract prior to 2002 by means other than a written notice of termination is "a question of fact that may be shown by a written contract, verbal agreement or by acts and conduct." *Montana Bank of Circle, N.A. v. United States*, 7 Cl. Ct. 601, 610 (Ct. Cl. 1985). "When a party engages in acts inconsistent with the existence of a contract, including acquiescing in a repudiation of the contract by the other party, courts have found an objective intent to abandon despite the party's assertion of subjective intent to the contrary." *Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 745 (2004) (citing *Avemco Ins. Co. v. Northern Colo. Air Charter, Inc.*, 38 P.3d 555, 565 (Colo. 2002)); *see also Alessandri v. April Industries, Inc.*, 934 F.2d 1, 2 (1st Cir. 1991) ("Parties to a contract may, by their conduct, show an intent to abandon it."); *Koby v. United States*, 53 Fed. Cl. 493, 499 (2002); RESTATEMENT (SECOND) OF CONTRACTS § 283 cmt. a ("Sometimes mere inaction on both sides, such as the failure to take any steps looking toward performance or enforcement, may indicate an intent to abandon the contract.").

The FBI contends it intended to terminate the contract by November 14, 1996, at the latest. *See* DX 7, at 149. Plaintiff, on the other hand, asserts that he believed the 1994 Contract had not been terminated prior to July 2002 because the FBI failed to provide him with a written notice of termination prior to that time. *See* Tr. at 863:2–18; JX 3, at Patton 000128. The Court must analyze the evidence regarding each party's state of mind and the objective manifestations of each party's intent, including the parties' conduct in negotiating, making, and accepting the $30,000 lump-sum payment.

Because plaintiff's testimony is central to the factual underpinning of his case, the Court must evaluate plaintiff's trustworthiness as a witness. Although plaintiff's testimony was helpful and necessary in developing the factual record, the Court did not find plaintiff to be an altogether

---

rescinded . . . ."), but the U.C.C. is silent as to the effect of no-oral-termination clauses. "'Modification or rescission' . . . does not include unilateral 'termination' . . . as defined in Section 2-106." U.C.C. § 2-209 cmt. 3. "Termination" is defined as occurring "when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach." U.C.C. § 2-106.

Plaintiff has not suggested that the 1994 Contract is governed by the laws of New York or of any other jurisdiction that has statutorily mandated the enforcement of no-oral-termination clauses, and the Court has not found that any such statutes are controlling here.

reliable witness. When he left organized crime to work for the FBI, plaintiff avers, he had no plans to return to the criminal life; in fact, "I would never pick up a penny off the street . . . . I have turned my life around 360 degrees." Tr. at 221:14–16. However, when asked at his deposition whether he reported on his tax returns the money paid him by the FBI, plaintiff invoked his Fifth Amendment privilege. DX 21, at 77:16–17. The Fifth Amendment "does not preclude [an adverse] inference where the privilege is claimed by a party to a Civil cause." *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (quoting 8 J. WIGMORE, EVIDENCE 439 (McNaughton rev. 1961)); *see also Aptix Corp. v. Quickturn Design Sys.*, 269 F.3d 1369, 1374 (Fed. Cir. 2001) ("Moreover, after Dr. Mohsen invoked his Fifth Amendment privilege . . . the trial court was free to make adverse inferences against him."); *McGuire v. Dep't of Treasury*, 915 F.2d 1583 (Fed. Cir. 1990). The Court does draw an adverse inference regarding plaintiff's credibility from plaintiff's assertion of his Fifth Amendment privilege. Based on that adverse inference and on the Court's observation of plaintiff's demeanor on the stand, the Court has concluded that it should give limited weight to plaintiff's testimony.

The FBI's conduct demonstrated its intent to terminate the 1994 Contract at the latest by November 14, 1996. It made what it regarded as its last monthly payment on the contract in February 1996, at which time the FBI ended its performance under the 1994 Contract, ceasing to make monthly payments to plaintiff and ceasing to pay the contractual expenses it had paid while plaintiff was in Los Angeles. However, because of an administrative oversight, the FBI left plaintiff's file "administratively open" and, in light of plaintiff's complaints that his contract had never been terminated in writing, agreed to make a lump-sum payment. Tr. at 802:1–11. The parties negotiated over a period of months and on November 14, 1996, the FBI paid plaintiff what it regarded as a final payment of $30,000 for the California investigation. The FBI believed that plaintiff's contract had been terminated in February 1996, but agreed to make the $30,000 payment in order to eliminate any further obligation it might have had under the 1994 Contract. *See* DX 7, at 149. Plaintiff's contracting officer had no contact with plaintiff after November 14, 1996, and the FBI never assigned plaintiff a new contracting officer. Tr. at 1123:3–15. Furthermore, other than the Donald Eugene Webb matter, for which he was paid separately, plaintiff did not perform any service for the FBI between February and November 1996. DX 21, at 92:19–93:12; Tr. at 1026:8–9.

Likewise, plaintiff's conduct of negotiations leading to the $30,000 payment demonstrates that he understood the payment to terminate that 1994 Contract. In the course of his negotiations, plaintiff continuously complained about the lack of payments under the 1994 Contract. *See, e.g.,* JX 3, at Patton 000128. About two weeks before the $30,000 payment, the FBI offered to pay plaintiff $16,000, which amounted to approximately $2,000 per month since he had last been paid. Plaintiff replied that he felt he was owed $32,000 for unpaid monthly installments under the 1994 Contract, and asked for $40,000 ($32,000 under the contract and $8,000 as a bonus). *Id.* at Patton 000128–29. Finally, the parties agreed on $30,000. Plaintiff testified that the $30,000 payment represented only a *bonus* for a job well done in California, and that no part of $30,000 was compensation for unpaid monthly installments under the 1994 Contract. Tr. at 860:2–5. However, plaintiff's handwritten notes, made contemporaneously with the negotiations, indicate that, contrary to plaintiff's testimony at trial, he understood the $30,000

payment to be in satisfaction of his claim that the FBI had failed to make monthly payments required under the 1994 Contract between March and November 1996. The Court finds that plaintiff's contemporaneous, handwritten notes more accurately reflect his state of mind in October and November 1996, and show that, as of that time, he understood that the $30,000 lump-sum payment was in settlement of his claim for compensation under the 1994 Contract for the unpaid monthly installments between March and November 1996, rather than a bonus for work done in California.

In addition to the course of negotiations, the FBI's behavior should have put plaintiff on notice that it regarded—and was treating—the 1994 Contract as no longer in effect. Not only did SA Wacks *tell* plaintiff in October 1995 that the 1994 Contract would be terminated in or around February 1996, but the FBI also ceased its contractual performance after the monthly payment made in February 1996. The 1994 Contract called for monthly payments to plaintiff of a set amount, rather than payments for specific information he provided on a cash-on-delivery basis. The payments ceased after February 1996. Other than the $30,000 lump-sum payment, the only payments plaintiff received from the FBI were reimbursement for his airfare to and lodging in Baltimore and payments for specific information he delivered regarding the Donald Eugene Webb investigation. Furthermore, when plaintiff left Los Angeles, the FBI stopped paying for his car, apartment, and utilities. Plaintiff asserts that an important part of a CW's job is being available when the FBI needs his help, which inevitably involves periods of inactivity. While working for the FBI, plaintiff sometimes went days, sometimes weeks, and sometimes even a month, without any assignment. *Id.* at 912:12–17. However, there is an order of magnitude difference between several *weeks* with no assignment and the two *years* that passed during which plaintiff did not receive an assignment under the 1994 Contract before he complained, through counsel in October 1998, that he was entitled to be paid his monthly stipend of $4,000 plus expenses of $3,250, plus interest, from March 1996 through July 2002.[12]

---

[12] Plaintiff calculated that, as of October 2006, including interest at the rate of 4.75% (which plaintiff chose because it was the "prime rate set by the Board of Governors of the Federal Reserve Board as of the end of July 2002") compounded monthly running from March 1996, the Government owed him $798,711.68 in damages for the 77 months he alleged he should have been, but was not, paid. Without interest, plaintiff claimed he was entitled to damages in the amount of $558,983.70. PX 16.

The CDA, however, is specific as to the manner by which interest is calculated. Contractors receive simple, not compound, interest, 48 C.F.R. § 33.208(b) (2006), which does not begin to accrue until the contracting officer receives the certified claim. *Id.* § 33.208(a)(1). The applicable rate is set by the Secretary of the Treasury every six months. *Id.* § 33.208(b). The Court calculated that, if plaintiff were successful, he would be entitled to approximately $745,000 in principal and interest, calculated in accordance with the CDA, as of the end of October 2006.

After the payment of the $30,000, plaintiff's conduct with regard to the 1994 Contract changed. Before the payment, he continually complained that he was not receiving his monthly stipend, that he had not been paid the promised bonus for his work in Florida, and that his personal possessions in storage had been lost due to the FBI's failure to pay storage charges. After the $30,000 payment, plaintiff did not complain about not receiving his monthly stipend for approximately two years; he did, however, continue to seek compensation for the loss of his personal possessions and payment of the $150,000 bonus. *See, e.g.*, DX 11; JX 3, at Patton 000141, 000147, 000148, 000153, 000169. Plaintiff testified that he continued complaining about the 1994 Contract after he received the $30,000 payment, Tr. at 876:2–9, but he presented no evidence that anyone heard him say he was under contract with the FBI in the nearly two years between his receipt of the $30,000 payment and his submitting, through counsel, an informal claim to the FBI in October 1998. Furthermore, plaintiff has no record of telling anybody that the 1994 Contract was still in effect between November 1996 and his filing a complaint with the FBI in October 1998. *See generally id.* at Patton 000138–72; Tr. at 421:16–24. This silence contrasts sharply with his behavior before the $30,000 payment, when, for example, he told SAs McCann and Roberson that he was under contract when they met with him concerning the Webb matter.

Additionally, like the FBI, after February 1996, plaintiff ceased performance under the 1994 Contract. Plaintiff points out that, after February 1996, he supplied the FBI information about Donald Eugene Webb, flew to Baltimore for a meeting with agents, and looked for "Cherry Nose" Brown after SA Goodwin sent him an email and photograph asking for his help. However, plaintiff furnished to the FBI information regarding Donald Eugene Webb prior to the payment of the $30,000 lump sum, and he was separately paid $2,500 for that information. The FBI reimbursed plaintiff for the cost of his airfare to and lodging in Baltimore, but chose not to enlist his aid in regard to the assassination plot he allegedly overheard. The FBI arrested Brown about three months after SA Goodwin sent his picture to plaintiff, without any assistance from plaintiff. *See* Tr. at 592:18–593:16.

Plaintiff also claims that he was in constant contact with FBI agents, talking about additional cases. His contemporaneous, handwritten notes and phone logs indicate that he was constantly on the phone with agents and retired agents, but that the majority of his post-1996 discussions were either social or focused on his desire to be paid for his Florida claims relating to the alleged $150,000 bonus and the loss of his household goods. Plaintiff did not proffer examples of any additional cases on which he worked after receiving the $30,000 payment, nor did he identify any agents for whom he allegedly performed additional services. The Court finds that both parties ceased to perform under the 1994 Contract as of February 1996. The Court also finds that the FBI's $30,000 payment to plaintiff on November 14, 1996, and plaintiff's execution of the receipt for the $30,000 as "full and final payment for services rendered" represented and was understood by the parties to effect a settlement of any liability the FBI may have had to plaintiff for monthly payments allegedly due under the 1994 Contract for the months between the February 1996 payment and November 1996.

## ***CONCLUSION***

For the reasons set forth above, the Court has determined that the parties understood, and manifested by their conduct, that the 1994 Contract was terminated as of November 14, 1996, at the latest, and that the payment of $30,000 to plaintiff and his execution of the receipt at that time were intended to and did effect a settlement of any liability the FBI may have had to plaintiff for unpaid monthly installments under the 1994 Contract. Accordingly, plaintiff's claim that defendant breached the 1994 Contract must fail. In view of the earlier adverse rulings by Judge Futey and the undersigned on plaintiff's claims seeking to recover: (1) $150,000 as a bonus allegedly due under the 1990 oral contract and (2) compensation for the loss of his household goods (see "Procedural History" at page 2, *supra*), the Court directs the Clerk to enter final judgment in favor of defendant with respect to all three of plaintiff's claims in this action.

IT IS SO ORDERED.

s/ George W. Miller
GEORGE W. MILLER
Judge